IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :

                                 :     Cr. No.  21-738 (BAH)

MICHAEL OLIVERAS,            :

         Defendant.           :

## MICHAEL OLIVERAS'S MOTION TO DISMISS COUNTS ONE AND TWO.

Michael Oliveras moves to dismiss counts one and two of the Information pursuant to Fed. R. Crim. P. 12(b). These counts fail to state an offense and fail to give proper notice to the defendant. The government does not concur in this motion.

## BACKGROUND

On December 9, 2021, Mr. Oliveras was arrested on a complaint charging him with (1) entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1); (2) disorderly and disruptive conduct in a restricted building or grounds with intent to impede the orderly conduct of government business, in violation of § 1752(a)(2); (3) disorderly and disruptive conduct in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) parading, demonstrating, or picketing in a Capitol building in violation of 40 U.S.C. § 5104(e)(2)(G). *See* ECF Dkt. No. 1. On December 16, 2021, the government filed an Information alleging the same offenses. *See* ECF Dkt. No. 7. This matter is scheduled for a jury trial on February 20, 2023.

The government alleges that, on January 6, 2021, Mr. Oliveras was at and inside the United States Capitol Building based on cellphone and cell site data, from 2:33 to 2:39 p.m.  See Complaint, Dkt. 1, ¶ 11. The government also alleges that Mr. Oliveras filmed numerous videos on January 6, 2021 from both inside the Capitol and outside, which were then posted on Parler. Complaint, ¶¶ 12, 13. The government alleges that Mr. Oliveras was chanting "Whose house? Our house" and narrating a video he took of other individuals that day who were pushing to enter the Capitol building, "Here we go. Here's the next rush. There's a push inside, with resistance." *Id*. ¶ 18. The complaint alleges numerous other videos taken and narrated by Oliveras, along with other social media posts on Parler. *Id*., ¶¶ 20-24.

## LEGAL AUTHORITY

An indictment (or information, in the case of misdemeanor charges) must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United*

*States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id.* at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id.* (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole. *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co*., 519 U.S. 337, 341 (1997)).

## ARGUMENT

### I.    18 U.S.C. §1752 fails to state an offense

#### a. The United States Secret Service is the Entity that May Designate "Restricted Areas" Under the Statute, Not the United States Capitol Police

Mr. Oliveras is charged with two counts of violating 18 U.S.C. §1752 for "entering and remaining in a Restricted Building or Grounds," and engaging in "disorderly and disruptive conduct in a Restricted Building or Grounds." *See* ECF Dkt. No. 7 (Information). When this statute was enacted, it is clear that the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the Treasury. Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. § 1752(d)(1). It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." *Id.* § 1752(d)(2). There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

The USSS's duties and responsibilities are outlined in 18 U.S.C. § 3056, which include:

> (e)(1): When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.
>
> (2) At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress--
>
> **(A)** what events, if any, were designated special events of national significance for security purposes under paragraph (1); and
>
> **(B)** the criteria and information used in making each designation.

*Id.* § 3056(e)(1)(2)(A)(B). The statute does not state that any other agency is permitted to designate events for security purposes and only explains that the USSS would be under the

4

designation of the Department of Homeland Security instead of the Treasury Department. The

statute makes the exclusive role of the USSS even clearer in § 3056(g), which states:

> (g) The United States Secret Service shall be maintained as a
> *distinct entity* within the Department of Homeland Security and
> shall not be merged with any other Department function. *No
> personnel and operational elements of the United States Secret
> Service shall report to an individual other than the Director of the
> United States Secret Service*, who shall report directly to the
> Secretary of Homeland Security without being required to report
> through any other official of the Department.

18 U.S.C. § § 3056(g) (emphases added).

### b. The Government Does Not Allege that the Secret Service Restricted the Capitol Grounds on January 6, 2021

The Information charges Mr. Oliveras with remaining or entering "restricted building or

grounds," however it does not allege that the USSS designated that area as being restricted. Nor

could it do so now because in *United States v. Griffen*, the government conceded that it was the

United States Capitol Police that attempted to designate the area as restricted that day and not the

USSS. 21-CR-92 (TNM), at Dkt. No. 33. The court in *Griffen* denied a motion to dismiss a

§1752 charge on the ground that the statute (Congress) did not specifically state who must

designate the "restricted areas." *Id*. at Dkt. No. 41.

