IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Cr. No. 21-738 (BAH) |
| MICHAEL OLIVERAS, | : | |
| Defendant. | : | |

### MICHAEL OLIVERAS'S MOTION FOR TRANSFER OF VENUE

Michael Oliveras, through counsel, and pursuant to Federal Rule of Criminal Procedure 21(a) and (b), respectfully requests transfer of these proceedings to the District of New Jersey. *See* Ex. 1, "Select Litigation" Jury Survey (comparing similar districts).[1] The government does not concur.

### ARGUMENT

**I.   Venue transfer is proper under Rule 21(a) because prejudice against Mr. Oliveras will prevent a fair and impartial trial.**

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is fundamental to Due Process and, notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial

---

[1] The jury survey attached was created by an expert hired by the Office of the Federal Public Defender as an effort to assess the federal jury pool in the District of Columbia. This motion to transfer venue is largely based on a similar motion filed in *United States v. Gieswein*, 21-cr-24 (TNF). A Motion Hearing is presently scheduled for March 31, 2023, as a Second Superceding Indictment in that case was filed on August 3, 2022.

trial in the indicting district, the district court *must* transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias). As recently as 2010, the Supreme Court reaffirmed the presumption approach in *Patton* and identified three factors to guide the lower courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage.[2] *Skilling*, 561 U.S. at 378.

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Florida*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726–27 (1963) ("But we do not

---

[2] Though not relevant to the instant motion, the Court identified a fourth factor for consideration upon appellate review, following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on only the facts presented, rather than preconceived notions of guilt.

hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, *voir dire* is simply not a cure for significant and substantiated Due Process concerns about the jury pool. Each of those concerns is pressing in this case.

### A. The size and characteristics of the District of Columbia jury pool weigh in favor of finding a presumption of prejudice.

The foundation for the presumption of prejudice is found in *Rideau*, 373 U.S. at 727. In *Rideau*, the first factor that the Court weighed in favor of a finding of prejudice was that about half of the small jury pool had been exposed to prejudicial media reporting about the case. *See id*. Despite the fact that *voir dire* revealed that only three jurors had actually seen the broadcasts at issue, the Court found that the share of the pool that was tainted was significant enough to render the defendant presumptively prejudiced. *See id*.

Because measuring the reach and impact of negative media reporting is difficult, in applying *Rideau*, many courts have focused on population size and diversity as a proxy for the share of the population that was likely impacted. For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal, and because Houston is the fourth-largest city in the United States, and is highly diverse, a significant number of prospective jurors would have had no connection to Enron whatsoever. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

In contrast to Houston, the District of Columbia is one of the smaller major US cities, with a population under 700,000.[3] And the impact of the events of January 6 on the residents of the District of Columbia were far more widespread than that of Enron in Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*.

First, as the Court is no doubt aware, a huge proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater DC area (excluding postal workers, federal bureau of investigation workers, and staff on several federal commissions). *See Federal Civilian Employment*, OPM (Sept. 2017), https://perma.cc/7PQ4-8TJ3. Nearly 200,000 of those workers and annuitants are within the District itself. *Id*. With a total population of around 690,000, it seems clear that any given member of the District jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the DC Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in the District itself. *Trends in Federal Employment in DC,* DC Policy Center (Mar. 28, 2019), https://perma.cc/XD3P-82W3. And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy.

In particular, nearly 15,000 individuals work for Congress directly, and many more residents have friends and family who do. *Vital Statistics on Congress*, Brookings Institute (July 11, 2013), https://perma.cc/8TJL-XCCP. Another large share are in, or have friends and family

---

[3] *See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous Decade*, DC.gov (Apr. 26, 2021) (DC population recorded by census as 689,545), https://perma.cc/526S-CBMD.

in, the many law enforcement groups who took part in responding to January 6.[4] This means that an enormous share of District of Columbia residents have significant and unique connections with individuals or institutions that were affected by January 6. Such connections are not likely to be present in any other comparable district. The government has characterized the events of January 6—including the attempted disorderly conduct in which the government alleges Mr. Oliveras participated—as an attack on our elections, government institutions generally, and democracy as a whole, suggest that those District residents closely connected to the government are more likely to view themselves as the direct victims of the events.

Second, even District residents that have no direct connection to the government reported feeling deeply traumatized by the events that took place so close to where they live and work. For example, one DC resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence.

