**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-738 (BAH)** |
| **MICHAEL OLIVERAS,** | |
| **Defendant.** | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Michael Oliveras to 30 months of incarceration, three years of supervised release, $2,000 in restitution, and a $100 mandatory assessment. This recommendation falls at the high end of the calculated sentencing guideline range of 24 to 30 months.

## I.      INTRODUCTION

The defendant, Michael Oliveras, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Oliveras traveled to Washington, D.C. prepared for "war on January 6" because he wanted

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

to stop the certification of the election. Prior to January 6, Oliveras booked a hotel room close to the Capitol so that he could generate an "understanding of access" to the building and posted on social media that the patriots needed to "[s]tand the fuck up and fight." On January 6, Oliveras posted, "Nothing can stop [wh]at is coming."

After attending the rally, Oliveras spent numerous hours on Capitol grounds and inside the Capitol building. He started on the West front, where he joined rioters swarming police officers and pushed officers. Then he entered the Capitol building, roaming the hallways and yelling menacing remarks like, "WHERE ARE THEY? DRAG THEM OUT BY THEIR FUCKING HAIR!" Oliveras was eventually corralled out of the building by officers but entered the Capitol building a second time not long after. After being ejected a second time, Oliveras attempted a third entry. As part of this attempted third entry, Oliveras stood in a doorway and yelled at rioters to "PUSH" and exclaimed "WE WANT THOSE FUCKING TRAITORS!"

Oliveras then joined a group of rioters resisting officers trying to clear the upper Northwest terrace. As Oliveras stood at the front of the line of rioters refusing to leave despite direct orders from officers, an altercation broke out between rioters and officers. Oliveras stepped forward and forcefully pushed into officers. Officers were able to eventually clear the area, but Oliveras still did not leave the Capitol grounds. Instead, he marched to the opposite side of the Capitol building and watched as other rioters destroyed media equipment. Oliveras encouraged the destruction, yelling things like, "FUCKING TRAITORS! GET THE FUCK OUT OF HERE!"

Oliveras felt no remorse for his conduct; rather, he glorified the violence of January 6. After returning to New Jersey, Oliveras posted on social media about his trip to Washington, D.C.: "Did we want to get our bare hands on the flesh of those who have committed treason, yes. Would

I, as one of those red blooded americans, if the opportunity presented itself, grasped and removed one of those traitors, yes." When Oliveras was interviewed by the FBI and asked about his participation in the Capitol siege, he confidently stated, "I wouldn't change a thing, I'd do it again."

The government recommends that the Court sentence Oliveras to 30 months' incarceration, which is within the Guidelines range calculation for his violation of 18 U.S.C. § 111(a)(1). A 30-month sentence reflects the gravity of Oliveras's conduct, his lack of remorse, and the need to deter Oliveras and others from similar conduct in the future.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack On The Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 60, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential race.

### B.    Michael Oliveras's Role In The January 6, 2021 Attack On The Capitol

#### *Social Media Activity Preceding January 6*

After the results from the Presidential election were announced in November 2020, Michael Oliveras frequently posted claims on Parler that the election results were fraudulent. For example, on November 12, he posted, "[t]he fraud in this election was pervasive. The reports are overwhelming. It should be enough to overturn the votes in at least 4 or 5 states." Ex. 35 at no. 3. In these posts, Oliveras encouraged others to "#fightback" against the "election fraud and interference." Ex. 35 at no. 6.

In December 2020, Oliveras started planning his January trip to Washington, D.C. and

describing the trip in terms of violence and war. Oliveras posted "It is time for a war on January 6" and "IamSoPumped. 1/6/20 Trumpers Unite. Join Us. WWG1WGA."[2] Oliveras queried his Parler audience asking, "who is descending to D.C.," and he called for others to travel: "Who are Patriots. We are Patriots. Who will be in dc. 1/6/21. Stand the fuck up and fight."

Oliveras made clear the purpose of his trip; he posted: "WeAreReadyToFight IForOneWill SpillMyBloodForOurPresidentAndEveryOneOfYouPatriots." Ex. 35 at no. 17. On December 27, 2020, after one user posted that Congress should be arrested for "voter fraud treason," Oliveras responded: "though I can certainly think of one other course of action..... when you get a capitol full of patriots who have had enough, and they decide on their own to rip them out of their chairs by their hair and drag them down the steps.....Would be very effective indeed." Ex. 35 at no. 21.

