**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cr-738- BAH** |
| | ) | |
| **MICHAEL OLIVARES** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## DEFENDANT'S SENTENCING STATEMENT

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

## I.      <u>**Introduction**</u>

Comes now Defendant Michael Olivares, by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on June 1, 2023.

Mr. Olivares appears for sentencing before this Court having pled guilty to Count One of a Superseding Information, charging him with a violation of 18 U.S.C. Section 111(a).

Mr. Olivares faces a statutory maximum penalty of up to 8 years imprisonment and a fine of not more than $250,000.

## II.     <u>**Sentencing Guidelines Calculation**</u>

Mr. Olivares and the Government entered into a written plea agreement providing for the following with regard to the application of the United States Sentencing Guidelines to this case:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2) | 14 |
| Official Victim (U.S.S.G. § 3A1.2) | +6 |
| | Total 20 |
| Acceptance of Responsibility (U.S.S.G. 3E1.1(a) and (b)) | <u>-3</u> |
| **Total Offense Level** | **17** |

Mr. Olivares has no criminal history points as determined by the United States Probation Officer in the Presentence Report.  As a result, Mr. Olivares is in Criminal History Category I.

Based on a Total Offense Level of 17, and a Criminal History Category of I, the parties agree that the advisory Guideline Range is 24-30 months.

**III.** **The Offense Conduct.**

The parties entered into an agreed upon "Statement of Offense" as part of the plea agreement.  The Probation Officer has accurately set forth the relevant facts in the Presentence Report.  The references below are offered only for purposes of clarification and additional context:

Par. 22:  The defendant's comments on the social media site Parler reflected the information he was consuming from various media sources he was following in the aftermath of the Presidential election.  He had no way to independently verify the accuracy of what those sites were reporting as "fact" when making allegations regarding the integrity of the election process and the accuracy of the media's predictions with respect to the outcome.

Par 23:  Mr. Olivares had been following news of other protest rallies and marches in Washington DC in November and December.  Wanting to be a part of such an event, he focused on the announcement of another rally and march on January 6 – the "Stop the Steal" rally which was a planned and permitted event at the Ellipse.  There were additional planned and permitted protest activities set for later in the afternoon on January 6 near the Capitol, and Mr. Olivares intended to attend those protest rallies as well.  His commentary on social media during the month of December – independent of any group or organization – was entirely about his own plans to attend and protest at the scheduled events as the schedule became known, and nothing more.

Par 27:   Mr. Olivares entered the Capitol carrying an American Flag attached to a flagpole.

Par 30:   The destruction of the media equipment on the East Side of the Capitol took place long before the Defendant arrived at that location.  The Defendant's only conduct in relation to the equipment was to record the scene using his cell phone.

**IV.      Sentencing Factors Under Sec. 3553(a)**

Pursuant to 18 U.S.C. § 3553(a), the numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to Mr. Olivares' background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

1.      Nature and circumstances of the offense and the history and personal characteristics of the defendant.

a. The Nature and Circumstances of the Offense.

For the most part the actions of Mr. Olivares on January 6 are not in dispute.  As Judges in this District have recognized after studying the events of January 6 in great detail, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1) a relatively small group of individuals who came to the Capitol for the purpose and with the intent to engage in violence for the purpose of disrupting the Congress's certification of the 2020 Electoral Vote.

2) a larger number of protesters who intended to protest loud and raucous manner as a manifestation of their unhappiness and distrust with regard to the outcome of the election -- but with no predetermined intention of engaging in violence – some of whom were drawn into committing acts of violence once there; and

3) an even larger group who remained as spectators to what developed into a riot by members of the first two groups.

Mr. Olivares does not fit easily into any of these three groups, but most accurately can be described as straddling the 2nd and 3rd groups.  Although he has entered a plea of guilty to a violation of Sec. 111(a), that statute defines a broad range of prohibited conduct, stretching from violent assault against the person of law enforcement officers, all the way to conduct that merely impedes or interferes with officers in the performance of their duties.

The drafters of Section 111 created four factual scenarios in which a violation of the statute constitutes a felony rather than a misdemeanor – 1) physical contact with the victim of the "assault;" 2) intent to commit another felony; 3) use of a dangerous or deadly weapon; and 4) inflicting bodily injury.

The charging language used by the Government includes both the "physical conduct with the victim of the assault" and "intent to commit another felony."

But the Statement of Offense drafted by the Government and agreed to by the Defendant falls short of constituting a factual admission to having "assaulted" any law enforcement office, but it does establish that he resisted, opposed, impeded, intimidated, or interfered with those officers.

Black's Law Dictionary defines "assault" as "A willful attempt or threat to inflict injury upon the person of another, when coupled with an apparent present ability to do so, and any intentional display of force such as would give the victim reason to fear or expect immediate bodily harm."

