**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-738 (BAH)** |
| **MICHAEL OLIVERAS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court depart or vary upwards to sentence defendant Michael Oliveras to 68 months of incarceration, three years of supervised release, $2,000 in restitution, and a $370 mandatory assessment.

## I.     INTRODUCTION

The defendant, Michael Oliveras, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Prior to January 6, Oliveras believed that the election was stolen and declared his intent to "descend" upon Washington, D.C. to spill his blood for his preferred presidential candidate. Oliveras traveled to Washington, D.C. prepared for "war on January 6" because he wanted to stop the certification of the election. He booked a hotel room close to the Capitol so that he could generate an "understanding of access" to the building and posted on social media that the patriots needed to "[s]tand the fuck up and fight." On the morning of January 6, Oliveras warned in a social media post, "Nothing can stop [wh]at is coming."

For hours and hours that day, Oliveras turned his plans into action. He started on the west front, where he joined rioters swarming police officers and pushed officers. Then he entered the Capitol building, roaming the hallways and yelling menacing remarks like, "WHERE ARE THEY? DRAG THEM OUT BY THEIR FUCKING HAIR!" Even after officers managed to corral him out of the building, Oliveras reentered not long after, encouraging other rioters to follow him through the breached Senate Wing Doors. After exiting a second time, Oliveras attempted a third entry. As part of this attempted third entry, Oliveras stood in a doorway and yelled at rioters to "PUSH" and exclaimed "WE WANT THOSE FUCKING TRAITORS!"

Even as law enforcement worked to clear the mob, Oliveras kept resisting. He joined a group of rioters resisting and assaulting officers trying to clear the upper Northwest terrace. As Oliveras stood at the front of the line of rioters refusing to leave despite direct orders from officers, an altercation broke out between rioters and officers. Oliveras stepped forward and forcefully pushed into officers. Officers were able to eventually clear the area, but Oliveras still did not leave

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

the Capitol grounds. Instead, he marched to the opposite side of the Capitol building and watched as other rioters destroyed media equipment. Oliveras encouraged the destruction, yelling things like, "FUCKING TRAITORS! GET THE FUCK OUT OF HERE!"

Oliveras felt no remorse for his conduct; rather, he glorified the violence of January 6. After returning to New Jersey, Oliveras posted on social media about his trip to Washington, D.C.: "Did we want to get our bare hands on the flesh of those who have committed treason, yes. Would I, as one of those red blooded americans, if the opportunity presented itself, grasped and removed one of those traitors, yes." When the FBI interviewed Oliveras and asked about his participation in the Capitol siege, he confidently stated, "I wouldn't change a thing, I'd do it again."

A jury convicted Oliveras of three felonies and four misdemeanors for his actions on January 6, and his conduct warrants a significant period of incarceration. The government recommends that the Court sentence Oliveras to 68 months' incarceration, which is above the Guidelines range calculated by the government after issuance of the D.C. Circuit's decision in *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). A 68-month sentence reflects the gravity of Oliveras's extensive planning and intent to disrupt the certification; repeated encounters with police officers, including multiple physical clashes; extensive time spent on Capitol grounds; and lack of remorse.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack On The Capitol

The government refers the court to the Statement of Facts filed in this case, ECF No. 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential

election.

**B.      Michael Oliveras's Role In The January 6, 2021 Attack On The Capitol**

*Social Media Activity Preceding January 6*

After the election, Oliveras frequently claimed on Parler that the election results were fraudulent and he encouraged "patriots" to "FIGHT FIGHT FIGHT." Govt Ex. 618 at 2. Oliveras declared that "WeAreTakimgOirCountryBack," *id.* at 9, and exclaimed that "[t]his country belongs to patriots motherfucker," *id.* at 28. As he planned for the certification day, Oliveras posted that he "want[ed] to see Traitors walked out. I want video footage." *Id.* at 15.

In December 2020, Oliveras started planning his January trip to Washington, D.C. and describing the trip in terms of violence and war. Oliveras posted "It is time for a war on January 6" and "IamSoPumped. 1/6/20 Trumpers Unite. Join Us. WWG1WGA."[2] *Id.* at 66. Oliveras queried his Parler audience asking, "who is descending to D.C.," *id.* at 84, and he called for others to travel to Washington, D.C. and warned that "WeAreComing 1/6/21 WeAreComingHard," *id.* at 73, and "WeAreReadyToFight," *id.* at 79. Oliveras proclaimed that "darkness has to occur soon[,] I can't see darkness waiting until after January 6," *id.* at 78, and he warned that he was prepared to spill his blood for his preferred presidential candidate, *id.* at 80.

As Oliveras planned for January 6, he repeatedly called for violence against Congresspeople who he perceived to be "traitors." For example, when discussing January 6, Oliveras posted "IWantFootageOfTraitors   Executions," *id.* at 95, and he noted his agreement that

---

[2]  "WWG1WGA" is a QAnon rallying cry that means "Where we go one, we go all." A review of Oliveras's Parler posts and comments shows that Oliveras subscribes to and regularly posts about QAnon conspiracy theories. *See generally* Ex. 618.

"most of congress needs to hang," *id.* at 81. After one user posted that Congress should be arrested for "voter fraud treason," Oliveras responded:



*Id.* at 86.

