UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| ) | |
| v. ) | Case No. 21-cr-738-BAH |
| ) | |
| **MICHAEL OLIVERAS** ) | |
| ) | |
| ) | |
| **Defendant** ) | |
| ) | |

**DEFENDANT MICHAEL OLIVERAS'S SENTENCING STATEMENT**

William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com
Attorney for Defendant

I.     **Introduction**

Comes now Defendant Michael Oliveras, by and through his undersigned counsel of record, William L. Shipley Esq., and submits to this Court his Sentencing Statement in advance of the Sentencing Hearing on April 18, 2024.

Mr. Oliveras appears for sentencing before this Court after having been found guilty by a jury on Counts One through Seven of the Superseding Indictment.

Mr. Oliveras faces a statutory maximum penalty of up to 20 years imprisonment and a fine of not more than $250,000 on Count Two, 18 U.S.C. Sec. 1512(c)(2), which is the most serious charge for which he was convicted.

II.    **Sentencing Guidelines Calculation**

Mr. Oliveras was convicted at trial of three felony offenses and four misdemeanor offenses.  The guideline calculations for the felony offenses are as follows:

Count 1:  18 U.S.C. Sec. 231: Civil Disorder

U.S.S.G. Sec. 2A2.4

| | |
|---|---|
| Based Offense Level: | 10 |
| Specific Offense Characteristics: | N/A |
| **Adjusted Offense Level:** | **10** |

Video evidence placed Mr. Oliveras at various locations on the Upper West Terrace of the Capitol and/or inside the Capitol building between approximately 2:10 p.m. and 4:25 p.m.  Thereafter video evidence showed Mr. Oliveras still in the area of the East Front of the Capitol building until approximately 6:00 p.m.  Efforts by law enforcement to clear the building and

the grounds of rioters/protesters were ongoing during nearly the entirety of this time.  Mr. Oliveras was directly to leave the building while next to the Senate Wing Door window, but later returned and re-entered the building for a few minutes later in the afternoon.  Video evidence also showed Mr. Oliveras among the crowd at approximately 4:25 p.m., when law enforcement officers moved in formation to push the remaining crowd off the Upper West Terrance and towards the northwest corner exit.

In neither instance – and not at any time while on the Upper West Terrace or the East Side of the Capitol – did Mr. Oliveras physically resist law enforcement's efforts to execute their duties.  At worst it might be claimed that he reluctantly and begrudgingly complied with law enforcement instructions when given directions on what to do.

<u>Count 2:  18 U.S.C. Sec. 1512(c)(2):</u> Obstruction of Official Proceeding

U.S.S.G. Sec. 2J1.2.

| | |
|---|---|
| Base Offense Level: | 14 |
| Specific Offense Characteristics: | N/A |
| **Adjusted Offense Level:** | **14** |

As to this offense, while Mr. Oliveras stands convicted, the evidence presented at trial showed that after reaching the Upper Terrace Level of the Capitol grounds at approximately 2:10 p.m., -- mere feet from the Senate Wing Doors and windows that had been broken by others in the crowd -- Mr. Oliveras lingered outside the building on the Upper West Terrace observing the actions of others in the same location.   After approximately 10 minutes in fell in line with others in the crowd who were slowly moving into the building

through the Senate Wing doors. This extended period of time outside the building but very near an entrance being used by the crowd -- watching others go inside the building through one or more entrances, and not rushing inside himself at the first opportunity -- reflects ambivalence in Mr. Oliveras' then state of mind with respect to the proceedings that were taking place inside the Capitol building.

<u>Count 3:</u>     <u>18 U.S.C. Sec. 111(a)</u>: Assaulting, Resisting, Etc. Federal Law Enforcement

U.S.S.G. Sec. 2A2.4

| | |
|---|---|
| Base Offense Level | 10 |
| Specific Offense Characteristics | N/A |
| **Adjusted Offense Level** | **10** |

The video evidence does not show Mr. Oliveras himself making any deliberate or intentional physical contact with any law enforcement officer that would constitute an "assault." This offense is indexed to both Sec. 2A2.2 and 2A2.4, and the PSR does not provide any basis for application of Sec. 2A2.2 based on the offense conduct. The applicable Guideline is 2A2.4.

<u>Grouping</u>:

The count of conviction with the highest Total Offense Level is Count 2.

At Paragraphs 54 and 55, the PSR groups Counts 1 and 3 (Group One), and Counts 2, 4, and 5 (Group Two). Counts 6 and 7 are "B" misdemeanors, and are not covered by the Sentencing Guidelines so they do not "group" with the others.