However, the plain language of §1752(c)(1)(B), defines "restricted building or grounds"

as a "building or grounds where the President or other person protected by the Secret Service is

or will be temporarily visiting."  Since it is the Secret Service who protects the President or

"other person," it is the Secret Service who must designate the area "restricted." The legislative

history bolsters this interpretation. Congress enacted § 1752 as part of the Omnibus Crime

Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that

time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report

accompanying the current version of § 1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

The court in *Griffen* hypothesized that the President would be unable to rely on the military fortification at Camp David already in existence when he visits that facility if the Secret Service was the only entity with the statutory authority to restrict the area. *See Griffen*, ECF Dkt. No. 41 at pg. 11. However, Camp David is a military installation and is not a "public forum" that needs an entity to "cordon off" areas and restrict them in light of a Presidential visit. Military bases have security and are not otherwise open to the public. And each military installation is subject to other laws that protect the facility, and those within it, from intruders. *See, e.g*., 18 U.S.C § 1382 (barring any person from entering any military installation for any purpose prohibited by law). Military bases are heavily guarded and have entrance and exit points and are different than federal buildings that need sections to be "cordoned" off in order for the general public to know which area is restricted. For these reasons, the example offered by the *Griffen* court is inapposite and does not support the court's decision.

> **c. Even if the Capitol Police were Authorized to Restrict the Grounds, 18 U.S.C. § 1752 is Not Applicable Because Former Vice President Pence Was not "Temporarily Visiting" the Capitol Building on January 6, 2021**

Under the plain language § 1752, the statute does not apply here. Section 1752 prohibits conduct in or near "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

> (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c); *see United States v. Samira Jabr*, Criminal No. 18-0105, Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts One and Two of the Information charge Mr. Oliveras with conduct "in a restricted building and grounds, that is, any posted, cordoned-off and otherwise restricted area *within the United States Capitol and its grounds, where the Vice President was temporarily visiting* . . ." *See* Information, Count One (emphasis added). The government's attempt to shoehorn Mr. Oliveras's conduct into the statute fails. Accordingly, those two counts should be dismissed. The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of § 1752(c)(1). Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit."

The plain meaning of "temporary" is "lasting for a time only." Black's Law Dictionary (11th Ed. 2019). "Visiting" is defined as "invited to join or attend an institution for a limited time." Merriam-Webster (2021). Together, the phrase "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis.

The former Vice President was not "temporarily visiting" the Capitol on January 6, 2021. The Capitol is a federal government building in the District of Columbia, where he lived and worked. Moreover, he actually worked at the Capitol Building and grounds—it was his place of employment. In his official capacity as the "President of the Senate," he had a permanent office "within the United States Capitol and its grounds." The Vice President was not "visiting" the

Capitol Building, he was working there, carrying out his sworn official duties to by "presiding," over the vote count ceremony. *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer*.") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly "temporarily visiting." *See, e.g., United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by United States Secret Service agents); *Blair v. City of Evansville, Ind*. 361 F. Supp.2d 846 (S.D. Indiana 2005) (defendant charged with § 1752 at protest during then Vice President Richard Cheney's visit to the Centre in Evansville, Indiana). These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose. As a result, those cases are entirely consistent with the plain meaning of § 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally. He was meeting with other government officials in a federal government building where he had a permanent office as part of fulfilling his official duties as Vice President/President of the Senate. Thus, he was not "temporarily visiting" the Capitol building as required by the plain language of § 1752.

**<u>CONCLUSION</u>**

This Court should dismiss counts one and two of the Information.

Respectfully submitted,

/s/ Lori M. Koch
Assistant Federal Public Defender
District of New Jersey
800 Cooper St., Suite 350
Camden, New Jersey 08102
Telephone:      (609) 649-0292
Email: Lori_Koch@fd.org

Date: November 3, 2022