*D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), https://perma.cc/QQ4V-4XB7. Such accounts are typical of those gathered in

---

[4] In early 2021, the U.S. Capitol Police Force employed an estimated 2,250 individuals, the Metropolitan Police Force employed 4,400 individuals, and the D.C. National Guard had 2,700 active members. *Human Capital Strategic Plan 2021-2025*, U.S.Capitol Police (2020), https://perma.cc/3RX7-CSVN; *Metropolitan Police Force Annual Report 2020*, DC.gov (2020), https://perma.cc/9K8Q-CQSY. More than 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt, *Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. TIMES (July 12, 2021), https://perma.cc/F87U-KG6N. And while not all individuals employed by these agencies reported to the Capitol on January 6, all 9,350 individuals *were* directly and adversely affected by the January 6 events in the form of increased presence and overtime demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, THE HILL (July 7, 2021), https://perma.cc/UK9D-572D.

interviews in the days following January 6, during which the Mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration. District neighborhoods became occupied by the Metropolitan Police and over 25,000 military personnel in the weeks that followed. Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, THE HILL (Jan. 15, 2021), https://perma.cc/U5QF-P9TP.  Reporting at the time explained the widespread disruption:

> Residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. […] Some residents are also worried that a stepped up military and police presence in the city may only add to their unease.

Jenny Gathright and Rachel Kurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, DCIST (Jan. 13, 2021), https://perma.cc/M8HC-D4ZA.

Moreover, as the Court is no doubt aware, the effects of these events continue to be felt in the District. Indeed, District residents reacted with fear in anticipation of protests planned for September of 2020 that were intended to show support for individuals detained in connection with prosecutions arising from the events of January 6. For example, the *New York Times* ran a piece titled "Washington, D.C. On Edge Over January 6 Protests," and the Associated Press similarly reported "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing the District's overall tenor and response to these ongoing demonstrations. Jonathan Weisman & Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. TIMES (Sept. 18, 2021), https://perma.cc/ZG3E-H6QP; Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US NEWS (Sept. 18, 2021), shorturl.at/bgDV3.

Third, an overwhelming number of District of Columbia residents—over 92 percent—voted for President Biden. *General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020), https://perma.cc/73ZK-7X6K. The government has alleged that Mr. Oliveras and the others charged in connection with January 6 did what they did in order to prevent Joseph Biden from becoming President notwithstanding his share of the electoral and popular vote. That is, the government's theory is that Mr. Oliveras and others were seeking to nullify the votes of an overwhelming majority of District residents—in the *only* national election in which District residents have any say, given their lack of representation in Congress. Finally, the government, the media, and even judges in this District speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat of January 6 can only take place in their home. *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021), https://perma.cc/F7EZ-FQP2. Residents of the District sitting as jurors are highly likely to view Mr. Oliveras not only as someone who victimized them, but also as someone who might victimize them again in the future, raising a concern about punishing for propensity.

Given the electoral makeup of the District, it would be impossible to empanel a jury that was not full of people that the government charges were the targets of Mr. Oliveras's alleged offenses. *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (the population of the greater metro area, including Virginia and Maryland, was large enough to not support an inference of prejudice by media reporting). Thus, though significantly more populous than the pool in *Rideau*, for example, Mr. Oliveras submits that the impact of the events of January 6 was felt by a far greater proportion of the residents and felt much more personally and viscerally. The events of January left those residents—and therefore the jury pool—neither impartial nor indifferent.

    **B. The nature and volume of national and local media coverage weigh in favor of finding that there is a presumption of prejudice because of greater saturation and impact at the local level.**

Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that "prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but dispassionate media reporting. *Skilling*, 561 U.S. at 358 (citing *Irvin*, 366 U.S. at 722). Something more, such as charged rhetoric or the reporting of gruesome details, is needed to establish prejudice. *See id*. (rejecting the argument that media coverage was prejudicial where "media coverage, on the whole, had been objective and unemotional, and the facts of the case were neither heinous nor sensational."). The Court has repeatedly recognized that "something more" exists when the media coverage is particularly inflammatory, and where it pervades the court proceedings. *See Murphy*, 421 U.S. at 799 (1975) ("In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings"); *see also id*. ("[P]roceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled"). Finally, the problematic media must either be local in distribution, or must have greater local saturation or impact than in other districts; otherwise, there is no disparate prejudicial effect between different (comparable) venues.