In early January, one Parler user posted, "Make sure we block all the tunnels out of the Capitol/Congress...adding maps...." Continuing with his militaristic planning, Oliveras responded: "My hotels on jersey avenue. I will be able to generate a real time understanding of access to the capitol physically."

### *Oliveras At The Capitol*

After attending the "Stop the Steal" rally, Oliveras marched to the U.S. Capitol grounds, carrying a flagpole with an American flag. Ex. 1.[3]

---

[2] "WWG1WGA" is a QAnon rallying cry that means "Where we go one, we go all." A review of Oliveras's Parler posts and comments shows that Oliveras subscribes to and regularly posts about QAnon conspiracy theories. *See* Ex. 35.

[3] Exhibits referenced refer to those uploaded to USAfx in support of the plea, as detailed in the Government's "Report and Position Regarding Public Release of Video Evidence re: Michael Oliveras Plea," ECF No. 56, as well as additional exhibits attached and submitted in support of this memorandum.



***Figures 1 & 2: Open Source footage showing Oliveras (left, yellow circle) on January 6, 2021***

Oliveras arrived on the West front of the Capitol grounds shortly before 1:00 p.m. He stepped onto a wall to elevate himself, near the line of vastly outnumbered police officers standing behind bike racks, and he joined the crowd chanting while wielding his flagpole.



***Figure 3: Oliveras standing on a wall and chanting***

Oliveras took photos of officers lining up to guard the building, *e.g.*, Ex. 16, and watched

violent clashes between rioters and officers, *see* Ex. 37 at 1:34.

A few moments later, a Metropolitan Police Department ("MPD") Civil Disturbance Unit ("CDU") tried to make their way through the crowd to provide much needed reinforcement to USCP officers protecting the Capitol building. The CDU marched in a two-by-two formation towards the Capitol building, identifying themselves as police and ordering the rioters to move aside. As the officers approached the area where Oliveras stood, members of the mob swarmed the officers and began harassing and insulting them. For example, a rioter standing directly in front of Oliveras screamed into a bullhorn "FUCKING OATHBREAKERS!" Oliveras joined in the harassment, yelling and aggressively pointing at officers and the Capitol building. Ex. 30.



***Figure 4: Open source footage showing Oliveras (yellow arrow) yelling
at officers protecting the Capitol (Ex. 30 at 1:22)***

As Oliveras and the other rioters continued to aggressively question the officers' authority and patriotism, hurling profanity and abuse, the interactions quickly turned physical. The crowd grew so dense that officers had to fall back one-by-one, holding onto each other by putting their arms on each other's shoulders. Rioters responded by attacking the officers, pushing into them,

trying to wrestle away their batons and weapons, throwing large objects at them, and assaulting them with various weapons and their bodies. For his part, Oliveras handed his flagpole to another rioter and joined the rioters pushing into the officers. Oliveras put his full body weight into his push, yelling, "HOLD THE FUCKING LINE!" Ex. 2.



*Figure 5: Open source footage showing Oliveras (yellow circle) pushing into rioters as they pushed into police officers, and yelling "HOLD THE FUCKING LINE!" (Ex. 2)*



*Figure 6: Open source footage showing Oliveras (yellow circle) using his full body weight to push into the officers*

Eventually, officers succeeded in breaking away from the sea of rioters attacking them.

Once the officers were no longer in reach, Oliveras moved directly towards the Capitol building.

Oliveras climbed a bike rack that rioters had turned into a makeshift ladder and ascended to the Northwest courtyard.



***Figure 7: Open source footage showing Oliveras (yellow circle) climbing
a ladder to reach the upper West courtyard***

After Oliveras reached the upper Northwest courtyard, he approached U.S. Capitol Police officers wearing riot gear and guarding the Parliamentarian's Door.[4]

---

[4] These officers did not wear bodyworn camera and so no audio was recorded.



*Figures 8 & 9: Open source footage showing Oliveras approaching police officers on the upper West terrace shortly before entering the Capitol building*

Oliveras continued past the officers guarding the Parliamentarian door and approached the nearby Senate Wing Door, which was unguarded and crowded with rioters. At about 2:22 p.m. – less than ten minutes after the Senate Wing Door was initially breached – Oliveras entered the Capitol building for the first time. Ex. 3. As he entered the building through the door with visibly smashed windows, sirens blared and broken glass scattered the floor.[5]



*Figure 10: Capitol surveillance footage showing Oliveras (yellow circle) entering the Capitol building for the first time (Ex. 3)*

---

[5] In his interview with the FBI, Oliveras maintained that Capitol police "let us in" the building.