Paragraphs 12 and 19 of the Statement of Offense read:

> 12. Around 2:00 p.m., as tension amongst the increasingly large mass of rioters grew, a squad of police officers responded to the Capitol. As the officers attempted to move through the crowd of rioters and ascend to the steps of the Capitol, a mob of rioters, defendant included, swarmed the officers and violently pushed into them. <u>Defendant pushed into a rioter</u> who was pushing into police officers and yelled, "HOLD THE FUCKING LINE!"

> 19. Around 4:20 p.m., police officers circled the rioters and corralled them away from the Senate Wing Door. A line of police officers collectively yelled "MOVE" and progressed forward, attempting to clear the rioters away from the Capitol building and off the Capitol grounds. Some rioters, like defendant, refused to leave. <u>Defendant stood at the front of the pack of rioters and forcibly resisted the police line</u>. As rioters continued to hold their ground, the police line progressed forward and a violent clash broke out between the police officers and the group of rioters who refused to leave, including defendant. In doing so, <u>defendant was attempting to prevent the officers from clearing him</u> and other rioters from the area, so that he and others could further their intent to obstruct the proceedings in Congress and engage in civil disorder.

The Statement of Offense does not include any physical act by Mr. Olivares that meets the definition of "assault." If one were to place on a spectrum the various episodes of conduct violating Section 111(a) by the dozens of defendants already convicted of that crime from "least serious" to "most serious," the actions of Mr. Olivares in pushing against the back of other rioters who were interfering/ impeding/assaulting Metropolitan Police Department Officers as they attempted to march through the crowd outside the Capitol would fall at the "least serious" end of that spectrum.

The evidence shows no physical contact by Mr. Olivares with any law enforcement officer, and no dangerous instrument or weapon being used by him.   Mr. Olivares was carrying a United States flag on a flagpole but the Government has not alleged, and there is no reference in the Statement of Offense to the flag pole being employed by him in any fashion.   There were no reports of injuries to any of the officers in the 2:00 episode – directly or indirectly -- from the actions of Mr. Olivares or anyone else in the crowd in connection with the sequence of events.

The Offense Conduct does reference other incidents of violence directed at officers later in the day by the "mob" in close proximity to where Mr. Olivares was located, but there is no evidence that Mr. Olivares' conduct in the area where police officers were injured was the direct or indirect cause of any injury to any officer.

Mr. Olivares remained on the Capitol ground for more than two hours after the 2:00 incident involving the officers moving through the crowd. During that time, he made three separate entrances into the Capitol itself through the Senate Wing door on the Upper West Terrace level.  When he did gain entrance to the Capitol, he walked around inside with his flag and took videos of himself and the interior of the building.  He did not engage in any illegal activity inside the building – other than being unlawfully inside the building.

Mr. Olivares conduct in being on restricted Capitol grounds and inside the Capitol building when it was closed to the public was all unlawful.  But the remaining conduct of Mr. Olivares on January 6 did not involve any violent

conduct engaged in by him with the intent to inflict bodily injury on any law enforcement officer present.

Mr. Oliveras' conduct certainly made the jobs of the officers present more difficult, and for that he stands before the Court willing to accept his punishment.  But justice demands that he be punished only for what he did, not for the actions of others nearby over whom he had no control.

b.  History and Personal Characteristics of Mr. Olivares.

Mr. Olivares' parents separated at a point when he was too young to actually remember the disruption in his life with any clarity. Ultimately, his mother remarried but that change in his life became very difficult as compared to when she was unmarried.  It resulted in a sudden relocation to Oklahoma because his step-father had a son who lived there.

Mr. Olivares was disconnected from the only life he had known by this move, leaving him lost, sad and confused.  The cultural differences between New Jersey and Oklahoma were overwhelming. While living in Oklahoma, he was subjected to some abuse, both verbal and physical, by his new step-father. The abuse was directed at both him and his mother.  This period of his life lasted for more than two years – between ages 13 and 15 – and were extremely difficult for him to navigate.

When he and his mother returned to New Jersey they lived with his grandparents for a short period of time. When his mother told him she was planning to move again, he refused to go with her, dropped out of school, and began working to support himself.  At the time he did not consider that his decision to separate himself from his mother would lead to a future where they

only had contact at family gatherings such as funerals, or when health problems would land one or the other in a hospital.  But that has been the nature of his relationship with his mother since his late teens.  This situation was made worse during the time he was married because his ex-wife did not want to have any relationship with his mother or his siblings.  This led to long periods of Mr. Olivares having no contact with any of his immediate family members, a situation that has now lasted for more than two decades.

Mr. Olivares quit high school as a 16-year-old sophomore.  He had no adult male guidance in the form of a father or other family member who he believed cared about him.  As a result, he exhibited repeated instances of poor decision-making due to a lack of stability while spending most of his time alone and feeling abandoned.

Mr. Olivares found some sense of satisfaction and self-worth as he learned the to become a carpenter, a field of work that he continues to this day.

He experimented with various kinds of illegal drugs -- including cocaine -- during his 20s, and regularly used marijuana and consumed alcohol to cope with his unhappiness and loneliness stemming from his upbringing.