Oliveras believed that he was familiar with the Congressional proceeding taking place on January 6, 2021. He explained to others on Parler that "there is a provision for new electors," *id.* at 87, and he discussed former Vice President Pence's role in the certification, *id.* at 80. Oliveras solidified his commitment to travel to Washington, D.C. to encourage Congress "#DoNotCertify on #JAN6!" because there was a "fraudulent Electoral College." *Id.* at 94.

In early January, one Parler user posted, "Make sure we block all the tunnels out of the Capitol/Congress...adding maps...." Continuing with his militaristic planning, Oliveras responded:



*Id.* at 107.

When Oliveras arrived in Washington, D.C. on January 5, he prepared for the following day. He posted, for example, "I strolled through the streets to a degree. I'll say this. Nothing can stop at is coming. Fuuuuck. CanYouFeelIt. WWG1WGA," Ex. 618 at 118, and "LeeeetsGooooooo!!!!" *Id.* at 117. Oliveras also warned, "Nothing can stop [wh]at is coming." *Id.* at 110.

In the early morning of January 6, Oliveras posted on social media, "Let's fucking go." *Id.* at 132.

### *Oliveras At The Capitol*

After attending the "Stop the Steal" rally and listening to the former president's speech, Ex. 703, Oliveras marched to the U.S. Capitol grounds, carrying a flagpole with an American flag, Ex. 804.[3]



***Figures 1 & 2: Exs. 804 (left), 806 (right) showing Oliveras (yellow circle) on January 6, 2021***

---

[3] References to Exhibit ("Ex.") throughout this memorandum refer to the Government's Trial Exhibits.

Oliveras arrived on the west front of the Capitol grounds shortly before 1:00 p.m. He stepped onto a wall to elevate himself near the line of vastly outnumbered police officers standing behind bike racks and he joined the crowd chanting. Ex. 506 at :00-3:19.



***Figure 3: Ex. 531 at :03 showing Oliveras standing on a wall and chanting***

Oliveras took photos of officers lining up to guard the building, *e.g.*, Ex. 627, and watched violent clashes between rioters and officers, *see* Exs. 502, 503.

A Metropolitan Police Department ("MPD") Civil Disturbance Unit ("CDU") arrived on Capitol grounds to reinforce USCP officers protecting the Capitol building. Ex. 501. The MPD CDU marched in a two-by-two formation towards the Capitol building, identifying themselves as police and ordering the rioters to move aside. As the officers approached the area where Oliveras stood, members of the mob swarmed the officers and began harassing and insulting them. For example, a rioter standing directly in front of Oliveras screamed into a bullhorn "FUCKING OATHBREAKERS!" Oliveras joined in the harassment by aggressively pointing at officers and the Capitol building, Exs. 404, 405, 501.1, 502 at :00-:04, 531, and yelling things like, "FUCK

YOU!" at the police officers, Ex. 403 at 7:30-7:46.



***Figure 4: Ex. 531 at 1:22 showing Oliveras (yellow arrow) yelling at officers***

As Oliveras and the other rioters continued to aggressively question the officers' authority and patriotism, hurling profanity and abuse, the interactions quickly turned physical. The crowd grew so dense that officers had to fall back one-by-one, holding onto each other by putting their arms on each other's shoulders. Rioters responded by attacking the officers, pushing into them, trying to wrestle away their batons and weapons, throwing large objects at them, and assaulting them with various weapons and their bodies. For his part, Oliveras joined the rioters pushing into the officers. Ex. 502 at :18-:27. Oliveras put his full body weight into his push, yelling, "HOLD THE FUCKING LINE!" Ex. 503 at :30, Ex. 502.



*Figure 5: Ex. 503.1 showing Oliveras (yellow circle) pushing into rioters as they pushed into police officers and yelling "HOLD THE FUCKING LINE!"*



*Figure 6: Open-source footage showing Oliveras (yellow circle) using his full body weight to push into the officers*

Eventually, officers succeeded in breaking away from the sea of rioters attacking them. Once the officers were no longer in reach, Oliveras moved directly towards the Capitol building. Oliveras climbed a bike rack that rioters had turned into a makeshift ladder, directed rioters on how to climb up the staircase, and ascended to the northwest courtyard. Exs. 504.1, 508.



*Figure 7: Ex. 508 showing Oliveras (yellow circle) climbing
a ladder to reach the upper west courtyard*

After Oliveras reached the upper northwest courtyard, he approached U.S. Capitol Police

officers wearing riot gear and guarding the Parliamentarian's Door.[4] Exs. 511, 309.



*Figures 8 & 9: Ex. 511 showing Oliveras approaching police officers on the upper west
terrace shortly before entering the Capitol building*

---

[4] These officers did not wear body worn camera and thus no audio was recorded.

Oliveras continued past the officers guarding the Parliamentarian door and approached the nearby Senate Wing Door, which was unguarded and crowded with rioters. At about 2:22 p.m. – less than ten minutes after the initial breach of the Senate Wing Door – Oliveras entered the Capitol building for the first time. Ex. 301. As he entered the building through the door with visibly smashed windows, sirens blared and broken glass scattered the floor.[5]



*Figure 10: Capitol surveillance footage showing Oliveras (yellow circle) entering the Capitol building for the first time (Ex. 301)*

Oliveras turned right, roaming the hallways, and moving towards and into the Crypt.