Pursuant to Sec. 3D1.4, two levels are added (+1 for Group One and +1 for Group Two).

| | |
|---|---:|
| Group 2 – Adjusted Offense Level | 14 |
| Grouping | +2 |
| **Total Offense Level** | **16** |

Mr. Oliveras has no criminal history points as determined by the United States Probation Officer. As a result, Mr. Oliveras is in Criminal History Category I.

Based on a Total Offense Level of 16, and a Criminal History Category of I, the **advisory Guideline Range is 21-27 months**.

### III. The Offense Conduct.

The PSR is generally accurate, but there are certain episodes of conduct where the evidence at trial is not consistent with the description of the Offense Conduct in the PSR.

Paragraph 28 omits the fact that Mr. Oliveras lingered outside the open Senate Wing Doors for approximately 10 minutes, watching as hundreds of others went into the Capitol through the doors without being impeded by any law enforcement presence.

A smaller number exited the building in the same manner during that time, without being hindered by members of law enforcement who were also observing the events. When he approached the Senate Wing Doors there was a small contingent of Officers standing outside the Parliamentarian's Door (Par. 29), but those Officers were merely observing the crowd and never attempted to intervene.

When Mr. Oliveras reached the Senate Wing Doors and entered the Capitol, there were no law enforcement officers present.

It is not disputed that there were many objective indicators that entry into the building at this location was not authorized – i.e., broken glass from the doors and windows, and the emergency siren going off.  The decision to proceed into the building – with the flow of the crowd – was certainly an exercise of questionable judgment at best.

Mr. Oliveras exited the Capitol at the direction of law enforcement without incident at 2:43 p.m. – approximately 20 minutes after he entered. The PSR accurately reflects that while inside the Capitol Mr. Olivaras did not engage in any destructive conduct nor did he have any physical encounter or confrontation with any member of law enforcement.  He walked around, took videos, and protested loudly along with hundreds of others.

Mr. Oliveras did appear at the doorway, or just inside the doorway of the Senate Wing Doors on two other occasions after his initial exit, but law enforcement officers were present just inside the doorway by this time, and prevented the crowd from getting further inside and walking around the Capitol again.

The events set forth in Par. 36 are irrelevant to the charged offenses, and it is not "relevant conduct" as defined in the Guidelines. The information in that Paragraph should be stricken.

The Court will recall that the video of the events set forth in Par. 35 of the PSR, starting around 4:25 p.m., showed that Mr. Oliveras as not involved in the assault of the Officer who was taken down to the ground as some angles

of video suggested might be the case. Various videos showed that after Mr. Oliveras initially attempted to stand his ground – flag in hand -- as an act of civil disobedience when the police line approached the crowd, once his flag was taken from him by an Officer and he was pushed by a baton, he quickly retreated from his position and within seconds was dozens of feet away, having gone down a set of steps to the landing below the Upper Terrace level. Only a few minutes later he had left the area of the northwest corner of the Capitol altogether and retreated to the East front of the Capitol where there was no clash between the crowd there and officers.

## IV.  Sentencing Factors Under Sec. 3553(a)

Pursuant to 18 U.S.C. § 3553(a), the numerous factors must be taken into account by the Court in formulating an appropriate sentence in this case.

The facts of this case, including the facts of the offense and factual circumstances pertinent to Mr. Oliveras' background and personal characteristics, should inform this Court with respect to the following issues to be considered pursuant to Sec. 3553(a):

> 1.  Nature and circumstances of the offense and the history and <u>personal characteristics of the defendant</u>.
>
>     a.  <u>The Nature and Circumstances of the Offense</u>.

The events of January 6 from a "macro" perspective are not in dispute. As many Judges in this District have observed after studying the events of the day in great detail over the course of hundreds of cases, the crowd at the Capitol that day can be generally categorized as having three primary constituent parts:

1) A relatively small group of individuals who came to the Capitol with the plan and intent to engage in violence for the purpose of disrupting the Congress's certification of the 2020 Electoral Vote.

2) A larger number of individuals who came from a political rally at the Ellipse, and who then traveled to the Capitol in order to protest in a loud and raucous manner as a manifestation of their unhappiness and distrust regarding the outcome of the election -- but with no predetermined intention to engage in violence at the Capitol.  Some in this group were drawn into committing acts of violence once at the Capitol; and

3) An even larger group who remained largely as spectators to what developed into a riot by members of the first two groups.

Mr. Oliveras does not fit easily into any of these three groups, but most accurately can be described as straddling the 2nd and 3rd groups.  Although he has been convicted of three felonies, his actual conduct consisted almost entirely of going to and remaining at locations where he was not allowed to be. At those locations his conduct was more "disruptive" than anything else, without engaging in acts of destruction or assaultive behavior as was the true of many of those around him.  Sec. 111(a) is a statute that defines a broad range of prohibited conduct, stretching from violent assault against the person of law enforcement officers, all the way to conduct that merely "impedes" or "interferes" with officers in the performance of their duties.