For example, in *Skilling*, the defendant cited to hundreds of media reports about the Enron scandal in his motion for a transfer of venue. 561 U.S. at 358. He argued that as the former Chief Executive Officer, such articles necessarily implicated him by proxy, if not directly. *See id*. The Court disagreed, referencing its earlier opinions concerning the modern ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See id*. at 382. Rather, it is sensationalism of the type that would be easily remembered—not an objective reporting of the facts—that was found to be prejudicial in prior cases before the Court. *Id*. at 381. The Court observed that the stories that *Skilling* cited about Enron contained "no confessions, no blatantly prejudicial information," and were "largely objective and unemotional." *Id*. at 370-71, 382 (observing that none of the reports "invited prejudgment of his culpability"). As such, the Court held that it was inappropriate to apply a broad presumption of prejudice. Of course, as the concurrence in part pointed out, *voir dire* later revealed that these "objective" media reports had indeed created a bias among many potential jurors, and that the District Court failed to properly vet their assurances of impartiality after those biases were revealed. *See id*. at 427 (Sotomayor, J., concurring in part).

Here, in a city still feeling the impacts described *supra*, the pre-trial publicity—both national and local–has only served to enhance and sustain the effects and by extension, sentiments about the participants. The volume, depth of coverage, and duration of the reporting about January 6 has been almost entirely unprecedented, perhaps only comparable to the reporting following September 11. And viewers who identified as Democrats—like most of the District population—were 20% more likely to have reported hearing "a lot" about the events than those who identify as Republicans. *Views on the Rioting at the US Capitol*, Pew Research Center (Jan. 15, 2021), https://perma.cc/S4HH-HLEG/. It has also been sensational, including the

repeated showing of select snippets of photographic and video footage appearing to show the destruction of the Capitol property and officers in distress. Indeed, some of these officers have testified before Congress about their experiences that may or may not have been representative of the whole—testimony that was also widely circulated in print and through video. *See, e.g.*, *Police Officers Deliver Emotional Testimony About Violent Day at the Capitol*, WASHINGTON POST (July 27, 2021), https://perma.cc/V9L6-UQXB.

The language used in media coverage of the events of January 6 and of the defendants involved in those events has been especially charged and inflammatory. Reporters and their interviewees, including members of Congress, consistently refer to the defendants as "insurrectionists," "rioters," "seditionists," "domestic terrorists" "white supremacists" and "criminals" in the media. For example, in late January, President Biden referred to those involved in the January 6 events as "a group of thugs, insurrectionists, political extremists, and white supremacists." *Remarks by President Biden at Signing of an Executive Order on Racial Equity*, THE WHITE HOUSE (2021), https://perma.cc/S2PS-B5JU. Similarly, representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack." *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), https://perma.cc/G4Y8-LLMN. The coverage of the scene itself has also been sensationalist, relying on gruesome details in click-bait headlines to galvanize the public. For example, a recent video released on CNN began:

> Hours after the last rioters had been pushed from the Capitol, when there was still glass on the stairs and ***blood on the floors***, Congress tried to get back to the business of democracy . . .

Wolf, *supra*, https://perma.cc/F7EZ-FQP2 (emphasis added). This is hardly comparable to the "unemotional" reporting on Enron's collapse and the white-collar crime allegations against its management as described by the Court in *Skilling*. 561 U.S. at 371–72, 382.

Additionally, much early reporting has since been shown to be factually inaccurate. For example, immediately following January 6, President Biden, among other high-profile individuals, including an official press release, claimed that January 6 protestors *killed* Officer Brian Sicknick, and repeated the claim months after it became clear that there was no basis for it. Christian Datoc & Jerry Dunleavy, *Biden Claims Jan. 6 Rioters Killed Capitol Police Officer Brian Sicknick*, Washington Examiner (June 17, 2021), https://perma.cc/C9X6-VF8M; *Press Release: Loss of USCP Officer Brian Sicknick*, United States Capitol Police (Jan. 7, 2021), https://perma.cc/4GCS-2BYM. These claims were widely circulated and did reputational damage to defendants before the medical examiner quietly reported—more than four months later—that Officer Sicknick died of two strokes, and that he sustained no internal or external injuries from his exposure to chemical spray on January 6. Peter Hermann & Spencer S. Hsu, *Capitol Police Officer Died of Natural Causes, Officials Say*, WASHINGTON POST (Apr. 19, 2021), https://perma.cc/G9TP-VRGS. The often repeated but wrong claim that protesters killed this officer could be especially prejudicial to Mr. Oliveras.

The saturation of this charged and inflammatory reporting in the District is so substantial that it would be surprising to identify any potential jurors who have not been exposed to the coverage. One only need look to the Washington Post comments section to observe the inflammatory attitudes of its readers toward defendants who are still pending trial. *See* Jaclyn Peizer, *A Capitol rioter pushed an officer over a ledge, FBI says. A photo from a sea turtle fundraiser led to his arrest,* WASHINGTON POST (Mar. 10, 2022), https://perma.cc/T9DN-MH73.