Oliveras turned right, roaming the hallways, and moving towards and into the Crypt.



***Figures 11 and 12: Capitol surveillance footage showing Oliveras (yellow circle) entering the Crypt, left, and open source footage showing Oliveras (yellow arrow) in the Crypt, right***

As he passed closed office doors, Oliveras screamed out menacing threats such as, "WHERE ARE THE FUCKING TRAITORS? DRAG EM OUT BY THEIR FUCKING HAIR! WHERE ARE THE FUCKING TRAITORS?" and "DRAG THE FUCKING TRAITORS OUT!" *See* Exs. 4 & 5 (videos filmed by Oliveras). At 2:24 p.m., Oliveras quickly took to social media to boast "I am inside the capital." Ex. 35 at 30.

About 16 minutes later, officers temporarily gained control of the Senate Wing Door area and corralled rioters out of the building as they secured the broken doors and windows. Oliveras was one of the last rioters in the area to exit. Before he exited the building, Oliveras turned and aggressively confronted one of the officers directing Oliveras out of the building. Ex. 6 at :42. Another rioter signaled for Oliveras to leave, and he finally did.



*Figure 13: Capitol surveillance footage showing Oliveras (yellow arrow)*
*aggressively confronting officer directing him out of the building (Ex. 6 at :42)*

Oliveras left the Capitol building but remained in the upper Northwest courtyard. He stood

close to a line of officers trying to keep the crowd under control, waving his flagpole, and joining

rioters yelling and chanting at the officers.



*Figure 14: Open source footage showing Oliveras (yellow arrow) waving flag and chanting*

At about 2:48 p.m., rioters successfully breached the Senate Wing Doors and windows for

a second time. Oliveras, who had remained nearby, took advantage of the situation by entering the

Capitol through the Senate Wing Door for the second time at 2:50 p.m. Once inside, Oliveras

waved his flag high, encouraging the other rioters pouring into the building. Oliveras exited the

building, but again, rather than leaving the area, he remained on the upper Northwest courtyard.

Oliveras took this opportunity to take photos of violent clashes between officers and rioters, Exs. 15-18, and to brag about his conduct on social media. He posted, for example, "I strolled through the streets to a degree. I'll say this. Nothing can stop at is coming. Fuuuuck. CanYouFeelIt. WWG1WGA." Ex. 35 at no. 33. And, at 3:33 p.m., "LeeeetsGooooooo!!!!" Ex. 35 at no. 29.

By 4:13 p.m., officers had regained control of the interior of the Senate Wing Doors and windows, but rioters remained outside the door, trying to get in. Oliveras approached the Senate Wing Doors for the third time and pushed his way to the front of the crowd. Ex. 24. Sirens blared and officers held a line at the door. Ex. 25. Rioters screamed at the officers guarding the entrance, yelling things like "TREASON!" and "LET US IN!" and "THE ELECTION WAS STOLEN AND YOU KNOW IT!" Exs. 8, 26. Oliveras joined in, encouraging the rioters attack on officers by yelling "PUSH!" Ex. 28 at :19. Facing the crowd of officers, Oliveras yelled, "WE WANT THOSE FUCKING TRAITORS!" Ex. 8 at :04.

About 10 minutes later, officers on the exterior of the building circled the rioters and corralled them away from the Senate Wing Doors, directing them North in an attempt to clear rioters from the Capitol grounds. Though Oliveras saw what the officers were doing and knew they were working to eject the rioters from the area, he refused to move. Instead, he stood his ground, waving his flag in front of a line of officers.



*Figure 15: Bodyworn camera footage showing Oliveras (yellow arrow) waving his flag and making a gesture as officers tried to clear rioters off the upper West courtyard*

Eventually, officers managed to get the resistant rioters, Oliveras included, off the courtyard and move them to the North. But before the rioters moved too far, they stopped and resisted the police again. Rioters yelled "HOLD OUR LINE" and refused to leave the area, despite the officers' repeated directions to the rioters to move back. Yet again, Oliveras stood at the front of the pack of rioters facing off with the officers, waving his flag and refusing to move, as well as encouraging the rioters.