He became a father at 28 years old and for the first time in many years believed it presented him a chance to find happiness and break out of the cycle of depression he had endured since his teenage years. He saw it as an opportunity to give to his children a loving and nurturing environment that he lacked growing up, providing them with a stable emotional foundation to find happiness in their lives.

Even though he was determined to succeed in what was the most important part of his life, his marriage began to fail over time and ultimately resulted in an amicable permanent separation in 2018 when his children were 17 and 12 years old.  He still regards his greatest accomplishment in life as the nearly two decades he and his ex-wife spent dedicated to providing stability in the lives of their children.  But he has allowed himself to drift away from them – now 22 and 17 -- in the time since the events of January 6 in order to shield them from the consequences of his actions.

Since the separation from his wife, Mr. Olivares has led a relatively solitary life, residing in a one bedroom and one bathroom apartment in Lindenwold, New Jersey.  His hobbies are fresh-water fishing and playing golf.

The solitude nature of his post-marital life led him to increased interaction on social media, as well as doing more reading on the internet.  In addition to politics, he learned more about lifestyle issues such as nutrition and the outdoor environment. Out of necessity he has also developed an appreciation of and enjoyment from cooking.

But an abundance of hours alone in his apartment led Mr. Olivares to a variety of news sources in 2020 regarding COVID, the civil unrest following the death of George Floyd, the Presidential campaign, and during and after the November Presidential election.  It is no mystery to this Court that the selection of which new sources to consume in the aftermath of the Nov. 2020 election often played a dominant role in shaping the consumer's views concerning the integrity of the election processes in various states across the country, and a

concomitant view with regard to one's faith in the accuracy of the election outcome that resulted.

This point of view led tens of thousands of Americans just like Mr. Olivares to come to the Capitol on November 14, December 12, and January 6 to express their unhappiness and frustration with both the political and legal processes.  Tens of thousands attended rallies and marched in the streets in protest of what they <u>believed</u> – based on what they had read and been told – was an inaccurately reported election result.

Those are time honored traditions in this city/district and this country.

As is the kind of extreme rhetoric that Mr. Olivares engaged in as reflected in the Presentence Report – political speech protected by the First Amendment.  His words were repugnant and condemnable, but they should play no role in determining his sentence.  We do not punish speech we disagree with no matter how much some percentage of the population of this country finds the speech to be offensive or contrary to this country's ideals.  The offense to which Mr. Olivares has admitted his guilt is not dependent in any way on his comments or thinking at the time of his conduct.  His words reflected the point of view he had developed as a news consumer over many weeks, and were an expression of his frustrations based on what he had come to believe about the outcome of the election.  But he was not alone.

      2.     The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

As noted above, the nature of Mr. Olivares' actions that make him guilty of violating Sec. 111(a) are readily distinguishable from the almost the entirety of the spectrum of offending conduct that can be said to constitute a felony violation of Sec. 111(a).

The fact that his adjusted offense level is only 17 reflects that very reality.  The only guideline enhancement the Government demanded as part of the plea agreement is the one that is indisputable under the facts – that the victims of the offense were law enforcement officers engaged in the performance of their duties.

Given that he has no criminal history score, the <u>starting point</u> for identifying the sentence that reflects the seriousness of the offense and to promote respect for the law – and law enforcement officers – is to be found at the bottom of the recommended guideline range – 24 months.

DEFENDANT'S SENTENCING RECOMMENDATION

Michael Olivares came to Washington D.C. alone on January 5 not to engage in violence for the purpose of overturning an election result he disputed.  He came to protest, and while engaged in that protest with thousands of like-minded individuals he succumbed to a mob mentality.  But even in those moments his conduct was almost entirely limited to obstructing and impeding the efforts of the U.S. Capitol Police and Metropolitan Police Officers to regain control of the Capitol building and the Capitol Grounds.

The bottom of the guideline range for such conduct should be the starting point for this Court's consideration of an appropriate sentence. From there the Court should take into consideration the mitigating factors of Mr.

Olivares' difficult upbringing leading him to be susceptible to periods of isolation and loneliness – often self-inflicted – which led him to be an over-consumer of conspiratorial sources of news that reinforced his existing point of view which lacked any significant factual foundation.

His personal and professional existence at that point in his life made him particularly vulnerable to disinformation and misinformation in the place of hard factual evidence.

Mr. Olivares has never shown himself to be a threat to the community in which he has lived nearly his entire life. A lengthy period of incarceration – relative to others whose conduct was similar – is not warranted by considerations of safety or the need to punish for purposes of making him an example.

Based on a totality of factors, a sentence of 12 months and one day is fair and just sentence that takes into account an accurate reflection of the facts as they related specifically to Mr. Olivares and his conduct.

Date: July 4, 2023                                   Respectfully Submitted,

                                                    /s/ William L. Shipley
                                                    William L. Shipley
                                                    PO Box 745
                                                    Kailua, Hawaii 96734
                                                    Tel: (808) 228-1341
                                                    Email: 808Shipleylaw@gmail.com

                                                    *Attorney for Defendant*