*Figures 11 and 12: Capitol surveillance footage showing Oliveras (yellow circle, Ex. 304) entering the Crypt, left, and open-source footage showing Oliveras (yellow arrow) in the Crypt, right*

---

[5]  In his interview with the FBI, Oliveras maintained that Capitol police "let us in" the building.

As he passed closed office doors, Oliveras screamed out menacing threats such as, "WHERE ARE THE FUCKING TRAITORS? DRAG EM OUT BY THEIR FUCKING HAIR! WHERE ARE THE FUCKING TRAITORS?" Ex. 615. At 2:24 p.m., Oliveras took to social media to boast "I am inside the capital." Ex. 618 at 143. As Oliveras peered down a hallway, he said, "They're gassing us inside," Ex. 604, and then he continued walking throughout the Crypt, Exs. 304, 305. As Oliveras continued roaming the building, he yelled "DRAG THE FUCKING TRAITORS OUT!" *See* Ex. 616.

About 16 minutes later, officers temporarily gained control of the Senate Wing Door area and corralled rioters out of the building as they secured the broken doors and windows. Oliveras was one of the last rioters in the area to exit. Before he exited the building, Oliveras turned and aggressively confronted one of the officers directing Oliveras out of the building. Exs. 302, 302.2 at :42. Another rioter signaled for Oliveras to leave, and he finally did.



***Figure 13: Capitol surveillance footage showing Oliveras (yellow arrow) aggressively confronting officer directing him out of the building (Ex. 302)***

Oliveras left the Capitol building but remained in the upper northwest courtyard. He stood close to a line of officers trying to keep the crowd under control, waving his flagpole, and joining

rioters yelling and chanting at the officers.



***Figure 14: Open-source footage showing Oliveras (yellow arrow) waving flag and chanting***

At about 2:48 p.m., officers had barricaded the nearby windows and re-secured the Senate

Wing Door in an effort to keep rioters out of the building. Trial Tr. at 166 (11/14/23). However,

rioters successfully breached the Senate Wing Doors and windows for a second time. Oliveras,

who had remained nearby, took advantage of the situation by entering the Capitol through the

Senate Wing Door for the second time at 2:50 p.m. Ex. 302. Once inside, Oliveras waved his flag

high, encouraging the other rioters pouring into the building. Oliveras eventually exited the

building, but again, rather than leaving the area, he remained on the upper northwest courtyard.

Oliveras took this opportunity to take photos of violent clashes between officers and rioters,

Exs. 626-629, and to brag about his conduct on social media, *e.g.*, Ex. 618.

By 4:13 p.m., officers had regained control of the interior of the Senate Wing Doors and

windows, but rioters remained outside the door, trying to get in. Oliveras approached the Senate

Wing Doors for the third time and pushed his way to the front of the crowd. Exs. 303, 606. Sirens

blared and officers held a line at the door. Trial Tr. at 176 (11/14/23). Rioters screamed at the

officers guarding the entrance, yelling things like "TREASON!" and "LET US IN!" and "OUR

HOUSE!" and "THE ELECTION WAS STOLEN AND YOU KNOW IT!" Exs. 523, 303, 606,

613, 610, 611, 612. Oliveras joined in, encouraging the rioters attack on officers by yelling "PUSH!," Ex. 606, and starting a chant "FUCK THE DEMS!," Ex. 523. Facing the crowd of officers, Oliveras yelled, "WE WANT THOSE FUCKING TRAITORS!" Ex. 606 at :04.

About 10 minutes later, officers on the exterior of the building circled the rioters and corralled them away from the Senate Wing Doors, directing them north in an attempt to clear rioters from the Capitol grounds. *See* Ex. 633. Though Oliveras saw what the officers were doing and knew they were working to eject the rioters from the area, he refused to move. Instead, he stood his ground, waving his flag in front of a line of officers and flipping his middle finger at them.



**Figure 15: Body worn camera footage showing Oliveras (yellow arrow) waving his flag and making a gesture as officers tried to clear rioters off the upper west courtyard**

Eventually, officers managed to get the resistant rioters, Oliveras included, off the courtyard and move them to the North. But before the rioters moved too far, they stopped and resisted the police again. Ex. 513 at 2:10. Rioters yelled "HOLD OUR LINE" and refused to leave the area, despite the officers' repeated directions to the rioters to move back. Trial Tr. at 5 (11/15/23). Yet again, Oliveras stood at the front of the pack of rioters facing off with the officers,

waving his flag and refusing to move, as well as encouraging the rioters. *Id.* at 11 (video footage

of rioter, presumably Oliveras, yelling "Traitors!").



***Figures 16 & 17: Ex. 513 showing Oliveras (yellow circle) standing at the front of the mob of rioters refusing to move, left, and directing rioters, right***

Officers moved forward in unison to move rioters out of the area as the officers commanded

"MOVE BACK!" Trial Tr. at 128, 194-195 (11/14/23). The rioters, including Oliveras, refused

orders.