The drafters of Sec. 111 created four factual scenarios in which a violation of the statute constitutes a felony rather than a misdemeanor – 1)

physical contact with the victim of the "assault;" 2) intent to commit another felony; 3) use of a dangerous or deadly weapon; and 4) inflicting bodily injury.

The charging language used by the Government includes both the "physical conduct with the victim of the assault" and "intent to commit another felony."

If one were to place on a spectrum the various episodes of conduct violating Sec. 111(a) by the dozens of defendants already convicted of that crime from "least serious" to "most serious," the actions of Mr. Oliveras in pushing against other rioters who themselves were interfering/impeding/ assaulting Metropolitan Police Department Officers attempting to move through the crowd outside the Capitol would fall at the "least serious" end of that spectrum.

The evidence shows no physical contact by Mr. Oliveras with any law enforcement officer, and no dangerous instrument or weapon being used by him.  Mr. Oliveras was carrying a United States flag on a flagpole but the Government did not argue, and there was no evidence offered at trial that Mr. Oliveras ever attempted to use the flag pole in any fashion that would resemble a weapon.  There were no reports of injuries to any of the officers in the 2:00 episode – directly or indirectly -- from the actions of Mr. Oliveras or anyone else in the crowd in connection with the sequence of events.

The evidence did show other incidents of violence directed at Officers later during the day by others in close proximity to Mr. Oliveras at various places and times.  But that evidence did not show Mr. Oliveras' to be involved

in any conduct where Police Officers were injured either directly or indirectly by anything done by Mr. Oliveras.

Mr. Oliveras remained on the Capitol ground for more than three hours after the 2:00 incident involving the officers moving through the crowd. During that time, the video showed him making three separate entrances into the Capitol through the Senate Wing door. When he did gain entrance to the Capitol, he walked around inside with his flag and took videos of himself and the interior of the building. He did not engage in any illegal activity inside the building – other than being unlawfully inside the building.

While Mr. Oliveras' conduct in being on restricted Capitol grounds and inside the Capitol building when it was closed to the public may have been unlawful, his actions on January 6 did not involve any violent conduct engaged in by him with the intent to inflict bodily injury on any law enforcement officer present.

But justice demands that he be punished only for what he did, not for the actions of others nearby over whom he had no control.

      b. <u>History and Personal Characteristics of Mr. Oliveras</u>.

Mr. Oliveras' parents separated at a point when he was too young to actually remember the disruption in his life with any clarity. Ultimately, his mother remarried but that change in his life became very difficult as compared to when she was unmarried. It resulted in a sudden relocation to Oklahoma because his step-father had a son who lived there.

Mr. Oliveras was disconnected from the only life he had known by this move, leaving him lost, sad and confused. The cultural differences between

New Jersey and Oklahoma were overwhelming. While living in Oklahoma, he was subjected to some abuse, both verbal and physical, by his new step-father. The abuse was directed at both him and his mother. This period of his life lasted for more than two years – between ages 13 and 15 – and were extremely difficult for him to navigate.

When he and his mother returned to New Jersey they lived with his grandparents for a short period of time. When his mother told him she was planning to move again, he refused to go with her, dropped out of school, and began working to support himself. At the time he did not consider that his decision to separate himself from his mother would lead to a future where they only had contact at family gatherings such as funerals, or when health problems would land one or the other in a hospital. But that has been the nature of his relationship with his mother since his late teens. This situation was made worse during the time he was married because his ex-wife did not want to have any relationship with his mother or his siblings. This led to long periods of Mr. Oliveras having no contact with any of his immediate family members, a situation that has now lasted for more than two decades.

Mr. Oliveras quit high school as a 16-year-old sophomore. He had no adult male guidance in the form of a father or other family member who he believed cared about him. As a result, he exhibited repeated instances of poor decision-making due to a lack of stability while spending most of his time alone and feeling abandoned.

Mr. Oliveras found some sense of satisfaction and self-worth as he learned the to become a carpenter, a field of work that he continues to this day.

He experimented with various kinds of illegal drugs -- including cocaine -- during his 20s, and regularly used marijuana and consumed alcohol to cope with his unhappiness and loneliness stemming from his upbringing.

He became a father at 28 years old and for the first time in many years believed it presented him a chance to find happiness and break out of the cycle of depression he had endured since his teenage years. He saw it as an opportunity to give to his children a loving and nurturing environment that he lacked growing up, providing them with a stable emotional foundation to find happiness in their lives.