Although some in the jury pool may not have heard of Mr. Oliveras specifically, his presence at the Capitol that day will necessarily cause prospective jurors to link his conduct to the January 6 reporting generally. As in *Rideau*, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726.

Finally, the media has widely reported comments of U.S. District Court Judges in this District regarding the events of January 6. For example, in comments that were widely reported, a judge stated that "*everyone* participating in the mob contributed to [the January 6] violence," and went on to conclude that "[m]embers of a mob who breach barriers and push back officers to disrupt the joint session of Congress are not trespassers, they are criminals."[5] There is no doubt that more than only District residents were exposed to these comments, which were in effect legal conclusions about every January 6 defendant who will go before a jury in this District. However, while the media coverage of these comments, among others, may not create disparate prejudice between the District jury pool and other jury pools by nature of its national broadcast, it *does* create disparate prejudice at the venue itself: because the comments were made by a member of the same court that is expected to provide instructions on burdens of proof and the presumption of innocence—instructions that are in direct conflict with the declarations that those involved are "criminals"—there is a serious question as to whether the earlier comments will be disregarded in favor of the instructions that carry precisely the same institutional authority. Thus, by members of this Court commenting on guilt prior to trial, this venue is necessarily tainted.

### C. The timing of the proceedings weighs in favor of finding a presumption of prejudice.

---

[5] *'Almost Schizophrenic': Judge Rips DOJ Approach to Jan. 6 Prosecutions*, Politico (Oct. 28, 2021) (emphasis added), https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442; *see also* Fischer et al., *supra* note 16.

Finally, in determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and the trial. For example, in *Skilling*, the Court found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting would have become attenuated. *Skilling*, 561 U.S. at 383.

Here, in the 22 months since January 6, 2021, media reporting about the events of January 6 remains at an all-time high. This has been especially true in recent weeks, given the high-profile House Select Committee activities focused on investigating the events. Additionally, many documentaries that include extensive footage of the day have been released—footage that would likely be offered into evidence by the prosecution at trial. For example, HBO released a feature-length *Four Hours at the Capitol* in late October 2021, which includes one of the most widely-circulated videos from that day: the breaking of a Capitol window. *Four Hours at the Capitol*, HBO (Oct. 4, 2021); *see also Day of Rage: How Trump Supporters Took the U.S. Capitol* at 18:17-21, N.Y. Times (June 30, 2021), https://perma.cc/6RXR-3F8X. There is no reason to think that coverage will wane before Mr. Oliveras's February 2023 trial, especially given the recent activities of the Select Committee.

Interest in the events of January 6 has been high since that day, and it has not waned in the District in the short time since. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

**II.   Venue transfer is proper under Rule 21(b) for convenience.**

Federal Rule of Criminal Procedure 21(b), which allows for venue transfer "for convenience," provides that, "[u]pon the defendant's motion, the court may transfer the

proceeding, or one or more counts, against the defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." When enacted, "the draftsmen of Rule 21(b) sought a provision that would ensure some degree of equality between prosecution and defense in choice of forum." *Assessment on Transfer Motion of Jury Bias in Transferee District Held Abuse of Discretion Remediable by Mandamus*, 63 COLUM. L. REV. 1324, 1325 (1963). Thus, the purpose of Rule 21(b) is to allow the Court to weigh the government's choice of forum against the inconvenience it poses to the defendant.

The Supreme Court has delineated a ten-factor test to be applied in determining whether to transfer a case under Rule 21(b):

> (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption to defendant's business if the case is not transferred; (6) the expense to the parties; (7) the location of counsel; (8) relative accessibility of place of trial; (9) docket conditions of each district or division involved; and (10) any other special elements which might affect the transfer.

*Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 243–44 (1964); *see also United States v. Bochene*, No. CR 21-418 (RDM), 2022 WL 123893, at *1 (D.D.C. Jan. 12, 2022). Here, a consideration of these factors weighs in favor of transfer to the District of New Jersey. *See, e.g.*, *United States v. Miller*, 314 F.R.D. 574, 577 (S.D. Ohio 2016) (finding that transfer from Ohio to California was appropriate where all factors favored transfer or were neutral); *United States v. Rodriguez,* No. 1:06-CR-302, 2007 WL 1287710, at *5 (W.D. Mich. May 2, 2007) (transferring case from Michigan to Illinois where, *inter alia*, location of Defendants and witnesses warranted transfer); *United States v. Benjamin*, 623 F. Supp. 1204, 1212 (D.D.C. 1985) (transferring from Washington D.C. to California); *United States v. Jessup*, 38 F.R.D. 42 (M.D. Tenn. 1965) (transferring two of three defendants from Tennessee to Southern District of Mississippi).