*Figures 16 & 17: Open source footage showing Oliveras (yellow circle) standing at the front of the mob of rioters refusing to move, left, and directing rioters, right*

Officers moved forward in unison in an effort to move rioters out of the area. The rioters, including Oliveras, refused to move.



*Figures 18 & 19: Oliveras (yellow arrow) standing at the front the mob of rioters refusing to move as officers step forward (Ex 36, left)*

As a physical clash ensued between the officers moving forward and the rioters refusing to move, Oliveras, who stood at the front of the mob of rioters and directly faced the officers, stepped forward with outstretched arms and pushed directly into the line officers, making physical contact with the officers.[6] One officer's bodyworn camera fell to the ground after he was struck by a rioter and captured Oliveras pushing directly into officers.



---

[6] These officers did not wear bodyworn cameras.



***Figures 20, 21, 22, & 23: Bodyworn camera footage showing Oliveras (yellow arrow) facing officers and stepping forward and pushing into officers with outstretched arms (Ex. 10)***

As fighting continued, rioters pulled officers to the ground and Oliveras remained at the front of the line of officers in the altercation pushing into the officers and attempting to maintain ground.





***Figures 24 & 25: Bodyworn camera footage showing Oliveras (yellow arrow) amid the fighting as one officer is pulled to the ground, left, and Oliveras' flag waving in officers' faces as the altercation continues, right (top & bottom left, Ex. 11) (bottom right, Ex 36)***

Only after officers deployed chemical irritant at Oliveras and the other resistant rioters did Oliveras turn and move away from the officers.



*Figure 26: Open source footage showing Oliveras (yellow arrow/circle) falling away from officers after altercation (Ex. 13)*

Still, Oliveras was not done. He stood close by as officers pushed rioters North, yelling, "EVERYTHING AROUND HERE CHANGES FROM THIS DAY FUCKING FORWARD!" Ex. 9. Oliveras video recorded as violence between rioters and officers continued. Ex. 29.

As officers succeeded in moving rioters off the upper West and Northwest terrace, Oliveras marched to the East side of the Capitol building where rioters were still amassed. Instead of leaving the Capitol, Oliveras made his way to the "media pen" – an area on the Northeast side of the Capitol where rioters had stacked up and destroyed media equipment. Oliveras stood at the head of the destroyed media equipment, rejoicing and yelling things like, "THIS IS WHAT HAPPENS TO FAKE NEWS! FUCKING TRAITORS! GET THE FUCK OUT OF HERE! GET THE FUCK OUT OF HERE!" and "Beyond that building right there, there's lots of traitors in that fucking media! You're gonna hear about them all soon! They're all fucking going down!" Ex. 14.



***Figures 27 & 28: Open source footage showing Oliveras (yellow circle) declaring the media
"fucking traitors," left, and standing by as rioters destroy media equipment, right (Ex. 14)***

Oliveras remained on Capitol grounds until into the evening hours, and only left when

officers finally gained control of the area and pushed the last remaining rioters, Oliveras included,

off the grounds.



***Figure 29: Open source footage showing Oliveras (yellow circle)
on the East side of Capitol grounds after dusk***

17

That evening, Oliveras continued to post to social media, reveling in the delay the riot had caused: "Looks as though the senate will have a long night ahead of them. DCTakeDown?" and "3:37 am Washington DC. Let's fucking go. Can you see this? Listening to Senate? Here goes cocaine Mitch. These Dummies. Senate. Lindsey Graham. Pence. #GonnaBeaLongNight. MattGaetz." Ex. 35 at no. 37. Oliveras bragged about being "gassed a few times" and said, "I feel like I played two football games." Ex. 35 at 39 & 40.

### *Social Media Activity Following January 6*

After January 6, Oliveras showed no regret for his actions. To the contrary, he bragged about his conduct and welcomed future violence. On January 8, Oliveras posted, "Patriots. Are any of you discouraged. What you saw in the senate. Was precisely what we want. Insurrection acts in motion." Ex. 35 at no. 33. He posted the same day, "Treasonous bastards. Draining the swamp." Ex. 35 at no. 44.