***Figures 18 & 19: Oliveras (yellow arrow) standing at the front the mob of rioters refusing to move as officers step forward (Ex. 421, left; Ex. 419, right)***

The rioters were being "very aggressive towards the officers," Trial Tr. at 114 (11/14/23),

and chanting things like, "Whose house? Our house!," *id.* at 201. As the police line stepped forward

and the rioters physically resisted, a physical clash ensued. *Id.* at 203-204 ("This was when a lot

of the . . . more intense fighting kind of kicked off, where it seemed like a lot of the rioters had

kind of dug in there and decided that they were no longer going to give more ground, and they

were going to try and hold their ground against us."). Oliveras, who stood at the front of the mob of rioters and directly faced the officers, stepped forward with outstretched arms and pushed directly into the line officers, making physical contact with the officers.[6] At once, the crowd became "assaultive towards the officers" and a melee broke out. *Id.* at 115, 117 (explaining that the rioters in the area near Oliveras were being non-compliant). The situation quickly became perilous for the police officers; the police line broke as the fighting continued, creating "threats" and a "dangerous" situation for the officers. *Id.* at 203-204.

One officer's body worn camera fell to the ground after he was struck by a rioter; the body worn camera footage captured Oliveras pushing directly into officers.



***Figures 20, 21, 22, & 23: Body worn camera footage showing Oliveras (yellow arrow) facing officers and stepping forward and pushing into officers with outstretched arms (Ex. 423)***

As fighting continued, rioters pulled officers to the ground, creating a dangerous situation

---

[6] These officers did not wear body worn cameras.

for the officers. Trial Tr. at 132, 210-211 (11/14/23), *id.* at 215 (describing the dangerous situation when an officer got pulled to the ground during the melee). Oliveras remained at the front of the line of officers in the altercation pushing into the officers and attempting to maintain ground.





***Figures 24 & 25: Body worn camera footage showing Oliveras (yellow arrow) amid the fighting as one officer is pulled to the ground, left, and Oliveras' flag waving in officers' faces as the altercation continues, right (top & bottom left, Ex. 419) (bottom right, Ex. 426)***

Only after officers deployed chemical irritant at Oliveras and the other resistant rioters did Oliveras turn and move away from the officers.



***Figure 26: Open-source footage showing Oliveras (yellow arrow/circle) falling away from officers after altercation (Ex. 514)***

17

Still, Oliveras was not done. He stood close by as officers pushed rioters north, yelling, "EVERYTHING AROUND HERE CHANGES FROM THIS DAY FUCKING FORWARD!" Ex. 639. Oliveras video recorded as violence between rioters and officers continued and he yelled, "YOU TOOK AN OATH – FUCKING TRAITORS!" Ex. 605.

As officers succeeded in moving rioters off the upper west and northwest terrace, Oliveras marched to the East side of the Capitol building where rioters were still amassed. Instead of leaving the Capitol, Oliveras made his way to the "media pen" – an area on the northeast side of the Capitol where rioters had stacked up and destroyed media equipment. Oliveras stood at the head of the destroyed media equipment, rejoicing and yelling things like, "THIS IS WHAT HAPPENS TO FAKE NEWS! FUCKING TRAITORS! GET THE FUCK OUT OF HERE! GET THE FUCK OUT OF HERE!" and "beyond that building right there, there's lots of traitors in that fucking media! You're gonna hear about them all soon! They're all fucking going down!" Exs. 607, 623, 525.



***Figures 27 & 28: Exs. 525, 526 showing Oliveras (yellow circle) declaring the media "fucking traitors," left, and standing by as rioters destroy media equipment, right***

18

Oliveras remained on Capitol grounds until into the evening hours, and only left when officers finally gained control of the area and pushed the last remaining rioters, Oliveras included, off the grounds. Ex. 529 at 3:45-4:15.



***Figure 29: Open-source footage showing Oliveras (yellow circle)
on the East side of Capitol grounds after dusk***

That evening, Oliveras continued to post to social media, reveling in the delay the riot had caused: "Looks as though the senate will have a long night ahead of them. DCTakeDown?," Ex. 618 at 123, and "3:37 am Washington DC. Let's fucking go. Can you see this? Listening to Senate? Here goes cocaine Mitch. These Dummies. Senate. Lindsey Graham. Pence. #GonnaBeaLongNight. MattGaetz," *id.* at 139, 151. Oliveras bragged about being "gassed a few times" and said, "I feel like I played two football games." *Id.* at 160, 165.

### ***Social Media Activity Following January 6***

After January 6, Oliveras showed no regret for his actions. To the contrary, he bragged about his conduct and welcomed future violence. On January 8, Oliveras posted, "Patriots. Are any of you discouraged. What you saw in the senate. Was precisely what we want. Insurrection acts in motion." *Id.* at 163. He posted the same day, "Treasonous bastards. Draining the swamp."

*Id.* at 167.

On January 10, Oliveras continued to boast about his involvement, and make clear his intention:



*Id.* at 187.

Additionally, after his arrest, Oliveras voluntarily spoke with the FBI. When asked why he went to the Capitol on January 6, Oliveras stated "our government is corrupt and the 2020 election was stolen through corrupt, nefarious deeds and acts," and "we were assembling because we knew . . . that the election was stolen and that our republic had been robbed of its sovereign ability and privilege to vote honestly for our commander in chief." When asked about his participation at the Capitol on January 6, Oliveras said, "I wouldn't change a thing, I'd do it again." He immediately followed up, "If I could looking glass forward today and know of this was going to happen, I'd do it again."