Even though he was determined to succeed in what was the most important part of his life, his marriage began to fail over time and ultimately resulted in an amicable permanent separation in 2018 when his children were 17 and 12 years old.  He still regards his greatest accomplishment in life as the nearly two decades he and his ex-wife spent dedicated to providing stability in the lives of their children.  But he has allowed himself to drift away from them – now 22 and 17 -- in the time since the events of January 6 in order to shield them from the consequences of his actions.

Since the separation from his wife, Mr. Oliveras has led a relatively solitary life, residing in a one-bedroom and one-bathroom apartment in Lindenwold, New Jersey.  His hobbies are freshwater fishing and playing golf.

The solitary nature of his post-marital life led him to increased interaction on social media, as well as doing more reading on the internet.  In addition to politics, he learned more about lifestyle issues such as nutrition

and the outdoor environment. Out of necessity, he has also developed an appreciation of and enjoyment from cooking.

But an abundance of hours alone in his apartment led Mr. Oliveras to a variety of news sources in 2020 regarding COVID, the civil unrest following the death of George Floyd, the Presidential campaign, and during and after the November Presidential election.  It is no mystery to this Court that the selection of which new sources to consume in the aftermath of the Nov. 2020 election often played a dominant role in shaping the consumer's views concerning the integrity of the election processes in various states across the country, and a concomitant view with regard to one's faith in the accuracy of the election outcome that resulted.

This point of view led tens of thousands of Americans just like Mr. Oliveras to come to the Capitol on November 14, December 12, and January 6 to express their unhappiness and frustration with both the political and legal processes.  Tens of thousands attended rallies and marched in the streets in protest of what they <u>believed</u> – based on what they had read and been told – was an inaccurately reported election result.

Those are time-honored traditions in this city/district and this country.

As is the kind of extreme rhetoric that Mr. Oliveras engaged in as reflected in the Presentence Report – political speech protected by the First Amendment.  His words were repugnant and condemnable, but they should play no role in determining his sentence.  We do not punish speech we disagree with no matter how much some percentage of the population of this country finds the speech to be offensive or contrary to this country's ideals.  The offense

to which Mr. Oliveras has admitted his guilt is not dependent in any way on his comments or thinking at the time of his conduct. His words reflected the point of view he had developed as a news consumer over many weeks and were an expression of his frustrations based on what he had come to believe about the outcome of the election. But he was not alone.

> 2. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other <u>correctional treatment in the most effective manner</u>.

The nature and totality of Mr. Oliveras' conduct throughout the day on January 6 is – relative to others convicted of the same 3 felonies – generally benign. His biggest "offense" was that he did not leave – he was inside and around the Capitol for approximately five hours while law enforcement was attempting to secure the building and grounds. The fact that his adjusted offense level is only 16 reflects that very reality.

Given that he has no criminal history score, the <u>starting point</u> for identifying the sentence that reflects the seriousness of the offense and promotes respect for the law – and law enforcement officers – is to be found at the bottom of the recommended guideline range – 21 months. There is no conduct in aggravation on his part with regard to either the offense conduct or other relevant conduct.

DEFENDANT'S SENTENCING RECOMMENDATION

Michael Oliveras came to Washington D.C. alone on January 5 not to engage in violence for the purpose of overturning an election result he

disputed. He came to protest, and while engaged in that protest with thousands of like-minded individuals he succumbed to a mob mentality. But even in those moments, his conduct was almost entirely actions that could be most accurately characterized as impeding -- by not cooperating with -- the efforts of the U.S. Capitol Police and Metropolitan Police Officers to control the Capitol building and the Capitol Grounds.

The bottom of the guideline range for such conduct should be the starting point for this Court's consideration of an appropriate sentence. From there the Court should take into consideration the mitigating factors of Mr. Oliveras' difficult upbringing leading him to be susceptible to periods of isolation – often self-imposed – causing him to be an over-consumer of news sources that reinforced his existing point of view doubting the validity of the reported outcome of the Nov. 2020 election.

Mr. Oliveras has never shown himself to be a threat to the community in which he has lived nearly his entire life. A lengthy period of incarceration – relative to others whose conduct was similar – is not warranted by considerations of safety or the need to punish for either special or general deterrence purposes.

Based on a totality of factors, a sentence of 12 months and one day is a fair and just sentence that takes into account an accurate reflection of the limited nature of Mr. Oliveras's actions on January 6 beyond his simple failure to leave and go home to New Jersey.

Date: April 8, 2024                                  Respectfully Submitted,

<u>/s/ William L. Shipley</u>
William L. Shipley
PO Box 745
Kailua, Hawaii 96734
Tel: (808) 228-1341
Email: 808Shipleylaw@gmail.com

*Attorney for Defendant*