Mr. Oliveras resides less than 15 miles from the federal courthouse in Camden, New Jersey, one of three courthouses in the District of New Jersey. During all relevant time periods, and presently, he works as a craftsman in the same district. These are facts that strongly support a transfer. *United States v. Lima*, No. 94-800, 1995 U.S. Dist. LEXIS 7796, 1995 WL 348105, at *2 (N.D. Ill. Jun. 1, 1995) (granting transfer where defendant's home and office were located within an hour of the New Jersey district courthouse and transfer to New Jersey "would cause less disruption of his family life"); *United States v. Russell*, 582 F. Supp. 660, 662 (S.D.N.Y. 1984) (finding that defendants living with their three college-aged children in Memphis "argues strongly" for transfer of the case out of the Southern District of New York).

Additionally, undersigned counsel is in the District of New Jersey and regularly practices in that district. There is significant additional expense of defending Mr. Oliveras in Washington D.C., and that expense strongly favors a transfer to a venue closer to Mr. Oliveras's home and counsel's office.

As to expense to the government, the prosecutor on this case is from the Eastern District of Missouri, so it is unlikely to be meaningfully more expensive to the government to try the case in Michigan as opposed to Washington, D.C. Moreover, "[t]he United States is ubiquitous." *Benjamin*, 623 F. Supp. at 1212. The Department of Justice is, "or should be, 'at home' not only in Washington, D.C.," but also in any other place "in which a federal court sits." *Id*. "In any federal district, the government lawyers have a built-in office, complete with local logistical support from parallel local staffs of the U.S. Attorney, . . . and the FBI." *Id.* The government will not be unreasonably inconvenienced if Mr. Oliveras's trial is transferred to New Jersey.

The government may argue that it has witnesses in Washington, D.C. But much of the anticipated evidence in this case involves video and social-media files, which can be verified by local field agents. Further, as explained in *Benjamin*: "The government's showing that many of

its witnesses, such as FBI and IRS agents are from Washington, D.C., must, however, be discounted by some of the same considerations which discount the inconvenience which will confront government lawyers required to conduct a protracted trial away from home. The government-employee witnesses, like the government lawyers, have nationwide responsibilities and are equipped to operate away from home with minimal disruption of their official business." 623 F. Supp. at 1213.

Under similar circumstances, district courts have heavily weighed the expense imposed upon indigent defendants in favor of a transfer, noting that transfer is appropriate where the defendant cannot afford to travel to a different district and remain there during there during trial. *United States v. Hanley*, No. 94 CRIM. 394 (DAB), 1995 WL 60019, at *3 (S.D.N.Y. Feb. 10, 1995); *see also United States v. Radley*, 558 F. Supp. 2d at 882 (while recognizing the expense to the government of transporting witnesses to an alternative forum, "[o]n the whole, the Court finds this factor supports transfer because defendants do not have the same resources to support an extended trial in Chicago"); *United States v. Ferguson,* 432 F. Supp. 2d 559, 567 (E.D. Va. 2006) (rejecting government argument that transfer would be expensive, and finding that expense to defendants' weighed in favor of transfer to their home district, because "the United States of America has, for all practical purposes, unlimited financial resources to bring to bear. Unlike the [defendants], the Government can, and does, mint money."). Therefore, this factor strongly supports a transfer to a venue closer to Defendant's home.

As the Supreme Court has explained, "[t]he provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). It is "principally a protection for the defendant." *United States v. Cabrales*, 524 U.S. 1, 6 (1998) (observing that our Nation's founders' "complaints against the King of Great Britain, listed in the Declaration of

Independence, included his transportation of colonists 'beyond Seas to be tried'"). Mr. Oliveras's circumstances are an example of these principles. Although he is not being transported across the seas, given his limited means, and the upheaval this prosecution will cause his employment, he asks for the case to be transferred to the District of New Jersey under Rule 21(b).

## CONCLUSION

Mr. Oliveras requests that the Court transfer the case to the District of New Jersey under Federal Rule of Criminal Procedure 21(a) and (b).

        Respectfully submitted,

        /s/ Lori M. Koch
        Assistant Federal Public Defender
        District of New Jersey
        800 Cooper St., Suite 350
        Camden, New Jersey 08102
        Telephone:     (609) 649-0292
        Email: Lori_Koch@fd.org

Date: November 3, 2022