On January 10, Oliveras continued to boast about his involvement, and make clear his intention: "For all of those out there seeing the reports that Trump deplorable's made a bad showing on 1/6/21 couldn't be further from the truth. . . . Were we red blooded american's pissed the fuck off, yes. Did we want to get our bare hands on the flesh of those who have committed treason, yes. Would I, as one of those red blooded americans, if the opportunity presented itself, grasped and removed one of those traitors, yes. WWG1WGAus." Ex. 35 at no. 49.

Additionally, after his arrest, Oliveras voluntarily spoke with the FBI. When asked why he went to the Capitol on January 6, Oliveras stated "our government is corrupt and the 2020 election was stolen through corrupt, nefarious deeds and acts," Ex. 34 at :22, and "we were assembling because we knew . . . that the election was stolen and that our republic had been robbed of its

sovereign ability and privilege to vote honestly for our commander in chief." When asked about his participation at the Capitol on January 6, Oliveras said, "I wouldn't change a thing, I'd do it again." Ex. 34 at 1:19. He immediately followed up, "If I could looking glass forward today and know of this was going to happen, I'd do it again."



*Figure 30: Oliveras's interview with the FBI (Ex. 34)*

### III.   THE CHARGES AND PLEA AGREEMENT

On January 26, 2023, the government filed a Superseding Information charging Oliveras with five counts, including assaulting, resisting, or impeding a federal officer, in violation of 18 U.S.C. § 111(a)(1). On January 27, 2023, Oliveras was convicted of violating 18 U.S.C. § 111(a)(1) based on a guilty plea entered pursuant to a plea agreement.

### IV.   STATUTORY PENALTIES

Oliveras now faces sentencing for one count of assaulting, resisting, or impeding a federal officer, in violation of 18 U.S.C. § 111(a)(1). As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR correctly calculates the Guidelines range. PSR at ¶ 10.

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | Adjusted Offense Level | 20 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **17** |

The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein. *See* Plea Agreement at ¶ 5.

United States Sentencing Guideline § 2A2.2 applies to Count One by cross-reference from U.S.S.G. § 2A2.4(c)(1), because the defendant's conduct constitutes "aggravated assault." Aggravated assault "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (*i.e.*, not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony."

Here, Oliveras's assault constitutes a "felonious assault" with intent to commit another felony, and thus U.S.S.G. § 2A2.2 applies. As explained above, as police officers attempted to clear the rioters away from the Capitol building and off the Capitol grounds, some rioters, like Oliveras, refused to leave causing a violent altercation to break loose. Oliveras forcibly pushed

into officers, making physical contact with the officers he assaulted. In doing so, Oliveras was attempting to prevent the officers from clearing him and other rioters from the area, so that he and others could further their intent to obstruct the proceedings in Congress.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 50. Accordingly, based on the parties' calculation of the defendant's total adjusted offense level after acceptance of responsibility, at 17, Oliveras's Guidelines range is 24 to 30 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature And Circumstances Of The Offense

As shown in Section II(B) of this memorandum, Oliveras's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Oliveras directly, and repeatedly, participated in this riot. He assaulted police officers attempting to regain control of the Capitol; he entered the Capitol building twice and attempted to enter a third time; he watched and participated in violence against police officers on two separate occasions; he emphatically encouraged rioters to drag lawmakers out of the Capitol building; he cheered as rioters destroyed media equipment; and he continued his social media rampage encouraging violence against elected officials after January 6. The nature and circumstances of Oliveras's offense was of the utmost seriousness, and fully support the government's recommended sentence of 30 months of incarceration.

### B.      The History And Characteristics Of The Defendant

Michael Oliveras is a 50-year-old from New Jersey. He has few family connections and is not currently employed. *See* PSR at ¶ 60-62, 75. Oliveras dropped out of school in 10th grade and did not obtain a GED. PSR at ¶ 73. His work history is primarily that of a commercial carpenter. PSR at ¶ 76. He is uncertain of the last time he filed personal income taxes with the Internal Revenue Service. PSR at ¶ 83.

While on pretrial release in this case, defendant consistently violated his conditions of release. These persistent violations resulted in the probation office finally recommending removal from supervision. *See* ECF No. 47 (enumerating a long list of instances when Oliveras failed to report, failed to provide employment verification, and failed to schedule a home assessment). At the time of the pretrial violations report, Oliveras faced only misdemeanor charges and thus the Court declined to detain the defendant prior to trial. Minute Order (1/6/23).