## III.   THE CHARGES AND TRIAL

On August 15, 2023, a federal grand jury returned a seven-count Superseding Indictment, charging Oliveras with Count One: Interfering with Law Enforcement Officers During a Civil

Disorder, 18 U.S.C. § 231(a)(3); Count Two: Obstruction of an Official Proceeding, Aiding and Abetting, 18 U.S.C. § 1512(c)(2), § 2; Count Three: Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1); Count Four: Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1); Count Five: Disorderly or Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2); Count Six: Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and Count Seven: Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). ECF No. 82. On November 16, 2023, a jury found Oliveras guilty on all counts. ECF No. 93.

## IV.    STATUTORY PENALTIES

Oliveras now faces sentencing on all seven counts listed above. As noted by the Presentence Report issued by the U.S. Probation Office, Oliveras faces up to: (1) 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count One; (2) 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count Two; (3) 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count Three; (4) 1 year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, restitution, and a mandatory special assessment of $25 on Counts Four and Five; and (5) 6 months of imprisonment, a fine up to $5,000 and a mandatory special assessment of $10 on Counts Six and Seven.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

### A.      Guidelines Calculation

The PSR calculated Oliveras's total offense level as 21, resulting in a Guidelines range of 37 to 46 months' imprisonment. This guidelines range is consistent with the Amended PSR. PSR ¶ 112.[7]

Because the PSR applied both enhancements in calculating Oliveras's total offense level, that calculation is no longer accurate. This change also affects the grouping analysis for Oliveras's multiple counts of conviction. The government submits its proposed calculation as follows:

Count One: 18 U.S.C. § 231(a)(3)
|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Specific Offense Characteristic (Physical contact) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | *Cross Reference*: |  |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
|  | **Total** | **20** |

Count Two: 18 U.S.C. § 1512(c)(2)
|  |  |  |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
|  | **Total** | **14** |

Count Three: 18 U.S.C. § 111(a)(1)
|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |

---

[7] The Court granted the government's motion to file our sentencing memorandum in light of the recent opinion in *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). *Brock* held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id.* at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice" does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes. Following *Brock*, on March 12, 2024, the Probation Office filed an amended PSR with updated Guidelines Calculations. ECF No. 104. The government agrees with the amended Guidelines Calculations.

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1)(A) | Specific Offense Characteristic (Physical contact) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | *Cross Reference*: | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

Count Four: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | +2 |
| U.S.S.G. § 2X1.1 | Cross Reference to Count One: Base Offense Level (adjusted) (§ 2A2.2) | 14 |
| | **Total** | **14** |

Count Five: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Specific Offense Characteristic (Physical contact) | +3 |
| U.S.S.G. § 2A2.4(c)(1) | Cross Reference: | |
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| | **Total** | **14** |

Counts Six and Seven are Class B misdemeanors. As such, the U.S. Sentencing Guidelines do not apply to these counts of conviction.

Grouping

Counts One and Three constitute a single group (Group One) because they involve the same victim – law enforcement – and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. U.S.S.G. § 3D1.2(a), (b). Counts Two, Four, and Five (Group Two) constitute a single group because they involve the same victim – Congress. U.S.S.G. § 3D1.2(a). That results in two groups:

- Group 1: Count One and Count Three (Offense Level 20)

- Group 2: Count Two, Count Four, and Count Five (Offense Level 14)

*See* U.S.S.G. § 3D1.3. When there are multiple groups, "[t]he combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level" as set out in the Guidelines. U.S.S.G. § 3D1.4. Here, Group 1 counts as one unit and Group 2 as ½ unit. *See* U.S.S.G.§ 3D1.4(a)–(b). When there are 1 ½ units, the offense level of the highest group (Group 1 – 20) is increased by one level. *See* U.S.S.G. § 3D1.4.

Accordingly, Oliveras has a total offense level of 21, which, when combined with a criminal history category of I, results in a Guidelines range of 37 to 46 months of imprisonment.

### B.   <u>Upward Departure or Variance</u>

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up). Specific departure statements reflect Commission guidance on what makes a case "atypical" and when departures are "encouraged." *Koon,* 518 U.S. at 94-95.

Following *Brock*, the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply. But that decision does not undercut the severity of Oliveras's crimes. If anything, assaulting officers and the Capitol in an attempt to stop Congress from certifying a presidential election is *far more serious* than interfering with a routine court proceeding. *See Brock*, 2024 WL 875795, at *15 ("[I]nterference with one stage of the electoral college vote-counting process . . . no doubt endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional

24

work[.]"). Although the D.C. Circuit has held that §§ 2J1.2(b)(1)(B) and (b)(2) do not technically apply to the certification of the electoral vote count, that does not prevent this Court from considering how the uniquely horrifying events of January 6 factor into an appropriate sentence. Precisely because the D.C. Circuit held, in *Brock*, that the Sentencing Guidelines do not account for this crucial factor, the Court should depart or vary to impose the government's requested sentence.[8] *See, e.g.*, *United States v. Bender*, 21-cr-508-BAH, ECF 161 at 3 n.1 ("The D.C. Circuit issued an opinion on March 1, 2024 in *United States v. Brock*, No. 23-3045, holding that the sentencing enhancement at U.S.S.G. § 2J1.2(b)(2) does not apply to convictions under 18 U.S.C. § 1512(c)(2) for conduct disrupting Congress's counting and certification of the electoral college votes on January 6, 2021, but that decision does not influence the outcome in this case, since *the Court would have varied upwards by at least three offense levels to account for the significant disruption of a critical and important governmental function as a result of defendants' offense conduct if the specific offense characteristic at U.S.S.G. § 2J1.2(b)(2) did not apply.*") (emphasis added). Indeed, pursuant to *Brock*—which was ultimately a technical dispute over the interpretation of a specific offense characteristic—a person who obstructed justice during a routine court proceeding, causing substantial interference, and even using violence or the threat of such violence, would receive a vastly higher punishment than a person who corruptly intended to stop a proceeding involving the democratic transfer of power inherent to the U.S. Constitution. That alone warrants an upward variance.

    Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the

---

[8] As originally calculated in the PSR, applying the enhancements in U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) here, would result in a total offense level of 25. *See* PSR at ¶¶ 52-68. Accordingly, the Guidelines range would have been 57-71 months' imprisonment. *See* PSR ¶ 112.

Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure. U.S.S.G. § 5K2.0(a)(2)(A). One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[9] A departure under this guideline is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense. *Id*. In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected." *Id*.

Although by its own terms § 5K2.7 "ordinarily" does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021 is the type of unusual circumstance that the Sentencing Commission could not have anticipated and that warrants an upward departure. As the commentary explains, departure under § 5K2.7 is appropriate if the disruption of a governmental function is "substantial," meaning "substantially in excess" of the disruption ordinarily involved in an obstruction offense. *See* § 5K2.0 cmt. 3(B)(ii). Those who obstructed the certification proceedings on January 6 targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy. *See* ECF No. 60. They were part of a mob that injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses.[10] Defendants like

---

[9] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765-66, 771 (D.C. Cir. 2011).

[10] Given the dangerous circumstances created by the riot, the Court could depart under § 5K2.14 in addition to, or as an alternative to, departing under § 5K2.7. Section 5K2.14 provides for a departure if "national security, public health, or safety was significantly endangered." The assault on the Capitol endangered the safety of the public, police, and elected officials in a way not already

Oliveras "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Brock*, 2024 WL 875795, at *15. It was an unprecedented day in American history. Surely few, if any, disruptions of governmental functions have been more "substantial," and it was a disruption far "in excess of . . . that which ordinarily is involved in" an obstruction offense (such as impeding a single judicial proceeding). § 5K2.0(a)(3); *id.* cmt. 3(B)(ii). But following *Brock*, the seriousness of the crimes committed by defendants like Oliveras is not adequately captured by the applicable Guideline, § 2J1.2. This Court has already applied § 5K2.7 in a January 6 case. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").[11]

If the Court decides not to apply § 5K2.7, an upward variance to the government's recommended sentence is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

Here, an upward variance is warranted to account for the unique nature and circumstances

---

captured by Oliveras's guidelines range, so a departure would be appropriate. *Cf. United States v. Calloway*, No. 21-3057, 2024 WL 925790, at *3 (D.C. Cir. Mar. 5, 2024) (affirming departure under § 5K2.14 where district court found that the defendant "created a serious risk that multiple individuals could have been killed or injured").

[11] If the Court does apply a departure, the government requests that the Court also specify that it would have imposed the same sentence as a variance. *See United States v. Brevard*, 18 F.4th 722, 728-29 (D.C. Cir. 2021) (upholding the district court's sentence where the departure was erroneously applied but the district court indicated that it was also imposing the sentence as a variance).

of the offense and to reflect the seriousness of the offense. As discussed throughout this memorandum, Oliveras's obstruction of justice on January 6 was a serious offense that attacked the fundamentals of American democracy. As Judge McFadden stated in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding*. . . . [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87 (emphasis added).

The specific facts and circumstances of Oliveras's case further (discussed in more detail below) support an upward variance to 68 months of incarceration. *See United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a *significant* upward variance would be warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself") (emphasis added); *see also United States v. Bender, et al.*, 21-cr-508 (BAH), Memorandum Opinion (March 6, 2024), ECF 161 at 3 n.1. Accordingly, the government requests that the Court vary upwards and sentence Oliveras to 68 months' imprisonment, in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

## C.    Adjustment for Zero Point Offender

The government agrees with the U.S. Probation Office that Oliveras is not eligible for an adjustment under U.S.S.G. § 4C1.1 (Adjustment for Zero Point Offender), *see* PSR ¶ 67, which

28

provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case because Oliveras used violence against officers on two distinct occasions and made credible threats of violence in connection with his crimes. *See* U.S.S.G. § 4C1.1(a)(3) (providing that the adjustment for zero-point offenders only applies if "the defendant did not use violence or credible threats of violence in connection with the offense"). Oliveras first used violence when he joined the mob and swarmed the MPD Civil Disturbance Unit on the lower west front and forcibly pushed into the police officers. As explained above, Oliveras handed his flagpole to another rioter so he could utilize both hands, leaned forward, and forcibly pushed into the police officers and rioters violently assaulted those officers, injuring several officers. Several hours later, Oliveras again used violence when he forcibly pushed against the line of police officers in the northwest courtyard. As explained above, on this occasion, Oliveras joined the mob in holding a line against police officers as the officers attempted to clear the area. After Oliveras and others refused to move, when police officers stepped forward, a violent clash broke out between the rioters – including Oliveras – and the officers. Several officers fell to the ground and others were struck by rioters with weapons and the rioters' bodies. Each of these distinct instances constitutes violent conduct that renders 4C1.1 inapplicable. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), ECF No. 195 at 4-5 (holding that "violence" is defined as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm" and "the "exertion of any physical force so as to injure or abuse."); *see also United States v. Hernandez*, No. 21-cr-445 (CKK), ECF No. 65 at 5 (same).