These facts – particularly Oliveras's continued refusal to comply with Court-ordered supervision while on pretrial release – support the Government's recommended sentence.

### C.      The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense And Promote Respect For The Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Oliveras's conduct on January 6 was the epitome of disrespect for the law.

### D.      The Need For The Sentence To Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence for this defendant weighs heavily in favor of a lengthy term of incarceration. Although the defendant has a criminal history category of I, his arrest and conviction in this case, combined with his violations of the conditions of his release, show a clear pattern of unapologetic and unremorseful behavior. Oliveras's social media statements prior to January 6 demonstrate that he was prepared for more than attending a rally; he was ready for "war on January 6." He booked a hotel nearby the Capitol so that he could "generate a real time understanding of access to the capitol physically," and he encouraged the public to "descend to DC" to "stand the fuck up and fight." And Oliveras's social media statements after January 6 were those of a man girding for another "war." Oliveras bragged that he went to the Capitol on January 6 because he wanted to "get [his] bare hands on the flesh of those who committed treason" and he would have, "if the opportunity presented itself, grasped and removed one of the traitors." Oliveras also spoke of "conducting new elections" and posted about a "DC Take Down." These statements demonstrate that Oliveras still believes violence is an appropriate solution to his political grievances. This defendant's sentence must be sufficient to deter him from committing future crimes of violence, especially in the following election cycle. Indeed, when he interviewed with the FBI, Oliveras said, "I wouldn't change a thing, I'd do it again."

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.     The Importance Of The Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Eckerman*, the defendant encouraged rioters attacking police officers outside the Capitol on the West Plaza and watched as violence ensued. Rather than leave, the defendant entered the Capitol building. While inside, the defendant was part of mob surges that forcibly breached three separate police lines. During one such breach, Eckerman maneuvered his way to the front of the mob and pushed a police officer. Rioters then surged passed the officers. The defendant also entered a sensitive room in the Capitol building. The defendant took videos and pictures throughout his time in the building. After pleading guilty to one count of 18 U.S.C. § 111(a)(1), Judge Cooper sentenced Eckerman to 20 months of incarceration.

Like Eckerman, Oliveras was involved in several incidents of violence against officers as part of the mob. He joined rioters on the lower West terrace pushing into a unit of officers that had

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

been swarmed by rioters. Also, like Eckerman, Oliveras assumed a front-line role during his altercation on the upper West terrace later in the day when he forcefully pushed into officers who were trying to clear the area. Oliveras also took many videos and pictures of his time on Capitol grounds.

However, Oliveras's conduct is more aggravating than defendant Eckerman's conduct. For example, Oliveras planned for violence on January 6. He called for it on social media prior to January 6 and, while on Capitol grounds and in the building, he encouraged rioters to engage in violence by yelling menacing remarks like, "DRAG THEM OUT BY THEIR FUCKING HAIR" as he roamed through the Capitol building; he yelled "HOLD THE LINE" as rioters attempted to prevent officers from moving through the crowd; he encouraged rioters to "PUSH!" through officers blockading the Senate Wing Doors; and he encouraged violence against the media as he watched rioters destroy media equipment. Oliveras entered the Capitol building twice and attempted he enter a third. He remained obstructive to officers until long after dusk, much later than most of the other rioters. Oliveras did not show remorse but instead, continued his violence-encouraging diatribe on social media even after January 6. Therefore, a higher sentence is warranted for Oliveras.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[10] *United States v. Papagno*, 639

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here, *see* 18 U.S.C.

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Oliveras must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Oliveras played in the riot on January 6.[11] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in October 2022. *Id.* Oliveras's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 30 months of incarceration, three years of supervised release, $2,000 in restitution, and a $100 mandatory assessment.

---

§ 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA, *see United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Respectfully submitted,

DATED: July 3, 2023

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: /s/ Ashley Akers
ASHLEY AKERS
MO Bar No. 69601
Trial Attorney, Detailee
601 D Street NW
Washington, DC 20001
(202) 353-0521
Ashley.Akers@usdoj.gov

VICTORIA A. SHEETS
Assistant United States Attorney
NY Bar No. 5548623

LYNNETT M. WAGNER
Assistant United States Attorney
NE Bar No. 21606