29

Oliveras also made credible threats of violence. For example, when inside the Capitol building, Oliveras roamed the halls of the Capitol yelling things like, "WHERE ARE THE FUCKING TRAITORS? DRAG EM OUT BY THEIR FUCKING HAIR! WHERE ARE THE FUCKING TRAITORS?" and "DRAG THE FUCKING TRAITORS OUT!" Oliveras encouraged other rioters to "PUSH!" against police officers as rioters attempted to re-breach the Senate Wing Door. And Oliveras yelled threatening and menacing remarks about the news media members later in the day.

The government is aware of several cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, including: *United States v. Giberson*, 23-cr-115 (CJN); *United States v. Kepley*, 23-cr-162 (BAH); *United States v. Grace*, 21-cr-138 (RBW); *United States v. Bauer*, No. 21-cr-386-2 (TNM); *United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); *United States v. Fonticoba*, 21-cr-638 (TJK); *United States v. Dillard*, 23-cr-49 (JMC).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature And Circumstances Of The Offense

As shown in Section II(B) of this memorandum, Oliveras's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Oliveras directly, repeatedly, and intentionally participated in this riot. He did so because, as his social media posts pre-January 6 show, he believed that the

election was "stolen" and that mob violence against Congress could deliver the presidency to his preferred candidate. *See, e.g.*, Govt Ex. 618 at 81 (agreeing that "most of congress needs to hang"). On January 6, he assaulted police officers attempting to regain control of the Capitol; he entered the Capitol building twice and attempted to enter a third time; he watched and participated in violence against police officers on two separate occasions; he emphatically encouraged rioters to drag lawmakers out of the Capitol building; he cheered as rioters destroyed media equipment; and he continued his social media rampage encouraging violence against elected officials after January 6. The nature and circumstances of Oliveras's offense was of the utmost seriousness, and fully support the government's recommended sentence of 68 months of incarceration.

### B.   The History And Characteristics Of The Defendant

Michael Oliveras is a 51-year-old from New Jersey. As set forth in the PSR, he has few family connections and is not currently employed but has worked as a "lifelong commercial contractor." *See* PSR at ¶¶ 80-81, 96-97. Oliveras dropped out of school in 10th grade and did not obtain a GED. PSR at ¶ 94. His work history is primarily that of a commercial carpenter. PSR at ¶ 76. He is uncertain of the last time he filed personal income taxes with the Internal Revenue Service. PSR at ¶ 104. Nothing in this background supports a downward departure from the Guidelines range.

Concerningly, defendant consistently violated his conditions of release while on pretrial release in this case,. These persistent violations resulted in the probation office finally recommending removal from supervision. *See* ECF No. 47 (enumerating a long list of instances when Oliveras failed to report, failed to provide employment verification, and failed to schedule a home assessment). At the time of the pretrial violations report, Oliveras faced only misdemeanor

charges and thus the Court declined to detain the defendant prior to trial. Minute Order (1/6/23). Oliveras's continued refusal to comply with Court-ordered supervision while on pretrial release supports the Government's recommended sentence.

### C.     The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense And Promote Respect For The Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration. Oliveras's conduct on January 6 was the epitome of disrespect for the law. His conduct since January 6, including his refusal to comply with Court-ordered supervision, further demonstrates that a significant sentence is necessary.

### D.     The Need For The Sentence To Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence for this defendant weighs heavily in favor of a lengthy term of incarceration. Although the defendant has a criminal history category of I, his arrest and conviction in this case, combined with his violations of the conditions of his release, show a clear pattern of unapologetic and unremorseful behavior. Oliveras's social media

---

[12] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

statements prior to January 6 demonstrate that he was prepared for more than attending a rally; he was ready for "war on January 6." He booked a hotel nearby the Capitol so that he could "generate a real time understanding of access to the capitol physically," and he encouraged the public to "descend to DC" to "stand the fuck up and fight." And Oliveras's social media statements after January 6 were those of a man girding for another "war." Oliveras bragged that he went to the Capitol on January 6 because he wanted to "get [his] bare hands on the flesh of those who committed treason" and he would have, "if the opportunity presented itself, grasped and removed one of the traitors." Oliveras also spoke of "conducting new elections" and posted about a "DC Take Down." These statements demonstrate that Oliveras still believes violence is an appropriate solution to his political grievances. Indeed, when he interviewed with the FBI, Oliveras said, "I wouldn't change a thing, I'd do it again." A significant sentence is necessary to deter Oliveras from committing future crimes of violence, especially in future election cycles.

### E.     The Importance Of The Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have

sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[13]

Although all the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[14] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Vincent Gillespie*, 22-CR-60 (BAH), this Court sentenced Gillespie to 68 months of incarceration after being convicted by a jury of, among other things, 18 U.S.C. §§ 111(a) and 231(a)(3). On January 6, 2021, Gillespie participated in the prolonged violence against officers in the Lower West Terrace tunnel. Once Gillespie entered the tunnel, he used a police shield to offensively push his way forward to the police line to get into the Capitol. Once he reached officers, Gillespie pulled at one officer and yanked the officer towards the crowd for at least seven seconds. Gillespie then took hold of a police shield and raised it offensively and banged it on the ground, refusing to back away from the officer line despite commands. Gillespie

---

[13] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[14] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

acknowledge that his goal was to gain entry into the Capitol building. He was inside the tunnel – one of the most violent areas of the riot – for approximately fifteen minutes. While on Capitol grounds, Gillespie gave an interview in which he proclaimed, among other things, "We were very close. We were almost overpowering them." At trial, Gillespie testified in his own defense and made multiple false statements. Like Oliveras, Gillespie did not show remorse for his conduct.

Oliveras also engaged in violent conduct against police officers on two occasions, including on the west front when the MPD CDU maneuvered their way towards the Capitol building and several hours later when he refused to clear the northwest courtyard as officers attempted to corral rioters out of the area. Both instances of collective violence against officers led to several officer injuries and created dangerous situations for the officers on the ground and in the police lines. In both instances, Oliveras intentionally used his positioning and strength to push into the officers. Although Gillespie engaged in violence against officers for a longer continuous period in the tunnel, both of Oliveras's attacks against officers indicated his willingness for violence. And, unlike Gillespie, who tried unsuccessfully to enter the Capitol building, Oliveras entered on two separate occasions and attempted to enter on a third. Finally, Oliveras remained obstructive to officers until long after dusk, much later than most of the other rioters, including Gillespie, and Oliveras remained on Capitol grounds for far longer than Gillespie.

Additionally, although Gillespie gave false testimony under oath at trial and Oliveras did not, Oliveras did plan for violence on January 6. He called for it on social media prior to January 6 and, while on Capitol grounds and in the building, he encouraged rioters to engage in violence by yelling menacing remarks like, "DRAG THEM OUT BY THEIR FUCKING HAIR" as he roamed through the Capitol building; he yelled "HOLD THE LINE" as rioters attempted to prevent

officers from moving through the crowd; he encouraged rioters to "PUSH!" through officers blockading the Senate Wing Doors; and he encouraged violence against the media as he watched rioters destroy media equipment. Oliveras also posted numerous statements before and after January 6 that indicated his intent to stop the Congressional proceeding on that day. Therefore, a comparable sentencing to defendant Gillespie is warranted here.

In *United States v. Isaac Sturgeon*, 21-CR-91 (RCL), following a bench trial, Isaac Sturgeon was found guilty on seven counts, including 18 U.S.C. §§ 1512(c)(2), 231(a)(3), and 111(a)(1). Sturgeon was sentenced to 72 months of incarceration. On January 6, 2021, like Oliveras, Sturgeon joined the mob on the west front of Capitol grounds. While he was near the front of the mob at the base of the inaugural stage, the mob reached its full strength and violently broke through the officer line, forcing officers to retreat. Sturgeon followed officers retreating up the southwest stairs and, when he reached the top of the staircase, confronted a newly formed line of officers standing behind a row of bike racks. Like Oliveras, Sturgeon remained at the front of the mob facing off with officers. After his co-defendant Taylor Johnatakis counted down, Sturgeon forcibly grabbed a bike rack and thrust it against the police line, resulting in injury to at least one officer. Following January 6, Sturgeon deleted evidence off his phone.

Like Oliveras, Sturgeon was involved in a violent confrontation between the mob and police officers. Although Oliveras did not use a weapon, like a bike rack, against officers like Sturgeon, Oliveras used his body to physically resist against and assault police officers as the officers attempted to clear the ground during the northwest courtyard incident. Several officers fell to the ground and were violently attacked during the confrontation that Oliveras engaged in, leading to officer injuries. Additionally, Oliveras was involved in another violent altercation when

he joined the mob and swarmed and forcibly pushed into police officers on the lower west front, which also led to officer injuries. Moreover, unlike Sturgeon, Oliveras entered the Capitol building twice and attempted to enter a third time, made numerous violent threats against members of Congress while inside the building, stayed on Capitol grounds longer than nearly all other rioters, and posted dozens of threatening messages on social media before and after January 6, 2021. Thus, a comparable sentence is warranted here.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Oliveras was

convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[15]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution

---

[15] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Oliveras to pay $2,000 in restitution for his convictions on Counts One through Seven. This amount fairly reflects Oliveras's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 68 months of incarceration, three years of supervised release, $2,000 in restitution, and a $370 mandatory assessment.

Respectfully submitted,

DATED: March 13, 2024                    MATTHEW M. GRAVES
                                         United States Attorney
                                         D.C. Bar No. 481052

                                         By: /s/ Ashley Akers
                                         ASHLEY AKERS
                                         MO Bar No. 69601
                                         Trial Attorney, Detailee
                                         601 D Street NW
                                         Washington, DC 20001
                                         (202) 353-0521
                                         Ashley.Akers@usdoj.gov

                                         VICTORIA A. SHEETS
                                         Assistant United States Attorney
                                         NY Bar No. 5548623