UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Criminal Action |
| | ) No. 21-738 |
| vs. | ) |
| | ) |
| MICHAEL OLIVERAS, | ) November 16, 2023 |
| | ) 10:08 a.m. |
| Defendant. | ) Washington, D.C. |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF TRIAL**
**BEFORE THE HONORABLE BERYL A. HOWELL**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

**APPEARANCES:**

FOR THE UNITED STATES:

ASHLEY AKERS
DOJ-CIV
1100 L Street Northwest
Washington, DC 20530
(202) 353-0521
Email: ashley.akers@usdoj.gov

VICTORIA ANNE SHEETS
U.S. Attorney's Office
for the District of Columbia
601 D St NW
Washington, DC  20004
(202) 252-7811
Email: victoria.sheets@usdoj.gov

FOR THE DEFENDANT:

WILLIAM L. SHIPLEY, JR.
PO BOX 745
Kailua, HI 96734
(808) 228-1341
Email: 808Shipleylaw@gmail.com

ALSO PRESENT:        Lauren Laielli, FBI Task Force Officer
                     Rachel Marcelin, Paralegal Specialist

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                     Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

## P R O C E E D I N G S

THE COURTROOM DEPUTY:  Your Honor, this is
Criminal Case 21-738, United States of America versus
Michael Oliveras.

Will the parties please come forward to the
lectern, identify yourselves for the record.  We'll start
with government counsel first this morning.

MS. AKERS:  Good morning, Your Honor.
Ashley Akers on behalf of the United States.  With me is my
co-counsel Victoria Sheets, our FBI Task Force Officer
Lauren Laielli, and our paralegal specialist Rachel
Marcelin.

THE COURT:  Good morning.

MR. SHIPLEY:  Good morning, Your Honor.
William Shipley on behalf of the defendant, Michael
Oliveras, who is present in the courtroom.

THE COURT:  All right.  Let's just begin, first
off, with the proposed addition to the jury instruction for
Count 3 that Mr. Shipley raised on behalf of the defendant
yesterday.

Mr. Shipley, is there anything you want to add to
your arguments on that?

MR. SHIPLEY:  No, Your Honor.

THE COURT:  Does the government want to respond
now that you have had an evening to think about their

proposed instruction addition?

        MS. AKERS:  Nothing much, Your Honor, other than we continue to object to it.  We think that the case that Mr. Shipley cited is dicta; it was, in fact, a case that was heard before that amendment to 18 U.S.C. 111, which Your Honor noted yesterday.  So we would object to the inclusion of it.  We think Your Honor's instructions accurately recite the law.

        THE COURT:  All right.  I am just going to detail -- having now had an opportunity to read the *Duran* case, I am just going to detail my understanding of the proposed addition to Count 3 -- the Count 3 instruction, and my reasons for rejecting it.

        At the charging conference yesterday, on November 15th, defendant proposed an additional instruction for Count 3, assaulting, resisting, or impeding officers beyond what the parties had agreed to and proposed in the joint pretrial statement.

        Specifically, the defendant has proposed that in addition to the, I think, five elements already required for the government to prove violation of 18 U.S.C. Section 111 that -- including that the conduct be done forcibly, that the defendant's conduct be voluntary and intentional, the defendant proposes that the government also be required to prove beyond a reasonable doubt that the charged conduct of

assaulting, resisting, opposing, impeding, intimidating, or interfering with officers was committed with the intent to commit bodily injury.

Do I have that right, Mr. Shipley?

MR. SHIPLEY:  Yes, Your Honor.

THE COURT:  So defendant believes that *U.S. v. Duran*, 96 F.3d 1495, a D.C. Circuit case from 1996, requires the additional proposed instruction.  I reject this belated proposed additional element to the instruction to Count 3 for several reasons.

In *Duran*, the D.C. Circuit interpreted the version of 18 U.S.C. Section 111 in place in 1996 in the context of the defendant's offense conduct of shooting at Secret Service agents outside the White House.  Ultimately, the Circuit affirmed the defendant's conviction under 18 U.S.C. Section 111 for forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with four Secret Service agents who were in the line or in the general location of where the defendant was firing his weapon because of the use of a dangerous weapon that the purpose of causing the agents to fear imminent, serious bodily injury.

To reach this conclusion, the D.C. Circuit consulted and essentially imported the Model Penal Code's definition of "assault" to establish the mens rea requirement under Section 111 in order to distinguish

between the "simple assault" offense conduct that triggers only misdemeanor penalties versus this nonsimple assault offense conduct that triggers the felony penalties.

The statute, to put it bluntly, has a slightly awkward penalty structure, and the Circuit turned to the Model Penal Code to help clarify the difference in mental state requirements for a simple assault and aggravated assault under Section 111.

As I read *Duran*, the Circuit was clearly focused only on the "assault" element of Section 111, given that the facts of the case involve shootings with a deadly weapon towards Secret Service officers who didn't suffer any bodily injury.

At the same time that the Circuit looked to the Model Penal Code mens rea requirements, the *Duran* court itself acknowledged this was not really a good fit and that the Model Penal Code cannot comfortably be squared with the overall federal statute, even as it existed in 1996 in Section 111. As the Circuit explains, Section 111 actually reflects, and I quote: "A legislative intent to diverge from the common law definition in regard to the significance of the use of a deadly weapon or dangerous weapon in setting the level of the assault." This was because the Model Penal Code assault definition could only be matched up with the specific intent requirement, whereas the statute did not

require that.

The court was not obviously focused on the other terms present in Section 111 and, thus, *Duran* does not support reading an additional mens rea requirement into those various other terms other than "assault."

*Duran* was only briefly mentioned again by the D.C. Circuit in a footnote in *U.S. v. Arrington*, 309 F.3d 40, jump cite 46, number 11, a D.C. Circuit case from 2002, where the D.C. Circuit notes that the statement, quote: "The act of using a deadly weapon with the purpose of causing Secret Service agents to fear imminent serious bodily injury constituted a crime punishable by 10 years imprisonment under Section 111."

It goes on to say that this was not intended to describe a generally applicable element of the Section 111(b) offense but rather to summarize the evidence against the defendant Duran.

So in this footnote that the Circuit did in 2002 seemingly was to cabin its analysis in *Duran* to the facts of that case where there was no evidence that the defendant assaulted those Secret Service agents by attempting to cause them bodily injury. I think the defense in the *Duran* case was a death wish. I think the defendant was claiming an insanity defense, and that took up most of the *Duran* opinion; and there was certainly some implication in the

*Duran* opinion that this was a defendant who wanted to be murdered by cop.  So rather than hurting the Secret Service agents, he wanted to provoke the Secret Services agents to injure the defendant.

So it's clear that, I think -- it's made clear by the Circuit in *Arrington*, which was cabined in the *Duran* analysis, that the evidence against Duran constituted a different category of assault, attempting to put officers in fear of imminent serious bodily injury, and certainly wasn't intended to describe an additional element requirement applicable to all of the different conduct covered by Section 111.

I know that *Duran* has been criticized by the Second Circuit in *U.S. v. Chestaro*, 197 F.3d 600, a Second Circuit case from 1999, where the Second Circuit noted that *Duran* incorrectly, in our view, under the Model Penal Code to define "simple assault" in Section 111 as including conduct that results in bodily injury.

And so I think that *Duran* hasn't had strong legs either in this Circuit or in other circuits.

A proposed instruction similar to the one the defendant raises here has been considered and rejected by other judges on this court.  As Mr. Shipley mentioned yesterday, he thought that Judge McFadden and Judge Friedrich had rejected a similar kind of proposed

instruction.  And I did check with both of them last night and, Mr. Shipley, you were right on that.

Judge McFadden made clear in *U.S. v. McCaughey*, 21-CR-40, in which the government also charged 111(a) and (b), but the requirement of causing serious bodily injury is only included in the statute in Section 111(b), which hasn't been charged here in this case; see the transcript on July 20th, 2023, at page 32 of that hearing.

Based on the Court's research, it doesn't appear that the D.C. Circuit has ever indicated that the Model Penal Code mens rea requirement that it read into the assault component of Section 111 in *Duran* should be applied to any of the other terms in the statute, as the defendant now urges here.

That's also what Judge McFadden indicated in *McCaughey* at a September 13th, 2022, hearing, where he said that the attempt or threat to inflict injury upon someone else applies only to the assault term in Section 111 and not to the terms:  Resist, oppose, impede, intimidate, and interfere which carry their ordinary meaning.

In that case, Judge McFadden found that the rioters forming a barrier to prevent the officers from pushing the crowd out of the tunnel qualified as resisting, opposing, impeding, and interfering under Section 111, and also rejected the defendant's argument that he did not know

that by pushing along with other rioters he was impeding and interfering with officers at the front line of the rioters.

I think, as I mentioned yesterday, *Duran* -- you know, I have a serious question whether the *Duran* holding still holds, in part, because *Duran* hasn't been considered by the Circuit since 1996; and there were significant amendments to 18 U.S.C. 111 in 2002, 2008, and in 2021 that involved both substantive and penalty changes in the statute.

So the *Duran* holding very helpfully repeated the specific statutory texts that the Circuit was considering, and it's very different from the statute that faces us today.

Finally, I find that the instruction that the parties jointly proposed accurately reflects the statute. 18 U.S.C. Section 111 requires the government to prove that the defendant forcibly assaulted, resisted, impeded, intimidated, or interfered with an officer or employee of the United States. And the use of the disjunctive "or" makes clear that the conduct may take various forms that differ from assault.

The defendant's proposed instruction doesn't track the statutory language. As I was mentioning yesterday, the statutory text seems pretty clear and, to my mind, would likely to confuse the jury. It also seems to suggest that

assault, resistance, impedence, intimidation, or
interference all require an apparent ability or an actual
injury or threatening act that easily would create in
another person a fear of immediate injury, but that isn't
true.  For instance, a person who uses force to hold a
police officer back from pursuing a suspect forcibly impedes
the officer, even though it might not injure or have the
apparent ability to injure her; see *U.S. v. Frizzi*, 491
F.2d. 1231, 1232, a First Circuit case from 1974, finding
that spitting on a mail carrier falls within Section 111.
See also *U.S. v. Sommerstedt*, 752 F.2d 1494, jump cite 1496,
Ninth Circuit from 1985, finding that shoving a prosecutor
in a courthouse hallway qualifies as a variation of Section
111.

So for all of these reasons in the statutory text,
changes in the statutes since *Duran*, the actual limited, I
think, holding of *Duran*, I reject the defendant's proposed
addition to the instruction to Count 3.

All right.  Now are we ready to bring the jury in?

For the government?

MS. AKERS:  Yes, Your Honor.

THE COURT:  Mr. Shipley?

MR. SHIPLEY:  Yes, Your Honor.

THE COURT:  All right.  So let's bring the jury in.

Mr. Shipley, I think you formally rested on the

record.

MR. SHIPLEY:  If the record is unclear, the defendant chooses to present no defense.

THE COURT:  All right.  And the government -- just so the record is clear, the government has no rebuttal case and is ready to proceed with summation?

MS. AKERS:  That is correct.

THE COURT:  All right.

(Whereupon, the jury returns to the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  I realized after I excused you yesterday that I actually had another matter on this morning, which is the reason we had a slight delay this morning because I have a number of other cases as well that require my attention.

We're now ready to proceed to summations in this case.  The way this goes is the government gives its summation, then the defendant can make their closing argument -- make closing arguments to you, then the government has an opportunity to make a rebuttal summation, and then I give you your final instructions so that you can begin your deliberations.  So that's what we're doing today.

Is the government ready to proceed with summation?

MS. AKERS:  Yes, Your Honor.

THE COURT:  Okay.

MS. AKERS:  Can you all see the screen in front of

you?

THE JURORS:  Yes.

(Whereupon, an exhibit was published.)

MS. AKERS:  Members of the jury, to the defendant, Michael Oliveras, the members of Congress were traitors. They were traitors because they were set to certify the results of the 2020 presidential election.

To Michael Oliveras, police officers were traitors.  They were traitors because they were guarding and protecting the United States Capitol Building and the people inside of it on January 6th.  And to the defendant, Michael Oliveras, members of the media were traitors.  They were traitors because they reported on the results of a presidential election that he didn't agree with.

Michael Oliveras did everything he could on January 6, 2021, to stop the traitors, to stop the certification of the Electoral College vote.  And he stopped at nothing.  Barriers, like bike racks, did not matter to Michael Oliveras.  Police officers in lines did not matter to Michael Oliveras.  The chaos, the melee, the sirens, the broken glass -- none of it mattered to Michael Oliveras; not even police officer commands to "move back," to get out, because he had a plan.

The evidence presented at this trial showed that his plan started in December of 2020.  He planned to come to

the Capitol to stop the certification.  You heard -- you saw a text message or Parler messages that showed that he booked a hotel close to the Capitol so that he could have realtime access.  He rented a car to travel here.  He corresponded with others and encouraged them to come.  He was, quote, American flag emoji, "ready for war."

For his actions on January 6, 2021, Michael Oliveras has been charged with seven counts.

Today, this morning, I am going to go through these counts with you and the elements of each count and summarize the evidence that you heard at trial that shows that the government has proven each and every count beyond a reasonable doubt.

As Judge Howell has already instructed you, my words are not evidence, Mr. Shipley's words are not evidence.  The evidence is the evidence.  In this case, you saw a lot of video footage, you saw a lot of Parler posts, you saw photos, and you heard from several witnesses; that's the evidence that will prove beyond a reasonable doubt all of these counts.

I am going to start with Count 1, which is civil disorder.

To find Michael Oliveras guilty of civil disorder, there are three elements.

I encourage the members of the jury to keep the

stipulations in mind as we go through each of these counts because the parties have stipulated to things that will help you during your deliberations.

For example, the parties have stipulated, in Government Exhibit 1, that what happened on January 6, 2021, was a civil disorder. As Judge Howell instructed you: When the parties stipulate to something, you should take that to be fact; take it to be true. There was a civil disorder on January 6, 2021.

The first element that the government must prove is that the defendant knowingly committed an act with the intended purpose of obstructing, impeding, or interfering with law enforcement officers.

You will get all of these instructions when you return to the jury room, so you don't need to write it verbatim.

The evidence that you heard in this trial overwhelmingly shows that the defendant obstructed, impeded, and interfered with law enforcement officers. You heard testimony and you saw video of Mr. Oliveras on the west front. He was pushing into a unit of police officers that was swarmed by rioters.

You saw, in Government Exhibit 503, rioters throwing objects at the police officers. One officer got hit in the head with a big speaker and fell over. The

defendant was part of the group that swarmed that line of officers, that unit of officers.  He handed his flagpole to another rioter.  He bent over, he pushed, and he yelled at the police -- or excuse me, he yelled to the fellow rioters to "hold the fucking line."

And he didn't stop there.  Later in the day, as you saw on the upper northwest terrace, he was again confronted by police officer commands to leave, to "move back," to get out.  And again, he obstructed and he interfered with the police officers.  He refused to move. He stood brazenly at the front of the line of rioters, looked the officers in the eye, and refused to comply with their commands.

He also berated the officers.  And as you saw, this was in the midst of the civil disorder, this was in the midst of the chaos.  This was when the officers were trying to get to the line to support their other officers, and they couldn't because people like Michael Oliveras stood on the ledge and -- rather than letting the officers -- screamed; he pointed at them and yelled "fuck you."

You heard United States Capitol Police Officer Amendola testify that the defendant also obstructed their efforts at the Senate wing door.  You saw a lot of video of that Senate wing door because the defendant was there for a long time.  He was yelling things like "push."  He was

yelling things like "fight for Trump," "this is our house."

All of these actions throughout the course of the day show that the defendant meets the first element of disorder -- excuse me, the evidence meets the first element of civil disorder.

Second, to find the defendant guilty of civil disorder:  At the time of the defendant's act, law enforcement officers have to be engaged in the lawful performance of their official duties incident to and during a civil disorder.  We already know there was a civil disorder.  And for this element, the parties again have stipulated to the element.

So if you review Government Exhibit No. 1, you will see that the parties have agreed that the law enforcement officers were engaged in their official duties during a civil disorder.  That element is met.

The third element is that the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function.  That element is also agreed to by stipulation.  You will see Government Exhibit 1, and the parties have agreed that that element is met.

So when you return to the jury room to deliberate and render your verdict, you can rely on the stipulations

for the third element.

Now, there is another path that you can find the defendant guilty of civil disorder, and that's if he attempted civil disorder. This is not a separate charge, it's the same charge; it's just a different way to get there. Either he did engage in a civil disorder or he attempted to.

And the jury instructions will instruct you that to find Mr. Oliveras guilty of attempt, he has to have intended to commit the crime of civil disorder and he has to have taken a substantial step toward committing a civil disorder. And he did, for all of the reasons that I just went through during the civil disorder presentation. He pushed the officers forcibly, he yelled at the officers, he swarmed the officers, he refused the officers' commands and demands. Mr. Oliveras is guilty of civil disorder.

Now, on the verdict form you will not only see this line, but you'll also see two other lines. And these two other lines that you have to render a determination on are the two things that I told you the parties already agreed to by stipulation: One, that the civil disorder affected commerce or the movement of any article or commodity in commerce; that's in a stipulation; and, two, that the civil disorder affected the conduct or performance of a federally protected function. So those are met.

On to Count 2, obstruction of an official proceeding. To find the defendant guilty of an obstruction of an official proceeding there are four elements. The first is that the defendant attempted to or did obstruct or impede an official proceeding. The evidence you heard at trial established there was, in fact, an official proceeding.

You saw the montage video that was a summary of the proceedings that were going on on January 6th; and you will also see in the stipulations, Government Exhibit 1, that the parties have agreed that the official proceeding was ongoing on January 6.

So whether the defendant attempted to or did obstruct or impede an official proceeding, you will have to consider whether he blocked, interfered with, or slowed the progress of the official proceeding; and we know that he and the mob that he joined did.

You have heard testimony and you saw evidence presented that there was an official proceeding going on in Congress. You also heard evidence that the mob overtook the Capitol Building and grounds. Captain Tia summers described to you -- and she was near the Capitol Building and watching it in realtime -- what was going on. She described to you how the mob of rioters came on the west front and quickly overtook the police lines and made it into the building, and

created an emergency situation for the members of Congress
and the officers protecting them.

You also heard from United States Secret Service
Inspector Lanelle Hawa, circled there in the CCTV footage
(indicating).  She told you on the stand that this was the
moment when she was about to evacuate the Vice President of
the United States out of Congress and his office near the
Senate because of the security breach, because his safety
was at risk; and it was because of the mob.

You saw on the montage video and you heard
testimony from Captain Summers and Lanelle Hawa that there
was a recess because of the mob.

Members of the jury, that meets the first element
of obstruction of an official proceeding.  The defendant did
stop the certification.

Second, the defendant has to have intended to
obstruct or impede the proceeding.

The evidence here, members of the jury, was
overwhelming.  It started all the way back in November of
2020 when you saw the defendant started going to Stop the
Steal rallies, started his rhetoric of having to take the
country back.  He believed, as you heard, that the election
was stolen; and he was bound to stop that from happening.

You heard TFO Laielli describe to you the pattern
of the defendant's rhetoric about stopping the certification

and stopping Congress and stopping the traitors.  So it started in November of 2020, and it continued.

You saw Parler posts where he started in December talking about coming to Washington, D.C.  You saw posts where he was quoting January 6th and saying:  Who will be in D.C.?  He wanted as many people there as possible.

You saw Parler posts that indicated that he thought nothing could stop what is coming.  He knew what was coming, he was planning for it.  He was intending to stop Congress.

You also saw evidence that he knew what January 6th was.  He knew Congress was certifying the results of the election on that date.

(Whereupon, an exhibit was published.)

MS. AKERS:  For example, you saw this Parler post where another user was saying:  Hashtag do not certify on January 6, and describing the process.

And the defendant responded.  He said that he would be there.  He was booked.  All the way back in December of 2020.  He was ready to ensure that Congress was stopped, that was his intention.

But it's not only his words that you learned about in trial, it is also his actions that are indicative of his intent.

You saw evidence presented at trial that as soon

as Michael Oliveras got to the Capitol grounds at 1 p.m., in
that first wave of rioters, he was intent on the Capitol
Building.  He was pointing at the Capitol Building.  He was
looking to it.  He was directing to it.  He was pushing
through officers to get to the Capitol Building.  His eyes
were on that prize.  He did everything he could because he
intended to stop Congress.

And his intent can also be shown by the number of
times he went in the building.  Three separate times Michael
Oliveras went into the Senate wing door.  He was stopped by
police officers the second two times so he didn't make it
very deep.  But we know the first time he made it all the
way into the Crypt, which you learned was the center of the
Capitol Building.

And then after January 6th you also learned of his
intent back on January 6.  He said, for example, that he
entered for the purpose of extracting traitors, which you
learned was the members of Congress.

Members of the jury, Michael Oliveras intended to
stop Congress on January 6th.

The next element of obstruction of an official
proceeding is whether he acted "knowingly" with the
awareness that the natural and probable effect of his
conduct would be to obstruct the proceeding.  This is one of
those elements that is a little bit of common sentence.  Of

course the result would be an obstruction of Congress when
you join a member of a mob and you storm the Capitol
Building.

Then you also have his words. You have his words,
for example, in December of 2020 when he was saying that:
It would be very effective, indeed, if there were a Capitol
full of patriots who had had enough and decided to rip them
out of their chairs by their hair and drag them down the
steps.

He knew that would be effective, that's why he
planned for it.

You saw evidence and you heard testimony that
Michael Oliveras knew the proceeding was happening on
January 6. He wanted his preferred candidate to remain in
office. He prepared for violence. He planned ahead of
time. He joined that initial surge of rioters. He entered
three times, and he stayed five hours on Capitol grounds.
He acted knowingly.

And finally, to find the defendant guilty of
obstruction of an official proceeding you, the members of
the jury, must find that he acted corruptly. The jury
instructions that you receive will tell you that "corruptly"
means that Michael Oliveras had to have had an unlawful
means, an unlawful purpose, or both. He had to have
consciousness of wrongdoing. In other words, he has to know

what he's doing is wrong and unlawful.  And the evidence

that you heard presented at this trial overwhelmingly meets

the elements that he had this corrupt intent.

Why else, ladies and gentlemen of the jury, would

Michael Oliveras forcefully swarm a unit of police officers

and push into them?  That's what "unlawful" means.

Why else would he enter the Capitol Building three

times trespassing?  Unlawful means.

Why else would he incite and try to rally up the

crowd at the Senate wing door as they were trying to push

through the officers?  Unlawful means.

Why else would he stand in front of a line of

officers and refuse to move -- standing, holding this flag,

when they were telling him to get out?  Unlawful means.

He also had unlawful purpose.  You can see this in

his Parler posts.

(Whereupon, an exhibit was published.)

MS. AKERS:  For example, here.  He said:  Did we

want to get our bare hands on the flesh of those who

committed treason?  Yes.

The purpose in his mind was unlawful.  It was

corrupt.

He said other things too.

(Whereupon, an exhibit was published.)

MS. AKERS:  For example, when another Parler user

said before January 6th that the people planning to go should block the tunnels out of the Capitol, out of -- and, slash, Congress, Michael Oliveras responded that he booked a hotel close to the Capitol to gain:  Real time understanding of access to the Capitol building.  Unlawful purpose, ladies and gentlemen.

He continued it.  He said that he was at the fight -- at the title fight for the most coveted prize on earth.  Unlawful purpose.

And you heard it again when you watched the video evidence.  You heard him yell things like:  "Everything around here changes from this day fucking forward!"  And he said that after the altercation on the northwest plaza, after he had already been pushed north.  He still had unlawful purpose.  He still had not given up.

You saw it too when he was at the Senate wing door when he was yelling, "Let's go.  We want those fucking traitors," in the face of police officers who were doing everything they could to protect the members of Congress.

And then you saw it again at the end of his day when he made it to the east side of the Capitol Building, when he again was calling out the traitors, when he was watching the destruction of media property, and when he was refusing to leave the Capitol grounds.

We know that Michael Oliveras had the

consciousness of wrongdoing.  He knew what he was doing was wrong based on everything he saw and joined on January 6th. He was in the initial breach of the Capitol.  And you saw that time lapse, it went very fast; and you saw the swarms and the masses of people who occupied the Capitol.  He was at the front.  He was there first, and he stayed until the end.

You saw that he was there when police officers turned and started running to the building because they were being overtaken.  This is the group of rioters, the defendant included, who was coming en masse towards the Capitol Building.  They very quickly progressed up to the bike racks, and you saw them tear the bike racks in front of the officers.

As soon as the bike racks were gone, they proceeded forward; and you saw them start to confront the officers themselves.  They started to engage physically with the officers, and what you saw was the defendant took a step up on the ledge and watched it all.

He had signs all along the way from there that what he -- what he was doing was wrong.  He knew what he was doing was wrong.  He had consciousness of wrongdoing.  You saw, for example, him climbing a bike rack to gain access to the stairwell.  Most of the time you visit a government building, you don't have to do things like this (indicating)

to enter -- lawfully, that is.

You saw him directing rioters coming up that same northwest staircase to gain access to the upper terrace near the doors. You saw him start to enter the doors; and there were police officers in his direct line of vision, he knew he wasn't supposed to be there.

You heard from Officer Amendola that the sirens were blaring the entire time he was at the Senate wing door. The glass was on the floor. You saw that the glass was shattered from the doors, the windows. You saw rioters climbing in through the windows.

The defendant saw people swarming police officers on the upper west terrace and yelling "traitors" at them; assaulting them before his very eyes. He knew he shouldn't have been there. He knew he shouldn't have been part of the mob, but he kept going. He kept going all the way until the evening when he was finally cleared out.

You also finally heard from TFO Laielli who explained to you that she interviewed Mr. Oliveras after he was arrested. He told her that he knew what he did was wrong. He had consciousness of wrongdoing.

All of the things that he saw, that he experienced, that he did, the mob that he joined, and the actions that he took all demonstrate that Michael Oliveras had corrupt intent to stop Congress.

And like the civil disorder charge, ladies and gentlemen, there are several ways you can get to a guilty verdict for this count. You can find that, as a principal actor, Michael Oliveras intended to and did stop the certification. And the evidence supports that.

You can also find that he attempted to stop the certification of the Electoral College votes. Same instructions as for civil disorder, he has to have intended to do it and he has to have taken a substantial step towards doing it.

Now, all of the evidence that I have just summarized constitutes "substantial steps." Many of them, in fact.

And the third way -- or excuse me.

"Substantial steps," for example, include his intent here to grasp and remove traitors.

The third way that you can find Mr. Oliveras guilty of obstruction of an official proceeding is by aiding and abetting. This, too, is not a separate charge. It's the same charge, just a different way to find him guilty.

You will receive in your jury instructions the elements for "aiding and abetting." And you will see that if others were committing this charge, this count, obstruction of an official proceeding -- and he was aware, performed an act in furtherance of it, that he also can be

found guilty of obstruction through aiding and abetting.

So members of the jury, whichever way you do it, Michael Oliveras is guilty of obstruction of an official proceeding.  The evidence overwhelmingly demonstrates that.

Next, he was charged with:  Assaulting, resisting opposing, impeding, intimidating, or interfering with certain officers.

For this charge there are five separate elements. The first is that he had to have:  Assaulted, resisted, opposed, impeded, intimidated, or interfered with officers. And the key for you here is the word "or."  He does not have to have done all six of those verbs, one is sufficient.

But as the evidence showed at trial, he is guilty on all of these verbs.  Michael Oliveras was part of a mob that stood off with police officers and eventually engaged in a brawl.  And he was at the front of the line of rioters for a minute and 45 seconds.

You saw several times on the CCTV footage him standing at the front.  You heard the officers' commands to "move back," to "move back."  And Michael Oliveras stood proudly with his flag in the air and refused to move.  He resisted, he impeded, he opposed.  He did not comply with the officers' commands.

(Whereupon, an exhibit was published.)

MS. AKERS:  You saw him on several different

body-worn camera footage.  You saw him at the very front of
the officer line.  And as the seconds went on, you saw him
take a step forward, towards the officer line.  You saw his
head peep through the other rioters.  And by this point,
this officer's body-worn camera -- the officers are almost
passed him because the officers had collectively stepped
forward, but he refused to step back.

        (Whereupon, an exhibit was published.)

        MS. AKERS:  Then you saw the body-worn camera
footage that fell to the ground and helpfully showed what
former Officer Wickham testified was a police officer here
(indicating).  And then, a second later, you see Michael
Oliveras stepping forward with his arms out pushing.

        (Whereupon, an exhibit was published.)

        MS. AKERS:  You see it from here, too
(indicating).  You see his arm in the air.  You can actually
see the white space below his arm.

        (Whereupon, an exhibit was published.)

        MS. AKERS:  You saw this footage, which is an
officer falling to the ground because of the result of the
violent brawl that happened because Michael Oliveras and
others refused to move back.  And he was right there
(indicating).  He was in the mix.  He was the tip of the
spear of rioters.

        After the rioters on the upper terrace refused to

move, you heard testimony that the lower terrace officers took a step forward; and that broke their line.  You heard testimony from Corporal Heaney and former Officer Wickham that when one part of the line moves forward and the other doesn't, that creates risk for officers.  It creates threats of injury because now the rioters can infiltrate the line. That's what happened, and an officer got pulled to the ground.

You heard testimony from Corporal Heaney that is the most dangerous situation for a police officer to be in, laying on the ground, helpless, in a mob.  And that's what happened.  The defendant afoot, next to him.

To find the defendant guilty of Count 3, you also need to find that he acted forcibly.  And your jury instructions will tell you that a person acts forcibly if he uses force, attempts to use force, or threatens to use force against the officer.  But physical force or contact, although sufficient, actual contact is not actually required.

Your jury instructions will tell you that:  If a person has the present ability to inflict bodily harm on another, and that -- and who threatens or attempts to inflict bodily harm on that person, that's forcible action.

Here, again, you heard the testimony and you saw the body-worn camera footage; you saw the open source

footage.  The officers were yelling "move back," he didn't.
He forcibly held his ground.  He forcibly resisted, impeded,
opposed.

(Whereupon, an exhibit was published.)

MS. AKERS:  You see he forcefully stands at the
front of the line and he forcefully refuses to give up any
ground.

Corporal Heaney testified that when an officer had
fallen, all of the rioters around that officer presented an
ability to inflict bodily harm on that officer and
threatened to inflict bodily harm on that officer, and that
is sufficient to find that he acted forcibly.

You also saw in his Parler, by his own account,
after January 6th, that he said he felt like he had played
two football games.  He was in the fight, he was in the
altercation; and he acted forcibly.

You heard Officer Wickham testify that the crowd
and Michael Oliveras resisted officers.  He testified
specifically that they opposed officers, they impeded
officers, and they interfered with officers.  And you see
that in all of the footage.

Next, ladies and gentlemen, you have to find that
he acted voluntarily and intentionally.  This is an easy
element to meet.  He stood there, again, very brazenly and
very insistent, essentially trying to provoke the officers,

refusing to move back, as we heard them continuously yell. And as the officers testified on the stand, they continuously said "move back."

The fourth element is that the person:  Assaulted, resisted, opposed, impeded, interfered with, or intimidated was engaged in the performance of their official duties. And we know, based on the certification -- excuse me -- based on the stipulation that this element is met.  The parties have already agreed that the officers were engaged in their official duties.

That takes us to the final element on this count, which is that the defendant must make physical contact with the officer or the defendant has to have intended to commit another felony.  One or the other.

So taking the second part of that first.  We know, based on Count 1 and Count 2, those qualify as other felonies.  So as long as you find the defendant intended to commit one or the other of those counts, then we meet the fifth element on Count 3.

Finally, you can find the "or," which is that the defendant made physical contact.  You can see this in numerous of the government's exhibits that we played several times for you during the course of this trial.  You can also find this based on the testimony that you heard from former Officer Wickham who testified that the officers and the

rioters at the front of the line were in a physical altercation and he watched it from that lower platform. In fact, he was on the west side and he turned and saw the altercation going on, he called it a commotion. And he ran over to help because the situation was so desire where Michael Oliveras was.

So when you return to the jury room, the evidence has established that Michael Oliveras is guilty of assaulting, resisting, or impeding officers.

And that takes us to the next chunk of charges, ladies and gentlemen, which can be grouped into sort of trespassing-type charges and disorderly conduct-type charges. The evidence you will see meets all of the elements of these last four charges.

First, entering and remaining in a restricted building or grounds. The first element here is that he had to have entered or remained in the restricted building or grounds without lawful authority to do so. We know there is a restricted perimeter here because you saw this map; you heard Captain Summers testify to it, and the parties have stipulated that there was a restricted perimeter.

(Whereupon, an exhibit was published.)

MS. AKERS: You saw that he entered onto Capitol grounds, the photo on the left here, and he stepped up on the ledge near 1 p.m.; and he actually remained, photo on

the right, until the very evening.

He did so knowingly. Again, this one takes just an ounce of common sense. He was there, he was climbing the bike rack as a -- to use as a ladder. He saw the police officers on the way to the Senate wing door. He saw police officers fighting to get rioters out of the area, and then he entered the building. And we know that he didn't enter once, he entered several times. We know that he made it, in fact, all the way to the Crypt which, again, you learned was the center, the heart of the Capitol Building. He saw in there that the police officers were using chemical irritant to try to disperse the rioters, but he didn't leave. In fact, he came back two more times.

Michael Oliveras is guilty of entering and remaining in a restricted building or grounds.

That takes us to Count 5, which is disorderly or disruptive conduct in a restricted building or grounds.

The first element here is that the defendant engaged in disorderly or disruptive conduct. I am not going to recount everything I just told you, but much of what we have already gone over is disorderly and disruptive and so you can consider all of that evidence. I am going to highlight a few additional things.

When the defendant was roaming the halls of the United States Capitol Building he was saying things like

this:  "Where are the fucking traitors?"  "Drag 'em out by their fucking hair!"  "Where are the fucking traitors?"

He was being disorderly.  He was being disruptive as he hunted for members of Congress.

You heard him repeat similar remarks as he stood in the Senate wing door trying to fight his way through the police officers who were guarding it.  Again, looking, hunting for the traitors.  Being disorderly, being disruptive.

You saw it when he was starting chants outside the Senate wing door.  When you heard him yell:  "Ready?"  "Ready?"  And then started chants.  Started to rile up the rioters as they were attempting to push through the Senate wing door.  And you saw it when he joined chants like:  "Fight for Trump," "fight for Trump" as they tried to reenter the building.

And then finally, you saw it on the east side of the Capitol front where the evidence shows that he went -- after he was escorted off the north side and he went to the area where rioters were destroying media equipment.  And there, too, he was yelling and commanding that the traitors get out.  He was watching as this pile of media equipment was destroyed.  He was justifying it.  He was saying:  "That's what happens when the fake news shows up at a patriot rally."

The second element of Count 5 is the defendant has to knowingly and with intent to impede or disrupt the orderly conduct of government business or official functions, and we know that he intended to stop Congress. I already explained that evidence during Count 2, obstruction of an official proceeding. It was his intent from December 2020 carried through, in words and in actions, all the way through January 6th.

And then finally, his conduct has to have, in fact, impeded or disrupted the orderly conduct of business. And, again, we know that to be true because you know the certification was, in fact, stopped for a long period of time as our members of Congress were in hiding after an emergency evacuation because of the mob.

Michael Oliveras is guilty of disorderly or disruptive conduct in a restricted building or grounds.

Next -- and we're getting very close to the end here -- Count 6 is disorderly conduct in a Capitol Building or grounds.

First, he has to have engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings.

(Whereupon, an exhibit was published.)

MS. AKERS: We saw him engage in disorderly conduct, for example, when he was escorted out of the Senate

wing door during his first entry and he turned and sort of
fronted the police officer who ended up having to push him
out.

We saw and we heard from Officer Amendola that he
was disorderly and disruptive inside the Senate wing door
when the rioters were attempting to get in.
Officer Amendola testified how disorderly and disruptive and
out of control they were.  The officers were doing
everything they could to keep them out.  They were using
historical artifacts to try to barricade the doors to keep
Michael Oliveras and company out of the Capitol Building.

And then finally -- excuse me -- you saw Parler
posts.

(Whereupon, an exhibit was published.)

MS. AKERS:  We have already looked at this one,
that show his intent.  He said it.  He said his intent was
for the purpose of extracting traitors.

And then finally, members of the jury, he has to
have acted willfully and knowingly.  Again, this is just
common sense:  His actions over the course of the five hours
on Capitol grounds and in the building, his actions and his
words starting in November, at the Stop the Steal rally, all
the way through show what TFO Laielli described as a pattern
of knowing and willful conduct.  His words were corroborated
by his actions and his actions corroborated his words.

Michael Oliveras is guilty of disorderly conduct in a Capitol Building.

And the very last count is parading, demonstrating, or picketing in a Capitol Building; just three elements.  The first is that the defendant was inside the Capitol Building, and you saw overwhelming evidence that he was.

(Whereupon, an exhibit was published.)

MS. AKERS:  This, for example, is him in the Crypt, in the center of the Capitol Building.

Second, he has to have paraded, demonstrated or picketed.  Your jury instructions will tell you that these words carry just their ordinary meaning.  For example, the defendant was in the building waving his flag.  He was in the building yelling at members of Congress.  He was in the building marching towards the Crypt saying:  "We want those traitors."  All of his conduct that I've already summarized for you today meets the second element on Count 7.

And then finally, he has to have acted willfully and knowingly.  And as we have discussed, there is no question that someone who enters a Capitol Building three times, who remains on Capitol grounds for five hours, has acted willful and knowingly.

Michael Oliveras is guilty of parading, demonstrating, or picketing in a Capitol Building.

Ladies and gentlemen of the jury, you have heard a lot of evidence the last few days and I have just summarized a lot of evidence.

You heard compelling and undisputed testimony from several officers who have put their lives on the line to protect our Capitol Building on January 6th. You heard them recount their stories and tell you how terrifying it was, and how they were doing everything they could to protect the members of Congress, to protect our Capitol Building.

But people like Michael Oliveras joined a mob and they collectively, for a period of time, overtook the Capitol Building. You heard the testimony about the strength in numbers. The officers stood no chance. They were so outnumbered they couldn't keep people out; they couldn't keep them out of the building, they couldn't keep them off of the grounds.

And this defendant, he was there first and he was there last. He was inciting rioters the whole day. He was yelling for members of Congress; he was asking for their execution, he was asking to drag them out. He was doing everything he could forcibly, with intent, to stop Congress; and he didn't care who got in his way.

So when you return to the jury room and you deliberate and you review the instructions, the stipulations, all of the evidence, the evidence will show

overwhelmingly that Michael Oliveras is guilty on all
counts.

Thank you.

THE COURT:  Thank you, Ms. Akers.

Mr. Shipley.

And while Mr. Shipley is getting set up, I believe
in at-your-chair calisthenics, so why don't we all stand up
and move a little bit so we can be fresh for Mr. Shipley
while he is changing microphones.

MR. SHIPLEY:  May it please the Court, counsel for
the government, Mr. Oliveras, ladies and gentlemen of the
jury.

There's a concept in American law, it's called
"mere presence."  What that means is:  The fact that you are
present while others around -- around you are engaging in
illegal activity doesn't make you guilty of what they are
doing.

One of the last thing Ms. Akers told you was that
law enforcement officers got on the stand and testified to
their experiences that day and how Mr. Oliveras was
responsible in some measure for their experiences that day.

See, what I remember is -- I remember three
particular sworn law enforcement officers getting on the
stand.  And at one point or another, all three of them said
either they didn't remember Mr. Oliveras or their

descriptions of Mr. Oliveras wasn't of anything he was doing that was illegal.

For example, retired Officer Wickham, if you recall, on cross-examination I asked him:  Does Michael -- the name Michael Oliveras never passed your lips, did it? He said no.

I said:  In fact, you didn't describe any illegal conduct by Michael Oliveras.  And he said:  I guess not.  He just simply picked them out of photos in a variety of places where he had been.

And then United States Capitol Police Officer Healy -- Amendola, remember, his only involvement was limited to the passageway just inside the Senate wing doors; and that he is the officer that testified at one point he took somebody into custody and was responsible for that person.  And he spent his whole time just right there inside the Senate wing doors, and he was there when Mr. Oliveras appeared at the door the second time.

By the time Mr. Oliveras appears at the door the third time, Officer Amendola was gone.  He was taking the person -- the prisoner down into the basement to process him.  So that's his only involvement with Mr. Oliveras, when Mr. Oliveras was standing at the door while the police are blocking people from coming in at approximately 2:50.  Now, you have that video; you can look at it.

I'm going to look at parts of this in a few minutes, but I am not going to spend a lot of time on the video.

The third officer who testified was the corporal from -- from Prince George's County. And while he had identified himself and some of his fellow officers in that episode between 4:20 and 4:26 on the upper west terrace, he testified: I don't remember Michael Oliveras. Pointed out the person in the red and, you know, he -- remember, he said: I remember the guy with the tan jacket. He had -- I remember what he did, he stood out to me. The guy with the flag in the red, I don't remember him.

So none of those three officers said anything about Michael Oliveras in a criminal respect. You had three officers, and the efforts for what they went through and the efforts they made to fulfill their duties and obligations that they undertook and the positions they had. But you had three officers come in and describe for you the crowd and the rioters and their experiences as a result over having been there several hours of the day, which was horrific.

Now, you have seen some of these videos -- let me mention this to you. In the most -- for the most part, you saw snippets of longer videos. And in most instances, you have the longer video. So you might have only seen -- we might have only played for the witness a minute of a video,

but the video might be six minutes long; and I encourage you to watch them all.

            The one thing I want you to be aware of -- and we see an episode, an example of this, with regard to the 4:26 incident. When you take a still shot of a video, the still shot can be unrepresentative of what you see when you watch the video because the video shows you a sequence of events in motion. The video captures an image, it doesn't reflect what's actually happening; and I will show you an example of that in a minute.

            So what did Michael Oliveras do?

            I submit to you what Michael Oliveras did was he didn't leave. The biggest sin that day was arriving at about 12:55 and not leaving until about 6 p.m. He stuck around all afternoon.

            You know, we played some *Where's Waldo?* with him for a while there yesterday, picking him out of a video here and a video here, and a still shot in this location, a still shot in that location, but all that really showed is that he was in those locations at those times. It didn't show he was doing anything in those locations at those times.

            He did not leave. He was told to leave, he should have left. He did not leave.

            There are seven charges here. And I am not standing here before you to deny the obvious, he was there.

He stuck around.  He went inside the Capitol.  Those are all indisputable facts.  You can't -- no magic makes them go away.

And in all likelihood, that makes your decision on five of the counts relatively easy:  Civil disorder, it was a riot.  I mean, you will see the definition of what that is, but there is no dispute that it was a riot.  We saw three other people, so there were more than people.

And the four misdemeanors, those last four charges:  Being on restricted grounds when you're not supposed to be there without authorization, and going inside the Capitol and doing things when it was closed.  It was certainly closed -- it was not open to the public, there's no question about that; and that was obvious to everybody who went through the threshold like Mr. Oliveras did, and he did go through the threshold.

Did any of you notice what I said to you in the opening a couple of days ago?

I said to you:  Keep in mind sometimes the evidence you don't see can be more important than the evidence you do see.

I went through that a little bit -- revisited that issue a little bit yesterday with Officer Laielli, which was she had access to all of the recording cameras inside the Capitol Building.  And those cameras are -- we reviewed

those cameras, what time he went in, he was inside 19 minutes.  She could try to track his movements inside by looking at the video of all of the corridors that he might have walked through.  She said when she identified all of the relevant evidence to her investigation, and the evidence you didn't see was him doing anything when he was inside.

Yes, he recorded himself.  You have got three or four videos that came off of his phone where he's saying particularly ugly things.  But that then takes us back to another point I raised.

We have got this thing called the First Amendment.  And I am not saying the First Amendment absolves you of all responsibility for your words.  But, you know, there are certain circumstances where your words are not met by your actions.  He's talking about wanting to drag Congresspeople out, traitors, by their hair.

Did he do anything that manifested that he really meant that?  Was that any more than false bravado?  Was that any more than over the top bombastic political rhetoric?

He was in there.  There were Congresspeople in there.  If he really wanted to drag people out by their hair, you would think he might have gone and, you know, tried a few office doors.  There is a big sign for them that says "Speaker of the House."  No evidence -- no evidence he did any of those things.

He went into the Crypt, he took some videos.  The Crypt is in the middle of the building under the Great Dome and, then, 19 minutes later he headed back out.  And there is no evidence he went anywhere else or did anything else. His words, objectionable as most would find them, were empty.  They were words.

And the same issue kind of comes alive with regard to whether or not he represented or engaged in any act of violence against any law enforcement officer.

He was there for six hours.  There were many opportunities where:  If he was there to brawl with the police, he could have done so.  And the closest the government can come to saying he engaged in any activity like that is he put his hands on the back of another protester, who was separated by three people from a police officer.

He didn't join in the brawl.  He is shouting stupid things, but he did not join in the brawl.  And the same is true at 4:26 -- for lack of a better description I am kind of giving you where I'm going, and we're going to look at some of this stuff in a few minutes.

(Whereupon, an exhibit was published.)

MR. SHIPLEY:  But at 4:26, the same thing.  What is he doing right here?  He's standing there with his flag and he doesn't backup.  But that's all he did.

If he wanted to brawl with the cops, they're right
there in front of him.  He didn't.  If he wanted to brawl
with the police that were inside the Capitol while he was
walking around, he didn't.

Now, this is one of those circumstances that we
don't send people to federal prison to because they say
things that we think are idiotic and make us mad.  We don't.

We tolerate dissent.  Even if it's dissent that
seems kind of ridiculous, over the top, and offensive, we
tolerate it.

For lack of a better description, this is -- I
sort of raised this issue in the opening.  And I am going --
I'm going to implore you to not read his words or listen to
his comments in the context of November 2023 when we know so
much more as a country about the events of November,
December, and January 2020 and 2021.

Now, this rhetoric, these comments, this kind of
antagonism between the two sides of the political spectrum
were caught up in that moment and, hopefully, as a country
we've come far beyond that.

But in that moment, emotions were high on both
sides; one side had lost and one side had won.  And the side
that had lost didn't think it had been fair and they were
animated and agitated and energized by that belief.

You have to read his words and consider his

conduct with your frame of reference then, not what we know now.

Did he plan?  What was his plan?

He planned to go to Washington, D.C.  He planned to go to Washington, D.C.

Unlike a lot of people -- and you can see them in the videos -- he is not wearing a helmet.  He doesn't have any bear spray.  He doesn't have any other kind of protective gear on.  I mean, if he went for the purpose of engaging in violence, he came awfully unprepared.

He went for the purpose of participating in a demonstration.  He was -- planned to go to the rally and listen to former President Trump speak, and he did that. And then he went to the Capitol.

Remember, I believe it was Captain Summers that told you there were planned and permitted protests for certain areas on the Capitol grounds for the afternoon of the 6th.

You have the planned and permitted speech at the Stop the Steal rally that morning at the Ellipse, and there were more planned and permitted protests that afternoon at the Capitol.

Now, the events kind of washed all of that away, but that was actually the truth.  When people went from the Ellipse to the Capitol, they were going from one planned

protest to another planned protest.  The second planned protest became a riot.

Ms. Akers said -- and, I mean, I am not sure I see it but, you know, she said Mr. Oliveras was leading -- leading the protest.  He was, you know, among the first through the barriers.  But I think if you kind of track his movements, he sort of was always lingering behind a little bit.

And think about this in this context.  If he is really at the Capitol -- if he is really there at 2:10, 2:12 for the purpose of stopping what is going on inside, would he just hang on outside until 2:22 while hundreds of people are streaming in in front of him.  I mean, if he's there for that purpose, don't you think you would see a little bit of urgency in his manner?

He is not in a hurry.  He is just -- he's just a participant in an event, an event that really became a spectacle.  I will show you what I mean by that.

(Whereupon, an exhibit was published.)

MR. SHIPLEY:  This is Government's Exhibit 309. This is outside looking at the Senate wing door.  It's closed-circuit camera TV from outside looking at the Senate wing door, and the time right now is 2:20:36.

So now, remember, from the inside camera we know that the crowd breached the door and started to come inside

at 2:13.  So we're seven minutes after that happened.

Remember, I played that time lapse -- it wasn't a time lapse.  I played the video of the interior doors, and I kind of skipped forward a little bit of time.  And you could see the crowd just kept coming in, kept coming in, and kept coming in.  I mean, hundreds of people came in in that nine minutes.

The nine minutes is between when they breached and the time Mr. Oliveras himself enters.  Nine minutes pass.

Now, this is after eight minutes have past.

And let's look and see if we see where Mr. Oliveras is and what his manner is.

(Whereupon, an exhibit was published.)

MR. SHIPLEY:  He is going to enter here (indicating), from the right -- from the right side of the screen.  As I said, remember the crowd has now been going inside for nine minutes.

Did I miss Mr. Oliveras?  Did I set it too far forward?

There he is (indicating).  So there is Mr. Oliveras.  He enters from the right, got his flag up in his hand.  And this is at 2:19:58.

Okay.  So we know that the window had been broke for six minutes and he does not enter for another three minutes.  Now, let's just watch him.

Now, this is, according to the government, somebody who is hellbent on putting a stop to what is going on inside that building, and the building has now been open and people have been going in for six minutes. Not "open." It had been breached; the doors and windows had been broken.

I will take that down.

My suggestion is he is not in a hurry to do anything. He's walking around outside and he sees people going in, so he walks up to see what is happening. Then, two minutes later you see him from the inside camera, walking in casually as can be, right behind people in front of him. He pauses for a moment, turns to the right, and walks down the hallway towards the Crypt; but doesn't have anything particular in mind except seeing what's happening inside.

But if you listen to the Government's theory, his only purpose for being there is to put a stop to the congressional certification. Now, you don't see him in that -- in that video.

When he leaves 19 minutes later -- and I apologize here, I have to use two different video players because one of the ones I have won't play everything.

Can we go up, if we're not up already.

(Whereupon, an exhibit was published.)

MR. SHIPLEY: Now, this is as Mr. Oliveras is

leaving.  Let's back up a little bit.  You have seen this a couple of times during the testimony.

But -- so this is 2:41, he has been inside for 19 minutes at this time.  And we know largely all he did was walk around the Crypt and take videos and yell things.  And he'll come down here in a minute.

You have got the officer there, towards the middle left of the screen, directing traffic, for lack of a better description.

Here comes Mr. Oliveras, flag in hand, down at his side.  He is heading for the exit, gets in line.  Remember these people have to crawl out of a window.  They're not walking through a door, they're crawling out a window.  And there's a big crowd outside, which Officer Amendola told you that.  And he turns to say something and then the officer pushes him, and he reacts badly.

Now, I mean, is that -- is that, you know, opposing or interfering or resisting?  He gets pushed, it's a natural human reaction, turns around.  Whatever he said, it didn't stop him; he turned right back around and he left. But not as fast as he could because the people in front of him were stacked up because they're crawling out a window with a crowd outside.

But what I suggest is that his demeanor, the manner in which he is acting, is just somebody looking

around.  Not somebody who is actually there to hunt down
Congresspeople, grab them by the hair, and drag them out
because they're traitors.  That's just empty words.  That's
just political bombast.  Over the line, but it is not
reflective of what he is actually doing inside the building.
What he's actually doing inside the building is exactly what
we see, which is a lot of nothing.

Now, I am not going to play this, but I will
invite you to, when you have a few moments in the jury
room -- this is Exhibit 301.

Now, 301 is actually the entry.  And if you
remember when I had -- when I was doing the
cross-examination yesterday, I made reference to the famous
2-by-4.  If you have seen that exhibit, you seen that 2-by-4
come through the window in the initial breach a few dozen
times.

And so that window -- that 2-by-4 is at 2:13.
Then you see one person jump through, a couple of other
people jump through.  They kick open the door.  Right on the
outside -- break out the windows on the right side.  And
within about 30, 45 seconds all three entrances are breached
and people just start to flow in.  I'm not sure -- and then
we know that Mr. Oliveras comes in at 2:22.

Take those nine minutes and just -- just watch
them.  Just watch them.  I mean, Michael Oliveras is -- he

comes in so long after that problem is a problem.  And he just, you know, casually wanders in like, oh, well, everybody else is.

Yeah.  That is illegal.  I am not suggesting it's not, and Mr. Oliveras is not contesting that it's not.  That's one of those misdemeanors, entering the closed Capitol in circumstances where you are not authorized to do so.

But you can just sort of -- take those nine minutes.  It's not that much time to invest, and you'll just -- if you haven't seen this before, it's kind of instructive.  It's sort of eye opening.  If you haven't been exposed to this evidence, if you haven't been exposed to this discovery and watched some of this stuff, it's like -- it's almost just, like, wow, this was just -- this was crazy.

Why didn't Michael Oliveras leave?

The best description I have heard from somebody is that it was just a spectacle.  A young man said:  Would I ever see that again?  When would this ever happen again in my lifetime?

Voters, citizens of the United States, regardless of what you might think about their politics, they took over the Capitol Building.

Now, I mean this town is no stranger -- remember

we talked about this with MPD Retired Sergeant Wickham.
This town is no stranger to protests.  Heck, we had one two
days ago with 300,000 people.  I guess that was a march, not
really a protest, but...  We had a big protest last night.

So -- and federal buildings, no stranger to
protests or efforts to take them over.  You had the Portland
Federal Courthouse in December 2020 had to have a fence
built around it to keep protesters from trying to burn it
down.  The Capitol Building in the United States has had
protestors get inside and disrupt individual proceedings.
Nothing like January 6th.

The building had never been, in effect, lost
before.  And it was lost for a couple of hours.  Lost in the
sense that authorities did not have control over the
entrances.  The first time ever.  So it's on the magnitude
of a scale different than any that's happened before, but it
was a spectacle.  And Mr. Oliveras hung around.  I mean,
ultimately he got in his car and drove back to New Jersey.
He was by himself.  And that's an important point.

I don't think -- the government hasn't suggested
this, but there's lots of, you know, historical media about
the organized groups that came to, you know, engage in
violence, be damned.  And there was certainly people who
came to the Capitol -- you have seen it, came to the Capitol
with bad intentions.  Came to the Capitol looking for a

fight that day.  They found it.  They did, in fact, find it.
It didn't matter whether it was going to be Antifa, Black
Lives Matter, or law enforcement.  They were just there to
fight.  Some bad people.

But then there are people just like Mr. Oliveras
who was just one face in the crowd, just a man in a sea of
people there by himself.  Arrived alone, left alone.

As I said just a few moments ago, I am not here to
deny the obvious to you.  I don't think I could say with a
straight face that he didn't violate some laws that day.  I
mean, he went inside the building and he was on the grounds.
He doesn't deny that.

Civil disorder, that's kind of another a tough
one, you know, sort of the gravamen -- where the heart of
that charge is a failure to comply with lawful orders of law
enforcement during a riot.  You know, not doing what you are
told to help them try to accomplish their job.  And probably
there is no better example of that when he's standing there
with his flag in the air when the police line is coming at
them and they want the people to head for the exits, so to
speak.  You know, they're on that upper west terrace at 4:25
in the afternoon; the police try to clear that terrace.  The
building is pretty much clear at that point, now it's time
to get people off the grounds; and they're trying to urge
those people still there to head for the exits.  Well,

Mr. Oliveras, he said that.  I'm not sure, you know, how you get any more civil disorder than that.

But as I had -- I believe it was retired Corporal Wickham, or retired U.S. Capitol Sergeant Wickham -- let me try it again.

Retired Metropolitan Police Department -- Sergeant, I think that's it -- yeah.  I said:  It's civil disobedience, isn't it?

He said:  Yeah, it's civil disobedience.

We have a long history in this country with civil disobedience when we see things that strike us as being injust or unfair, so...  But you live with the consequences of your civil disobedience sometimes.

Michael Oliveras did fail to comply with the lawful orders of law enforcement and remained on the Capitol grounds, thereby interfering and impeding the ability of law enforcement to carry out their lawful duties.  That description, I submit to you, is a pretty apt description of everything he did.  It just encapsulates this idea that he never left.  He hung around, and he hung around, and he hung around.  And he watched from vantage point one, he watched from vantage point two, and he watched from vantage point three.  But the closest we get him to joining in to anything is two hands on the back of the protestor who is separated from the police by two other protestors.

Not only do I suggest to you that his manner of lingering outside -- not rushing into the building is suggestive of what his true intention is with regard to obstructing Congress count, I think there is another factor there to consider whether or not it's been left out. The government -- remember, this is something I pointed out in the opening statement.

The government has the burden of proof on each of these elements, and they did a good job of listing for you the individual elements of each of the charged offenses. The government has to provide the evidence beyond a reasonable doubt of each individual element. Failure to do so on just one element leads to a not guilty verdict.

If you are not convinced that there is evidence on a particular single element of a particular offense, you stop; it's a not guilty verdict on that count at least. The government has not -- it's failure of proof. They have not carried their burden.

Yes, you saw all of the various documentary evidence that the certification procedure that day started at one o'clock by law, and it lasts until it's done. Mr. Oliveras entered the building at 2:22. I submit there is no evidence before you that Mr. Oliveras knew the proceeding was still going on at 2:22, an hour and 22 minutes after it started.

Now, we can juxtapose -- the video wouldn't stop. We have the video wouldn't stop, and we have the testimony from Secret Service Hawa about handling Vice President Pence, and all of that information. But what we don't have is that Mr. Oliveras knew any of that.

If Mr. Oliveras believes that the proceedings were done, then he's not obstructing anything when he goes inside. If he had some knowledge that what he's doing is going to produce this result that violates the statute -- and I would just leave it to you to discuss among yourselves whether you see anything in the evidence that he knew going inside was going to naturally lead to the obstruction of what Congress is doing. If they're done, they're done. If they're not done, they're not done. But he has got to have some view of that.

Now, this is -- I did want to kind of track for you one piece of evidence, and then it will probably be the end here.

I'm really bothered by, sort of, the way the government has presented the 4:26 episode up on top. And this is -- you know, this is 4:26. We're talking about an hour and 50 minutes or an hour or 40 minutes after he had left the building and he never -- he had never gone back inside. Remember, he's hanging around out there for a long time. You see him in the doorway, he never goes back

inside.

But now we're at 4:56 [sic], and he left at 2:41. We're at 4:26, and that -- the episode begins when the police are trying to clear people off of the upper terrace, and he is standing there with a flag. I mean, I -- I mean, this image is probably burned in your memory by now, even just in two days.

But I think it's really important for you to watch from a couple of different angles of what actually happened to Mr. Oliveras. And there was some little point of controversy yesterday. I made the comment that, you know, he sort of immediately moved himself 50 feet away from the encounter, just literally a few seconds.

And this kind of goes back to that point of: Well, was he there to engage in violence with the police? I mean, like the first moment that there is a face-to-face, he -- he is gone.

Let's just watch this just for a minute. Let me see if I can find what am I looking for. It's at 503.

Maybe I am not looking for 503. That was the west front from earlier in the day.

513, not 503.

(Whereupon, an exhibit was published.)

MR. SHIPLEY: Now, this is a crowd shot video that's from behind. And the reason I show this to you for

just a second -- if we go forward, we will see that -- we don't see Mr. Oliveras anywhere here in this video, so just watch.

The video is going to pan towards a column here on the right. You know, this is -- this is like 4:20. This is before Mr. Oliveras is even involved. He hasn't even arrived yet raising his -- raising his flag. This is not him. That is not his flag on the far right. You will see him in a minute.

There we go.

1:45, I am going to still it right there. Mr. Oliveras is going to appear on the right-hand side. Now, we see right now he is not there.

Now, it goes -- shoots over to the column here for about five seconds; then, when it comes back, you will see Mr. Oliveras. And let's watch what he does.

(Whereupon, an exhibit was published.)

MR. SHIPLEY: See. There he is. He is down in the front there, flag held high.

Now let's watch what he does over the next 15 or 20 seconds. Notice there is quite a bit of gap there between the officers and the protestors. They're not lined up in each other's face. There's four to five feet of space there between the two groups.

Now, he takes his flag down and he turns. He is

yelling at people.  It looks like he is telling people to
back up or move away.  He knows that the police are coming.

Again, he is yelling at people in the back.  He
seems to be motioning for them to back up.  He goes back to
the same position, flag high, just standing in place.

(Whereupon, an exhibit was published.)

MR. SHIPLEY:  Now, 514 captures some of the
same -- this one is another crowd shot video, a little hard
to follow.  Right in here (indicating).  This is where
the first couple -- this is the officer -- the officer right
in the middle of the screen with the yellow is the one that
goes down, and then we'll see the gray jacket -- or tan
jacket, gray hoodie fall on top of him.  Right there
(indicating).

Now, notice -- and this is -- I brought this out
yesterday.  Mr. Oliveras in the middle there, he's got
his -- he's holding the flag with his right hand.  His left
hand is gripping the gray jacket of the person in front of
him.  He's not a police officer.  He is trying to keep from
falling.  He is not doing anything except trying to keep
from falling.  He's grabbing onto that guy and he's
steadying himself.  He has got his flag in one hand.

He is in no way involved or threatening the
officer who is going down, nor is he in contact with any of
the other officers who are further back.

There is at least -- there is at least -- one, two, three -- gray hoodie guy, all between him and the police at that point.

And now you see right there (indicating) -- now, okay.  So now, if you watch in the next second, the flag was just ripped off the flagpole.  One of the officers reached up, grabbed the flag, ripped it off the flag pole.

Now let's watch what Mr. Oliveras does next.  He is gone.

(Whereupon, an exhibit was published.)

MR. SHIPLEY:  Okay.  He is already moving away. And we're going to look at another video in just a second. We'll get a better angle of what that -- of what he did.

But he is no longer involved in this episode with tan jacket/gray hoodie.  He is -- he is getting the heck out of dodge.

Now, that same scene was captured on closed-circuit TV camera.  This is Government's Exhibit 1009, a little further away.  I am going to advance this to 2:10 on the marker.

(Whereupon, an exhibit was published.)

MR. SHIPLEY:  Okay.  But note this for a moment -- and I think I mentioned this during the cross-examination yesterday -- it's relatively calm.  "Relatively" an important word there.

The police are standing -- in the two locations they're standing.  The crowd is just standing quietly.  The police do what they were ordered to do, which was move forward and begin to push the people toward the exits.

At this point not a lot was happening.  Pay attention to the pole in the middle.  The pole is going to be important in a minute.

Okay.  Now, the government has put in the yellow circle there which helps us sort of track Mr. Oliveras.  There he is waving again.  Remember from the other picture, he is waving to people behind him.  He's not waiving forward.  There's nothing about his movements that suggest he's trying to tell other people to come forward.  He's doing the opposite.  He puts his flag back in the air, just standing there.

Now, if you watch the bottom group of officers in the yellow vest, they move first.  And then the group on the top begins to move.  It's hard to tell if they're in line or not in line at this point, it's just the angle is impossible to judge.  Still just standing there, flag up in the air.

Now, we will see some jostling starts.  This is when the officer falls over, the guy falls on top of him.  The officers began to engage, pushes the crowd back.

Right there, (indicating).  Flag was pulled off the flagpole.  Go back -- go back a little.

We saw the flag pulled off the flagpole, and what happens next?

Now, here is when the pole becomes important. We can't see Mr. Oliveras anymore because he's behind the pole. But let's see what happens when he comes from out behind the pole.

There he is (indicating). He's -- he is getting away. He is not -- he is not interested in any encounter with the police. Remember, there are two levels here. He goes to there, he gets down (indicating).

Now, that's the end of that video. But there is one more with an even better view.

Let me try to find it again. 735 [sic].

THE COURT: What is this exhibit number?

MR. SHIPLEY: I am almost done, Your Honor.

MS. AKERS: Exhibit number?

MR. SHIPLEY: Oh, this is. Number 419 is the original video, and then there is an enhanced version of 419. But this is 419, I think.

That's Officer Linwood.

Okay. So this is a body-worn camera of one of the officers involved. And this is where the push is happening and the one officer falls over.

And really, you can't see Mr. Oliveras here, but you will see him in just a minute. I will point him out to

you when we get there.

The officer is moving forward.  Right there (indicating).

THE COURT:  Excuse me.

MR. SHIPLEY:  On the left side, and he will come into focus on the left edge --

THE COURT:  Mr. Shipley, this is Exhibit 419?

MR. SHIPLEY:  Yes.

THE COURT:  That hasn't been admitted.

MR. SHIPLEY:  There was an enhanced version.  It's same thing.

What's the enhanced version for 419?

MS. AKERS:  I think 1002.

MR. SHIPLEY:  1002?  It was the same video, I thought.

THE COURT:  1002 has been admitted.

MR. SHIPLEY:  Yes.  This is an enhanced version -- 1002 is an enhanced version of this, so this is the source video.

THE COURT:  Usually we just play during summations what is precisely been admitted into evidence, which is 1002.

MR. SHIPLEY:  Okay.  I am not sure I have 1002 loaded, but I will take that down.

THE COURT:  But I am sure maybe the government

would help you play that, if you wanted to play 1002.

        MR. SHIPLEY:  Did we?  Didn't we put in two still shots?

        MS. AKERS:  Yes, just the still shots.

        MR. SHIPLEY:  Oh, okay.  We put in still images of 419.  I have marked down 419.

        THE COURT:  Yes.

        MR. SHIPLEY:  All right.  1002 is this video if you want to watch it.  I don't have 1002 loaded up, so I can't show it to you.

        But if you watch that what you see is:  After he jumped down off the wall, which we saw on the other video, he continued to move further away until he kind of gathered himself.

        And the reason it looks like in a video the government showed you that he didn't get that far away is the police kept moving forward.  They kept closing ground on them.  That doesn't change the fact that he went 50 feet to get away from the police.  Again, maybe it seems like I'm making a big point of this.  But my point is at no point in his five hours here did he demonstrate any conduct that would suggest he was there to have any kind of physical involvement with the police.

        Civil disorder, no question.  Didn't comply with their directives, always.  Sometimes he did, but not at

every moment.

But for 111(a), it just doesn't seem like that was there.  It wasn't what he was there to do.  Just like he wasn't really there to drag people out by their hair.  Didn't do anything that would suggest he was there to drag people out by their hair, notwithstanding his words.

Now, I will go back to -- I promise I am right at the end.

The first part of my cross-examination of Officer Laielli, I went through with her the -- you know, she was assigned to the joint terrorism task force of the FBI.  I went through the fact that there are at least one and, in some instances, more than one such task force in every one of the FBI's 54 field offices.  And these task forces have multiple officers representing multiple agencies.  I mean, the FBI invests a lot of resources.  The Department of Justice invests a lot of resources in that effort.

But you know when that's your job, when that's the metric against which your performance is measured, you tend to find it, sometimes when it's not even really there.

Its natural tendency, you want to succeed at the task you have been given.  You are on a terrorism task force, you are looking for terrorism.  When you are looking for something specific, it's much easier to find it, and

that tends to go in favor of your endeavor.

Michael Oliveras did a lot of things to bring attention to himself; his comments on Parler that the government found afterwards, what was captured on video of what he was saying, the fact that he hung around for five plus hours. He brought a lot of reasons to be looked at. But what is not there when you look closely is any real evidence that he had any real purpose beyond simply attending what became a spectacle.

So like I said, not going to deny the obvious. It seems to me based on the instructions, the evidence, some of your questions, some of your decisions -- not going to challenge you too much, but I think there are a couple of hard ones. I think it's hard to reconcile the evidence of action with the words.

The evidence of action strongly suggests that in almost every respect the words were empty. On that basis, I think it's necessary and I think it's required to honorably and faithfully execute your oaths to find that the government's evidence does not rise to the necessary standard to find him guilty on the counts of obstructing Congress or assaulting, impeding, or interfering with officers.

Thank you.

THE COURT: Okay. Ladies and gentlemen, I think

we're going to take a short ten-minute break now.

When we come back, we'll hear the government's rebuttal and then I will give you your instructions on the law.  Your lunch is going to be a bit late but lunch is going to be delivered to you in the jury room.  But I would like to get everything concluded so that, when you go back to have your lunch, you can begin your deliberations.

So if you could just bear with me.  If you are hungry, maybe have a snack on your ten-minute break so that, when you come back, we can finish the summations and have instructions -- the final instructions.  And when you get back to the jury room it will be time for you to begin your deliberations.

So a ten-minute break now.

(Whereupon, the jury was excused, and a recess was taken.)

THE COURT:  Is the government ready for rebuttal summation?

MS. SHEETS:  Yes, Your Honor.

THE COURT:  Ms. Sheets.

MS. SHEETS:  Members of the jury, Mr. Shipley just told you that the defendant didn't actually rip members out by their hair out of the Capitol Building.  Good.  He is not charged with that in this case.

He is on trial for obstructing or attempting to

obstruct an official proceeding, and the evidence of intent and on each of those elements is overwhelming as Ms. Akers has already gone through.

He talked to you about tolerating dissent and the First Amendment. And you will get an instruction from the judge in your jury instructions on the First Amendment, that we have a right to lawfully exercise those First Amendment rights. And thank goodness that's the case.

But what we do not tolerate are the actions that Mr. Oliveras took in furtherance of those words by coming to the Capitol on January 6th, by storming past officers, past barriers, by engaging in physical violence that we saw over and over throughout this trial.

Mr. Shipley said there is no indication that he was there for violence, that he just came because he wanted to see the spectacle. And that's why he stuck around, that he was wandering around through the Capitol Building.

Members of the jury, I encourage you and the law requires you to focus not on the statements of me or Mr. Shipley, but on the evidence.

When you look back and play the video evidence -- in particular, when you play Exhibit 1009 -- now, again, the judge explained this to you, the evidence is in categories. And that 1000 series is very important because that's the series that has the markers, the circles on it, so it will

help you in your deliberations.

And Mr. Shipley asked you to watch the full videos, and I agree. He showed you a couple of clips here, but he conveniently skipped some of what was happening there. And when you watch that 1009, you can't see -- that's the CCTV with the pole, you can't see exactly what is going on, but what you can see is that flag.

(Whereupon, an exhibit was published.)

MS. SHEETS: We just saw it -- there (indicating), against officers on the front line. Now, arguably, everyone on that terrace was resisting, opposing officers. As you heard, they were shouting "Move back," moving their arms, dressed in riot gear. There were lots of clues that their orders were to leave.

And you heard Mr. Shipley say that there had been another violent brawl right before the one Mr. Oliveras engaged in, and that's true. And Mr. Oliveras was lingering right there.

What's another verb we can think of? Observing. He saw a violent brawl, and then he came right to the front of that police line; that's when his flag is in the air, that's when he is facing up against officers.

Take all of this into account when you review 1009.

We don't have to wonder about the defendant's intentions that day. His pushing of officers on the west

front, his climbing up the scaffolding, going into the building, shouting in the halls of Congress to:  "Pull them out by their fucking hair," coming back outside, seeing more violence from officers -- excuse me, I skipped a step.

He didn't just come back outside and go directly to that fight.  He came back outside and then he went back to the Capitol.  And then he was back outside and he went right back to that same door again, the same door where he had seen glass shattered, heard that ringing alarm, and then directed -- there is video evidence of him being directed the first time he is in the Capitol by officers, one of which you heard from, Officer Amendola:  Hey, get out.  He crawls through that broken window.  That's how desperate police were.

He saw them barricading the Capitol and he came back, and then he didn't leave.  He saw the violence on the northwest terrace.  He saw officers engaging in a fight that Mr. Shipley just showed you.  Mr. Oliveras is standing still over by the Senate wing door, and then he walks up to the front of the police line and stands there.

Now like I said, arguably, everyone there was resisting, opposing what officers were directing them, to move back in that big line formation.

Mr. Oliveras was using force, the force of his body, by standing there for a minute and 45 seconds.  Watch

the video, watch that flag.  He is struggling against officers.  He is using force to resist them and oppose them.

And on his intentions for violence when he came to the Capitol, not just to participate in a rally, not just to hear what people would say at the rally and observe anything.  You heard in his Parler posts -- look up Exhibit 618, it's that very long PDF.  I encourage you to look through it; we looked through some of it.  He told us why he was coming.  He was looking for that title fight, and he stayed unlawfully on Capitol grounds until he found it.

Now, the judge is going to instruct you in a few minutes to leave your biases, your personal preferences, your personal opinions outside of this courtroom, outside of that door.  And it's very, very important that you do that.

But listen as she gives you the instructions because there is one thing that you won't hear her ask you to leave outside that door, and that's your common sense, members of the jury.

We ask that you return the only verdict that makes sense in this case, the only verdict supported by the evidence that you've heard here:  Guilty on all counts.

THE COURT:  Thank you, Ms. Sheets.

All right.  Ladies and gentlemen, at this time it is my duty and responsibility as the trial judge to give you instructions as to the law that applies to this case and to

the evidence that has been presented.  It is your sworn duty
to base your verdict upon the law given in these
instructions and upon the evidence that has been admitted in
this trial.

I am going to provide you -- each of you with a
copy of these instructions so you do not need to take notes
while I am talking.  I see many of you picking up pens to
conscientiously take notes.  Just listen.

During your deliberations you may, if you want,
refer to these instructions.  While you may refer to any
particular portion of the instructions, you are to consider
the instructions as a whole, and you may not follow some and
ignore others.

If you have any questions about the instructions,
you should feel free to send me a note.  I will give you
instructions on how to do that at the end of these
instructions.  The copy of these instructions that will be
given to you will be returned to me when you render your
verdict.

As I stated in my preliminary instructions to you
at the beginning of the trial, my function is to conduct
this trial in an orderly, fair, and efficient manner, to
rule on questions of law, and instruct you on the law that
applies in this case.  It is your duty to accept the law as
I instruct you.

You should consider all of the instructions as a whole, you may not ignore or refuse to follow any of them.

Your function as the jury is to determine what the facts are in this case; you are the sole judges of the facts.  While it is my responsibility to decide what is admitted as evidence during the trial, you alone decide what weight, if any, to give to that evidence.  You alone decide the credibility or believability of the witnesses.

Be aware that, as human beings, we all have personal likes and dislikes, opinions, prejudices, and biases.  Generally, we are aware of these things; but you also should consider the possibility that you have implicit biases, that is, biases of which you may not be consciously aware.  Personal prejudices, preferences, or biases have no place in the courtroom where our goal is to arrive at a just and impartial verdict.

All people deserve fair treatment in our system of justice regardless of any personal characteristics such as: Race, national or ethnic origin, religion, age, disability, sex, gender identity or expression, sexual orientation, education or income levels, or any other personal characteristic.  You should determine the facts solely from a fair consideration of the evidence.

You may not take anything I may have said or done as indicating how I think you should decide this case.  If

you believe that I have expressed or indicated any such opinion, you should ignore it.  The verdict in this case is your sole and exclusive responsibility.

If any reference by me or any of the attorneys to the evidence is different from your own memory of the evidence, it is your memory that should control during your deliberations.

During your deliberations you may consider only the evidence properly admitted in this trial.  The evidence in this case consists of the sworn testimony of the witnesses, the exhibits that were admitted into evidence, and the facts and testimony stipulated to by the parties.

During the trial you were told the parties had stipulated, that is, had agreed to certain facts; and you should consider any stipulation of fact to be undisputed evidence.

When you consider the evidence, you are permitted to draw from the facts that you have found have been proven such reasonable inferences as you feel are justified in light of your experience.  You should give any evidence such weight as in your judgment it is fairly entitled to receive.

The statements and arguments of the lawyers are not evidence, they are only intended to assist you in understanding the evidence.  Similarly, the questions of the lawyers are not evidence.

Every defendant in a criminal case is presumed to be innocent.  This presumption of innocence remains with the defendant throughout the trial, unless and until the government has proven he is guilty beyond a reasonable doubt.  This burden never shifts throughout the trial.

The law does not require the defendant, Michael Oliveras, to prove his innocence or to produce any evidence at all.

If you find that the government has proven beyond a reasonable doubt every element of a particular offense with which Mr. Oliveras is charged, it is your duty to find him guilty of that offense.  On the other hand, if you find that the government has failed to prove any element of a particular offense beyond a reasonable doubt, it is your duty to find Mr. Oliveras not guilty of that offense.

As stated during the preliminary instructions I gave you at the beginning of the trial, the government has the burden of proving Mr. Oliveras guilty beyond a reasonable doubt as to each element of each charge against him.  In civil cases, by contrast, it is only necessary to prove that a fact is more likely true than not or, in some cases, that its truth is highly probable.

In criminal cases such as this one, the government's proof must be more powerful than that; it must be beyond a reasonable doubt.  Reasonable doubt, as the name

implies, is a doubt based on reason.  A doubt for which you have a reason based upon the evidence or lack of evidence in the case.

If after careful, honest, and impartial consideration of all of the evidence you cannot say you are firmly convinced of Mr. Oliveras's guilt, then you have a reasonable doubt.  Reasonable doubt is the kind of doubt that would cause a reasonable person, after careful and thoughtful reflection, to hesitate to act in the graver or more important matters of life.  However, it is not an imaginary doubt nor a doubt based on speculation or guesswork; it is a doubt based on reason.

The government is not required to prove guilt beyond all doubt or to a mathematical or scientific certainty; its burden is to prove guilt beyond a reasonable doubt.

Now, there are two types of evidence from which you may determine what the facts are in this case; direct evidence and circumstantial evidence.  When a witness, such as an eyewitness, asserts actual knowledge of a fact, that witness's testimony is direct evidence.  On the other hand, evidence of facts and circumstances from which reasonable inferences may be drawn is circumstantial evidence.

Let me give you an example.

Assume a person looked out a window and saw that

snow was falling.  If he later testified in court about what

he had seen, his testimony would be direct evidence that

snow was falling at the time he saw it happen.

Assume, however, that he looked out a window, saw

no snow on the ground and then went to sleep and saw snow on

the ground after he woke up.  His testimony about what he

had seen would be circumstantial evidence that it had snowed

while he was sleep.

The law says that both direct and circumstantial

evidence are acceptable as a means of proving a fact.  The

law does not favor one form of evidence over another.  It is

for you to decide how much weight to give to any particular

evidence, whether it is direct or circumstantial.  You are

permitted to give equal weight to both.

Circumstantial evidence does not require a greater

degree of certainty than direct evidence.  In reaching a

verdict in this case you should consider all of the evidence

presented, both direct and circumstantial.

One of the questions you were asked when we were

selecting this jury was whether the nature of the charges

itself would affect your ability to reach a fair and

impartial verdict.  We asked you that question because we

must not allow the nature of the charges to affect your

verdict.  You must consider only the evidence that has been

presented in this case in reaching a fair and impartial

verdict.

The weight of the evidence is not necessarily determined by the number of witnesses testifying for each side, rather, you should consider all the facts and circumstances and evidence to determine which of the witnesses you believe. You might find that the testimony of a smaller number of witnesses on one side is more believable than the testimony of a greater number of witnesses on the other side, or you might find the opposite.

The lawyers in this case sometimes objected when the other side asked a question, made an argument or offered evidence that the objecting lawyer believed was not proper. You must not hold such objections against a lawyer who made them or the party they represent. It is the lawyer's responsibility to object to evidence that they believe is not admissible.

If, during the trial, I sustained an objection to a lawyer's question, you should ignore the question and you must not speculate as to what the answer would have been.

During the course of this trial a number of exhibits were admitted into evidence. Sometimes only portions of an exhibit were admitted, such as portions of a larger video or a document with some words or pictures blacked out or otherwise removed. There are a variety of reasons why only a portion of an exhibit is admitted,

including that the other portions are inadmissible or implicate an individual's privacy.

As you examine the exhibits and you see or hear portions where there appear to be omissions, you should consider only the portions that were admitted.  You should not guess as to what has been taken out or why, and you should not hold it against either party.  You are to decide the facts only from the evidence that is before you.

Someone's intent or knowledge ordinarily cannot be proved directly because there is no way of knowing what a person is actually thinking, but you may infer someone's intent or knowledge from the surrounding circumstances.  You may consider any statements made or acts done by Mr. Oliveras, and all other facts and circumstances received in evidence which may indicate his intent or knowledge.

You may infer but are not required to infer that a person intends the natural and probable consequences of acts he intentionally did or did not do.  It is entirely up to you, however, to decide what facts to find from the evidence received during this trial.

You should consider all of the circumstances and evidence that you think are relevant in determining whether the government has proved beyond a reasonable doubt that Mr. Oliveras acted with the necessary state of mind.

I am going to talk about evaluating testimony.

In determining whether the government has proved the charges against the defendant beyond a reasonable doubt, you must consider the testimony of all of the witnesses who have testified.  You are the sole judges of the credibility of the witnesses.  You alone determine whether to believe any witness and the extent to which a witness should be believed.  Judging a witness's credibility means evaluating whether the witness has testified truthfully and also whether the witness accurately observed, recalled, and described the matters about which the witness testified.

As I instructed you at the beginning of the trial, you should evaluate the credibility of witnesses free from prejudices and biases.  You may consider anything else that in your judgment affects the credibility of any witness. For example, you may consider the demeanor and the behavior of the witness on the witness stand, the witness's manner of testifying, whether the witness impresses you as having an accurate memory, whether the witness has any reason for not telling the truth, whether the witness had a meaningful opportunity to observe the matters about which he or she has testified, whether the witness has any interest in the outcome of this case, stands to gain anything by testifying, or has friendship or hostility toward other people concerned with this case.

In evaluating the accuracy of a witness's memory,

you may consider the circumstances surrounding the event, including the time that elapsed between the event and any later recollections of the event and the circumstances under which the witness was asked to recall details of the event.

You may consider whether there are any consistencies or inconsistencies in a witness's testimony or between a witness's testimony and any previous statements made by the witness.  You may also consider any consistencies or inconsistencies between the witness's testimony and any other evidence that you credit.  You may consider whether any inconsistencies are the result of lapses in memory, mistake, misunderstanding, intentional falsehood, or differences in perception.  You may consider the reasonableness or unreasonableness, the probability or improbability of the testimony of a witness in determining whether to accept it as true and accurate.  You may consider whether the witness has been contradicted or supported by other evidence that you credit.

If you believe that any witness has shown him or herself to be biased or prejudiced for or against either side in this trial or motivated by self interest, you may consider and determine whether such bias or prejudice has colored the testimony of the witness so as to affect the desire and capability of that witness to tell the truth. You should give the testimony of each witness such weight as

85

in your judgment it is fairly entitled to receive.

A police officer's testimony should be evaluated by you just as any other evidence in the case. In evaluating the officer's credibility, you should use the same guidelines that you apply to the testimony of any other witness. In no event should you give either greater or lesser weight to the testimony of any witness merely because he or she is a police officer or law enforcement officer.

Every defendant in a criminal case has an absolute right not to testify. Mr. Oliveras has chosen to exercise this right. You must not hold this decision against him, and it would be improper for you to speculate as to the reason or reasons for his decision. You must not assume the defendant is guilty because he chose not to testify.

Now, I'm going to talk about the charges.

At the beginning of the trial I gave you preliminary instructions that generally described the different types of charges that the government has brought against the defendant, Mr. Oliveras. He is charged with committing offenses charged in seven separate counts. I will read those charges to you now, and then explain the definition of terms used in the charges and the elements of each charge. When no formal definition is provided for a term, please rely on your every day understanding of the word.

Again, keep in mind that you will have a copy of

these instructions when you deliberate, so you don't need to remember all of these details or write any of it down.

Now, before discussing the charges I will define the term "knowingly." I am going to define that term for you because this term will appear in many of the charges.

A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly you may consider all of the evidence, including what the defendant did or said.

Count 1, civil disorder.

Count 1 charges that: On or about January 6, 2021, at approximately 4:26 p.m., within the District of Columbia, Michael Oliveras committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer lawfully engaged in the lawful performance of his or her official duties incident to and during the commission of a civil disorder which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce, and the conduct and performance of any federally protected function in violation of 18 U.S.C. Section 231(a)(3).

Count 1 charges the defendant with a substantive offense of committing civil disorder and also with

attempting to commit civil disorder.  I will first explain the elements of the substantive offense, along with its associated definitions, then I will explain how to determine whether the defendant attempted the commission of this offense.

Elements for Count 1:  To find the defendant guilty of the offense charged in Count 1, you must find that the government proved each of the following elements beyond a reasonable doubt:

First, the defendant knowingly committed an acted with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

Second, at the time of the defendant's act, the law enforcement officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

If you find defendant Michael Oliveras guilty of this offense, you must also answer two questions that follow Count 1 on the verdict form asking whether the jury unanimously agrees that the government has shown:

One, that the civil disorder obstructed, delayed,

or adversely affected commerce or the movement of an article of commodity in commerce; or, two, that the civil disorder obstructed, delayed, or adversely affected the conduct or performance of a federally protected function.

While the charge in Count 1 is written with "and," the government is not required to show that the civil disorder affected both one and two of what I have just described as one and two. In other words, you may find that the civil disorder affected both commerce and the conduct of a federally protected function or affected neither. In that case, you will answer both of the questions that follow Count 1 with the same answer.

Alternatively, you may find that the government has only shown that a civil disorder affected either commercial or a federally protected function and, in that case, you will answer yes to only one of the questions that follow Count 1.

Definitions. "Knowingly" has the same definition that I gave to you above.

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons which, A, causes immediate danger of injury to another individual; B, causes an immediate danger of damage to another individual's property; C, results in injury to another individual; or D, results in damage to another

individual's property.

The term "commerce" means commerce or travel between one's state, including the District of Columbia, and any other state including the District of Columbia. It also means commerce wholly within the District of Columbia.

The term "federally protected function" means any function, operation, or action carried out under the laws of the United States by any department, agency, or instrumentality of the United States or by an officer or employee thereof.

The term "department" includes one of the departments of the executive branch such as the Department of Homeland Security, which includes the United States Secret Service.

The term "agency" includes any department, independent establishment, commission, administration, authority, board, or bureau of the United States.

The term "instrumentality" includes any other formal entity through which the government operates, such as Congress or the United States Capitol Police.

The term "law enforcement officer" means any officer or employee of the United States or the District of Columbia while engaged in the enforcement or prosecution of any criminal laws of the United States or the District of Columbia.

For the U.S. Capitol Police and Metropolitan
Police Department on January 6, 2021, the term "official
duties" means policing U.S. Capitol Building and grounds and
enforcing federal law and D.C. law in those areas.

"Attempt."  In Count 1, Michael Oliveras is
alternatively charged with attempt to commit the crime of
civil disorder.  Attempting to commit this offense is not a
separate offense, but an alternative way in which the
government alleges that defendant Michael Oliveras committed
the same offense in Count 1.

In order to find the defendant guilty of attempt
to commit civil disorder, you must find that the government
proved beyond a reasonable doubt each of the following two
elements:  One, the defendant intended to commit the crime
of civil disorder as I have defined that offense above.
And, two, the defendant took a substantial step toward
committing civil disorder.

With respect to the first element of "attempt,"
you may not find the defendant guilty of attempt to commit
civil disorder merely because he thought about it.  You must
find that the evidence proved beyond a reasonable doubt that
the defendant's mental state passed beyond the stage of
thinking beyond the crime to actually intending to commit it.

With respect to the "substantial step" element,
you may not find that the defendant -- you may not find the

defendant guilty of attempt to commit civil disorder merely because he made some plans to or some preparation for committing the crime.  Instead, you must find that the defendant took some firm, clear, undeniable action to accomplish his intent to commit civil disorder.  However, the substantial step element does not require the government to prove that the defendant did everything except the last step necessary to complete the crime.

Count 2, obstruction of an official proceeding.

Count 2 charges that:  On or about January 6, 2021, within the District of Columbia and elsewhere, Michael Oliveras attempted to and did corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically Congress's certification of the Electoral College vote, as set out in Twelfth Amendment of the Constitution of the United States and 3 U.S.C. Sections 15 through 18, in violation of 18 U.S.C. Sections 1512(c)(2) and 2.

Count 2 charges the defendant with the substantive offense of corruptly obstructing an official proceeding and also with attempting to obstruct or impede an official proceeding, and aiding and abetting others to commit that offense.

I will first explain the elements of the substantive offense, along with its associated definitions,

then I will explain how to determine whether the defendant attempted the offense and whether the defendant aided and abetted the offense.

Elements for Count 2. To find the defendant guilty of the offense charged in Count 2, you must find that the government proved each of the following elements beyond a reasonable doubt: First, the defendant attempted to or did obstruct or impede any official proceeding; second, the defendant acted with the intent to obstruct or impede the official proceeding; third, the defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding; and fourth, the defendant acted corruptly.

Definitions: "Knowingly" has the same definition that I gave you above.

To "obstruct" or "impede" means to block, interfere with, or slow the progress of an official proceeding.

As the term "official proceeding" is used in this count, Congress's Joint Session to certify the Electoral College vote on January 6, 2021, was an official proceeding. The official proceeding need not be pending or about to be instituted at the time of the offense. If the official proceeding was not pending or about to be instituted, the government must prove beyond a reasonable doubt that the

official proceeding was reasonably foreseeable to the defendant.

To act "corruptly," the defendant must use independently, unlawful means to act with -- or act with an unlawful purpose, or both. The defendant must also act with consciousness of wrongdoing.

"Consciousness of wrongdoing" means with an understanding or awareness that what the person is doing is wrong or unlawful.

Not all attempts to obstruct or impede an official proceeding involve acting corruptly. For example, a witness in a court proceeding may refuse to testify by invoking his or her constitutional privilege against self-incrimination, thereby obstructing or impeding the proceeding but that person does not act corruptly. In contrast, an individual who obstructs or impedes a court proceeding by bribing a witness to refuse to testify in that proceeding or by engaging in other independently unlawful conduct does act corruptly.

In addition, the First Amendment to the United States Constitution affords people the right to speak, assemble, and petition the government for grievances. And, thus, an individual who does no more than lawfully exercise those rights does not act corruptly. Often acting corruptly involves acting with the intent to secure an unlawful

advantage or benefit either for one's self or for another person.

While the defendant must act with intent to obstruct the official proceeding, this need not be his sole purpose. A defendant's unlawful intent to obstruct an official proceeding is not negated by the simultaneous presence of another purpose for his conduct. However, the fact that the defendant's mere presence may have had the unintended effect of obstructing or impeding a proceeding does not establish both the defendant acted with the intent to obstruct or impede that proceeding.

"Attempt." In Count 2, Michael Oliveras was alternatively charged with attempt to commit the crime of obstruction of an official proceeding. An attempt to commit obstruction of an official proceeding is a crime even if the defendant did not actually complete the crime of obstruction of an official proceeding.

In order to find the defendant guilty of attempt to commit an obstruction of an official proceeding you must find that the government proved beyond a reasonable doubt each of the following two elements: First, the defendant intended to commit the crime of obstruction of an official proceeding as that offense is defined above. Second, the defendant engaged in conduct that constituted a substantial step toward committing obstruction of an official proceeding

it strongly corroborates or confirms that the defendant intended to commit that crime.

With respect to the first element of attempt, you may not find the defendant guilty of attempt to commit obstruction of an official proceeding merely because he thought about it. You must find beyond a reasonable doubt that the evidence proved beyond a reasonable doubt that the defendant's mental state passed beyond the stage of thinking about the crime to actually intending to commit it.

With respect to the substantial step element, you may not find the defendant guilty of attempt to commit obstruction of an official proceeding merely because of some plans to or some preparation for committing that crime. Instead, you must find beyond a reasonable doubt that the defendant took some firm, clear, undeniable action to accomplish his attempt to commit obstruction of an official proceeding. However, the substantial step element does not require the government to prove that the defendant did everything except the last act necessary to complete the crime.

Aiding and abetting. The government further charges that the defendant committed obstruction of an official proceeding by aiding and abetting others in committing this offense. This is not a separate offense, but merely another way in which the government alleges that

the defendant committed this offense in Count 2.

A person may be guilty of an offense if he aided and abetted another person in committing the offense. A person who has aided and abetted another person in committing an offense is often called an "accomplice." The person who the accomplice aids and abets is known as the "principal." It is not necessary that all of the people who committed a crime be caught or identified. It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone, and that the defendant knowingly and intentionally aided and abetted that person in committing the crime.

To find the defendant guilty of obstruction of an official proceeding in Count 2 because the defendant aided and abetted others in committing this offense, you must find that the government proved beyond a reasonable doubt the following elements: First, that others committed obstruction of an official proceeding by committing each of the elements of the offense charged as I have explained above; second, that the defendant knew that obstruction of an official proceeding was going to be committed or was being committed by others; third, that the defendant performed an act or acts in furtherance of that offense; fourth, that the defendant knowingly performed that act or acts for the purpose of aiding, assisting, soliciting,

facilitating, or encouraging others in committing the offense of obstruction of an official proceeding; fifth, that the defendant did that act or acts with the intent that others commit the offense of obstruction of an official proceeding.

To show that the defendant performed an act or acts in furtherance of the offense charged, the government must prove some affirmative participation by the defendant which at least encouraged others to commit the offense. That is, you must find that the defendant's act or acts did, in some way, aid, assist, facilitate, or encourage others to commit the offense. The defendant's act or acts need not further aid, assist, facilitate, or encourage every part or phase of the offense charged. It is enough if the defendant's act or acts further aided, assisted, facilitated, or encouraged only one or some parts or phases of the offense. Also, the defendant's acts need not themselves be against the law.

In deciding whether the defendant had the required knowledge and intent to satisfy the fourth requirement for aiding and abetting, you may consider both direct and circumstantial evidence, including the defendant's words and actions and other facts and circumstances. However, evidence that the defendant merely associated with persons involved in a criminal venture or was merely present or was

merely a knowing spectator during the commission of the offense is not enough for you to find the defendant guilty as an aider and abettor.  If the evidence shows that the defendant knew that the offense was being committed or was about to be committed but does not also prove beyond a reasonable doubt that it was the defendant's intent and purpose to aid, assist, encourage, facilitate, or otherwise associate the defendant with the offense, you may not find the defendant guilty of obstruction of an artificial proceeding as aider and abettor.  The government must prove beyond a reasonable doubt that the defendant in some way participated in the offense committed by others as something the defendant wished to bring about and to make succeed.

Count 3, assaulting, resisting, or impeding officers.

Count 3 charges that:  On or about January 6, 2021, at approximately 4:26 p.m., within the District of Columbia, Michael Oliveras did forcibly assault, resist, oppose, impede, intimidate, and interfere with an officer, an employee of the United States, and any branch of the United States government, including any member of the uniformed service, and any person assisting such an officer employee which such person was engaged in and on account of the performance of official duties and where the acts in violation of this section involved physical contact with the

victim and the intent to commit another felony in violation of 18 U.S.C. Section 111(a)(1).

Elements for Count 3.

To find the defendant guilty of the offense charged in Count 3 you must find that the government proved each of the following elements beyond a reasonable doubt: First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer from Metropolitan Police Department, United States Capitol Police, or other law enforcement agency; second, the defendant did such acts forcibly; third, the defendant did such acts voluntarily and intentionally; fourth, the person assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer or an employee of the United States who was then engaged in the performance of his or her official duties or assisting officers of the United States who were then engaged in the performance of their official duties; fifth, the defendant made physical contact with that officer or acted with the intent to commit another felony.

For purposes of this element, another felony refers to the offenses charged in Counts 1 and 2.

While the charge is written with an "and," you need only decide the defendant either made physical contact with that officer or acted with the intent to commit another felony.

You are instructed that officers of the Metropolitan Police Department were acting in their official duties to assist federal officers of the United States Capitol Police and in protecting the U.S. Capitol complex on January 6, 2021. It is not necessary to show that the defendant knew the person being forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with was at that time assisting federal officers in carrying out an official duty so long as it is established beyond a reasonable doubt that the victim was, in fact, assisting a federal officer acting in the course of his duty, and that the defendant intentionally forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with that officer.

Definitions. A person acts "forcibly" if he uses -- if he used force, attempted to use force, or threatened to use force against the officer. Physical force or contact is sufficient, but actual physical contact is not required.

You may also find that a person who has the present ability to inflict bodily harm upon another and who threatens or attempts to inflict bodily harm upon that person acts forcibly. In such case the threat must be a present one. A threat to use force at some unspecified time in the future is not sufficient to establish that the

defendant acted forcibly.

The term "assault" means any intentional attempt to or threat to inflict injury upon someone else when coupled with an apparent present ability to do so.  To find that the defendant committed an assault you must find beyond a reasonable doubt that the defendant intended to inflict or to threaten injury.

"Injury" means any physical injury, however small, including a touch offensive to a person of reasonable sensibility.

The terms "resist, oppose, impede, intimidate," and "interfere with" carry their every day ordinary meanings.

Count 4, entering and remaining in a restricted building or grounds.

Count 4 charges that:  On or about January 6, 2021, within the District of Columbia, Michael Oliveras did knowingly enter and remain in a restricted building or grounds, that is, any posted, cordoned off, and otherwise restricted area within the United States Capitol and its grounds where the Vice President was and would be temporarily visiting without lawful authority to do so in violation of 18 U.S.C. Section 1752(a)(1).

Elements for Count 4.

To find the defendant guilty of the offense charged in Count 4, you must find that the government proved

each of the following elements beyond a reasonable doubt:
First, the defendant entered and remained in a restricted
building or grounds without lawful authority to do so;
second, the defendant did so knowingly.

Where the charge is written with an "and," the
government must prove beyond a reasonable doubt only that
the defendant either knowingly entered or knowingly remained
in a restricted building or grounds without lawful
authority, or both.

Definitions.  "Knowingly" has the same definition
that I gave you above.

The term "restricted building or grounds" means
any posted, cordoned off, or otherwise restricted area of a
building or grounds where a person protected by the Secret
Service is or will be temporarily visiting.

The term "person protected by the Secret Service"
includes the Vice President and the immediate family of the
Vice President.

Count 5, disorderly and disruptive conduct in a
restricted building or grounds.

Count 5 charges that:  On or about January 6,
2021, within the District of Columbia, Michael Oliveras did
knowingly and with intent to impede and disrupt the orderly
conduct of government business and official functions
engaged in disorderly and disruptive conduct in and within

such proximity to a restricted building or grounds, that is, any posted, cordoned off, and otherwise restricted area within the United States Capitol and its grounds where the Vice President was and would be temporarily visiting when and so that such conduct did, in fact, impede and disrupt the orderly conduct of government business and official fictions in violation of 18 U.S.C. Section 1752(a)(2).

Elements for Count 5.

To find the defendant guilty of the offense charged in Count 5 you must find that the government proved each of the following elements beyond a reasonable doubt: First, the defendant engaged in disorderly or disruptive conduct in or in proximity to any restricted building or grounds. While the charge is written with an "and," the government must prove beyond a reasonable doubt that the defendant engaged in either disorderly or disruptive conduct, or both; second, the defendant did so knowingly and with intent to impede or disrupt the orderly conduct of government business or official functions; third, the defendant's conduct occurred when or so that his conduct, in fact, impeded or disrupted the orderly conduct of government business or official functions.

Definitions. "Knowingly" has the same definition that I gave you above.

The term "restricted building or grounds" has the

same meaning as described for Count 4.

"Disorderly conduct" is conduct that tends to disturb the public peace or undermine public safety. Disorderly conduct includes when a person acts in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken, uses words -- uses words likely to produce violence on the part of others or is unreasonably loud and disruptive under the circumstances.

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.

Count 6, disorderly conduct in a Capitol Building.

Count 6 charges that:  On or about January 6, 2021, within the District of Columbia, Michael Oliveras willfully and knowingly engaged in disorderly and disruptive conduct within the United States Capitol grounds in any of the Capitol Buildings, with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress, in either House of Congress, and the orderly conduct in that building of a hearing before or any deliberation of a committee of Congress or either House of Congress in violation of 40 U.S.C. -- "U.S.C." stands for United States Code -- Section 5104(e)(2)(D).

Elements for Count 6.

To find the defendant guilty of the offense charged in Count 6, you must find that the government proved each of the following elements beyond a reasonable doubt: First, the defendant engaged in disorderly or disruptive conduct in any of the United States Capitol buildings.

While the charge is written with an "and," you need only decide the defendant was either disorderly or disruptive.

Second, the defendant did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.  Third, the defendant acted willfully and knowingly.

"Knowingly" has the same definition that I gave you above.

The term "Capitol buildings" includes the United States Capitol, located at First Street, Southeast, in Washington, D.C.

The "Capitol grounds" includes the area depicted in Government's Exhibit 105.

For the purposes of Count 6, orderly conduct in a session of Congress or either House of Congress includes the actions of the Joint Session of Congress convened on January 6, 2021, to certify the Electoral College presidential election of 2020.

The term "disrupt the orderly conduct" has the

same meaning described in the instructions for Count 5 defining "disorderly conduct" and "disruptive conduct."

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law.  Willfully does not, however, require proof that the defendant be aware of the specific law or rule for this conduct he may be violating.

Last count, Count 7:  Parading, demonstrating, or picketing in a Capitol Building.

Count 7 charges that:  On or about January 6, 2021, within the District of Columbia, Michael Oliveras willfully and knowingly engaged in unlawful parading, demonstrating, or picketing in a Capitol Building in violation of 40 U.S.C. Section 5104(e)(2)(G).

Elements for Count 7.

To find the defendant guilty of the offense charged in Count 7 you must find that the government proved each of the following elements beyond a reasonable doubt: First, the defendant paraded, demonstrated, or picketed in any of the United States Capitol Buildings; second, the defendant acted willfully and knowingly.

The terms "parade" and "picket" have their ordinary meanings.

The term "demonstrate" refers to conduct that would disrupt the orderly business of Congress by, for

example, impeding or obstructing passageways, hearings, or meetings.  It does not include activities such as quiet praying.

The terms "Capitol Buildings," "knowingly," and "willfully" were previously defined.

Now, to the end of these instructions.  I am going to talk about deliberations and some logistical matters.

Each count charges a separate offense.  You should consider each offense and the evidence which applies to it separately and you should return separate verdicts as to each count.  The fact that you may find the defendant guilty or not guilty on any one charge should not influence your verdict with respect to any other charge.  At any time during your deliberations you may return a verdict of guilty or not guilty with respect to any count.

A verdict must represent the considered judgment of each juror and, in order to return a verdict, each juror must agree on the verdict.  In other words, your verdict on each count must be unanimous.

You will be provided with a verdict form for your use when you have concluded your deliberations.  The form is not evidence in this case, and nothing in it should be taken to suggest or convey any opinion by me as to what the verdict should be.  Nothing in the form replaces the instructions of law as I have given them to you, nothing in

it replaces or modifies the instructions about the elements
which the government must prove beyond a reasonable doubt.
The form is meant only to assist you in recording your
verdict.

       I will be sending into the jury room with you the
exhibits that have been admitted into evidence.  You may
examine any or all of them as you consider your verdicts.
Please keep in mind that any exhibits that were only marked
for identification but were not admitted into evidence will
not be given to you to examine or consider in reaching your
verdict.

       When you return to the jury room you should first
select a foreperson to preside over your deliberations and
to be your spokesperson here in court.  There are no
specific rules regarding how you as the jury should select a
foreperson.  That is up to you.  However, as you go about
this task, be mindful of your mission to reach a fair and
just verdict based on the evidence.  Consider selecting a
foreperson who will be able to facilitate your discussions,
who will help you organize the evidence, and who will
encourage civility and mutual respect among all of you, who
will invite each juror to speak up regarding his or her
views about the evidence, and who will promote a fair and
full consideration of that evidence.

       The question of possible punishment of the

defendant in the event of a conviction is not a concern for you and should not enter into or influence your deliberations in any way.  The duty of imposing a sentence in the event of a conviction rests exclusively with me. Your verdict should be based solely on the evidence in this case and you should not consider the matter of punishment at all.

I would like to remind you that in some cases there may be reports on the internet, television, radio, or newspaper concerning this case, or other reporting related to the events at the U.S. Capitol on January 6, 2021.  You may be tempted to read, listen to, or watch it, and you must not read, listen to, or watch such reports because you must decide this case solely on the evidence presented in this courtroom.  If any publicity about this trial or related events inadvertently comes to your attention during the deliberations, do not discuss it with other jurors or anyone else.  Just let Mr. Coates, the courtroom deputy, know, or the court security officer who will be seated outside the jury room during your deliberations.  I will then briefly discuss it with you.

As you retire to the jury room to deliberate, I also wish to remind you of an instruction I gave you at the beginning of the trial:

During your deliberations you must not communicate

with or provide any information to anyone by any means about
the -- by any means about the case.  You may not use any
electronic device or media, such as a phone, smartphone,
iPhone, computer, tablet, the internet, or any internet
service, any text or instant messaging service, any internet
chat room, blog, or social media service, such as:
Facebook, LinkedIn, YouTube, Twitter or X, or Instagram to
communicate to anyone any information about this case or to
conduct any research about this case until I accept your
verdict.

In other words, you cannot talk to anyone on the
phone, correspond with anyone, or electronically communicate
with anyone about the case.  You can only discuss the case
in the jury room with your fellow jurors during
deliberations.  I expect you will inform me as soon as you
become aware of another juror's violation of these
instructions.

You may not use these electronic means to
investigate or communicate about the case because it is
important that you decide this case based solely on the
evidence presented in the courtroom.  Information on the
internet or available through social media might be wrong,
incomplete or inaccurate, and you are only permitted to
discuss this case with your fellow jurors during
deliberations because they have seen and heard the same

evidence you have.

In our judicial system it is important that you are not influenced by anything or anyone outside the courtroom, otherwise your decision may be based on information known only by you and not your fellow jurors or the parties in the case and that would unfairly and adversely affect the judicial process.

If it becomes necessary during your deliberations to communicate with me, you may send a note by the courtroom deputy or court security officer who will be stationed outside the jury room, signed by your foreperson or by one or more members of the jury. No member of the jury should try to communicate with me except by such a signed note, and I will never communicate with any member of the jury on any matter concerning the merits of this case except in writing or orally here in open court.

Bear in mind that you are never, under any circumstances, to reveal to any person -- not the clerk, the court security officer, or me -- how jurors are voting until after you have reached a unanimous verdict. This means that you should never tell me in writing or in open court how the jury is divided on any matter, for example: 6-6, or 7-1, or 11-1, or in any other fashion, whether the vote is for a conviction or acquittal or on any other issue in the case.

The attitude and conduct of jurors at the

beginning of their deliberations are matters of considerable importance.  It may not be useful for a juror, upon entering the jury room, to voice a strong expression of an opinion on the case or to announce a determination to stand for a certain verdict.  When one does that at the outset, a sense of pride may cause that juror to hesitate to back away from an announced position after a discussion of the case.  Furthermore, many jurors find it useful to avoid an initial vote upon retiring to the jury room.  Calmly reviewing and discussing the case at the beginning of deliberations is often a more useful way to proceed.

Remember that you are not partisans or advocates in this matter, but you are judges of the facts.

All right.  That concludes my instructions.

Before I excuse the regular jurors to begin your deliberations and have their lunch, which should be in the jury room for you, my last task is to excuse the alternate jurors.  As I told you before, the selection of alternates was an entirely random process, it's nothing personal.  We selected two seats to be the alternate seats before any of you entered the courtroom.  Since the rest of you have remained attentive and healthy, I can now excuse the jurors in Seats 13 and 14, the last two seats in the back row.

Before you leave, alternates, I am going to ask that you tear a page out of your notebook and write your

contact information on it.  It's unlikely but it is possible
that if one of the regular jurors during deliberations has
to be excused, we might be calling you back to assume a spot
as a regular juror.  What that means, also, is that I am
going to ask that you follow my instructions not to talk
about this case with anyone until you receive a phone call
from Mr. Coates telling you that a verdict -- that the jury
has reached verdicts and have been excused, then you are
free to discuss the case just in case we have to call you
back.  I want to thank you very much for your service.

I will ask the jury to -- you can take your
notebooks with you and retire to your deliberations while
the two alternates give their information to Mr. Coates.

(Whereupon, the jury was excused.)

THE COURT:  All right.  I am sure they're starving
since it's almost 1:20.  Just make sure that Mr. Coates has
your contact information so that he can call you in case
there is a jury note.  And you have to work with Mr. Coates
now to pull together all of the exhibits, which you have all
there.  Okay.

It's all on a thumb drive?

MS. AKERS:  Yes, Your Honor.  We just need to show
it to Mr. Shipley to confirm.

THE COURT:  Okay.  So why don't you do that.  And
then you have to sign -- I like having exhibit sheets

signed -- that everybody has signed off, they have approved the exhibits going back to the jury.

You will also -- it will take about five, ten minutes.  You are going to see the jury version of the instructions that I have just read, catching typos that I have caught as well; you can look at those.  Then I will send 12 copies back with the jury so they each have their own copy.

All right.  Anything else to cover?

MS. AKERS:  No, Your Honor.

THE COURT:  Okay.  Mr. Shipley?

MR. SHIPLEY:  No, Your Honor.  Thank you.

THE COURT:  Okay.

(Whereupon, court recessed during deliberations.)

THE COURT:  I don't know whether Mr. Coates has told you, but we did receive a jury note that the jury has reached a verdict.

We'll bring the jury in.

MR. SHIPLEY:  A note or a verdict?

THE COURT:  A note that they have reached a verdict.

MR. SHIPLEY:  Okay.

(Whereupon, the jury returns to the courtroom.)

THE COURT:  Good afternoon, ladies and gentlemen. I have received your note that you have reached a verdict.

Who on the jury speaks as your foreperson?

(Whereupon, a juror raises his/her hand.)

THE COURT:  Okay.  Thank you.

I am going to give you a microphone, a hand-held mic.  I would ask the jury foreperson to please open your envelope.

If you could stand and publish your verdict in open court.

THE FOREPERSON:  Do I have to read each verdict?

THE COURT:  I'm sorry?

THE FOREPERSON:  Do I have to read each one?

THE COURT:  Yes, please.

THE FOREPERSON:  Count 1, guilty.

Count 2 --

THE COURT:  And as to the questions?

THE FOREPERSON:  And as to the questions, the first question is a yes.

The second question is also yes.

THE COURT:  And as to Count 2?

THE FOREPERSON:  Count 2, guilty.

THE COURT:  As to Count 3?

THE FOREPERSON:  Count 3, guilty.

THE COURT:  As to Count 4?

THE FOREPERSON:  Count 4, guilty.

THE COURT:  As to Count 5?

THE FOREPERSON:  Count 5, guilty.

THE COURT:  As to Count 6?

THE FOREPERSON:  Count 6, guilty.

THE COURT:  Count 7?

THE FOREPERSON:  Guilty.

THE COURT:  Thank you.

Mr. Coates, could you please take the verdict form.

Do either party want the jury polled?

MS. AKERS:  No, Your Honor.

THE COURT:  Mr. Shipley?

MR. SHIPLEY:  Your Honor, we do not request a polling.

THE COURT:  All right.  Ladies and gentlemen, you have been very conscientious this week.  I want to thank you very much for your service.

Our criminal justice system only works when citizens step forward and agree to serve as jurors.  I want to thank you very much for your service this week.  With the thanks of the entire court, you are now excused.

I do take some time to talk to jurors afterwards to find out if there is anything we can do better here.  I have a couple of things I need to take up with the parties. If any of you have any questions or things you want to discuss if you just wait in the jury room, when I finish here in five to ten minutes, I will stop by the jury room to speak to you if you wish.  Thank you.

(Whereupon, the jury was excused.)

THE COURT:  All right.  We need to set a sentencing date.

I would propose Friday, March 15, 2024, at 9:30. Please check your calendars.

MR. SHIPLEY:  March?

THE COURT:  March, yes.

Our probation office is very, very busy.  They are now asking for about 110 days to prepare the presentence investigation reports.

MS. AKERS:  That works for the government, Your Honor.

THE COURT:  Mr. Shipley.

MR. SHIPLEY:  I'm sorry.  My client is asking --

THE COURT:  March.  March 15, 2024, at 9:30.

Are you available?

MR. SHIPLEY:  Yes.  I have a trial with Judge Jackson in March, but I don't think it's going to go.

THE COURT:  Okay.  I will set that down for the sentencing date.

Did you get that, Mark?

THE COURTROOM DEPUTY:  March 15th.

THE COURT:  Right.  At 9:30.

All right.  Does the government have any position on pretrial release or detention pending sentencing?

MS. AKERS:  The government's position is that the defendant can remain on his current release conditions at this time.

THE COURT:  All right.  So Mr. Oliveras --

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  -- I will allow you to remain on release pending sentencing, but I have to caution you about your compliance with your release conditions.

You are on the same release conditions that you have been on; up to far you have been doing very well on those.

Let me just caution you also:  If you violate any of those terms of release or if you fail to appear for sentencing on the March 15, 2024, sentencing date, that could result -- failure to appear can result in a separate criminal offense so it's very important that you be here on that date.

If you violate any of the conditions of your release you can be subject to revocation of release or a separate prosecution for contempt of court.

If you are convicted of any new offense committed while you are on release pending sentencing, you could be subject to an enhanced or an additional term of imprisonment and a separate prosecution for committing an offense while on release pending sentencing.

Do you understand that?

THE DEFENDANT:  I do, Your Honor.

THE COURT:  Is there anything further today from the government?

MS. AKERS:  No, Your Honor.

THE COURT:  Anything further from you, Mr. Shipley?

MR. SHIPLEY:  Nothing.  No, Your Honor.

THE COURT:  Nothing further?

MR. SHIPLEY:  Nothing.  Thank you.

THE COURT:  Okay.  You are all excused.

I will see you on March 15.

(Whereupon, the proceeding concludes, 3:19 p.m.)

* * * * *

### CERTIFICATE

I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby certify that the foregoing constitutes a true and accurate transcript of my stenographic notes, and is a full, true, and complete transcript of the proceedings to the best of my ability.


This certificate shall be considered null and void if the transcript is disassembled and/or photocopied in any manner by any party without authorization of the signatory below.


Dated this 11th day of February, 2024.

/s/ Elizabeth Saint-Loth, RPR, FCRR
Official Court Reporter

**'**

**'em** [1] - 35:1

**/**

**/s** [1] - 119:23

**1**

**1** [21] - 13:21, 14:5, 16:13, 16:22, 18:10, 21:1, 32:16, 33:25, 86:11, 86:12, 86:24, 87:6, 87:7, 87:23, 88:5, 88:12, 88:17, 90:5, 90:10, 99:21, 115:12
**10** [1] - 6:12
**1000** [1] - 71:24
**1002** [9] - 66:13, 66:14, 66:16, 66:18, 66:22, 66:23, 67:1, 67:8, 67:9
**1009** [4] - 63:19, 71:22, 72:5, 72:23
**105** [1] - 105:19
**10:08** [1] - 1:5
**11** [1] - 6:8
**11-1** [1] - 111:23
**110** [1] - 117:9
**1100** [1] - 1:11
**111** [20] - 3:5, 3:21, 4:12, 4:16, 4:25, 5:8, 5:10, 5:19, 6:3, 6:13, 7:12, 7:17, 8:12, 8:18, 8:24, 9:7, 9:16, 10:10, 10:14
**111(a** [2] - 8:4, 68:2
**111(a)(1)** [1] - 99:2
**111(b** [2] - 6:16, 8:6
**11th** [1] - 119:22
**12** [1] - 114:7
**1231** [1] - 10:9
**1232** [1] - 10:9
**12:55** [1] - 43:14
**13** [1] - 112:23
**13th** [1] - 8:16
**14** [1] - 112:23
**1494** [1] - 10:11
**1495** [1] - 4:7
**1496** [1] - 10:11
**15** [6] - 61:20, 91:17, 117:4, 117:15, 118:14, 119:12
**1512(c)(2** [1] - 91:18
**15th** [2] - 3:15, 117:22
**16** [1] - 1:4
**1752(a)(1)** [1] - 101:22
**1752(a)(2)** [1] - 103:7

**18** [12] - 3:5, 3:21, 4:12, 4:15, 9:7, 9:16, 86:22, 91:17, 99:2, 101:22, 103:7
**19** [4] - 45:1, 46:3, 51:20, 52:4
**197** [1] - 7:14
**1974** [1] - 10:9
**1985** [1] - 10:12
**1996** [4] - 4:7, 4:12, 5:18, 9:6
**1999** [1] - 7:15
**1:20** [1] - 113:16
**1:45** [1] - 61:11

**2**

**2** [16] - 18:1, 32:16, 36:5, 91:9, 91:10, 91:18, 91:19, 92:4, 92:5, 94:12, 96:1, 96:14, 99:21, 115:13, 115:18, 115:19
**2-by-4** [3] - 53:14, 53:17
**20** [1] - 61:21
**20004** [1] - 1:16
**2002** [3] - 6:8, 6:18, 9:7
**2008** [1] - 9:7
**202** [2] - 1:12, 1:16
**2020** [10] - 12:7, 12:25, 19:20, 20:2, 20:20, 22:5, 36:7, 47:16, 55:7, 105:24
**2021** [18] - 9:7, 12:16, 13:7, 14:5, 14:9, 47:16, 86:13, 90:2, 91:11, 92:21, 98:17, 100:5, 101:16, 102:22, 104:15, 105:23, 106:11, 109:11
**2022** [1] - 8:16
**2023** [3] - 1:4, 8:8, 47:14
**2024** [4] - 117:4, 117:15, 118:14, 119:22
**20530** [1] - 1:12
**20th** [1] - 8:8
**21-738** [2] - 1:3, 2:3
**21-CR-40** [1] - 8:4
**22** [1] - 58:24
**228-1341** [1] - 1:20
**231(a)(3)** [1] - 86:23
**252-7811** [1] - 1:16
**2:10** [2] - 49:10, 63:20
**2:12** [1] - 49:10

**2:13** [2] - 50:1, 53:17
**2:19:58** [1] - 50:22
**2:20:36** [1] - 49:23
**2:22** [4] - 49:12, 53:23, 58:22, 58:24
**2:41** [2] - 52:3, 60:2
**2:50** [1] - 41:24

**3**

**3** [15] - 2:19, 3:12, 3:16, 4:9, 10:18, 30:13, 32:19, 91:16, 98:14, 98:16, 99:3, 99:5, 115:20, 115:21
**30** [1] - 53:21
**300,000** [1] - 55:3
**301** [2] - 53:10, 53:11
**309** [2] - 6:7, 49:20
**32** [1] - 8:8
**353-0521** [1] - 1:12
**3:19** [1] - 119:13

**4**

**4** [7] - 101:13, 101:15, 101:23, 101:25, 104:1, 115:22, 115:23
**40** [4] - 6:7, 59:22, 104:23, 106:14
**419** [7] - 65:17, 65:19, 66:7, 66:12, 67:6
**45** [3] - 28:17, 53:21, 73:25
**46** [1] - 6:8
**491** [1] - 10:8
**4:20** [2] - 42:7, 61:5
**4:25** [1] - 56:21
**4:26** [9] - 42:7, 43:4, 46:19, 46:23, 59:20, 59:21, 60:3, 86:13, 98:17
**4:56** [1] - 60:2

**5**

**5** [9] - 34:16, 36:1, 102:19, 102:21, 103:8, 103:10, 106:1, 115:24, 115:25
**50** [3] - 59:22, 60:12, 67:18
**503** [4] - 14:23, 60:19, 60:20, 60:22
**5104(e)(2)(D)** [1] - 104:24
**5104(e)(2)(G)** [1] - 106:14

**513** [1] - 60:22
**514** [1] - 62:7
**54** [1] - 68:14

**6**

**6** [29] - 12:16, 13:7, 14:5, 14:9, 18:12, 20:17, 21:16, 22:14, 36:18, 43:14, 86:12, 90:2, 91:10, 92:21, 98:16, 100:5, 101:15, 102:21, 104:13, 104:14, 104:25, 105:2, 105:20, 105:23, 106:10, 109:11, 116:1, 116:2
**6-6** [1] - 111:22
**600** [1] - 7:14
**601** [1] - 1:15
**618** [1] - 74:7
**6th** [14] - 12:11, 18:9, 20:5, 20:12, 21:15, 21:20, 24:1, 25:2, 31:14, 36:8, 39:6, 48:18, 55:11, 71:11

**7**

**7** [6] - 38:18, 106:8, 106:10, 106:15, 106:17, 116:3
**7-1** [1] - 111:22
**735** [1] - 65:13
**745** [1] - 1:19
**752** [1] - 10:11

**8**

**808** [1] - 1:20
**808Shipleylaw@ gmail.com** [1] - 1:20

**9**

**96** [1] - 4:7
**96734** [1] - 1:19
**9:30** [3] - 117:4, 117:15, 117:23

**A**

**a.m** [1] - 1:5
**abets** [1] - 96:6
**abetted** [5] - 92:3, 96:3, 96:4, 96:11, 96:15
**abetting** [7] - 27:19, 27:22, 28:1, 91:22,

**95:21, 95:23, 97:21
**abettor** [2] - 98:3, 98:10
**ability** [9] - 10:2, 10:8, 30:21, 31:10, 57:16, 80:21, 100:21, 101:4, 119:18
**able** [1] - 108:19
**absolute** [1] - 85:9
**absolves** [1] - 45:12
**accept** [3] - 75:24, 84:16, 110:9
**acceptable** [1] - 80:10
**access** [5] - 13:4, 24:5, 25:23, 26:3, 44:24
**accident** [1] - 86:8
**accomplice** [2] - 96:5, 96:6
**accomplish** [3] - 56:17, 91:5, 95:16
**according** [1] - 51:1
**account** [3] - 31:13, 72:23, 98:23
**accuracy** [1] - 83:25
**accurate** [3] - 83:18, 84:16, 119:16
**accurately** [3] - 3:7, 9:15, 83:9
**acknowledged** [1] - 5:16
**acquittal** [1] - 111:24
**act** [26] - 6:10, 10:3, 14:11, 16:7, 27:25, 46:8, 79:9, 86:8, 86:15, 87:13, 93:3, 93:4, 93:5, 93:15, 93:18, 93:24, 94:3, 95:19, 96:23, 96:24, 97:3, 97:6, 97:10, 97:12, 97:15
**acted** [22] - 21:22, 22:18, 22:21, 30:14, 31:12, 31:16, 31:23, 37:19, 38:19, 38:23, 82:24, 86:9, 87:10, 92:9, 92:10, 92:13, 94:10, 99:19, 99:24, 101:1, 105:12, 106:21
**acting** [6] - 52:25, 93:11, 93:24, 93:25, 100:2, 100:11
**action** [6] - 30:23, 69:15, 69:16, 89:7, 91:4, 95:15
**Action** [1] - 1:2
**actions** [13] - 13:7, 16:2, 20:23, 26:24, 36:7, 37:20, 37:21,

2

37:25, 45:15, 71:9,
97:23, 105:22
**activities** [1] - 107:2
**activity** [3] - 40:16,
46:13, 104:11
**actor** [1] - 27:4
**acts** [21] - 30:15,
82:13, 82:17, 86:6,
88:21, 96:23, 96:25,
97:3, 97:7, 97:10,
97:12, 97:15, 97:17,
98:24, 99:10, 99:11,
100:15, 100:23,
104:4, 106:3
**actual** [5] - 10:2,
10:16, 30:18, 79:20,
100:18
**add** [1] - 2:21
**addition** [6] - 2:18,
3:1, 3:12, 3:20,
10:18, 93:20
**additional** [7] - 3:15,
4:8, 4:9, 6:4, 7:10,
34:23, 118:23
**administration** [1] -
89:16
**admissible** [1] - 81:16
**admitted** [13] - 66:9,
66:16, 66:21, 75:3,
76:6, 77:9, 77:11,
81:21, 81:22, 81:25,
82:5, 108:6, 108:9
**advance** [1] - 63:19
**advantage** [1] - 94:1
**adversely** [6] - 16:18,
86:19, 87:18, 88:1,
88:3, 111:7
**advocates** [1] - 112:12
**affect** [4] - 80:21,
80:23, 84:23, 111:7
**affected** [11] - 16:18,
17:22, 17:24, 86:19,
87:18, 88:1, 88:3,
88:7, 88:9, 88:10,
88:14
**affects** [1] - 83:14
**affirmed** [1] - 4:15
**affords** [1] - 93:21
**afoot** [1] - 30:12
**afternoon** [5] - 43:15,
48:17, 48:21, 56:22,
114:23
**afterwards** [2] - 69:4,
116:19
**age** [1] - 76:19
**agencies** [1] - 68:16
**agency** [3] - 89:8,
89:15, 99:10
**agents** [4] - 4:14,
4:18, 4:21, 6:11,

6:21, 7:3
**aggravated** [1] - 5:7
**agitated** [1] - 47:24
**ago** [3] - 44:18, 55:3,
56:8
**agree** [4] - 12:14,
72:3, 107:18, 116:16
**agreed** [8] - 3:17,
16:14, 16:21, 16:23,
17:21, 18:11, 32:9,
77:14
**agrees** [1] - 87:24
**ahead** [1] - 22:15
**aid** [3] - 97:11, 97:13,
98:7
**aided** [7] - 1:25, 92:2,
96:2, 96:4, 96:11,
96:14, 97:15
**aider** [2] - 98:3, 98:10
**aiding** [8] - 27:18,
27:22, 28:1, 91:22,
95:21, 95:23, 96:25,
97:21
**aids** [1] - 96:6
**air** [6] - 28:21, 29:16,
56:19, 64:14, 64:20,
72:21
**Akers** [5] - 2:9, 40:4,
40:18, 49:3, 71:2
**AKERS** [29] - 1:10,
2:8, 3:2, 10:21, 11:7,
11:23, 11:25, 12:4,
20:15, 23:18, 23:25,
28:25, 29:9, 29:15,
29:19, 31:5, 33:23,
36:24, 37:15, 38:9,
65:16, 66:13, 67:4,
113:22, 114:10,
116:8, 117:11,
118:1, 119:5
**alarm** [1] - 73:9
**alive** [1] - 46:7
**alleges** [2] - 90:9,
95:25
**allow** [2] - 80:23,
118:6
**almost** [5] - 29:5,
54:15, 65:15, 69:17,
113:16
**alone** [5] - 56:7, 76:6,
76:7, 83:5
**ALSO** [1] - 1:21
**altercation** [4] - 24:13,
31:16, 33:2, 33:4
**alternate** [2] - 112:17,
112:20
**alternates** [3] -
112:18, 112:24,
113:13
**alternative** [1] - 90:8

**alternatively** [3] -
88:13, 90:6, 94:13
**Amendment** [7] -
45:11, 45:12, 71:5,
71:6, 71:7, 91:15,
93:20
**amendment** [1] - 3:5
**amendments** [1] - 9:7
**Amendola** [8] - 15:22,
26:7, 37:4, 37:7,
41:12, 41:20, 52:14,
73:12
**America** [1] - 2:3
**AMERICA** [1] - 1:2
**American** [2] - 13:6,
40:13
**analysis** [2] - 6:19, 7:7
**angle** [2] - 63:13,
64:19
**angles** [1] - 60:9
**animated** [1] - 47:24
**ANNE** [1] - 1:14
**announce** [1] - 112:4
**announced** [1] - 112:7
**answer** [5] - 81:19,
87:22, 88:11, 88:12,
88:16
**antagonism** [1] -
47:18
**Antifa** [1] - 56:2
**apologize** [1] - 51:20
**apparent** [3] - 10:2,
10:8, 101:4
**appear** [5] - 8:9,
61:12, 82:4, 86:5,
118:13, 118:15
**APPEARANCES** [1] -
1:9
**appeared** [1] - 41:18
**applicable** [2] - 6:15,
7:11
**applied** [1] - 8:12
**applies** [4] - 8:18,
74:25, 75:24, 107:9
**apply** [1] - 85:5
**approved** [1] - 114:1
**apt** [1] - 57:18
**area** [6] - 34:6, 35:20,
101:19, 102:13,
103:2, 105:18
**areas** [2] - 48:17, 90:4
**arguably** [2] - 72:10,
73:21
**argument** [3] - 8:25,
11:18, 81:11
**arguments** [3] - 2:22,
11:18, 77:22
**arm** [2] - 29:16, 29:17
**arms** [2] - 29:13, 72:12
**arrested** [1] - 26:20

**Arrington** [2] - 6:7, 7:6
**arrive** [1] - 76:15
**arrived** [2] - 56:7, 61:7
**arriving** [1] - 43:13
**article** [5] - 16:19,
17:22, 86:20, 87:19,
88:1
**artifacts** [1] - 37:10
**artificial** [1] - 98:9
**ASHLEY** [1] - 1:10
**Ashley** [1] - 2:9
ashley.akers@usdoj
.gov [1] - 1:13
**assault** [18] - 4:24,
5:1, 5:2, 5:7, 5:8,
5:10, 5:23, 5:24, 6:5,
7:8, 7:17, 8:12, 8:18,
9:21, 10:1, 98:18,
101:2, 101:5
**assaulted** [8] - 6:21,
9:17, 28:9, 32:4,
99:7, 99:12, 100:6,
100:12
**assaulting** [8] - 3:16,
4:1, 4:16, 26:14,
28:5, 33:9, 69:22,
98:14
**assemble** [1] - 93:22
**asserts** [1] - 79:20
**assigned** [1] - 68:11
**assist** [6] - 77:23,
97:11, 97:13, 98:7,
100:3, 108:3
**assisted** [1] - 97:15
**assisting** [5] - 96:25,
98:22, 99:16, 100:8,
100:10
**associate** [1] - 98:8
**associated** [3] - 87:3,
91:25, 97:24
**assume** [4] - 79:25,
80:4, 85:13, 113:3
**at-your-chair** [1] -
40:7
**attempt** [17] - 8:17,
17:9, 90:5, 90:6,
90:11, 90:18, 90:19,
91:1, 94:12, 94:13,
94:14, 94:18, 95:3,
95:4, 95:11, 95:16,
101:2
**attempted** [11] - 17:4,
17:7, 18:4, 18:13,
27:6, 86:14, 87:4,
91:12, 92:2, 92:7,
100:16
**attempting** [8] - 6:21,
7:8, 35:13, 37:6,
70:25, 87:1, 90:7,
91:21

**attempts** [4] - 30:16,
30:22, 93:10, 100:22
**attending** [1] - 69:9
**attention** [4] - 11:14,
64:6, 69:3, 109:16
**attentive** [1] - 112:22
**attitude** [1] - 111:25
**Attorney's** [1] - 1:14
**attorneys** [1] - 77:4
**authorities** [1] - 55:14
**authority** [5] - 33:18,
89:17, 101:21,
102:3, 102:9
**authorization** [2] -
44:11, 119:20
**authorized** [1] - 54:7
**available** [2] - 110:22,
117:16
**avoid** [1] - 112:8
**aware** [8] - 27:24,
43:3, 76:9, 76:11,
76:14, 86:7, 106:6,
110:16
**awareness** [3] - 21:23,
92:11, 93:8
**awfully** [1] - 48:10
**awkward** [1] - 5:5

## B

**backup** [1] - 46:25
**bad** [2] - 55:25, 56:4
**badly** [1] - 52:16
**bare** [1] - 23:19
**barricade** [1] - 37:10
**barricading** [1] -
73:15
**barrier** [1] - 8:22
**barriers** [3] - 12:18,
49:6, 71:12
**base** [1] - 75:2
**based** [15] - 8:9, 25:2,
32:7, 32:8, 32:16,
32:24, 69:11, 79:1,
79:2, 79:11, 79:12,
108:18, 109:5,
110:20, 111:4
**basement** [1] - 41:21
**basis** [1] - 69:17
**bear** [3] - 48:8, 70:8,
111:17
**became** [3] - 49:2,
49:17, 69:9
**become** [1] - 110:16
**becomes** [2] - 65:3,
111:8
**BEFORE** [1] - 1:7
**began** [1] - 64:23
**begin** [6] - 2:17,
11:21, 64:4, 70:7,

3

70:12, 112:15
**beginning** [7] - 75:21, 78:17, 83:11, 85:16, 109:24, 112:1, 112:10
**begins** [2] - 60:3, 64:18
**behalf** [3] - 2:9, 2:15, 2:19
**behavior** [1] - 83:15
**behind** [6] - 49:7, 51:11, 60:25, 64:11, 65:4, 65:5
**beings** [1] - 76:9
**belated** [1] - 4:8
**belief** [1] - 47:24
**believability** [1] - 76:8
**believable** [1] - 81:7
**believes** [2] - 4:6, 59:6
**below** [2] - 29:17, 119:21
**benefit** [1] - 94:1
**bent** [1] - 15:3
**berated** [1] - 15:14
**BERYL** [1] - 1:7
**best** [2] - 54:18, 119:17
**better** [7] - 46:19, 47:11, 52:8, 56:18, 63:13, 65:12, 116:20
**between** [11] - 5:1, 42:7, 47:18, 50:8, 61:22, 61:24, 63:2, 84:2, 84:7, 84:9, 89:3
**beyond** [42] - 3:17, 3:25, 13:12, 13:19, 47:20, 58:11, 69:8, 78:4, 78:9, 78:14, 78:18, 78:25, 79:14, 79:15, 82:23, 83:2, 87:8, 90:13, 90:21, 90:22, 90:23, 92:6, 92:25, 94:20, 95:6, 95:7, 95:8, 95:14, 96:9, 96:16, 98:5, 98:11, 99:6, 100:9, 101:5, 102:1, 102:6, 103:11, 103:15, 105:3, 106:18, 108:2
**bias** [1] - 84:22
**biased** [1] - 84:20
**biases** [6] - 74:12, 76:11, 76:13, 76:14, 83:13
**big** [6] - 14:25, 45:23, 52:14, 55:4, 67:20, 73:23
**biggest** [1] - 43:13
**bike** [6] - 12:18, 25:13,

25:15, 25:23, 34:4
**bit** [10] - 21:25, 40:8, 44:22, 44:23, 49:8, 49:14, 50:4, 52:1, 61:21, 70:4
**Black** [1] - 56:2
**blacked** [1] - 81:24
**blaring** [1] - 26:8
**block** [2] - 24:2, 92:16
**blocked** [1] - 18:15
**blocking** [1] - 41:24
**blog** [1] - 110:6
**bluntly** [1] - 5:4
**board** [1] - 89:17
**bodily** [14] - 4:3, 4:21, 5:12, 6:12, 6:22, 7:9, 7:18, 8:5, 30:21, 30:23, 31:10, 31:11, 100:21, 100:22
**body** [6] - 29:1, 29:5, 29:9, 30:25, 65:21, 73:25
**body-worn** [5] - 29:1, 29:5, 29:9, 30:25, 65:21
**bombast** [1] - 53:4
**bombastic** [1] - 45:19
**booked** [2] - 13:2, 20:19, 24:3
**bothered** [1] - 59:19
**bottom** [1] - 64:16
**bound** [1] - 19:23
**BOX** [1] - 1:19
**branch** [2] - 89:12, 98:20
**bravado** [1] - 45:18
**brawl** [9] - 28:16, 29:21, 46:11, 46:17, 46:18, 47:1, 47:2, 72:16, 72:20
**brazenly** [2] - 15:11, 31:24
**breach** [3] - 19:8, 25:3, 53:15
**breached** [4] - 49:25, 50:8, 51:5, 53:21
**break** [4] - 53:20, 70:1, 70:9, 70:14
**bribing** [1] - 93:16
**briefly** [2] - 6:6, 109:20
**bring** [5] - 10:19, 10:24, 69:2, 98:13, 114:18
**broke** [2] - 30:2, 50:23
**broken** [3] - 12:21, 51:5, 73:13
**brought** [3] - 62:15, 69:6, 85:18
**building** [40] - 18:25,

21:9, 24:5, 25:9, 25:25, 33:16, 33:17, 34:7, 34:15, 34:17, 35:16, 36:16, 37:21, 38:14, 38:15, 38:16, 39:15, 46:2, 51:3, 53:5, 53:6, 55:12, 56:11, 56:23, 58:2, 58:22, 59:23, 73:2, 101:14, 101:17, 102:3, 102:8, 102:12, 102:14, 102:20, 103:1, 103:13, 103:25, 104:21
**Building** [33] - 12:10, 18:21, 18:22, 21:3, 21:5, 21:14, 22:3, 23:7, 24:21, 25:12, 34:10, 34:25, 36:18, 37:11, 38:2, 38:4, 38:6, 38:10, 38:21, 38:25, 39:6, 39:9, 39:12, 41:11, 44:1, 44:12, 44:25, 47:3, 48:14, 48:17, 48:22, 48:25, 49:10, 54:7, 54:24, 55:9, 55:24, 55:25, 57:4, 57:15, 70:23, 71:11, 71:17, 73:7, 73:11, 73:15, 74:4, 74:10, 89:20, 90:1, 90:3, 99:9, 100:4, 101:19, 103:3, 104:13, 104:17, 104:18, 105:5, 105:15, 105:16, 105:18, 106:9, 106:13, 106:20, 107:4, 109:11
**Buildings** [4] - 36:22, 104:18, 106:20, 107:4
**buildings** [3] - 55:5, 105:5, 105:15
**built** [1] - 55:8
**burden** [5] - 58:8, 58:18, 78:5, 78:18, 79:15
**bureau** [1] - 89:17
**burn** [1] - 55:8
**burned** [1] - 60:6
**business** [7] - 36:3, 36:10, 102:24, 103:6, 103:19, 103:22, 106:25
**busy** [1] - 117:8
**but..** [1] - 55:4

# C

**cabin** [1] - 6:19
**cabined** [1] - 7:6
**calendars** [1] - 117:5
**calisthenics** [1] - 40:7
**calm** [1] - 63:24
**calmly** [1] - 112:9
**camera** [9] - 29:1, 29:5, 29:9, 30:25, 49:22, 49:24, 51:10, 63:18, 65:21
**cameras** [3] - 44:24, 44:25, 45:1

**candidate** [1] - 22:14
**cannot** [4] - 5:17, 79:5, 82:9, 110:11
**capability** [1] - 84:24
**Capitol** [87] - 12:10, 13:1, 13:3, 15:21, 18:21, 18:22, 21:1, 21:2, 21:3, 21:5, 21:14, 22:2, 22:6, 22:17, 23:7, 24:2, 24:4, 24:5, 24:21, 24:24, 25:3, 25:5, 25:12, 33:23, 34:10, 34:25, 35:18, 36:18, 36:21, 37:11, 37:21, 38:2, 38:4, 38:6, 38:10, 38:21, 38:22, 38:25, 39:6, 39:9, 39:12, 41:11, 44:1, 44:12, 44:25, 47:3, 48:14, 48:17, 48:22, 48:25, 49:10, 54:7, 54:24, 55:9, 55:24, 55:25, 57:4, 57:15, 70:23, 71:11, 71:17, 73:7, 73:11, 73:15, 74:4, 74:10, 89:20, 90:1, 90:3, 99:9, 100:4, 101:19, 103:3, 104:13, 104:17, 104:18, 105:5, 105:15, 105:16, 105:18, 106:9, 106:13, 106:20, 107:4, 109:11
**captain** [1] - 18:21
**Captain** [3] - 19:11, 33:20, 48:15
**captured** [2] - 63:17, 69:4
**captures** [2] - 43:8, 62:7
**car** [2] - 13:4, 55:18
**care** [1] - 39:22
**careful** [2] - 79:4, 79:8
**carried** [3] - 36:7, 58:18, 89:7
**carrier** [1] - 10:10
**carry** [4] - 8:20, 38:13, 57:17, 101:12
**carrying** [1] - 100:8
**case** [59] - 3:3, 3:4, 3:11, 4:7, 5:11, 6:8, 6:20, 6:22, 7:15, 8:7, 8:21, 10:9, 11:5, 11:16, 13:16, 70:24, 71:8, 74:20, 74:25, 75:24, 76:4, 76:25, 77:2, 77:10, 78:1,

79:3, 79:18, 80:17, 80:25, 81:10, 83:22, 83:24, 85:3, 85:9, 88:11, 88:16, 100:23, 107:22, 109:6, 109:10, 109:14, 110:2, 110:8, 110:9, 110:13, 110:19, 110:20, 110:24, 111:6, 111:15, 111:24, 112:4, 112:7, 112:10, 113:6, 113:9, 113:17
**Case** [1] - 2:3
**cases** [5] - 11:14, 78:20, 78:22, 78:23, 109:8
**casually** [2] - 51:11, 54:2
**catching** [1] - 114:5
**categories** [1] - 71:23
**category** [1] - 7:8
**caught** [3] - 47:19, 96:8, 114:6
**causes** [2] - 88:22, 88:23
**causing** [3] - 4:21, 6:11, 8:5
**caution** [2] - 118:7, 118:12
**CCTV** [3] - 19:4, 28:18, 72:6
**center** [3] - 21:13, 34:10, 38:10
**certain** [5] - 28:7, 45:14, 48:17, 77:14, 112:5
**certainly** [4] - 6:25, 7:9, 44:13, 55:23
**certainty** [2] - 79:15, 80:16
**CERTIFICATE** [1] - 119:15
**certificate** [1] - 119:19
**certification** [11] - 12:17, 13:1, 19:15, 19:25, 27:5, 27:7, 32:7, 36:12, 51:18, 58:20, 91:14
**certify** [5] - 12:6, 20:16, 92:20, 105:23, 119:16
**certifying** [1] - 20:12
**chair** [1] - 40:7
**chairs** [1] - 22:8
**challenge** [1] - 69:13
**chance** [1] - 39:13
**change** [1] - 67:18
**changes** [3] - 9:8,

4

10:16, 24:12
**changing** [1] - 40:9
**chants** [3] - 35:10, 35:12, 35:14
**chaos** [2] - 12:20, 15:16
**characteristic** [1] - 76:22
**characteristics** [1] - 76:18
**charge** [17] - 17:4, 17:5, 27:1, 27:19, 27:20, 27:23, 28:8, 56:15, 78:19, 85:23, 88:5, 99:22, 102:5, 103:14, 105:6, 107:12, 107:13
**charged** [23] - 3:25, 8:4, 8:7, 13:8, 28:5, 58:10, 70:24, 78:11, 85:19, 85:20, 87:7, 90:6, 92:5, 94:13, 96:19, 97:7, 97:14, 99:5, 99:21, 101:25, 103:10, 105:2, 106:17
**charges** [26] - 33:10, 33:12, 33:13, 33:14, 43:24, 44:10, 80:20, 80:23, 83:2, 85:15, 85:18, 85:21, 85:22, 86:3, 86:5, 86:12, 86:24, 91:10, 91:19, 95:22, 98:16, 101:15, 102:21, 104:14, 106:10, 107:8
**charging** [1] - 3:14
**chat** [1] - 110:6
**check** [2] - 8:1, 117:5
**chemical** [1] - 34:11
**Chestaro** [1] - 7:14
**chooses** [1] - 11:3
**chose** [1] - 85:14
**chosen** [1] - 85:10
**chunk** [1] - 33:10
**circle** [1] - 64:9
**circled** [1] - 19:4
**circles** [1] - 71:25
**circuit** [2] - 49:22, 63:18
**Circuit** [22] - 4:7, 4:11, 4:15, 4:22, 5:5, 5:9, 5:14, 5:19, 6:7, 6:8, 6:9, 6:18, 7:6, 7:14, 7:15, 7:20, 8:10, 9:6, 9:11, 10:9, 10:12
**circuits** [1] - 7:20
**circumstances** [13] - 45:14, 47:5, 54:7,

79:22, 81:5, 82:12, 82:14, 82:21, 84:1, 84:3, 97:23, 104:9, 111:18
**circumstantial** [8] - 79:19, 79:23, 80:7, 80:9, 80:13, 80:15, 80:18, 97:22
**cite** [2] - 6:8, 10:11
**cited** [1] - 3:4
**citizens** [2] - 54:22, 116:16
**CIV** [1] - 1:11
**civil** [50] - 13:21, 13:23, 14:6, 14:8, 15:15, 16:5, 16:6, 16:10, 16:16, 16:17, 17:3, 17:4, 17:6, 17:10, 17:11, 17:13, 17:16, 17:21, 17:24, 27:1, 27:8, 44:5, 56:13, 57:2, 57:7, 57:9, 57:10, 57:13, 67:24, 78:20, 86:11, 86:18, 86:25, 87:1, 87:16, 87:17, 87:25, 88:2, 88:6, 88:9, 88:14, 88:20, 90:7, 90:12, 90:15, 90:17, 90:20, 91:1, 91:5
**civility** [1] - 108:21
**claiming** [1] - 6:23
**clarify** [1] - 5:6
**clear** [11] - 7:5, 8:3, 9:20, 9:24, 11:5, 56:22, 56:23, 60:4, 91:4, 95:15
**cleared** [1] - 26:17
**clearly** [1] - 5:9
**clerk** [1] - 111:18
**client** [1] - 117:14
**climbing** [4] - 25:23, 26:11, 34:3, 73:1
**clips** [1] - 72:3
**close** [3] - 13:3, 24:4, 36:17
**closed** [5] - 44:12, 44:13, 49:22, 54:6, 63:18
**closed-circuit** [2] - 49:22, 63:18
**closely** [1] - 69:7
**closest** [2] - 46:12, 57:23
**closing** [3] - 11:17, 11:18, 67:17
**clues** [1] - 72:13
**co** [1] - 2:10
**co-counsel** [1] - 2:10
**coates** [7] - 109:18,

113:7, 113:13, 113:16, 113:18, 114:15, 116:6
**Code** [7] - 5:6, 5:15, 5:17, 5:24, 7:16, 8:11, 104:24
**Code's** [1] - 4:23
**collectively** [2] - 29:6, 39:11
**College** [5] - 12:17, 27:7, 91:15, 92:21, 105:23
**colored** [1] - 84:23
**COLUMBIA** [1] - 1:1
**Columbia** [13] - 1:15, 86:14, 89:3, 89:4, 89:5, 89:23, 89:25, 91:11, 98:18, 101:16, 102:22, 104:15, 106:11
**column** [2] - 61:4, 61:14
**comfortably** [1] - 5:17
**coming** [14] - 20:4, 20:8, 20:9, 25:11, 26:2, 41:24, 50:5, 50:6, 56:19, 62:2, 71:10, 73:3, 74:9
**commanding** [1] - 35:21
**commands** [6] - 12:22, 15:8, 15:13, 17:15, 28:19, 28:23
**comment** [1] - 60:11
**comments** [3] - 47:14, 47:17, 69:3
**commerce** [14] - 16:19, 16:20, 17:22, 17:23, 86:20, 86:21, 87:18, 87:19, 88:1, 88:2, 88:9, 89:2, 89:5
**commercial** [1] - 88:15
**commission** [4] - 86:18, 87:4, 89:16, 98:1
**commit** [30] - 4:3, 17:10, 32:13, 32:18, 86:14, 87:1, 90:6, 90:7, 90:12, 90:14, 90:19, 90:23, 91:1, 91:5, 91:22, 94:13, 94:14, 94:19, 94:22, 95:2, 95:4, 95:9, 95:11, 95:16, 97:4, 97:9, 97:12, 99:1, 99:19, 99:24
**committed** [18] - 4:2, 14:11, 23:20, 86:14,

87:10, 90:9, 95:22, 96:1, 96:8, 96:10, 96:17, 96:21, 96:22, 98:4, 98:5, 98:12, 101:5, 118:21
**committee** [1] - 104:22
**committing** [16] - 17:11, 27:23, 85:20, 86:25, 90:17, 91:3, 94:25, 95:13, 95:24, 96:3, 96:5, 96:11, 96:15, 96:18, 97:1, 118:24
**commodity** [5] - 16:19, 17:23, 86:20, 87:19, 88:2
**common** [5] - 5:21, 21:25, 34:3, 37:20, 74:17
**commotion** [1] - 33:4
**communicate** [7] - 109:25, 110:8, 110:12, 110:19, 111:9, 111:13, 111:14
**company** [1] - 37:11
**compelling** [1] - 39:4
**complete** [4] - 91:8, 94:16, 95:19, 119:17
**complex** [1] - 100:4
**compliance** [1] - 118:8
**comply** [5] - 15:12, 28:22, 56:15, 57:14, 67:24
**component** [1] - 8:12
**computer** [2] - 1:25, 110:4
**computer-aided** [1] - 1:25
**concept** [1] - 40:13
**concern** [1] - 109:1
**concerned** [1] - 83:23
**concerning** [2] - 109:10, 111:15
**concluded** [2] - 70:6, 107:21
**concludes** [2] - 112:14, 119:13
**conclusion** [1] - 4:22
**conditions** [4] - 118:2, 118:8, 118:9, 118:18
**conduct** [67] - 3:22, 3:23, 3:25, 4:13, 5:1, 5:3, 7:11, 7:18, 9:20, 16:20, 17:24, 21:24, 33:12, 34:17, 34:19, 36:3, 36:9, 36:10, 36:16, 36:18, 36:21,

36:25, 37:24, 38:1, 38:17, 41:8, 48:1, 67:21, 75:21, 86:7, 86:21, 87:20, 88:3, 88:9, 92:12, 93:18, 94:7, 94:24, 102:19, 102:24, 102:25, 103:5, 103:6, 103:13, 103:17, 103:18, 103:20, 103:21, 104:2, 104:4, 104:10, 104:13, 104:17, 104:19, 104:20, 105:5, 105:10, 105:20, 105:25, 106:2, 106:7, 106:24, 110:9, 111:25
**conduct-type** [1] - 33:12
**conference** [1] - 3:14
**confirm** [1] - 113:23
**confirms** [1] - 95:1
**confront** [1] - 25:16
**confronted** [1] - 15:8
**confuse** [1] - 9:25
**Congress** [38] - 12:5, 18:20, 19:1, 19:7, 20:1, 20:10, 20:12, 20:20, 21:7, 21:18, 21:20, 22:1, 24:3, 24:19, 26:25, 35:4, 36:4, 36:13, 38:15, 39:9, 39:19, 39:21, 58:4, 59:13, 69:22, 73:2, 89:20, 91:14, 104:19, 104:20, 104:22, 105:11, 105:21, 105:22, 106:25
**Congress's** [2] - 91:14, 92:20
**congressional** [1] - 51:18
**Congresspeople** [3] - 45:15, 45:20, 53:2
**conscientious** [1] - 116:13
**conscientiously** [1] - 75:8
**consciously** [1] - 76:13
**consciousness** [5] - 22:25, 25:1, 25:22, 26:21, 93:6
**Consciousness** [1] - 93:7
**consequences** [2] - 57:12, 82:17

**consider** [33] - 18:15, 34:22, 47:25, 58:5, 75:11, 76:1, 76:12, 77:8, 77:15, 77:17, 80:17, 80:24, 81:4, 82:5, 82:13, 82:21, 83:3, 83:13, 83:15, 84:1, 84:5, 84:8, 84:11, 84:13, 84:16, 84:22, 86:9, 97:21, 107:9, 108:7, 108:10, 108:18, 109:6
**considerable** [1] - 112:1
**consideration** [3] - 76:23, 79:5, 108:24
**considered** [4] - 7:22, 9:5, 107:16, 119:19
**considering** [1] - 9:11
**consistencies** [2] - 84:6, 84:9
**consists** [1] - 77:10
**constituted** [3] - 6:12, 7:7, 94:24
**constitutes** [2] - 27:12, 119:16
**Constitution** [2] - 91:16, 93:21
**constitutional** [1] - 93:13
**consulted** [1] - 4:23
**contact** [12] - 30:17, 30:18, 32:12, 32:21, 62:24, 98:25, 99:18, 99:23, 100:18, 113:1, 113:17
**contempt** [1] - 118:20
**contesting** [1] - 54:5
**context** [3] - 4:12, 47:14, 49:9
**continue** [1] - 3:3
**continued** [3] - 20:2, 24:7, 67:13
**continuously** [2] - 32:1, 32:3
**contradicted** [1] - 84:17
**contrast** [2] - 78:20, 93:15
**control** [3] - 37:8, 55:14, 77:6
**controversy** [1] - 60:11
**convened** [1] - 105:22
**conveniently** [1] - 72:4
**convey** [1] - 107:23
**convicted** [1] - 118:21
**conviction** [4] - 4:15,

109:1, 109:4, 111:24
**convinced** [2] - 58:14, 79:6
**cop** [1] - 7:2
**copies** [1] - 114:7
**cops** [1] - 47:1
**copy** [4] - 75:6, 75:17, 85:25, 114:8
**cordoned** [3] - 101:18, 102:13, 103:2
**Corporal** [4] - 30:3, 30:9, 31:8, 57:4
**corporal** [1] - 42:4
**correct** [1] - 11:7
**correspond** [1] - 110:12
**corresponded** [1] - 13:4
**corridors** [1] - 45:3
**corroborated** [2] - 37:24, 37:25
**corroborates** [1] - 95:1
**corrupt** [3] - 23:3, 23:22, 26:25
**corruptly** [11] - 22:21, 22:22, 91:12, 91:20, 92:13, 93:3, 93:11, 93:15, 93:19, 93:24
**counsel** [3] - 2:7, 2:10, 40:10
**count** [16] - 13:10, 13:12, 27:3, 27:23, 32:11, 38:3, 58:4, 58:16, 92:20, 104:13, 104:14, 106:8, 107:8, 107:11, 107:15, 107:19
**Count** [70] - 2:19, 3:12, 3:16, 4:9, 10:18, 13:21, 18:1, 30:13, 32:16, 32:19, 34:16, 36:1, 36:5, 36:18, 38:18, 86:11, 86:12, 86:24, 87:6, 87:7, 87:23, 88:5, 88:12, 88:17, 90:5, 90:10, 91:9, 91:10, 91:19, 92:4, 92:5, 94:12, 96:1, 96:14, 98:14, 98:16, 99:3, 99:5, 101:13, 101:15, 101:23, 101:25, 102:19, 102:21, 103:8, 103:10, 104:1, 104:25, 105:2, 105:20, 106:1, 106:8, 106:10,

106:15, 106:17, 115:12, 115:13, 115:18, 115:19, 115:20, 115:21, 115:22, 115:23, 115:24, 115:25, 116:1, 116:2, 116:3
**country** [4] - 19:22, 47:15, 47:19, 57:10
**Counts** [1] - 99:21
**counts** [10] - 13:8, 13:10, 13:20, 14:1, 32:18, 40:2, 44:5, 69:21, 74:21, 85:20
**County** [1] - 42:5
**couple** [9] - 44:18, 52:2, 53:18, 55:13, 60:9, 62:10, 69:13, 72:3, 116:21
**coupled** [1] - 101:4
**course** [7] - 16:2, 22:1, 32:23, 37:20, 81:20, 100:11, 104:11
**COURT** [58] - 1:1, 1:8, 2:13, 2:17, 2:24, 3:9, 4:6, 10:22, 10:24, 11:4, 11:8, 11:10, 11:24, 40:4, 65:14, 66:4, 66:7, 66:9, 66:16, 66:20, 66:25, 67:7, 69:25, 70:17, 70:20, 74:22, 113:15, 113:24, 114:11, 114:13, 114:15, 114:20, 114:23, 115:2, 115:9, 115:11, 115:14, 115:18, 115:20, 115:22, 115:24, 116:1, 116:3, 116:5, 116:9, 116:12, 117:2, 117:7, 117:13, 117:15, 117:19, 117:23, 118:4, 118:6, 119:3, 119:6, 119:9, 119:11
**Court** [4] - 1:23, 1:23, 40:10, 119:24
**court** [16] - 5:15, 6:2, 7:23, 80:1, 93:12, 93:16, 108:14, 109:19, 111:10, 111:16, 111:19, 111:21, 114:14, 115:7, 116:18, 118:20
**Court's** [1] - 8:9
**Courthouse** [1] - 55:7

**courthouse** [1] - 10:13
**COURTROOM** [2] - 2:2, 117:22
**courtroom** [11] - 2:16, 11:9, 74:13, 76:15, 109:15, 109:18, 110:21, 111:4, 111:9, 112:21, 114:22
**cover** [1] - 114:9
**covered** [1] - 7:11
**coveted** [1] - 24:8
**crawl** [1] - 52:12
**crawling** [2] - 52:13, 52:22
**crawls** [1] - 73:13
**crazy** [1] - 54:16
**create** [1] - 10:3
**created** [1] - 19:1
**creates** [2] - 30:5
**credibility** [6] - 76:8, 83:4, 83:7, 83:12, 83:14, 85:4
**credit** [2] - 84:10, 84:18
**crime** [18] - 6:12, 17:10, 90:6, 90:14, 90:23, 91:3, 91:8, 94:13, 94:15, 94:16, 94:22, 95:2, 95:9, 95:13, 95:20, 96:8, 96:9, 96:12
**criminal** [8] - 42:14, 78:1, 78:23, 85:9, 89:24, 97:25, 116:15, 118:16
**Criminal** [2] - 1:2, 2:3
**criticized** [1] - 7:13
**cross** [4] - 41:4, 53:13, 63:23, 68:9
**cross-examination** [4] - 41:4, 53:13, 63:23, 68:9
**crowd** [14] - 8:23, 23:10, 31:17, 42:18, 49:25, 50:5, 50:16, 52:14, 52:23, 56:6, 60:24, 62:8, 64:2, 64:23
**Crypt** [8] - 21:13, 34:9, 38:10, 38:16, 46:1, 46:2, 51:13, 52:5
**current** [1] - 118:2
**custody** [1] - 41:15

**D**

**D.C** [14] - 1:5, 4:7, 4:11, 4:22, 6:6, 6:8,

6:9, 8:10, 20:4, 20:6, 48:4, 48:5, 90:4, 105:17
**damage** [2] - 88:23, 88:25
**damned** [1] - 55:23
**danger** [2] - 88:22, 88:23
**dangerous** [3] - 4:20, 5:22, 30:10
**date** [5] - 20:13, 117:3, 117:20, 118:14, 118:17
**Dated** [1] - 119:22
**days** [5] - 39:2, 44:18, 55:3, 60:7, 117:9
**DC** [2] - 1:12, 1:16
**deadly** [3] - 5:11, 5:22, 6:10
**death** [1] - 6:23
**December** [7] - 12:25, 20:3, 20:20, 22:5, 36:7, 47:16, 55:7
**decide** [11] - 76:5, 76:6, 76:7, 76:25, 80:12, 82:7, 82:19, 99:23, 105:7, 109:14, 110:20
**decided** [1] - 22:7
**deciding** [2] - 86:8, 97:19
**decision** [4] - 44:4, 85:11, 85:13, 111:4
**decisions** [1] - 69:12
**deep** [1] - 21:12
**defendant** [146] - 2:15, 2:19, 3:15, 3:19, 3:24, 4:6, 4:19, 6:17, 6:20, 6:23, 7:1, 7:4, 7:22, 8:13, 9:17, 11:3, 11:17, 12:4, 12:11, 14:11, 14:18, 15:1, 15:22, 15:24, 16:3, 16:6, 17:3, 18:2, 18:4, 18:13, 19:14, 19:16, 19:20, 20:18, 22:19, 25:11, 25:18, 26:12, 30:12, 30:13, 32:12, 32:13, 32:17, 32:21, 34:18, 34:24, 36:1, 38:5, 38:14, 39:17, 70:22, 78:1, 78:3, 78:6, 83:2, 85:9, 85:14, 85:19, 86:9, 86:10, 86:24, 87:4, 87:6, 87:10, 87:21, 90:9, 90:11, 90:14, 90:16, 90:19, 90:25, 91:1, 91:4, 91:7, 91:19,

6

92:1, 92:2, 92:4, 92:7, 92:9, 92:10, 92:13, 93:2, 93:3, 93:5, 94:3, 94:10, 94:16, 94:18, 94:21, 94:24, 95:1, 95:4, 95:11, 95:15, 95:18, 95:22, 96:1, 96:10, 96:13, 96:14, 96:20, 96:22, 96:24, 97:3, 97:6, 97:8, 97:19, 97:24, 98:2, 98:4, 98:8, 98:9, 98:11, 98:13, 99:4, 99:7, 99:10, 99:11, 99:18, 99:23, 100:6, 100:12, 101:1, 101:5, 101:6, 101:24, 102:2, 102:4, 102:7, 103:9, 103:12, 103:16, 103:17, 105:1, 105:4, 105:7, 105:9, 105:12, 106:6, 106:16, 106:19, 106:21, 107:11, 109:1, 118:2

**Defendant** [1] - 1:5

**DEFENDANT** [3] - 1:18, 118:5, 119:2

**defendant's** [21] - 3:23, 4:13, 4:15, 8:25, 9:22, 10:17, 16:7, 19:25, 72:24, 87:13, 90:22, 94:5, 94:8, 95:8, 97:10, 97:12, 97:15, 97:17, 97:22, 98:6, 103:20

**defense** [3] - 6:22, 6:24, 11:3

**define** [3] - 7:17, 86:3, 86:4

**defined** [3] - 90:15, 94:23, 107:5

**defining** [1] - 106:2

**definition** [11] - 4:24, 5:21, 5:24, 44:6, 85:22, 85:23, 88:18, 92:14, 102:10, 103:23, 105:13

**definitions** [7] - 87:3, 88:18, 91:25, 92:14, 100:15, 102:10, 103:23

**degree** [4] - 16:18, 80:16, 86:19, 87:17

**delay** [1] - 11:13

**delayed** [5] - 16:18, 86:19, 87:18, 87:25, 88:3

**deliberate** [4] - 16:24, 39:24, 86:1, 109:22

**deliberation** [1] - 104:21

**deliberations** [25] - 11:21, 14:3, 70:7, 70:13, 72:1, 75:9, 77:7, 77:8, 107:7, 107:14, 107:21, 108:13, 109:3, 109:17, 109:20, 109:25, 110:15, 110:25, 111:8, 112:1, 112:10, 112:16, 113:2, 113:12, 114:14

**delivered** [1] - 70:5

**demands** [1] - 17:16

**demeanor** [2] - 52:24, 83:15

**demonstrate** [3] - 26:24, 67:21, 106:24

**demonstrated** [2] - 38:11, 106:19

**demonstrates** [1] - 28:4

**demonstrating** [4] - 38:4, 38:25, 106:8, 106:13

**demonstration** [1] - 48:12

**deny** [4] - 43:25, 56:9, 56:12, 69:10

**Department** [6] - 57:6, 68:17, 89:12, 90:2, 99:9, 100:2

**department** [3] - 89:8, 89:11, 89:15

**departments** [1] - 89:12

**depicted** [1] - 105:18

**DEPUTY** [2] - 2:2, 117:22

**deputy** [2] - 109:18, 111:10

**describe** [5] - 6:15, 7:10, 19:24, 41:7, 42:18

**described** [8] - 18:21, 18:23, 37:23, 83:10, 85:17, 88:8, 104:1, 106:1

**describing** [1] - 20:17

**description** [6] - 46:19, 47:11, 52:9, 54:18, 57:18

**descriptions** [1] - 41:1

**deserve** [1] - 76:17

**desire** [2] - 33:5, 84:24

**desperate** [1] - 73:13

**destroyed** [1] - 35:23

**destroying** [1] - 35:20

**destruction** [1] - 24:23

**detail** [2] - 3:10, 3:11

**details** [2] - 84:4, 86:2

**detention** [1] - 117:25

**determination** [2] - 17:19, 112:4

**determine** [8] - 76:3, 76:22, 79:18, 81:5, 83:5, 84:22, 87:3, 92:1

**determined** [1] - 81:3

**determining** [3] - 82:22, 83:1, 84:15

**device** [1] - 110:3

**dicta** [1] - 3:4

**differ** [1] - 9:21

**difference** [1] - 5:6

**differences** [1] - 84:13

**different** [11] - 7:8, 7:11, 9:12, 17:5, 27:20, 28:25, 51:21, 55:16, 60:9, 77:5, 85:18

**direct** [9] - 26:5, 79:18, 79:21, 80:2, 80:9, 80:13, 80:16, 80:18, 97:21

**directed** [2] - 73:10

**directing** [4] - 21:4, 26:2, 52:8, 73:22

**directives** [1] - 67:25

**directly** [2] - 73:5, 82:10

**disability** [1] - 76:19

**disassembled** [1] - 119:20

**discovery** [1] - 54:14

**discuss** [7] - 59:10, 109:17, 109:21, 110:13, 110:24, 113:9, 116:23

**discussed** [1] - 38:20

**discussing** [2] - 86:3, 112:10

**discussion** [1] - 112:7

**discussions** [1] - 108:19

**disjunctive** [1] - 9:19

**dislikes** [1] - 76:10

**disobedience** [4] - 57:8, 57:9, 57:11, 57:13

**disobey** [1] - 106:5

**disorder** [46] - 13:22, 13:23, 14:6, 14:8, 15:15, 16:4, 16:5,

16:7, 16:10, 16:11, 16:16, 16:17, 17:3, 17:4, 17:6, 17:10, 17:12, 17:13, 17:16, 17:21, 17:24, 27:1, 27:8, 44:5, 56:13, 57:2, 67:24, 86:11, 86:18, 86:25, 87:1, 87:16, 87:17, 87:25, 88:2, 88:7, 88:9, 88:14, 88:20, 90:7, 90:12, 90:15, 90:17, 90:20, 91:1, 91:5

**disorderly** [24] - 33:12, 34:16, 34:19, 34:21, 35:3, 35:8, 36:15, 36:18, 36:20, 36:24, 37:5, 37:7, 38:1, 102:19, 102:25, 103:12, 103:16, 104:2, 104:4, 104:14, 104:16, 105:4, 105:7, 106:2

**disperse** [1] - 34:12

**dispute** [1] - 44:7

**disregard** [1] - 106:5

**disrupt** [9] - 36:2, 55:10, 102:23, 103:5, 103:18, 104:18, 105:10, 105:25, 106:25

**disrupted** [2] - 36:10, 103:21

**disruptive** [19] - 34:17, 34:19, 34:21, 35:3, 35:9, 36:16, 36:21, 37:5, 37:7, 102:19, 102:25, 103:12, 103:16, 104:9, 104:10, 104:16, 105:4, 105:8, 106:2

**dissent** [3] - 47:8, 71:4

**distinguish** [1] - 4:25

**DISTRICT** [3] - 1:1, 1:1, 1:8

**District** [13] - 1:15, 86:13, 89:3, 89:4, 89:5, 89:22, 89:24, 91:11, 98:17, 101:16, 102:22, 104:15, 106:11

**disturb** [3] - 104:3, 104:19, 105:10

**disturbance** [2] - 88:21, 104:10

**diverge** [1] - 5:20

**divided** [1] - 111:22

**document** [1] - 81:23

**documentary** [1] - 58:19

**dodge** [1] - 63:16

**DOJ** [1] - 1:11

**DOJ-CIV** [1] - 1:11

**Dome** [1] - 46:2

**done** [12] - 3:22, 28:12, 46:12, 58:21, 59:7, 59:13, 59:14, 65:15, 76:24, 82:13

**door** [25] - 15:23, 15:24, 21:10, 23:10, 24:16, 26:8, 34:5, 35:6, 35:11, 35:14, 37:1, 37:5, 41:18, 41:19, 41:23, 49:21, 49:23, 49:25, 52:13, 53:19, 73:8, 73:19, 74:14, 74:17

**doors** [9] - 26:4, 26:10, 37:10, 41:13, 41:17, 45:23, 50:3, 51:5

**doorway** [1] - 59:25

**doubt** [45] - 3:25, 13:13, 13:19, 58:12, 78:5, 78:10, 78:14, 78:19, 78:25, 79:1, 79:7, 79:11, 79:12, 79:14, 79:16, 82:23, 83:2, 87:9, 90:13, 90:21, 92:7, 92:25, 94:20, 95:6, 95:7, 95:14, 96:9, 96:16, 98:6, 98:11, 99:6, 100:10, 101:6, 102:1, 102:6, 103:11, 103:15, 105:3, 106:18, 108:2

**down** [18] - 22:8, 41:21, 51:6, 51:13, 52:6, 52:10, 53:1, 55:9, 61:18, 61:25, 62:12, 62:24, 65:10, 66:24, 67:6, 67:12, 86:2, 117:19

**dozen** [1] - 53:15

**drag** [8] - 22:8, 35:1, 39:20, 45:15, 45:21, 53:2, 68:4, 68:5

**draw** [1] - 77:18

**drawn** [1] - 79:23

**dressed** [1] - 72:13

**drive** [1] - 113:21

**drove** [1] - 55:18

**Duran** [24] - 3:10, 4:7, 4:11, 5:9, 5:15, 6:3, 6:6, 6:17, 6:19, 6:22, 6:24, 7:1, 7:6, 7:7,

7

7:13, 7:16, 7:19,
8:12, 9:3, 9:4, 9:5,
9:10, 10:16, 10:17
**during** [32] - 14:3,
16:9, 16:16, 17:13,
32:23, 36:5, 37:1,
52:2, 56:16, 63:23,
66:20, 75:9, 76:6,
77:6, 77:8, 77:13,
78:16, 81:17, 81:20,
82:20, 86:18, 87:15,
98:1, 107:14,
109:16, 109:20,
109:25, 110:14,
110:24, 111:8,
113:2, 114:14
**duties** [13] - 16:9,
16:15, 32:6, 32:10,
42:16, 57:17, 86:17,
87:15, 90:3, 98:24,
99:15, 99:17, 100:3
**duty** [8] - 74:24, 75:1,
75:24, 78:11, 78:15,
100:9, 100:11, 109:3

## E

**earth** [1] - 24:9
**easier** [1] - 68:25
**easily** [1] - 10:3
**east** [2] - 24:21, 35:17
**easy** [2] - 31:23, 44:5
**edge** [1] - 66:6
**education** [1] - 76:21
**effect** [4] - 21:23,
55:12, 92:11, 94:9
**effective** [2] - 22:6,
22:10
**efficient** [1] - 75:22
**effort** [1] - 68:18
**efforts** [4] - 15:23,
42:15, 42:16, 55:6
**eight** [1] - 50:10
**either** [18] - 7:20,
16:19, 17:6, 40:25,
82:7, 84:20, 85:6,
88:14, 94:1, 99:23,
102:7, 103:16,
104:20, 104:22,
105:7, 105:11,
105:21, 116:7
**elapsed** [1] - 84:2
**election** [5] - 12:7,
12:14, 19:22, 20:13,
105:24
**Electoral** [5] - 12:17,
27:7, 91:15, 92:20,
105:23
**electronic** [2] - 110:3,
110:18

**electronically** [1] -
110:12
**element** [38] - 4:9,
5:10, 6:15, 7:10,
14:10, 16:3, 16:4,
16:11, 16:12, 16:16,
16:17, 16:21, 16:23,
17:1, 19:13, 21:21,
31:24, 32:4, 32:8,
32:11, 32:19, 33:16,
34:18, 36:1, 38:18,
58:12, 58:13, 58:15,
78:10, 78:13, 78:19,
90:18, 90:24, 91:6,
95:3, 95:10, 95:17,
99:20
**elements** [35] - 3:20,
13:10, 13:24, 18:3,
21:25, 23:3, 27:22,
28:8, 33:14, 38:5,
58:9, 58:10, 71:2,
85:22, 87:2, 87:6,
87:8, 90:14, 91:24,
92:4, 92:6, 94:21,
96:17, 96:19, 99:3,
99:6, 101:23, 102:1,
103:8, 103:11,
104:25, 105:3,
106:15, 106:18,
107:1
**Elizabeth** [1] - 1:23,
119:23
**ELIZABETH** [1] -
119:16
**Ellipse** [2] - 48:20,
48:25
**elsewhere** [1] - 91:11
**Email** [3] - 1:13, 1:17,
1:20
**emergency** [2] - 19:1,
36:14
**emoji** [1] - 13:6
**emotions** [1] - 47:21
**employee** [6] - 9:18,
89:10, 89:22, 98:20,
98:23, 99:14
**empty** [3] - 46:6, 53:3,
69:17
**en** [1] - 25:11
**encapsulates** [1] -
57:19
**encounter** [2] - 60:13,
65:8
**encourage** [8] - 13:25,
43:1, 71:18, 74:7,
97:11, 97:13, 98:7,
108:21
**encouraged** [3] - 13:5,
97:9, 97:16
**encouraging** [1] -

97:1
**end** [8] - 24:20, 25:7,
36:17, 59:18, 65:11,
68:8, 75:16, 107:6
**endeavor** [1] - 69:1
**ended** [1] - 37:2
**energized** [1] - 47:24
**enforcement** [18] -
14:13, 14:19, 16:8,
16:15, 40:19, 40:23,
46:9, 56:3, 56:16,
57:15, 57:17, 85:8,
86:16, 87:12, 87:14,
89:21, 89:23, 99:10
**enforcing** [1] - 90:4
**engage** [6] - 17:6,
25:17, 36:24, 55:22,
60:15, 64:23
**engaged** [23] - 16:8,
16:15, 28:15, 32:6,
32:9, 34:19, 36:20,
46:8, 46:13, 72:17,
86:16, 87:14, 89:23,
94:24, 98:23, 99:15,
99:17, 102:25,
103:12, 103:16,
104:16, 105:4,
106:12
**engaging** [5] - 40:15,
48:10, 71:12, 73:17,
93:18
**enhanced** [6] - 65:18,
66:10, 66:12, 66:17,
66:18, 118:23
**ensure** [1] - 20:20
**enter** [8] - 23:7, 26:1,
26:4, 34:7, 50:14,
50:24, 101:17, 109:2
**entered** [10] - 21:17,
22:16, 33:17, 33:23,
34:7, 34:8, 58:22,
102:2, 102:7, 112:21
**entering** [5] - 33:15,
34:14, 54:6, 101:13,
112:2
**enters** [3] - 38:21,
50:9, 50:21
**entire** [2] - 26:8,
116:18
**entirely** [2] - 82:18,
112:19
**entitled** [2] - 77:21,
85:1
**entity** [1] - 89:19
**entrances** [2] - 53:21,
55:15
**entry** [2] - 37:1, 53:11
**envelope** [1] - 115:5
**episode** [5] - 42:7,
43:4, 59:20, 60:3,

63:14
**equal** [1] - 80:14
**equipment** [2] - 35:20,
35:22
**escorted** [2] - 35:19,
36:25
**essentially** [2] - 4:23,
31:25
**establish** [3] - 4:24,
94:10, 100:25
**established** [3] - 18:6,
33:8, 100:9
**establishment** [1] -
89:16
**ethnic** [1] - 76:19
**evacuate** [1] - 19:6
**evacuation** [1] - 36:14
**evaluate** [1] - 83:12
**evaluated** [1] - 85:2
**evaluating** [4] - 82:25,
83:7, 83:25, 85:4
**evening** [3] - 2:25,
26:17, 34:1
**event** [10] - 49:17,
84:1, 84:2, 84:3,
84:4, 85:6, 104:11,
109:1, 109:4
**events** [5] - 43:7,
47:15, 48:23,
109:11, 109:16
**eventually** [1] - 28:15
**evidence** [126] - 6:16,
6:20, 7:7, 12:24,
13:11, 13:15, 13:16,
13:19, 14:17, 16:4,
18:5, 18:18, 18:20,
19:18, 20:11, 20:25,
22:12, 23:1, 24:11,
27:5, 27:11, 28:4,
28:13, 33:7, 33:13,
34:22, 35:18, 36:5,
38:6, 39:2, 39:3,
39:25, 44:20, 44:21,
45:5, 45:24, 46:4,
54:13, 58:11, 58:14,
58:20, 58:23, 59:11,
59:17, 66:21, 69:8,
69:11, 69:14, 69:16,
69:20, 71:1, 71:20,
71:21, 71:23, 73:10,
74:21, 75:1, 75:3,
76:6, 76:7, 76:23,
77:5, 77:6, 77:9,
77:11, 77:16, 77:17,
77:20, 77:23, 77:24,
77:25, 78:7, 79:2,
79:5, 79:17, 79:19,
79:21, 79:22, 79:23,
80:2, 80:7, 80:10,
80:11, 80:13, 80:15,

80:16, 80:17, 80:24,
81:2, 81:5, 81:12,
81:15, 81:21, 82:8,
82:15, 82:19, 82:22,
84:10, 84:18, 85:3,
86:10, 90:21, 95:7,
97:22, 97:24, 98:3,
107:9, 107:22,
108:6, 108:9,
108:18, 108:20,
108:23, 108:24,
109:5, 109:14,
110:21, 111:1
**exactly** [2] - 53:6, 72:6
**examination** [4] -
41:4, 53:13, 63:23,
68:9
**examine** [2] - 82:3,
108:7, 108:10
**example** [20] - 14:4,
20:15, 21:16, 22:5,
23:18, 23:25, 25:23,
27:15, 36:25, 38:9,
38:13, 41:3, 43:4,
43:9, 56:18, 79:24,
83:15, 93:11, 107:1,
111:22
**except** [6] - 51:14,
62:20, 91:7, 95:19,
111:13, 111:15
**exclusive** [1] - 77:3
**exclusively** [1] - 109:4
**excuse** [10] - 15:4,
16:4, 27:14, 32:7,
37:12, 66:4, 73:4,
112:15, 112:17,
112:22
**excused** [8] - 11:11,
70:15, 113:3, 113:8,
113:14, 116:18,
117:1, 119:11
**execute** [1] - 69:19
**execution** [1] - 39:20
**executive** [1] - 89:12
**exercise** [3] - 71:7,
85:10, 93:23
**Exhibit** [12] - 14:5,
14:23, 16:13, 16:22,
18:10, 49:20, 53:10,
63:19, 66:7, 71:22,
74:7, 105:19
**exhibit** [29] - 12:3,
20:14, 23:17, 23:24,
28:24, 29:8, 29:14,
29:18, 31:4, 33:22,
36:23, 37:14, 38:8,
46:22, 49:19, 50:13,
51:24, 53:14, 60:23,
61:17, 62:6, 63:10,
63:21, 65:14, 65:16,

8

72:8, 81:22, 81:25,
113:25
**exhibits** [8] - 32:22,
77:11, 81:21, 82:3,
108:6, 108:8,
113:19, 114:2
**existed** [1] - 5:18
**exit** [1] - 52:11
**exits** [3] - 56:20,
56:25, 64:4
**expect** [1] - 110:15
**experience** [1] - 77:20
**experienced** [1] -
26:23
**experiences** [3] -
40:20, 40:21, 42:19
**explain** [5] - 85:21,
87:1, 87:3, 91:24,
92:1
**explained** [4] - 26:19,
36:5, 71:23, 96:19
**explains** [1] - 5:19
**exposed** [2] - 54:13
**expressed** [1] - 77:1
**expression** [2] -
76:20, 112:3
**extent** [1] - 83:6
**extracting** [2] - 21:17,
37:17
**eye** [2] - 15:12, 54:12
**eyes** [2] - 21:5, 26:14
**eyewitness** [1] - 79:20

## F

**F.2d** [2] - 10:9, 10:11
**F.3d** [3] - 4:7, 6:7, 7:14
**face** [6] - 24:18, 56:6,
56:10, 60:16, 61:23
**face-to-face** [1] -
60:16
**Facebook** [1] - 110:7
**faces** [1] - 9:12
**facilitate** [4] - 97:11,
97:13, 98:7, 108:19
**facilitated** [1] - 97:16
**facilitating** [1] - 97:1
**facing** [1] - 72:22
**fact** [24] - 3:4, 14:8,
18:6, 27:13, 33:3,
34:9, 34:13, 36:10,
36:12, 40:14, 41:7,
56:1, 67:18, 68:12,
69:5, 77:15, 78:21,
79:20, 80:10, 94:8,
100:10, 103:5,
103:21, 107:11
**factor** [1] - 58:4
**facts** [17] - 5:11, 6:19,
44:2, 76:4, 76:5,

76:22, 77:12, 77:14,
77:18, 79:18, 79:22,
81:4, 82:8, 82:14,
82:19, 97:23, 112:13
**fail** [2] - 57:14, 118:13
**failed** [1] - 78:13
**failure** [4] - 56:15,
58:12, 58:17, 118:15
**fair** [8] - 47:23, 75:22,
76:17, 76:23, 80:21,
80:25, 108:17,
108:23
**fairly** [2] - 77:21, 85:1
**faithfully** [1] - 69:19
**fake** [1] - 35:24
**fall** [1] - 62:13
**fallen** [1] - 31:9
**falling** [3] - 29:20,
62:20, 62:21, 80:1,
80:3
**falls** [4] - 10:10, 64:22,
65:23
**false** [1] - 45:18
**falsehood** [1] - 84:13
**family** [1] - 102:17
**famous** [1] - 53:13
**far** [5] - 47:20, 50:18,
61:8, 67:16, 118:10
**fashion** [1] - 111:23
**fast** [2] - 25:4, 52:21
**favor** [2] - 69:1, 80:11
**FBI** [4] - 1:21, 2:10,
68:12, 68:16
**FBI's** [1] - 68:14
**FCRR** [3] - 1:23,
119:16, 119:23
**fear** [5] - 4:21, 6:11,
7:9, 10:4, 104:5
**February** [1] - 119:22
**federal** [7] - 5:18,
47:6, 55:5, 90:4,
100:3, 100:8, 100:11
**Federal** [1] - 55:7
**federally** [8] - 16:20,
17:25, 86:21, 87:20,
88:4, 88:10, 88:15,
89:6
**feet** [3] - 60:12, 61:23,
67:18
**fell** [2] - 14:25, 29:10
**fellow** [5] - 15:4, 42:6,
110:14, 110:24,
111:5
**felonies** [1] - 32:17
**felony** [6] - 5:3, 32:14,
99:1, 99:19, 99:20,
99:25
**felt** [1] - 31:14
**fence** [1] - 55:7
**few** [10] - 34:23, 39:2,

42:1, 45:23, 46:21,
53:9, 53:15, 56:8,
60:13, 74:11
**fictions** [1] - 103:7
**field** [1] - 68:14
**fifth** [3] - 32:19, 97:2,
99:17
**Fight** [1] - 35:15
**fight** [11] - 16:1, 24:8,
31:15, 35:6, 35:15,
56:1, 56:4, 73:6,
73:17, 74:9
**fighting** [1] - 34:6
**final** [3] - 11:20, 32:11,
70:11
**finally** [10] - 9:14,
22:19, 26:17, 26:18,
32:20, 35:17, 36:9,
37:12, 37:18, 38:19
**finish** [2] - 70:10,
115:24
**firing** [1] - 4:19
**firm** [2] - 91:4, 95:15
**firmly** [1] - 79:6
**first** [40] - 2:7, 2:17,
14:10, 16:3, 16:4,
18:4, 19:13, 21:2,
21:12, 25:6, 28:9,
32:15, 33:15, 33:16,
34:18, 36:20, 37:1,
38:5, 39:17, 49:5,
55:15, 60:16, 62:10,
64:17, 68:9, 73:11,
87:1, 87:10, 90:18,
91:24, 92:7, 95:3,
96:17, 99:7, 102:2,
103:12, 105:4,
106:19, 108:12,
115:16
**First** [9] - 10:9, 45:11,
45:12, 71:5, 71:6,
71:7, 93:20, 94:21,
105:16
**fit** [1] - 5:16
**five** [12] - 3:20, 22:17,
28:8, 37:20, 38:22,
44:5, 61:15, 61:23,
67:21, 69:5, 114:3,
116:24
**flag** [27] - 13:6, 23:13,
28:21, 38:14, 42:12,
46:24, 50:21, 52:10,
56:19, 60:5, 61:7,
61:8, 61:19, 61:25,
62:5, 62:17, 62:22,
63:5, 63:7, 64:14,
64:20, 64:24, 65:1,
72:7, 72:21, 74:1
**flagpole** [4] - 15:2,
63:6, 64:25, 65:1

**flesh** [1] - 23:19
**floor** [1] - 26:9
**flow** [1] - 53:22
**focus** [2] - 66:6, 71:19
**focused** [2] - 5:9, 6:2
**follow** [7] - 62:9,
75:12, 76:2, 87:22,
88:11, 88:17, 113:5
**following** [10] - 87:8,
90:13, 92:6, 94:21,
96:17, 99:6, 102:1,
103:11, 105:3,
106:18
**footage** [9] - 13:17,
19:4, 28:18, 29:1,
29:10, 29:19, 30:25,
31:1, 31:21
**football** [1] - 31:15
**footnote** [2] - 6:7, 6:18
**FOR** [3] - 1:1, 1:10,
1:18
**forbids** [1] - 106:4
**Force** [2] - 1:21, 2:10
**force** [16] - 10:5,
30:16, 30:17, 68:11,
68:13, 68:24, 73:24,
74:2, 100:16,
100:17, 100:24
**forcefully** [3] - 23:5,
31:5, 31:6
**forces** [1] - 68:15
**forcible** [1] - 30:23
**forcibly** [19] - 3:22,
4:16, 9:17, 10:6,
17:14, 30:14, 30:15,
31:2, 31:12, 31:16,
39:21, 98:18, 99:11,
100:6, 100:12,
100:15, 100:23,
101:1
**foregoing** [1] - 119:16
**FOREPERSON** [10] -
115:8, 115:10,
115:12, 115:15,
115:19, 115:21,
115:23, 115:25,
116:2, 116:4
**foreperson** [6] -
108:13, 108:16,
108:19, 111:11,
114:25, 115:4
**foreseeable** [1] - 93:1
**form** [8] - 17:17,
80:11, 87:23,
107:20, 107:21,
107:24, 108:3, 116:6
**formal** [2] - 85:23,
89:19
**formally** [1] - 10:25
**formation** [1] - 73:23

**former** [4] - 29:11,
30:3, 32:24, 48:13
**forming** [1] - 8:22
**forms** [1] - 9:20
**forward** [17] - 2:5,
24:12, 25:16, 29:3,
29:7, 29:13, 30:2,
30:4, 50:4, 50:19,
61:1, 64:4, 64:12,
64:13, 66:2, 67:17,
116:16
**four** [7] - 4:17, 18:3,
33:14, 44:9, 45:8,
61:23
**fourth** [5] - 32:4,
92:13, 96:24, 97:20,
99:12
**frame** [1] - 48:1
**free** [3] - 75:15, 83:12,
113:9
**fresh** [1] - 40:8
**Friday** [1] - 117:4
**Friedrich** [1] - 7:25
**friendship** [1] - 83:23
**Frizzl** [1] - 10:8
**front** [25] - 9:2, 11:25,
14:21, 15:11, 18:24,
23:12, 25:6, 25:13,
28:16, 28:19, 29:1,
31:6, 33:1, 35:18,
47:2, 49:13, 51:11,
52:21, 60:21, 61:19,
62:18, 72:10, 72:20,
73:1, 73:20
**fronted** [1] - 37:2
**fuck** [1] - 15:20
**fucking** [7] - 15:5,
24:12, 24:17, 35:1,
35:2, 73:3
**fulfill** [1] - 42:16
**full** [4] - 22:7, 72:2,
108:24, 119:17
**function** [11] - 16:21,
17:25, 75:21, 76:3,
86:22, 87:20, 88:4,
88:10, 88:15, 89:6,
89:7
**functions** [4] - 36:4,
102:24, 103:19,
103:22
**furtherance** [4] -
27:25, 71:10, 96:23,
97:7
**furthermore** [1] -
112:8
**future** [1] - 100:25

## G

**gain** [4] - 24:4, 25:23,

26:3, 83:22
**games** [1] - 31:15
**gap** [1] - 61:21
**gathered** [1] - 67:13
**gear** [2] - 48:9, 72:13
**gender** [1] - 76:20
**general** [1] - 4:18
**generally** [3] - 6:15,
76:11, 85:17
**gentlemen** [12] -
11:10, 23:4, 24:6,
27:2, 31:22, 33:11,
39:1, 40:11, 69:25,
74:23, 114:23,
116:12
**George's** [1] - 42:5
**given** [7] - 5:10, 24:15,
68:23, 75:2, 75:18,
107:25, 108:10
**glass** [4] - 12:21, 26:9,
73:9
**goal** [1] - 76:15
**goodness** [1] - 71:8
**government** [72] - 2:7,
2:24, 3:21, 3:24, 8:4,
9:16, 10:20, 11:4,
11:5, 11:16, 11:19,
11:22, 13:12, 14:10,
25:24, 36:3, 40:11,
46:13, 51:1, 55:20,
58:6, 58:8, 58:11,
58:17, 59:20, 64:8,
66:25, 67:16, 69:4,
70:17, 78:4, 78:9,
78:13, 78:17, 79:13,
82:23, 83:1, 85:18,
87:8, 87:24, 88:6,
88:13, 89:19, 90:9,
90:12, 91:6, 92:6,
92:25, 93:22, 94:20,
95:18, 95:21, 95:25,
96:16, 97:7, 98:10,
98:21, 99:5, 101:25,
102:6, 102:24,
103:6, 103:10,
103:15, 103:19,
103:21, 105:2,
106:17, 108:2,
117:11, 117:24,
119:4
**Government** [5] -
14:5, 14:23, 16:13,
16:22, 18:10
**Government's** [4] -
49:20, 51:16, 63:18,
105:19
**government's** [5] -
32:22, 69:20, 70:2,
78:24, 118:1
**grab** [1] - 53:2

**grabbed** [1] - 63:7
**grabbing** [1] - 62:21
**grasp** [1] - 27:16
**gravamen** [1] - 56:14
**graver** [1] - 79:9
**gray** [4] - 62:12, 62:13,
62:18, 63:2
**Great** [1] - 46:2
**greater** [3] - 80:15,
81:8, 85:6
**grievances** [1] - 93:22
**gripping** [1] - 62:18
**ground** [9] - 29:10,
29:20, 30:8, 30:11,
31:2, 31:7, 67:17,
80:5, 80:6
**grounds** [35] - 18:21,
21:1, 22:17, 24:24,
33:16, 33:18, 33:24,
34:15, 34:17, 36:16,
36:19, 37:21, 38:22,
39:16, 44:10, 48:17,
56:11, 56:24, 57:16,
74:10, 90:3, 101:14,
101:18, 101:20,
102:3, 102:8,
102:12, 102:14,
102:20, 103:1,
103:3, 103:14,
103:25, 104:17,
105:18
**group** [4] - 15:1,
25:10, 64:16, 64:17
**grouped** [1] - 33:11
**groups** [3] - 55:22,
61:24, 88:21
**guarding** [2] - 12:9,
35:7
**guess** [3] - 41:8, 55:3,
82:6
**guesswork** [1] - 79:12
**guidelines** [1] - 85:5
**guilt** [3] - 79:6, 79:13,
79:15
**guilty** [59] - 13:23,
16:6, 17:3, 17:9,
17:16, 18:2, 22:19,
27:2, 27:18, 27:20,
28:1, 28:3, 28:13,
30:13, 33:8, 34:14,
36:15, 38:1, 38:24,
40:1, 40:16, 58:13,
58:16, 69:21, 74:21,
78:4, 78:12, 78:15,
78:18, 85:14, 87:7,
87:21, 90:11, 90:19,
91:1, 92:5, 94:18,
95:4, 95:11, 96:2,
96:13, 98:2, 98:9,
99:4, 101:24, 103:9,

105:1, 106:16,
107:11, 107:12,
107:14, 107:15,
115:12, 115:19,
115:21, 115:23,
115:25, 116:2, 116:4
**guy** [5] - 42:10, 42:11,
62:21, 63:2, 64:22

### H

**hair** [9] - 22:8, 35:2,
45:16, 45:22, 53:2,
68:4, 68:6, 70:23,
73:3
**halls** [2] - 34:24, 73:2
**hallway** [2] - 10:13,
51:13
**hand** [10] - 50:22,
52:10, 61:12, 62:17,
62:18, 62:22, 78:12,
79:21, 115:1, 115:3
**hand-held** [1] - 115:3
**handed** [1] - 15:2
**handling** [1] - 59:3
**hands** [3] - 23:19,
46:14, 57:24
**hang** [1] - 49:12
**hanging** [1] - 59:24
**hard** [4] - 62:8, 64:18,
69:14
**harm** [6] - 30:21,
30:23, 31:10, 31:11,
100:21, 100:22
**harmed** [1] - 104:7
**hashtag** [1] - 20:16
**Hawa** [1] - 19:4, 19:11,
59:3
**head** [4] - 14:25, 29:4,
56:20, 56:25
**headed** [1] - 46:3
**heading** [1] - 52:11
**healthy** [1] - 112:22
**Healy** [1] - 41:12
**Heaney** [3] - 30:3,
30:9, 31:8
**hear** [4] - 70:2, 74:5,
74:16, 82:3
**heard** [44] - 3:5, 13:1,
13:11, 13:18, 14:17,
14:19, 15:21, 18:5,
18:18, 18:20, 19:3,
19:10, 19:22, 19:24,
22:12, 23:2, 24:10,
24:11, 26:7, 26:18,
28:19, 30:1, 30:2,
30:9, 30:24, 31:17,
32:1, 32:24, 33:20,
35:5, 35:11, 37:4,
39:1, 39:4, 39:6,

39:12, 54:18, 72:12,
72:15, 73:9, 73:12,
74:6, 74:21, 110:25
**hearing** [3] - 8:8, 8:16,
104:21
**hearings** [1] - 107:1
**heart** [2] - 34:10,
56:14
**heck** [2] - 55:2, 63:15
**held** [3] - 31:2, 61:19,
115:3
**hellbent** [1] - 51:2
**helmet** [1] - 48:7
**help** [7] - 5:6, 14:2,
33:5, 56:17, 67:1,
72:1, 108:20
**helpfully** [2] - 9:10,
29:10
**helpless** [1] - 30:11
**helps** [1] - 64:9
**hereby** [1] - 119:16
**herself** [1] - 84:20
**hesitate** [2] - 79:9,
112:6
**HI** [1] - 1:19
**hiding** [1] - 36:13
**high** [3] - 47:21,
61:19, 62:5
**highlight** [1] - 34:23
**highly** [1] - 78:22
**himself** [9] - 42:6,
45:7, 50:9, 55:19,
56:7, 60:12, 62:22,
67:14, 69:3
**his/her** [1] - 115:1
**historical** [2] - 37:10,
55:21
**history** [1] - 57:10
**hit** [1] - 14:25
**hold** [5] - 10:5, 15:5,
81:13, 82:7, 85:11
**holding** [5] - 9:4, 9:10,
10:17, 23:13, 62:17
**holds** [1] - 9:5
**Homeland** [1] - 89:13
**honest** [1] - 79:4
**Honor** [22] - 2:2, 2:8,
2:14, 2:23, 3:2, 3:6,
4:5, 10:21, 10:23,
11:23, 65:15, 70:19,
113:22, 114:10,
114:12, 116:8,
116:10, 117:12,
118:5, 119:2, 119:5,
119:8
**Honor's** [1] - 3:7
**HONORABLE** [1] - 1:7
**honorably** [1] - 69:18
**hoodie** [3] - 62:13,
63:2, 63:15

**hopefully** [1] - 47:19
**horrific** [1] - 42:20
**hostility** [1] - 83:23
**hotel** [2] - 13:3, 24:4
**hour** [3] - 58:24, 59:22
**hours** [8] - 22:17,
37:20, 38:22, 42:20,
46:10, 55:13, 67:21,
69:6
**House** [6] - 4:14,
45:24, 104:20,
104:22, 105:11,
105:21
**house** [1] - 16:1
**Howell** [2] - 13:14,
14:6
**HOWELL** [1] - 1:7
**human** [2] - 52:19,
76:9
**hundreds** [2] - 49:12,
50:6
**hung** [5] - 55:17,
57:20, 69:5
**hungry** [1] - 70:9
**hunt** [1] - 53:1
**hunted** [1] - 35:4
**hunting** [1] - 35:8
**hurry** [2] - 49:16, 51:7
**hurting** [1] - 7:2

### I

**idea** [1] - 57:19
**identification** [1] -
108:9
**identified** [3] - 42:6,
45:4, 96:8
**identify** [1] - 2:6
**identity** [1] - 76:20
**idiotic** [1] - 47:7
**ignorance** [1] - 86:8
**ignore** [4] - 75:13,
76:2, 77:2, 81:18
**illegal** [4] - 40:16,
41:2, 41:7, 54:4
**image** [2] - 43:8, 60:6
**images** [1] - 67:5
**imaginary** [1] - 79:11
**immediate** [5] - 10:4,
88:22, 88:23,
102:17, 104:6
**immediately** [1] -
60:12
**imminent** [3] - 4:21,
6:11, 7:9
**impartial** [4] - 76:16,
79:4, 80:22, 80:25
**impede** [1] - 8:19,
18:5, 18:14, 19:17,
36:2, 86:15, 91:13,

91:21, 92:8, 92:9,
92:12, 92:16, 93:10,
94:11, 98:19,
101:11, 102:23,
103:5, 103:18,
104:18, 105:10
**impeded** [13] - 9:17,
14:18, 28:10, 28:22,
31:2, 31:19, 32:5,
36:10, 99:7, 99:13,
100:7, 100:13,
103:21
**impedence** [1] - 10:1
**impedes** [2] - 10:6,
93:16
**impeding** [15] - 3:16,
4:1, 4:17, 8:24, 9:1,
14:12, 28:6, 33:9,
57:16, 69:22, 87:11,
93:14, 94:9, 98:14,
107:1
**implicate** [1] - 82:2
**implication** [1] - 6:25
**implicit** [1] - 76:12
**implies** [1] - 79:1
**implore** [1] - 47:13
**importance** [1] - 112:2
**important** [12] - 44:20,
55:19, 60:8, 63:25,
64:7, 65:3, 71:24,
74:14, 79:10,
110:20, 111:2,
118:16
**imported** [1] - 4:23
**imposing** [1] - 109:3
**impossible** [1] - 64:19
**impresses** [1] - 83:17
**imprisonment** [2] -
6:13, 118:23
**improbability** [1] -
84:15
**improper** [1] - 85:12
**inaccurate** [1] -
110:23
**inadmissible** [1] -
82:1
**inadvertently** [1] -
109:16
**incident** [4] - 16:9,
43:5, 86:17, 87:15
**incite** [1] - 23:9
**inciting** [1] - 39:18
**include** [2] - 27:15,
107:2
**included** [2] - 8:6,
25:11
**includes** [9] - 89:11,
89:13, 89:15, 89:18,
102:17, 104:4,
105:15, 105:18,

105:21
**including** [10] - 3:22,
7:17, 82:1, 84:2,
86:10, 89:3, 89:4,
97:22, 98:21, 101:9
**inclusion** [1] - 3:6
**income** [1] - 76:21
**incomplete** [1] -
110:23
**inconsistencies** [3] -
84:6, 84:9, 84:11
**incorrectly** [1] - 7:16
**incrimination** [1] -
93:13
**indeed** [1] - 22:6
**independent** [1] -
89:16
**independently** [2] -
93:4, 93:18
**indicate** [1] - 82:15
**indicated** [4] - 8:10,
8:15, 20:7, 77:1
**indicating** [5] - 25:25,
50:15, 63:4, 72:9,
76:25
**indicating)** [11] - 19:5,
29:12, 29:16, 29:23,
50:20, 62:9, 62:14,
64:24, 65:7, 65:10,
66:3
**indication** [1] - 71:14
**indicative** [1] - 20:23
**indisputable** [1] - 44:2
**individual** [7] - 55:10,
58:10, 58:12, 88:23,
88:25, 93:15, 93:23
**individual's** [3] - 82:2,
88:24, 89:1
**infer** [3] - 82:11, 82:16
**inferences** [2] - 77:19,
79:23
**infiltrate** [1] - 30:6
**inflict** [9] - 8:17,
30:21, 30:23, 31:10,
31:11, 100:21,
100:22, 101:3, 101:6
**influence** [3] - 91:12,
107:12, 109:2
**influenced** [1] - 111:3
**inform** [1] - 110:15
**information** [8] - 59:4,
110:1, 110:8,
110:21, 111:5,
113:1, 113:13,
113:17
**initial** [4] - 22:16, 25:3,
53:15, 112:8
**injure** [3] - 7:4, 10:7,
10:8
**injury** [18] - 4:3, 4:21,

5:13, 6:12, 6:22, 7:9,
7:18, 8:5, 8:17, 10:3,
10:4, 30:6, 88:22,
88:24, 101:3, 101:7,
101:8
**injust** [1] - 57:12
**innocence** [2] - 78:2,
78:7
**innocent** [1] - 78:2
**insanity** [1] - 6:24
**inside** [28] - 12:11,
37:5, 38:5, 41:13,
41:16, 44:1, 44:11,
44:24, 45:1, 45:2,
45:6, 47:3, 49:11,
49:24, 49:25, 50:17,
51:3, 51:10, 51:15,
52:3, 53:5, 53:6,
55:10, 56:11, 59:8,
59:12, 59:24, 60:1
**insistent** [1] - 31:25
**Inspector** [1] - 19:4
**Instagram** [1] - 110:7
**instance** [1] - 10:5
**instances** [2] - 42:23,
68:13
**instant** [1] - 110:5
**instead** [2] - 91:3,
95:14
**instituted** [2] - 92:23,
92:24
**instruct** [4] - 17:8,
74:11, 75:23, 75:25
**instructed** [4] - 13:14,
14:6, 83:11, 100:1
**instruction** [13] - 2:18,
3:1, 3:12, 3:15, 4:8,
4:9, 7:21, 8:1, 9:14,
9:22, 10:18, 71:5,
109:23
**instructions** [40] - 3:7,
11:20, 14:14, 17:8,
22:22, 27:8, 27:21,
30:15, 30:20, 38:12,
39:24, 69:11, 70:3,
70:11, 71:6, 74:15,
74:25, 75:3, 75:6,
75:10, 75:11, 75:12,
75:14, 75:16, 75:17,
75:20, 76:1, 78:16,
85:17, 86:1, 106:1,
107:6, 107:25,
108:1, 110:17,
112:14, 113:5, 114:5
**instructive** [1] - 54:12
**instrumentality** [2] -
89:9, 89:18
**intended** [12] - 6:14,
7:10, 14:12, 17:10,
19:16, 21:7, 21:19,

27:4, 27:8, 32:13,
32:17, 36:4, 77:23,
87:11, 90:14, 94:22,
95:2, 101:6
**intending** [3] - 20:9,
90:23, 95:9
**intends** [1] - 82:17
**intent** [36] - 4:2, 5:20,
5:25, 20:24, 21:2,
21:8, 21:16, 23:3,
26:25, 27:16, 36:2,
36:6, 37:16, 39:21,
71:1, 82:9, 82:12,
82:15, 91:5, 92:9,
93:25, 94:3, 94:5,
94:10, 97:3, 97:20,
98:6, 99:1, 99:19,
99:24, 102:23,
103:18, 104:18,
105:9, 106:4
**intention** [2] - 20:21,
58:3
**intentional** [3] - 3:23,
84:12, 101:2
**intentionally** [5] -
31:23, 82:18, 96:11,
99:12, 100:12
**intentions** [3] - 55:25,
72:25, 74:3
**interest** [2] - 83:21,
84:21
**interested** [1] - 65:8
**interfere** [5] - 8:20,
86:15, 92:17, 98:19,
101:12
**interfered** [11] - 9:18,
14:19, 15:10, 18:15,
28:10, 31:20, 32:5,
99:8, 99:13, 100:7,
100:13
**interference** [1] - 10:2
**interfering** [10] - 4:2,
4:17, 8:24, 9:2,
14:12, 28:6, 52:18,
57:16, 69:22, 87:12
**interior** [1] - 50:3
**internet** [5] - 109:9,
110:4, 110:5, 110:22
**interpreted** [1] - 4:11
**interrupts** [1] - 104:11
**interviewed** [1] -
26:19
**intimidate** [3] - 8:19,
98:19, 101:11
**intimidated** [7] - 9:18,
28:10, 32:5, 99:8,
99:13, 100:7, 100:13
**intimidating** [3] - 4:1,
4:17, 28:6
**intimidation** [1] - 10:1

**invest** [1] - 54:10
**investigate** [1] -
110:19
**investigation** [2] -
45:5, 117:10
**invests** [2] - 68:16,
68:17
**invite** [2] - 53:9,
108:22
**invoking** [1] - 93:12
**involve** [2] - 5:11,
93:11
**involved** [7] - 9:8,
61:6, 62:23, 63:14,
65:22, 97:25, 98:25
**involvement** [3] -
41:12, 41:22, 67:23
**involves** [1] - 93:25
**involving** [1] - 88:21
**iPhone** [1] - 110:4
**irritant** [1] - 34:11
**issue** [4] - 44:23, 46:7,
47:12, 111:24
**itself** [2] - 5:16, 80:21

---

**J**

**jacket** [4] - 42:10,
62:12, 62:13, 62:18
**jacket/gray** [1] - 63:15
**Jackson** [1] - 117:18
**January** [34] - 12:11,
12:16, 13:7, 14:5,
14:9, 18:9, 18:12,
20:5, 20:12, 20:17,
21:15, 21:16, 21:20,
22:14, 24:1, 25:2,
31:14, 36:8, 39:6,
47:16, 55:11, 71:11,
86:12, 90:2, 91:10,
92:21, 98:16, 100:5,
101:15, 102:21,
104:14, 105:23,
106:10, 109:11
**Jersey** [1] - 55:18
**job** [3] - 56:17, 58:9,
68:19
**join** [3] - 22:2, 46:17,
46:18
**joined** [6] - 18:17,
22:16, 25:2, 26:23,
35:14, 39:10
**joining** [1] - 57:23
**Joint** [2] - 92:20,
105:22
**joint** [2] - 3:18, 68:11
**jointly** [1] - 9:15
**jostling** [1] - 64:21
**JR** [1] - 1:18
**Judge** [8] - 7:24, 8:3,

11

8:15, 8:21, 13:14, 14:6, 117:17
**judge** [5] - 64:20, 71:6, 71:23, 74:11, 74:24
**JUDGE** [1] - 1:8
**judges** [4] - 7:23, 76:4, 83:4, 112:13
**judging** [1] - 83:7
**judgment** [4] - 77:21, 83:14, 85:1, 107:16
**judicial** [2] - 111:2, 111:7
**July** [1] - 8:8
**jump** [4] - 6:8, 10:11, 53:18, 53:19
**jumped** [1] - 67:12
**juror** [7] - 107:17, 108:22, 112:2, 112:6, 113:4, 115:1
**juror's** [1] - 110:16
**JURORS** [1] - 12:2
**jurors** [13] - 109:17, 110:14, 110:24, 111:5, 111:19, 111:25, 112:8, 112:15, 112:18, 112:22, 113:2, 116:16, 116:19
**jury** [68] - 2:18, 9:25, 10:19, 10:24, 11:9, 12:4, 13:25, 14:15, 16:24, 17:8, 19:13, 19:18, 21:19, 22:21, 23:4, 27:21, 28:2, 30:14, 30:20, 33:7, 37:18, 38:12, 39:1, 39:23, 40:12, 53:9, 70:5, 70:12, 70:15, 70:21, 71:6, 71:18, 74:18, 76:3, 80:20, 87:23, 108:5, 108:12, 108:15, 109:20, 109:22, 110:14, 111:11, 111:12, 111:14, 111:22, 112:3, 112:9, 112:17, 113:7, 113:11, 113:14, 113:18, 114:2, 114:4, 114:7, 114:16, 114:18, 114:22, 114:25, 115:4, 116:7, 116:23, 116:24, 117:1
**justice** [2] - 76:18, 116:15
**Justice** [1] - 68:17
**justified** [1] - 77:19

**justifying** [1] - 35:23
**juxtapose** [1] - 59:1

## K

**Kailua** [1] - 1:19
**keep** [12] - 13:25, 37:9, 37:10, 39:14, 39:15, 44:19, 55:8, 62:19, 62:20, 85:25, 108:8
**kept** [7] - 26:16, 50:5, 67:17
**key** [1] - 28:11
**kick** [1] - 53:19
**kind** [16] - 7:25, 46:7, 46:20, 47:9, 47:17, 48:8, 48:23, 49:6, 50:4, 54:11, 56:13, 59:16, 60:14, 67:13, 67:22, 79:7
**knowing** [3] - 37:24, 82:10, 98:1
**knowingly** [31] - 14:11, 21:22, 22:18, 34:2, 36:2, 37:19, 38:20, 38:23, 86:4, 86:6, 86:9, 87:10, 88:18, 92:10, 92:14, 96:10, 96:24, 101:17, 102:4, 102:7, 102:10, 102:23, 103:17, 103:23, 104:16, 105:12, 105:13, 106:12, 106:21, 107:4
**knowledge** [6] - 59:8, 79:20, 82:9, 82:12, 82:15, 97:20
**known** [2] - 96:6, 111:5
**knows** [1] - 62:2

## L

**lack** [4] - 46:19, 47:11, 52:8, 79:2
**ladder** [1] - 34:4
**ladies** [12] - 11:10, 23:4, 24:5, 27:1, 31:22, 33:11, 39:1, 40:11, 69:25, 74:23, 114:23, 116:12
**Laielli** [7] - 1:21, 2:11, 19:24, 26:18, 37:23, 44:23, 68:10
**Lanelle** [2] - 19:4, 19:11
**language** [1] - 9:23

**lapse** [3] - 25:4, 50:2, 50:3
**lapses** [1] - 84:12
**largely** [1] - 52:4
**larger** [1] - 81:23
**last** [13] - 8:1, 33:14, 38:3, 39:2, 39:18, 40:18, 44:9, 55:4, 91:7, 95:19, 106:8, 112:17, 112:23
**lasts** [1] - 58:21
**late** [1] - 70:4
**Lauren** [2] - 1:21, 2:10
**law** [38] - 3:8, 5:21, 14:13, 14:19, 16:7, 16:14, 40:13, 40:19, 40:23, 46:9, 56:3, 56:15, 57:15, 57:16, 58:21, 70:4, 71:18, 74:25, 75:2, 75:23, 75:24, 78:6, 80:9, 80:11, 85:8, 86:15, 87:12, 87:14, 89:21, 90:4, 97:18, 99:10, 106:4, 106:5, 106:7, 107:25
**lawful** [10] - 16:8, 33:18, 56:15, 57:15, 57:17, 86:16, 87:14, 101:21, 102:3, 102:8
**lawfully** [4] - 26:1, 71:7, 86:16, 93:23
**laws** [3] - 56:10, 89:7, 89:24
**lawyer** [2] - 81:12, 81:13
**lawyer's** [2] - 81:14, 81:18
**lawyers** [3] - 77:22, 77:25, 81:10
**laying** [1] - 30:11
**lead** [1] - 59:12
**leading** [2] - 49:4, 49:5
**leads** [1] - 58:13
**learned** [5] - 20:22, 21:13, 21:15, 21:18, 34:9
**least** [5] - 58:16, 63:1, 68:12, 97:9
**leave** [14] - 15:8, 24:24, 34:12, 43:13, 43:22, 43:23, 54:17, 59:10, 72:14, 73:16, 74:12, 74:17, 112:24
**leaves** [1] - 51:20
**leaving** [2] - 43:14, 52:1
**lectern** [1] - 2:6
**ledge** [3] - 15:19,

25:19, 33:25
**left** [12] - 33:24, 43:23, 52:8, 52:20, 56:7, 57:20, 58:5, 59:23, 60:2, 62:17, 66:5, 66:6
**legislative** [1] - 5:20
**legs** [1] - 7:19
**lesser** [1] - 85:7
**letting** [1] - 15:19
**level** [1] - 5:23
**levels** [2] - 65:9, 76:21
**life** [1] - 79:10
**lifetime** [1] - 54:21
**light** [1] - 77:20
**likelihood** [1] - 44:4
**likely** [4] - 9:25, 78:21, 104:7, 104:8
**limited** [2] - 10:16, 41:13
**line** [27] - 4:18, 9:2, 15:1, 15:5, 15:11, 15:17, 17:18, 23:12, 26:5, 28:16, 29:2, 29:3, 30:2, 30:4, 30:6, 31:6, 33:1, 39:5, 52:11, 53:4, 56:19, 64:18, 64:19, 72:10, 72:21, 73:20, 73:23
**lined** [1] - 61:22
**lines** [4] - 12:19, 17:18, 17:19, 18:25
**lingering** [3] - 49:7, 58:2, 72:17
**LinkedIn** [1] - 110:7
**Linwood** [1] - 65:20
**lips** [1] - 41:5
**listen** [7] - 47:13, 48:13, 51:16, 74:15, 75:8, 109:12, 109:13
**listing** [1] - 58:9
**literally** [1] - 60:13
**live** [1] - 57:12
**lives** [1] - 39:5
**Lives** [1] - 56:3
**loaded** [2] - 66:24, 67:9
**located** [1] - 105:16
**location** [3] - 4:19, 43:18, 43:19
**locations** [3] - 43:20, 43:21, 64:1
**logistical** [1] - 107:7
**look** [10] - 41:25, 42:1, 46:21, 50:11, 63:12, 69:7, 71:21, 74:6, 74:8, 114:6
**looked** [7] - 5:14, 15:12, 37:15, 69:6,

74:8, 79:25, 80:4
**looking** [12] - 21:4, 35:7, 45:3, 49:21, 49:22, 52:25, 55:25, 60:19, 60:20, 68:24, 74:9
**looks** [2] - 62:1, 67:15
**lost** [5] - 47:22, 47:23, 55:12, 55:13
**Loth** [2] - 1:23, 119:23
**LOTH** [1] - 119:16
**loud** [1] - 104:9
**lower** [2] - 30:1, 33:2
**lunch** [4] - 70:4, 70:7, 112:16

## M

**machine** [1] - 1:24
**mad** [1] - 47:7
**magic** [1] - 44:2
**magnitude** [1] - 55:15
**mail** [1] - 10:10
**man** [2] - 54:19, 56:6
**manifested** [1] - 45:17
**manner** [8] - 49:15, 50:12, 52:25, 58:1, 75:22, 83:16, 104:5, 119:20
**map** [1] - 33:19
**Marcelin** [2] - 1:22, 2:12
**March** [8] - 117:4, 117:6, 117:7, 117:15, 117:18, 117:22, 118:14, 119:12
**march** [2] - 55:3, 117:15
**marching** [1] - 38:16
**Mark** [1] - 117:21
**marked** [2] - 67:6, 108:8
**marker** [1] - 63:20
**markers** [1] - 71:25
**masse** [1] - 25:11
**masses** [1] - 25:5
**matched** [1] - 5:24
**mathematical** [1] - 79:14
**Matter** [1] - 56:3
**matter** [8] - 11:12, 12:18, 12:19, 56:2, 109:6, 111:15, 111:22, 112:13
**mattered** [1] - 12:21
**matters** [5] - 79:10, 83:10, 83:20, 107:7, 112:1
**McCaughey** [2] - 8:3,

12

8:16

**McFadden** [4] - 7:24, 8:3, 8:15, 8:21

**mean** [15] - 44:6, 48:9, 49:3, 49:13, 49:18, 50:6, 52:17, 53:25, 54:25, 55:17, 56:11, 60:5, 60:16, 68:16

**meaning** [4] - 8:20, 38:13, 104:1, 106:1

**meaningful** [1] - 83:19

**meanings** [2] - 101:12, 106:23

**means** [26] - 22:23, 22:24, 23:6, 23:8, 23:11, 23:14, 40:14, 80:10, 83:7, 88:20, 89:2, 89:5, 89:6, 89:21, 90:3, 92:16, 93:4, 93:7, 101:2, 101:8, 102:12, 110:1, 110:2, 110:18, 111:20, 113:4

**meant** [2] - 45:18, 108:3

**measure** [1] - 40:21

**measured** [1] - 68:20

**media** [8] - 12:12, 24:23, 35:20, 35:22, 55:21, 110:3, 110:6, 110:22

**meet** [2] - 31:24, 32:18

**meetings** [1] - 107:2

**meets** [6] - 16:3, 16:4, 19:13, 23:2, 33:13, 38:18

**melee** [1] - 12:20

**member** [4] - 22:2, 98:21, 111:12, 111:14

**members** [23] - 12:4, 12:5, 12:12, 13:25, 19:1, 19:13, 19:18, 21:18, 21:19, 22:20, 24:19, 28:2, 35:4, 36:13, 37:18, 38:15, 39:9, 39:19, 70:21, 70:22, 71:18, 74:18, 111:12

**memory** [6] - 60:6, 77:5, 77:6, 83:18, 83:25, 84:12

**mens** [4] - 4:24, 5:15, 6:4, 8:11

**mental** [3] - 5:6, 90:22, 95:8

**mention** [1] - 42:22

**mentioned** [4] - 6:6, 7:23, 9:3, 63:23

**mentioning** [1] - 9:23

**mere** [2] - 40:14, 94:8

**merely** [9] - 85:7, 90:20, 91:1, 95:5, 95:12, 95:25, 97:24, 97:25, 98:1

**merits** [1] - 111:15

**message** [1] - 13:2

**messages** [1] - 13:2

**messaging** [1] - 110:5

**met** [6] - 16:16, 16:23, 17:25, 32:8, 45:14

**metric** [1] - 68:20

**Metropolitan** [4] - 57:6, 90:1, 99:8, 100:2

**mic** [1] - 115:4

**Michael** [60] - 2:4, 2:15, 12:5, 12:8, 12:11, 12:15, 12:19, 12:20, 12:21, 13:7, 13:23, 15:18, 21:1, 21:9, 21:19, 22:13, 22:23, 23:5, 24:3, 24:25, 26:24, 27:4, 28:3, 28:14, 28:20, 29:12, 29:21, 31:18, 33:6, 33:8, 34:14, 36:15, 37:11, 38:1, 38:24, 39:10, 40:1, 41:4, 41:5, 41:8, 42:8, 42:14, 43:11, 43:12, 53:25, 54:17, 57:14, 69:2, 78:6, 86:14, 87:21, 90:5, 90:9, 91:11, 94:12, 98:18, 101:16, 102:22, 104:15, 106:11

**MICHAEL** [1] - 1:4

**microphone** [1] - 115:3

**microphones** [1] - 40:9

**middle** [5] - 46:2, 52:7, 62:11, 62:16, 64:6

**midst** [2] - 15:15, 15:16

**might** [11] - 10:7, 42:24, 42:25, 43:1, 45:3, 45:22, 54:23, 81:6, 81:9, 110:22, 113:3

**mind** [9] - 9:24, 14:1, 23:21, 44:19, 51:14, 82:24, 85:25, 108:8, 111:17

**mindful** [1] - 108:17

**minute** [12] - 28:17,

42:25, 43:10, 52:6, 60:18, 61:9, 64:7, 65:25, 70:1, 70:9, 70:14, 73:25

**minutes** [25] - 42:2, 43:1, 45:2, 46:3, 46:21, 50:1, 50:7, 50:8, 50:9, 50:10, 50:17, 50:24, 50:25, 52:4, 53:24, 54:10, 58:25, 59:22, 74:12, 114:4, 116:24

**misdemeanor** [1] - 5:2

**misdemeanors** [2] - 44:9, 54:6

**miss** [1] - 50:18

**mission** [1] - 108:17

**mistake** [2] - 84:12, 86:8

**misunderstanding** [1] - 84:12

**mix** [1] - 29:23

**mob** [12] - 18:17, 18:20, 18:24, 19:9, 19:12, 22:2, 26:16, 26:23, 28:14, 30:11, 36:14, 39:10

**Model** [7] - 4:23, 5:6, 5:15, 5:17, 5:23, 7:16, 8:10

**modifies** [1] - 108:1

**moment** [7] - 19:6, 47:19, 47:21, 51:12, 60:16, 63:22, 68:1

**moments** [2] - 53:9, 56:8

**montage** [2] - 18:8, 19:10

**morning** [9] - 2:7, 2:8, 2:13, 2:14, 11:10, 11:12, 11:13, 13:9, 48:20

**most** [8] - 6:24, 24:8, 25:24, 30:10, 42:22, 42:23, 46:5

**motion** [1] - 43:8

**motioning** [1] - 62:4

**motivated** [1] - 84:21

**Move** [1] - 72:12

**move** [19] - 12:22, 15:8, 15:10, 23:13, 28:20, 28:21, 29:22, 30:1, 31:1, 32:1, 32:3, 40:8, 62:2, 64:3, 64:17, 64:18, 67:13, 73:23

**moved** [1] - 60:12

**movement** [5] - 16:19, 17:22, 86:20, 87:19,

88:1

**movements** [3] - 45:2, 49:7, 64:12

**moves** [1] - 30:4

**moving** [4] - 63:11, 66:2, 67:17, 72:12

**MPD** [1] - 55:1

**MR** [35] - 2:14, 2:23, 4:5, 10:23, 11:2, 40:10, 46:23, 49:20, 50:14, 51:25, 60:24, 61:18, 62:7, 63:11, 63:22, 65:15, 65:17, 66:5, 66:8, 66:10, 66:14, 66:17, 66:23, 67:2, 67:5, 67:8, 114:12, 114:19, 114:21, 116:10, 117:6, 117:14, 117:17, 119:8, 119:10

**MS** [31] - 2:8, 3:2, 10:21, 11:7, 11:23, 11:25, 12:4, 20:15, 23:18, 23:25, 28:25, 29:9, 29:15, 29:19, 31:5, 33:23, 36:24, 37:15, 38:9, 65:16, 66:13, 67:4, 70:19, 70:21, 72:9, 113:22, 114:10, 116:8, 117:11, 118:1, 119:5

**multiple** [2] - 68:15

**murdered** [1] - 7:2

**must** [45] - 14:10, 22:21, 32:12, 78:24, 80:23, 80:24, 81:13, 81:19, 83:3, 85:11, 85:13, 87:7, 87:22, 90:12, 90:20, 91:3, 92:5, 92:25, 93:3, 93:5, 94:3, 94:19, 95:6, 95:14, 96:15, 97:8, 97:10, 98:10, 99:5, 100:23, 101:5, 101:25, 102:6, 103:10, 103:15, 105:2, 106:17, 107:16, 107:18, 107:19, 108:2, 109:12, 109:13, 109:25

**mutual** [1] - 108:21

---

# N

**name** [2] - 41:5, 78:25

**national** [1] - 76:19

**natural** [5] - 21:23, 52:19, 68:22, 82:17,

92:11

**naturally** [1] - 59:12

**nature** [3] - 80:20, 80:23, 86:7

**near** [4] - 18:22, 19:7, 26:3, 33:25

**necessarily** [1] - 81:2

**necessary** [9] - 69:18, 69:20, 78:20, 82:24, 91:8, 95:19, 96:7, 100:5, 111:8

**need** [13] - 14:15, 30:14, 75:6, 86:1, 92:22, 94:4, 97:12, 97:17, 99:23, 105:7, 113:22, 116:21, 117:2

**negated** [1] - 94:6

**never** [10] - 41:5, 55:12, 57:20, 59:23, 59:25, 78:5, 111:14, 111:17, 111:21

**new** [1] - 118:21

**New** [1] - 55:18

**news** [1] - 35:24

**newspaper** [1] - 109:10

**next** [10] - 21:21, 28:5, 30:12, 31:22, 33:10, 36:17, 61:20, 63:5, 63:8, 65:2

**night** [2] - 8:1, 55:4

**nine** [6] - 50:6, 50:8, 50:9, 50:17, 53:24, 54:9

**Ninth** [1] - 10:12

**none** [2] - 12:21, 42:13

**nonsimple** [1] - 5:2

**normal** [1] - 104:11

**north** [2] - 24:14, 35:19

**Northwest** [1] - 1:11

**northwest** [4] - 15:7, 24:13, 26:3, 73:17

**note** [9] - 63:22, 75:15, 111:9, 111:13, 113:18, 114:16, 114:19, 114:20, 114:24

**notebook** [1] - 112:25

**notebooks** [1] - 113:12

**noted** [2] - 3:6, 7:15

**notes** [4] - 6:9, 75:6, 75:8, 119:17

**nothing** [13] - 3:2, 12:18, 20:8, 53:7, 55:11, 64:12, 107:22, 107:24,

13

107:25, 112:19,
119:8, 119:9, 119:10
**notice** [3] - 44:17,
61:21, 62:15
**notwithstanding** [1] -
68:6
**November** [7] - 1:4,
3:15, 19:19, 20:2,
37:22, 47:14, 47:15
**null** [1] - 119:19
**number** [9] - 6:8,
11:13, 21:8, 65:14,
65:16, 81:3, 81:7,
81:8, 81:20
**Number** [1] - 65:17
**numbers** [1] - 39:13
**numerous** [1] - 32:22
**NW** [1] - 1:15

## O

**o'clock** [1] - 58:21
**oaths** [1] - 69:19
**object** [3] - 3:3, 3:6,
81:15
**objected** [1] - 81:10
**objecting** [1] - 81:12
**objection** [1] - 81:17
**objectionable** [1] -
46:5
**objections** [1] - 81:13
**objects** [1] - 14:24
**obligations** [1] - 42:16
**observe** [2] - 74:5,
83:20
**observed** [1] - 83:9
**observing** [1] - 72:19
**obstruct** [16] - 18:4,
18:14, 19:17, 21:24,
71:1, 86:15, 91:12,
91:21, 92:8, 92:9,
92:12, 92:16, 93:10,
94:4, 94:5, 94:11
**obstructed** [8] -
14:18, 15:9, 15:22,
16:18, 86:19, 87:18,
87:25, 88:3
**obstructing** [10] -
14:12, 58:4, 59:7,
69:21, 70:25, 87:11,
91:20, 93:14, 94:9,
107:1
**obstruction** [29] -
18:1, 18:2, 19:14,
21:21, 22:1, 22:20,
27:18, 27:24, 28:1,
28:3, 36:5, 59:12,
91:9, 94:14, 94:15,
94:16, 94:19, 94:22,
94:25, 95:5, 95:12,

95:16, 95:22, 96:13,
96:18, 96:20, 97:2,
97:4, 98:9
**obstructs** [1] - 93:16
**obvious** [4] - 43:25,
44:14, 56:9, 69:10
**obviously** [1] - 6:2
**occupied** [1] - 25:5
**occurred** [1] - 103:20
**OF** [3] - 1:1, 1:2, 1:7
**offense** [56] - 4:13,
5:1, 5:3, 6:16, 58:15,
78:10, 78:12, 78:14,
78:15, 86:25, 87:2,
87:5, 87:7, 87:22,
90:7, 90:8, 90:10,
90:15, 91:20, 91:23,
91:25, 92:2, 92:3,
92:5, 92:23, 94:23,
95:24, 96:1, 96:2,
96:3, 96:5, 96:15,
96:19, 96:23, 97:2,
97:4, 97:7, 97:9,
97:12, 97:14, 97:17,
98:2, 98:4, 98:8,
98:12, 99:4, 101:24,
103:9, 105:1,
106:16, 107:8,
107:9, 118:16,
118:21, 118:24
**offenses** [3] - 58:10,
85:20, 99:21
**offensive** [2] - 47:9,
101:9
**offered** [1] - 81:11
**office** [4] - 19:7,
22:15, 45:23, 117:8
**Office** [1] - 1:14
**Officer** [18] - 1:21,
2:10, 15:21, 26:7,
29:11, 30:3, 31:17,
32:25, 37:4, 37:7,
41:3, 41:11, 41:20,
44:23, 52:14, 65:20,
68:10, 73:12
**officer** [50] - 9:18,
10:6, 10:7, 12:22,
14:24, 15:8, 29:2,
29:3, 29:11, 29:20,
30:7, 30:10, 30:17,
31:8, 31:9, 31:10,
31:11, 32:13, 37:2,
41:14, 42:4, 46:9,
46:16, 52:7, 52:15,
62:10, 62:19, 62:24,
64:22, 65:23, 66:2,
85:8, 86:16, 89:9,
89:21, 89:22, 98:19,
98:22, 99:8, 99:14,
99:18, 99:24,

100:11, 100:14,
100:17, 109:19,
111:10, 111:19
**officer's** [3] - 29:5,
85:2, 85:4
**officers** [93] - 3:16,
4:2, 5:12, 7:8, 8:22,
9:2, 12:8, 12:19,
14:13, 14:19, 14:21,
14:24, 15:2, 15:10,
15:12, 15:14, 15:16,
15:17, 15:19, 16:8,
16:15, 17:14, 17:15,
19:2, 21:5, 21:11,
23:5, 23:11, 23:13,
24:18, 25:8, 25:14,
25:17, 25:18, 26:5,
26:12, 28:7, 28:10,
28:15, 29:5, 29:6,
30:1, 30:5, 31:1,
31:18, 31:19, 31:20,
31:25, 32:2, 32:9,
32:25, 33:9, 34:5,
34:6, 34:11, 35:7,
37:8, 39:5, 39:13,
40:19, 40:23, 42:6,
42:13, 42:15, 42:18,
61:22, 62:25, 63:6,
64:16, 64:23, 65:22,
68:15, 69:23, 71:11,
72:10, 72:11, 72:22,
72:25, 73:4, 73:11,
73:17, 73:22, 74:2,
87:12, 87:14, 98:15,
99:16, 100:1, 100:3,
100:8
**officers'** [3] - 17:15,
28:19, 28:23
**offices** [1] - 68:14
**official** [65] - 16:9,
16:15, 18:1, 18:3,
18:5, 18:6, 18:11,
18:14, 18:16, 18:19,
19:14, 21:21, 22:20,
27:18, 27:24, 28:3,
32:6, 32:10, 36:3,
36:6, 71:1, 86:17,
87:15, 90:2, 91:9,
91:13, 91:20, 91:21,
92:8, 92:10, 92:12,
92:17, 92:19, 92:21,
92:22, 92:23, 93:1,
93:10, 94:4, 94:6,
94:14, 94:15, 94:17,
94:19, 94:22, 94:25,
95:5, 95:12, 95:16,
95:23, 96:14, 96:18,
96:21, 97:2, 97:4,
98:24, 99:15, 99:17,
100:2, 100:9,

102:24, 103:6,
103:19, 103:22,
119:24
**Official** [1] - 1:23
**often** [3] - 93:24, 96:5,
112:11
**OLIVERAS** [1] - 1:4
**Oliveras** [112] - 2:4,
2:16, 12:5, 12:8,
12:12, 12:15, 12:19,
12:20, 12:21, 13:8,
13:23, 14:20, 15:18,
17:9, 17:16, 21:1,
21:10, 21:19, 22:13,
22:23, 23:5, 24:3,
24:25, 26:19, 26:24,
27:4, 27:17, 28:3,
28:14, 28:20, 29:13,
29:21, 31:18, 33:6,
33:8, 34:14, 36:15,
37:11, 38:1, 38:24,
39:10, 40:1, 40:11,
40:20, 40:25, 41:1,
41:5, 41:8, 41:17,
41:19, 41:22, 41:23,
42:8, 42:14, 43:11,
43:12, 44:15, 49:4,
50:9, 50:12, 50:18,
50:21, 51:25, 52:10,
53:23, 53:25, 54:5,
54:17, 55:17, 56:5,
57:1, 57:14, 58:22,
58:23, 59:5, 59:6,
60:10, 61:2, 61:6,
61:12, 61:16, 62:16,
63:8, 64:9, 65:4,
65:24, 69:2, 71:10,
72:16, 72:17, 73:18,
73:24, 78:7, 78:11,
78:15, 78:18, 82:14,
82:24, 85:10, 85:19,
86:14, 87:21, 90:5,
90:9, 91:12, 94:12,
98:18, 101:16,
102:22, 104:15,
106:11, 118:4
**Oliveras's** [1] - 79:6
**omissions** [1] - 82:4
**once** [1] - 34:8
**one** [60] - 7:21, 14:24,
17:21, 21:24, 28:12,
30:4, 32:14, 32:18,
34:2, 37:15, 40:18,
40:24, 41:14, 43:3,
47:5, 47:22, 48:25,
51:21, 53:18, 54:6,
55:2, 56:6, 56:14,
57:21, 58:13, 58:21,
59:17, 62:8, 62:11,
62:22, 63:1, 63:6,

65:12, 65:21, 65:23,
68:12, 68:13, 68:14,
72:16, 73:11, 74:16,
78:23, 80:11, 80:19,
81:7, 87:12, 87:25,
88:7, 88:8, 88:16,
89:11, 90:14, 97:16,
100:24, 107:12,
111:11, 112:5,
113:2, 115:10
**one's** [2] - 89:3, 94:1
**ones** [2] - 51:22, 69:14
**ongoing** [1] - 18:12
**open** [9] - 30:25,
44:13, 51:3, 51:4,
53:19, 111:16,
111:21, 115:4, 115:7
**opening** [4] - 44:18,
47:12, 54:12, 58:7
**operates** [1] - 89:19
**operation** [1] - 89:7
**opinion** [5] - 6:25, 7:1,
77:2, 107:23, 112:3
**opinions** [2] - 74:13,
76:10
**opportunities** [1] -
46:11
**opportunity** [3] - 3:10,
11:19, 83:20
**oppose** [4] - 8:19,
74:2, 98:19, 101:11
**opposed** [9] - 28:10,
28:22, 31:3, 31:19,
32:5, 99:7, 99:13,
100:7, 100:13
**opposing** [7] - 4:1,
4:16, 8:24, 28:6,
52:18, 72:11, 73:22
**opposite** [2] - 64:14,
81:9
**orally** [1] - 111:16
**order** [4] - 4:25, 90:11,
94:18, 107:17
**ordered** [1] - 64:3
**orderly** [13] - 36:3,
36:10, 75:22,
102:23, 103:6,
103:18, 103:21,
104:19, 104:20,
105:10, 105:20,
105:25, 106:25
**orders** [3] - 56:15,
57:15, 72:14
**ordinarily** [1] - 82:9
**ordinary** [4] - 8:20,
38:13, 101:12,
106:23
**organize** [1] - 108:20
**organized** [1] - 55:22
**orientation** [1] - 76:20

14

**origin** [1] - 76:19
**original** [1] - 65:18
**otherwise** [6] - 81:24, 98:7, 101:18, 102:13, 103:2, 111:4
**ounce** [1] - 34:3
**outcome** [1] - 83:22
**outnumbered** [1] - 39:14
**outset** - 112:5
**outside** [20] - 4:14, 35:10, 49:12, 49:21, 49:22, 51:8, 52:14, 52:23, 53:20, 58:2, 73:3, 73:5, 73:6, 73:7, 74:13, 74:17, 109:19, 111:3, 111:11
**overall** [1] - 5:18
**overtaken** [1] - 25:10
**overtook** [3] - 18:20, 18:25, 39:11
**overwhelming** [3] - 19:19, 38:6, 71:2
**overwhelmingly** [4] - 14:18, 23:2, 28:4, 40:1
**own** [3] - 31:13, 77:5, 114:8

**P**

**p.m** [6] - 21:1, 33:25, 43:14, 86:13, 98:17, 119:13
**page** [2] - 8:8, 112:25
**pan** [1] - 61:4
**parade** [1] - 106:22
**paraded** [2] - 38:11, 106:19
**parading** [4] - 38:3, 38:24, 106:8, 106:12
**paralegal** [1] - 2:11
**Paralegal** [1] - 1:22
**Parler** [11] - 13:2, 13:17, 20:3, 20:7, 20:15, 23:16, 23:25, 31:13, 37:12, 69:3, 74:6
**part** [10] - 9:5, 15:1, 26:15, 28:14, 30:4, 32:15, 42:22, 68:9, 97:13, 104:8
**participant** [1] - 49:17
**participate** [1] - 74:4
**participated** [1] - 98:12
**participating** [1] - 48:11
**participation** [1] -

97:8
**particular** [9] - 40:23, 51:14, 58:15, 71:22, 75:11, 78:10, 78:14, 80:12
**particularly** [1] - 45:9
**parties** [17] - 2:5, 3:17, 9:15, 14:2, 14:4, 14:7, 16:11, 16:14, 16:23, 17:20, 18:11, 32:9, 33:20, 77:12, 77:13, 111:6, 116:21
**partisans** [1] - 112:12
**parts** [2] - 42:1, 97:16
**party** [4] - 81:14, 82:7, 116:7, 119:20
**pass** [1] - 50:9
**passageway** [1] - 41:13
**passageways** [1] - 107:1
**passed** [4] - 29:6, 41:5, 90:22, 95:8
**past** [3] - 50:10, 71:11
**path** [1] - 17:2
**patriot** [1] - 35:25
**patriots** [1] - 22:7
**pattern** [2] - 19:24, 37:23
**pauses** [1] - 51:12
**pay** [1] - 64:5
**PDF** [1] - 74:7
**peace** [1] - 104:3
**peep** [1] - 29:4
**Penal** [7] - 4:23, 5:6, 5:15, 5:17, 5:23, 7:16, 8:11
**penalties** [2] - 5:2, 5:3
**penalty** [2] - 5:5, 9:8
**Pence** [1] - 59:4
**pending** [6] - 92:22, 92:24, 117:25, 118:7, 118:22, 118:25
**pens** [1] - 75:7
**people** [47] - 12:10, 15:18, 20:6, 24:1, 25:5, 26:12, 39:10, 39:14, 41:24, 44:8, 45:21, 46:15, 47:6, 48:6, 48:24, 49:12, 50:6, 51:4, 51:8, 51:11, 52:12, 52:21, 53:19, 53:22, 55:3, 55:23, 56:4, 56:5, 56:7, 56:20, 56:24, 56:25, 60:4, 62:1, 62:3, 64:4, 64:11, 64:13, 68:4, 68:6, 74:5, 76:17, 83:23,

93:21, 96:7
**perception** [1] - 84:13
**performance** [13] - 16:9, 16:20, 17:24, 32:6, 68:20, 86:17, 86:21, 87:15, 87:20, 88:4, 98:24, 99:15, 99:17
**performed** [4] - 27:25, 96:23, 96:24, 97:6
**perimeter** [2] - 33:19, 33:21
**period** [2] - 36:12, 39:11
**permitted** [6] - 48:16, 48:19, 48:21, 77:17, 80:14, 110:23
**person** [40] - 10:4, 10:5, 30:15, 30:21, 30:23, 32:4, 41:16, 41:21, 42:9, 53:18, 62:18, 79:8, 79:25, 82:11, 82:17, 86:6, 93:8, 93:15, 94:2, 96:2, 96:3, 96:4, 96:6, 96:11, 98:22, 98:23, 99:12, 100:6, 100:15, 100:20, 100:23, 101:9, 102:14, 102:16, 104:4, 104:5, 104:6, 106:3, 111:18
**person's** [1] - 104:6
**personal** [7] - 74:12, 74:13, 76:10, 76:14, 76:18, 76:21, 112:19
**persons** [2] - 88:22, 97:24
**petition** [1] - 93:22
**phase** [1] - 97:14
**phases** [1] - 97:16
**phone** [4] - 45:8, 110:3, 110:12, 113:6
**photo** [2] - 33:24, 33:25
**photocopied** [1] - 119:20
**photos** [2] - 13:18, 41:9
**physical** [12] - 30:17, 32:12, 32:21, 33:1, 67:22, 71:12, 98:25, 99:18, 99:23, 100:17, 100:18, 101:8
**physically** [1] - 25:17
**picked** [1] - 41:9
**picket** [1] - 106:22
**picketed** [2] - 38:12, 106:19

**picketing** [4] - 38:4, 38:25, 106:9, 106:13
**picking** [2] - 43:17, 75:7
**picture** [1] - 64:10
**pictures** [1] - 81:23
**piece** [1] - 59:17
**pile** [1] - 35:22
**place** [3] - 4:12, 62:5, 76:15
**places** [1] - 41:9
**plan** [4] - 12:23, 12:25, 48:3
**planned** [12] - 12:25, 22:11, 22:15, 48:4, 48:12, 48:16, 48:19, 48:21, 48:25, 49:1
**planning** [2] - 20:9, 24:1
**plans** [2] - 91:2, 95:13
**platform** [1] - 54:23
**play** [7] - 51:22, 53:8, 66:20, 67:1, 71:21, 71:22
**played** [6] - 31:14, 32:22, 42:25, 43:16, 50:2, 50:3
**players** [1] - 51:21
**plaza** [1] - 24:13
**plus** [1] - 69:6
**PO** [1] - 1:19
**point** [18] - 29:4, 40:24, 41:14, 45:10, 55:19, 56:23, 57:21, 57:22, 60:10, 60:14, 63:3, 64:5, 64:19, 65:25, 67:20
**pointed** [3] - 15:20, 42:8, 58:6
**pointing** [1] - 21:3
**pole** [7] - 63:7, 64:6, 65:3, 65:4, 65:6, 72:6
**Police** [10] - 15:21, 41:11, 57:6, 89:20, 90:1, 90:2, 99:9, 100:2, 100:4
**police** [47] - 10:6, 12:8, 12:19, 12:22, 14:21, 14:24, 15:4, 15:8, 15:10, 18:25, 21:11, 23:5, 24:18, 25:8, 26:5, 26:12, 28:15, 29:11, 30:10, 34:4, 34:5, 34:11, 35:7, 37:2, 41:23, 46:12, 46:15, 47:3, 56:19, 56:22, 57:25, 60:4, 60:15, 62:2, 62:19, 63:3, 64:1,

64:3, 65:9, 67:17, 67:19, 67:23, 72:21, 73:14, 73:20, 85:2, 85:8
**policing** [1] - 90:3
**political** [3] - 45:19, 47:18, 53:4
**politics** [1] - 54:23
**polled** [1] - 116:7
**polling** [1] - 116:11
**portion** [2] - 75:11, 81:25
**portions** [5] - 81:22, 82:1, 82:4, 82:5
**Portland** [1] - 55:6
**position** [4] - 62:5, 112:7, 117:24, 118:1
**positions** [1] - 42:17
**possession** [1] - 104:6
**possibility** [1] - 76:12
**possible** [3] - 20:6, 108:25, 113:1
**post** [1] - 20:15
**posted** [3] - 101:18, 102:13, 103:2
**posts** [7] - 13:17, 20:3, 20:4, 20:7, 23:16, 37:13, 74:6
**powerful** [1] - 78:24
**praying** [1] - 107:3
**precisely** [1] - 66:21
**preferences** [2] - 74:12, 76:14
**preferred** [1] - 22:14
**prejudice** [1] - 84:22
**prejudiced** [1] - 84:20
**prejudices** [3] - 76:10, 76:14, 83:13
**preliminary** [1] - 75:20, 78:16, 85:17
**preparation** [2] - 91:2, 95:13
**prepare** [1] - 117:9
**prepared** [1] - 22:15
**presence** [2] - 40:14, 94:7, 94:8
**PRESENT** [1] - 1:21
**present** [9] - 2:16, 6:3, 11:3, 30:21, 40:15, 97:25, 100:21, 100:24, 101:4
**presentation** [1] - 17:13
**presented** [11] - 12:24, 18:19, 20:25, 23:2, 31:9, 59:20, 75:1, 80:18, 80:25, 109:14, 110:21
**presentence** [1] -

15

117:9
**preside** [1] - 108:13
**President** [7] - 19:6, 48:13, 59:3, 101:20, 102:17, 102:18, 103:4
**presidential** [3] - 12:7, 12:14, 105:24
**presumed** [1] - 78:1
**presumption** [1] - 78:2
**pretrial** [2] - 3:18, 117:25
**pretty** [3] - 9:24, 56:23, 57:18
**prevent** [1] - 8:22
**previous** [1] - 84:7
**previously** [1] - 107:5
**pride** [1] - 112:6
**Prince** [1] - 42:5
**principal** [2] - 27:3, 96:7
**prison** [1] - 47:6
**prisoner** [1] - 41:21
**privacy** [1] - 82:2
**privilege** [1] - 93:13
**prize** [2] - 21:6, 24:8
**probability** [1] - 84:14
**probable** [4] - 21:23, 78:22, 82:17, 92:11
**probation** [1] - 117:8
**problem** [2] - 54:1
**procedure** [1] - 58:20
**proceed** [4] - 11:6, 11:15, 11:22, 112:11
**proceeded** [1] - 25:16
**proceeding** [60] - 18:2, 18:3, 18:5, 18:7, 18:11, 18:14, 18:16, 18:19, 19:14, 19:17, 21:22, 21:24, 22:13, 22:20, 27:18, 27:24, 28:4, 36:6, 58:24, 71:1, 91:9, 91:13, 91:20, 91:22, 92:8, 92:10, 92:13, 92:18, 92:19, 92:21, 92:22, 92:24, 93:1, 93:11, 93:12, 93:14, 93:16, 93:17, 94:4, 94:6, 94:9, 94:11, 94:14, 94:15, 94:17, 94:19, 94:23, 94:25, 95:5, 95:12, 95:17, 95:23, 96:14, 96:18, 96:21, 97:2, 97:5, 98:10, 119:13
**Proceedings** [1] - 1:24
**proceedings** [4] -

18:9, 55:10, 59:6, 119:17
**process** [5] - 20:17, 41:21, 104:12, 111:7, 112:19
**produce** [3] - 59:9, 78:7, 104:8
**produced** [1] - 1:25
**progress** [2] - 18:16, 92:17
**progressed** [1] - 25:12
**promise** [1] - 68:7
**promote** [1] - 108:23
**proof** [4] - 58:8, 58:17, 78:24, 106:6
**proper** [1] - 81:12
**properly** [1] - 77:9
**property** [4] - 24:23, 88:24, 89:1, 104:6
**propose** [1] - 117:4
**proposed** [13] - 2:18, 3:1, 3:12, 3:15, 3:17, 3:19, 4:8, 4:9, 7:21, 7:25, 9:15, 9:22, 10:17
**proposes** [1] - 3:24
**prosecution** [3] - 89:23, 118:20, 118:24
**prosecutor** [1] - 10:12
**protect** [4] - 24:19, 39:6, 39:8, 39:9
**protected** [10] - 16:21, 17:25, 86:22, 87:20, 88:4, 88:10, 88:15, 89:6, 102:14, 102:16
**protecting** [3] - 12:10, 19:2, 100:4
**protective** [1] - 48:9
**protest** [6] - 49:1, 49:2, 49:5, 55:4
**protester** [1] - 46:15
**protesters** [1] - 55:8
**protestor** [1] - 57:24
**protestors** [3] - 55:10, 57:25, 61:22
**protests** [4] - 48:16, 48:21, 55:2, 55:6
**proudly** [1] - 28:21
**prove** [19] - 3:21, 3:25, 9:16, 13:19, 14:10, 78:7, 78:13, 78:21, 79:13, 79:15, 91:7, 92:25, 95:18, 97:8, 98:5, 98:10, 102:6, 103:15, 108:2
**proved** [15] - 82:10, 82:23, 83:1, 87:8, 90:13, 90:21, 92:6, 94:20, 95:7, 96:16,

99:5, 101:25, 103:10, 105:2, 106:17
**proven** [4] - 13:12, 77:18, 78:4, 78:9
**provide** [3] - 58:11, 75:5, 110:1
**provided** [2] - 85:23, 107:20
**proving** [2] - 78:18, 80:10
**provoke** [2] - 7:3, 31:25
**proximity** [2] - 103:1, 103:13
**public** [4] - 44:13, 88:20, 104:3
**publicity** [1] - 109:15
**publish** [1] - 115:6
**published** [23] - 12:3, 20:14, 23:17, 23:24, 28:24, 29:8, 29:14, 29:18, 31:4, 33:22, 36:23, 37:14, 38:8, 46:22, 49:19, 50:13, 51:24, 60:23, 61:17, 62:6, 63:10, 63:21, 72:8
**pull** [2] - 73:2, 113:19
**pulled** [3] - 30:7, 64:24, 65:1
**punishable** [1] - 6:12
**punishment** [2] - 108:25, 109:6
**purpose** [23] - 4:20, 6:10, 14:12, 21:17, 22:24, 23:15, 23:21, 24:5, 24:9, 24:15, 37:17, 48:9, 48:11, 49:11, 49:14, 51:17, 69:8, 87:11, 93:5, 94:5, 94:7, 96:25, 98:7
**purposes** [2] - 99:20, 105:20
**pursuing** [1] - 10:6
**push** [7] - 15:25, 23:6, 23:10, 35:13, 37:2, 64:4, 65:22
**pushed** [4] - 15:3, 17:14, 24:14, 52:18
**pushes** [2] - 52:16, 64:23
**pushing** [6] - 8:23, 9:1, 14:21, 21:4, 29:13, 72:25
**put** [8] - 5:4, 7:8, 39:5, 46:14, 51:17, 64:8, 67:2, 67:5
**puts** [1] - 64:14

**putting** [1] - 51:2

**Q**

**qualified** [1] - 8:23
**qualifies** [1] - 10:13
**qualify** [1] - 32:16
**questions** [9] - 69:12, 75:14, 75:23, 77:24, 80:19, 87:22, 88:11, 88:16, 115:14, 115:15, 116:22
**quickly** [2] - 18:24, 25:12
**quiet** [1] - 107:2
**quietly** [1] - 64:2
**quite** [1] - 61:21
**quote** [3] - 5:20, 6:9, 13:5
**quoting** [1] - 20:5

**R**

**race** [1] - 76:19
**Rachel** [2] - 1:22, 2:11
**rack** [2] - 25:23, 34:4
**racks** [4] - 12:18, 25:13, 25:15
**radio** [1] - 109:9
**raised** [3] - 2:19, 45:10, 47:12
**raises** [2] - 7:22, 115:1
**raising** [2] - 61:7
**rallies** [1] - 19:21
**rally** [7] - 23:9, 35:25, 37:22, 48:12, 48:20, 74:4, 74:5
**ran** [1] - 33:4
**random** [1] - 112:19
**rather** [4] - 6:16, 7:2, 15:19, 81:4
**rea** [4] - 4:24, 5:15, 6:4, 8:11
**reach** [4] - 4:22, 80:21, 108:17
**reached** [6] - 63:6, 111:20, 113:8, 114:17, 114:20, 114:24
**reaching** [3] - 80:16, 80:25, 108:10
**reaction** [1] - 52:19
**reacts** [1] - 52:16
**read** [11] - 3:10, 5:9, 8:11, 47:13, 47:25, 85:21, 109:12, 109:13, 114:5, 115:8, 115:10
**reading** [1] - 6:4
**ready** [9] - 10:19, 11:6,

11:15, 11:22, 13:6, 20:20, 35:11, 35:12, 70:17
**real** [3] - 24:4, 69:7, 69:8
**realized** [1] - 11:11
**realizes** [1] - 86:6
**really** [13] - 5:16, 43:19, 45:17, 45:21, 49:10, 49:17, 55:4, 59:19, 60:8, 65:24, 68:4, 68:21
**realtime** [2] - 13:3, 18:23
**reason** [8] - 11:12, 60:25, 67:15, 79:1, 79:2, 79:12, 83:18, 85:13
**reasonable** [43] - 3:25, 13:13, 13:19, 58:12, 77:19, 78:4, 78:10, 78:14, 78:19, 78:25, 79:7, 79:8, 79:15, 79:22, 82:23, 83:2, 87:9, 90:13, 90:21, 92:7, 92:25, 94:20, 95:6, 95:7, 95:14, 96:9, 96:16, 98:6, 98:11, 99:6, 100:10, 101:6, 101:9, 102:1, 102:6, 103:11, 103:15, 104:5, 105:3, 106:13, 106:18, 108:2
**reasonableness** [1] - 84:14
**reasonably** [1] - 93:1
**reasons** [7] - 3:13, 4:10, 10:15, 17:12, 69:6, 81:25, 85:13
**rebuttal** [4] - 11:5, 11:19, 70:3, 70:17
**recalled** [1] - 83:9
**receive** [6] - 22:22, 27:21, 77:21, 85:1, 113:6, 114:16
**received** [3] - 82:14, 82:20, 114:24
**recess** [2] - 19:12, 70:15
**recessed** [1] - 114:14
**recite** [1] - 3:7
**recollections** [1] - 84:3
**reconcile** [1] - 69:14
**record** [4] - 2:6, 11:1, 11:2, 11:5
**recorded** [1] - 45:7
**recording** [2] - 44:24, 108:3
**recount** [2] - 34:20,

39:7
**red** [2] - 42:9, 42:12
**reenter** [1] - 35:16
**refer** [2] - 75:10
**reference** [3] - 48:1, 53:13, 77:4
**refers** [2] - 99:21, 106:24
**reflect** [1] - 43:8
**reflection** [1] - 79:9
**reflective** [1] - 53:5
**reflects** [2] - 5:20, 9:15
**refuse** [4] - 23:13, 76:2, 93:12, 93:17
**refused** [7] - 15:10, 15:12, 17:15, 28:21, 29:7, 29:22, 29:25
**refuses** [1] - 31:6
**refusing** [2] - 24:24, 32:1
**regard** [4] - 5:21, 43:4, 46:7, 58:3
**regarding** [2] - 108:15, 108:22
**regardless** [2] - 54:22, 76:18
**regular** [3] - 112:15, 113:2, 113:4
**reject** [2] - 4:8, 10:17
**rejected** [3] - 7:22, 7:25, 8:25
**rejecting** [1] - 3:13
**related** [2] - 109:10, 109:15
**relatively** [3] - 44:5, 63:24
**release** [10] - 117:25, 118:2, 118:7, 118:8, 118:9, 118:13, 118:19, 118:22, 118:25
**relevant** [2] - 45:5, 82:22
**religion** [1] - 76:19
**rely** [2] - 16:25, 85:24
**remain** [4] - 22:14, 101:17, 118:2, 118:6
**remained** [6] - 33:17, 33:25, 57:15, 102:2, 102:7, 112:22
**remaining** [3] - 33:15, 34:15, 101:13
**remains** [2] - 38:22, 78:2
**remarks** [1] - 35:5
**remember** [22] - 40:22, 40:25, 41:12, 42:8, 42:9, 42:10, 42:11, 42:12, 48:15,

49:24, 50:2, 50:16, 52:11, 53:12, 54:25, 58:6, 59:24, 64:10, 65:9, 86:2, 112:12
**remind** [2] - 109:8, 109:23
**remove** [1] - 27:16
**removed** [1] - 81:24
**render** [3] - 16:25, 17:19, 75:18
**rented** [1] - 13:4
**repeat** [1] - 35:5
**repeated** [1] - 9:10
**replaces** [2] - 107:24, 108:1
**reported** [2] - 1:24, 12:13
**Reporter** [3] - 1:23, 1:23, 119:24
**reporting** [1] - 109:10
**reports** [3] - 109:9, 109:13, 117:10
**represent** [2] - 81:14, 107:16
**represented** [1] - 46:8
**representing** [1] - 68:15
**request** [1] - 116:10
**require** [8] - 6:1, 10:2, 11:14, 78:6, 80:15, 91:6, 95:18, 106:6
**required** [9] - 3:20, 3:24, 30:19, 69:18, 79:13, 82:16, 88:6, 97:19, 100:19
**requirement** [7] - 4:25, 5:25, 6:4, 7:10, 8:5, 8:11, 97:20
**requirements** [2] - 5:7, 5:15
**requires** [3] - 4:7, 9:16, 71:19
**research** [2] - 8:9, 110:9
**resist** [4] - 8:19, 74:2, 98:18, 101:11
**resistance** [1] - 10:1
**resisted** [9] - 9:17, 28:9, 28:22, 31:2, 31:18, 32:5, 99:7, 99:12, 100:7, 100:12
**resisting** [10] - 3:16, 4:1, 4:16, 8:23, 28:5, 33:9, 52:18, 72:11, 73:22, 98:14
**resources** [2] - 68:16, 68:17
**respect** [9] - 42:14, 69:17, 90:18, 90:24, 95:3, 95:10, 107:13,

107:15, 108:21
**respond** [1] - 2:24
**responded** [2] - 20:18, 24:3
**responsibility** [5] - 45:13, 74:24, 76:5, 77:3, 81:15
**responsible** [2] - 40:21, 41:15
**rest** [1] - 112:21
**rested** [1] - 10:25
**restricted** [20] - 33:15, 33:17, 33:19, 33:21, 34:15, 34:17, 36:16, 44:10, 101:13, 101:17, 101:19, 102:2, 102:8, 102:12, 102:13, 102:20, 103:1, 103:2, 103:13, 103:23
**rests** [1] - 109:4
**result** [7] - 22:1, 29:20, 42:19, 59:9, 84:11, 118:15
**results** [6] - 7:18, 12:7, 12:13, 20:13, 88:24, 88:25
**retire** [2] - 109:22, 113:12
**retired** [4] - 41:3, 57:3, 57:4, 57:6
**Retired** [1] - 55:1
**retiring** [1] - 112:9
**return** [9] - 14:15, 16:24, 33:7, 39:23, 74:19, 107:10, 107:14, 107:17, 108:12
**returned** [1] - 75:18
**returns** [2] - 11:9, 114:22
**reveal** [1] - 111:18
**review** [3] - 16:13, 39:24, 72:23
**reviewed** [1] - 44:25
**reviewing** [1] - 112:9
**revisited** [1] - 44:22
**revocation** [1] - 118:19
**rhetoric** [4] - 19:21, 19:25, 45:19, 47:17
**ridiculous** [1] - 47:9
**right-hand** [1] - 61:12
**rights** [2] - 71:8, 93:24
**rile** [1] - 35:12
**ringing** [1] - 73:9
**riot** [5] - 44:6, 44:7, 49:2, 56:16, 72:13
**rioter** [1] - 15:3

**rioters** [27] - 8:22, 9:1, 9:2, 14:22, 14:23, 15:4, 15:11, 18:24, 21:2, 22:16, 25:10, 26:2, 26:10, 28:16, 29:4, 29:24, 29:25, 30:6, 31:9, 33:1, 34:6, 34:12, 35:13, 35:20, 37:6, 39:18, 42:19
**rip** [2] - 22:7, 70:22
**ripped** [2] - 63:6, 63:7
**rise** [1] - 69:20
**risk** [2] - 19:9, 30:5
**roaming** [1] - 34:24
**room** [19] - 14:15, 16:24, 33:7, 39:23, 53:10, 70:5, 70:12, 108:5, 108:12, 109:20, 109:22, 110:6, 110:14, 111:11, 112:3, 112:9, 112:17, 116:23, 116:24
**row** [1] - 112:23
**RPR** [3] - 1:23, 119:16, 119:23
**rule** [2] - 75:23, 106:7
**rules** [1] - 108:15
**running** [1] - 25:9
**rushing** [1] - 58:2

## S

**safety** [2] - 19:8, 104:3
**SAINT** [1] - 119:16
**Saint** [2] - 1:23, 119:23
**SAINT-LOTH** [1] - 119:16
**Saint-Loth** [2] - 1:23, 119:23
**satisfy** [1] - 97:20
**saw** [74] - 13:1, 13:17, 13:18, 14:20, 14:23, 15:7, 15:14, 15:23, 18:8, 18:18, 19:10, 19:20, 20:3, 20:4, 20:7, 20:11, 20:15, 20:25, 22:12, 24:16, 24:20, 25:2, 25:3, 25:4, 25:8, 25:13, 25:16, 25:18, 25:23, 26:2, 26:4, 26:9, 26:10, 26:12, 26:22, 28:18, 28:25, 29:1, 29:2, 29:3, 29:9, 29:19, 30:24, 30:25, 31:13, 33:3, 33:19, 33:23, 34:4, 34:5,

34:10, 35:10, 35:14, 35:17, 36:24, 37:4, 37:12, 38:6, 42:23, 44:7, 58:19, 65:1, 67:12, 71:12, 72:9, 72:20, 73:15, 73:16, 73:17, 79:25, 80:3, 80:4, 80:5
**scaffolding** [1] - 73:1
**scale** [1] - 55:16
**scene** [1] - 63:17
**scientific** [1] - 79:14
**screamed** [1] - 15:19
**screen** [4] - 11:25, 50:16, 52:8, 62:11
**sea** [1] - 56:6
**seated** [1] - 109:19
**seats** [3] - 112:20, 112:23
**Seats** [1] - 112:23
**Second** [4] - 7:14, 7:15, 94:23
**second** [22] - 16:6, 19:16, 21:11, 29:12, 32:15, 36:1, 38:11, 38:18, 41:18, 49:1, 61:1, 63:5, 63:12, 87:13, 92:8, 96:20, 99:10, 102:4, 103:17, 105:9, 106:20, 115:17
**seconds** [7] - 28:17, 29:2, 53:21, 60:13, 61:15, 61:21, 73:25
**Secret** [12] - 4:13, 4:17, 5:12, 6:11, 6:21, 7:2, 7:3, 19:3, 59:3, 89:14, 102:14, 102:16
**section** [1] - 98:25
**Section** [26] - 3:21, 4:12, 4:16, 4:25, 5:8, 5:10, 5:19, 6:3, 6:13, 6:16, 7:12, 7:17, 8:6, 8:12, 8:18, 8:24, 9:16, 10:10, 10:13, 86:22, 99:2, 101:22, 103:7, 104:24, 106:14
**Sections** [2] - 91:17
**secure** [1] - 93:25
**security** [4] - 19:8, 109:19, 111:10, 111:19
**Security** [1] - 89:13
**see** [64] - 8:7, 10:8, 10:11, 11:25, 16:14, 16:22, 17:17, 17:18, 18:10, 23:15, 27:22, 29:12, 29:15, 29:16,

17

29:17, 31:5, 31:20,
32:21, 33:13, 40:22,
43:4, 43:6, 44:6,
44:20, 44:21, 45:6,
48:6, 49:3, 49:14,
50:5, 50:11, 51:9,
51:10, 51:18, 53:7,
53:18, 54:20, 57:11,
59:11, 59:25, 60:19,
61:1, 61:2, 61:8,
61:13, 61:15, 61:18,
62:12, 63:4, 64:21,
65:4, 65:5, 65:24,
65:25, 67:11, 71:16,
72:5, 72:6, 72:7,
75:7, 82:3, 114:4,
119:12

**seeing** [2] - 51:14,
73:3
**seem** [1] - 68:2
**seemingly** [1] - 6:19
**sees** [1] - 51:8
**select** [2] - 108:13,
108:15
**selected** [1] - 112:20
**selecting** [2] - 80:20,
108:18
**selection** [1] - 112:18
**self** [3] - 84:21, 93:13,
94:1
**self-incrimination** [1]
- 93:13
**Senate** [18] - 15:23,
15:24, 19:8, 21:10,
23:10, 24:16, 26:8,
34:5, 35:6, 35:11,
35:13, 36:25, 37:5,
41:13, 41:17, 49:21,
49:22, 73:19
**send** [4] - 47:6, 75:15,
111:9, 114:7
**sending** [1] - 108:5
**SENIOR** [1] - 1:8
**sense** [6] - 34:3,
37:20, 55:14, 74:17,
74:20, 112:5
**sensibility** [1] - 101:10
**sentence** [2] - 21:25,
109:3
**sentencing** [8] -
117:3, 117:20,
117:25, 118:7,
118:14, 118:22,
118:25
**separate** [12] - 17:4,
21:9, 27:19, 28:8,
85:20, 90:8, 95:24,
107:8, 107:10,
118:15, 118:20,
118:24

**separated** [2] - 46:15,
57:24
**separately** [1] -
107:10
**September** [1] - 8:16
**sequence** [1] - 43:7
**Sergeant** [3] - 55:1,
57:4, 57:7
**series** [2] - 71:24,
71:25
**serious** [5] - 4:21,
6:11, 7:9, 8:5, 9:4
**serve** [1] - 116:16
**Service** [11] - 4:14,
4:18, 5:12, 6:11,
6:21, 7:2, 19:3, 59:3,
89:14, 102:15,
102:16
**service** [7] - 98:22,
110:5, 110:6,
113:10, 116:14,
116:17
**Services** [1] - 7:3
**Session** [2] - 92:20,
105:22
**session** [3] - 104:19,
105:10, 105:21
**set** [6] - 12:6, 40:6,
50:18, 91:15, 117:2,
117:19
**setting** [1] - 5:22
**seven** [4] - 13:8,
43:24, 50:1, 85:20
**several** [9] - 4:10,
13:18, 27:2, 28:18,
28:25, 32:22, 34:8,
39:5, 42:20
**sex** [1] - 76:20
**sexual** [1] - 76:20
**shall** [1] - 119:19
**shattered** [2] - 26:10,
73:9
**Sheets** [3] - 2:10,
70:20, 74:22
**SHEETS** [4] - 1:14,
70:19, 70:21, 72:9
**sheets** [1] - 113:25
**shifts** [1] - 78:5
**Shipley** [24] - 2:15,
2:19, 2:21, 3:4, 4:4,
7:23, 8:2, 10:22,
10:25, 40:5, 40:6,
40:8, 66:7, 70:21,
71:14, 71:20, 72:2,
72:15, 73:18,
113:23, 114:11,
116:9, 117:13, 119:7
**SHIPLEY** [36] - 1:18,
2:14, 2:23, 4:5,
10:23, 11:2, 40:10,

46:23, 49:20, 50:14,
51:25, 60:24, 61:18,
62:7, 63:11, 63:22,
65:15, 65:17, 66:5,
66:8, 66:10, 66:14,
66:17, 66:23, 67:2,
67:5, 67:8, 114:12,
114:19, 114:21,
116:10, 117:6,
117:14, 117:17,
119:8, 119:10
**Shipley's** [1] - 13:15
**shooting** [1] - 4:13
**shootings** [1] - 5:11
**shoots** [1] - 61:14
**short** [1] - 70:1
**shorthand** [1] - 1:24
**shot** [6] - 43:5, 43:6,
43:18, 43:19, 60:24,
62:8
**shots** [2] - 67:3, 67:4
**shouting** [3] - 46:17,
72:12, 73:2
**shoving** [1] - 10:12
**show** [13] - 16:3,
37:16, 37:23, 39:25,
43:9, 43:20, 49:18,
60:25, 67:10, 88:6,
97:6, 100:5, 113:22
**showed** [8] - 12:24,
13:2, 28:13, 29:10,
43:19, 67:16, 72:3,
73:18
**shown** [4] - 21:8,
84:19, 87:24, 88:14
**shows** [6] - 13:11,
14:18, 35:18, 35:24,
43:7, 98:3
**sic** [1] - 60:2
**sic]** [1] - 65:13
**side** [17] - 24:21, 33:3,
35:17, 35:19, 47:22,
50:15, 52:11, 53:20,
61:12, 66:5, 81:4,
81:7, 81:9, 81:11,
84:21
**sides** [2] - 47:18,
47:22
**sign** [2] - 45:23,
113:25
**signatory** [1] - 119:20
**signed** [4] - 111:11,
111:13, 114:1
**significance** [1] - 5:21
**significant** [1] - 9:6
**signs** [1] - 25:20
**similar** [3] - 7:21,
7:25, 35:5
**similarly** [1] - 77:24
**simple** [3] - 5:1, 5:7,

7:17
**simply** [2] - 41:9, 69:8
**simultaneous** [1] -
94:6
**sin** [1] - 43:13
**single** [1] - 58:15
**sirens** [2] - 12:20,
26:7
**situation** [3] - 19:1,
30:10, 33:5
**six** [5] - 28:12, 43:1,
46:10, 50:24, 51:4
**skipped** [2] - 50:4,
72:4, 73:4
**slash** [1] - 24:3
**sleep** [2] - 80:5, 80:8
**slight** [1] - 11:13
**slightly** [1] - 5:4
**slow** [1] - 92:17
**slowed** [1] - 18:15
**small** [1] - 101:8
**smaller** [1] - 81:7
**smartphone** [1] -
110:3
**snack** [1] - 70:9
**snippets** [2] - 42:23
**snow** [4] - 80:1, 80:3,
80:5
**snowed** [1] - 80:7
**so..** [1] - 57:12
**social** [2] - 110:6,
110:22
**sole** [4] - 76:4, 77:3,
83:4, 94:4
**solely** [4] - 76:22,
109:5, 109:14,
110:20
**soliciting** [1] - 96:25
**someone** [6] - 8:17,
38:21, 96:10, 101:3
**sometimes** [6] -
44:19, 57:13, 67:25,
68:21, 81:10, 81:21
**Sommerstedt** [1] -
10:11
**soon** [3] - 20:25,
25:15, 110:15
**sorry** [2] - 115:9,
117:14
**sort** [10] - 33:11, 37:1,
47:12, 49:7, 54:9,
54:12, 56:14, 59:19,
60:12, 64:9
**source** [2] - 30:25,
66:18
**Southeast** [1] - 105:16
**space** [2] - 29:17,
61:23
**speaker** [1] - 14:25
**Speaker** [1] - 45:24

**speaks** [1] - 114:25
**spear** [1] - 29:24
**specialist** [1] - 2:11
**Specialist** [1] - 1:22
**specific** [5] - 5:25,
9:11, 68:25, 106:6,
108:15
**specifically** [3] - 3:19,
31:19, 91:14
**spectacle** [5] - 49:18,
54:19, 55:17, 69:9,
71:16
**spectator** [1] - 98:1
**spectrum** [1] - 47:18
**speculate** [2] - 81:19,
85:12
**speculation** [1] -
79:11
**speech** [1] - 48:19
**spend** [1] - 42:2
**spent** [1] - 41:16
**spitting** [1] - 10:10
**spokesperson** [1] -
108:14
**spot** [1] - 113:3
**spray** [1] - 48:8
**squared** [1] - 5:17
**St** [1] - 1:15
**stacked** [1] - 52:22
**stage** [2] - 90:22, 95:8
**staircase** [1] - 26:3
**stairwell** [1] - 25:24
**stand** [9] - 19:5,
23:12, 32:2, 40:7,
40:19, 40:24, 83:16,
112:4, 115:6
**standard** [1] - 69:21
**standing** [15] - 23:13,
28:19, 41:23, 43:25,
46:24, 56:18, 60:5,
62:5, 64:1, 64:2,
64:15, 64:20, 73:18,
73:25
**stands** [4] - 31:5,
73:20, 83:22, 104:23
**start** [5] - 2:6, 13:21,
25:16, 26:4, 53:22
**started** [12] - 12:25,
19:19, 19:20, 19:21,
20:2, 20:3, 25:9,
25:17, 35:12, 49:25,
58:20, 58:25
**starting** [2] - 35:10,
37:22
**starts** [1] - 64:21
**starving** [1] - 113:15
**state** [6] - 5:7, 82:24,
89:3, 89:4, 90:22,
95:8
**statement** [3] - 3:18,

6:9, 58:7
**statements** [4] -
71:19, 77:22, 82:13,
84:7
**STATES** [4] - 1:1, 1:2,
1:8, 1:10
**States** [34] - 2:3, 2:9,
9:19, 12:10, 15:21,
19:3, 19:7, 34:25,
36:21, 41:11, 54:22,
55:9, 89:8, 89:9,
89:13, 89:17, 89:20,
89:22, 89:24, 91:16,
93:21, 98:20, 98:21,
99:9, 99:14, 99:16,
100:3, 101:19,
103:3, 104:17,
104:23, 105:5,
105:16, 106:20
**stationed** [1] - 111:10
**statute** [9] - 5:4, 5:18,
5:25, 8:6, 8:13, 9:9,
9:12, 9:15, 59:9
**statutes** [1] - 10:16
**statutory** [4] - 9:11,
9:23, 9:24, 10:15
**stayed** [3] - 22:17,
25:6, 74:10
**steadying** [1] - 62:22
**Steal** [3] - 19:21,
37:22, 48:20
**stenographic** [1] -
119:17
**step** [15] - 17:11,
25:18, 27:9, 29:3,
29:7, 30:2, 73:4,
90:16, 90:24, 91:6,
91:8, 94:25, 95:10,
95:17, 116:16
**stepped** [2] - 29:6,
33:24
**stepping** [1] - 29:13
**steps** [3] - 22:9, 27:12,
27:15
**still** [15] - 9:5, 24:14,
24:15, 43:5, 43:18,
56:25, 58:24, 61:11,
64:20, 67:2, 67:4,
67:5, 73:18
**stipulate** [1] - 14:7
**stipulated** [6] - 14:2,
14:4, 16:12, 33:21,
77:12, 77:14
**stipulation** [5] - 16:22,
17:21, 17:23, 32:8,
77:15
**stipulations** [4] - 14:1,
16:25, 18:10, 39:25
**stolen** [1] - 19:23
**stood** [8] - 15:11,

15:18, 28:15, 28:20,
31:24, 35:5, 39:13,
42:11
**stop** [22] - 12:16, 13:1,
15:6, 19:15, 19:23,
20:8, 20:9, 21:7,
21:20, 26:25, 27:4,
27:6, 36:4, 39:21,
51:2, 51:17, 52:20,
58:16, 59:1, 59:2,
116:24
**Stop** [3] - 19:20,
37:22, 48:20
**stopped** [4] - 12:17,
20:21, 21:10, 36:12
**stopping** [4] - 19:25,
20:1, 49:11
**stories** [1] - 39:7
**storm** [1] - 22:2
**storming** [1] - 71:11
**straight** [1] - 56:10
**stranger** [3] - 54:25,
55:2, 55:5
**streaming** [1] - 49:13
**Street** [2] - 1:11,
105:16
**strength** [1] - 39:13
**strike** [1] - 57:11
**strong** [2] - 7:19,
112:3
**strongly** [2] - 69:16,
95:1
**structure** [1] - 5:5
**struggling** [1] - 74:1
**stuck** [3] - 43:14, 44:1,
71:16
**stuff** [1] - 46:18
**stupid** [1] - 46:21, 54:14
**stupid** [1] - 46:18
**subject** [2] - 118:19,
118:23
**submit** [3] - 43:12,
57:18, 58:22
**substantial** [10] -
17:11, 27:9, 27:12,
27:15, 90:16, 90:24,
91:6, 94:24, 95:10,
95:17
**substantive** [5] - 9:8,
86:24, 87:2, 91:19,
91:25
**succeed** [2] - 68:22,
98:13
**suffer** [1] - 5:12
**sufficient** [6] - 28:12,
30:18, 31:12, 96:8,
100:18, 100:25
**suggest** [7] - 9:25,
52:24, 58:1, 64:12,
67:22, 68:5, 107:23
**suggested** [1] - 55:20

**suggesting** [1] - 54:4
**suggestion** [1] - 51:7
**suggestive** [1] - 58:3
**suggests** [1] - 69:16
**summarize** [2] - 6:16,
13:11
**summarized** [3] -
27:12, 38:17, 39:2
**summary** [1] - 18:8
**summation** [5] - 11:6,
11:17, 11:19, 11:22,
70:18
**summations** [3] -
11:15, 66:20, 70:10
**summers** [1] - 18:21
**Summers** [3] - 19:11,
33:20, 48:15
**support** [2] - 6:4,
15:17
**supported** [2] - 74:20,
84:17
**supports** [1] - 27:5
**supposed** [2] - 26:6,
44:11
**surge** [1] - 22:16
**surrounding** [2] -
82:12, 84:1
**suspect** [1] - 10:6
**sustained** [1] - 81:17
**swarm** [1] - 23:5
**swarmed** [3] - 14:22,
15:1, 17:15
**swarming** [1] - 26:12
**swarms** [1] - 25:4
**sworn** [3] - 40:23,
75:1, 77:10
**system** [3] - 76:17,
111:2, 116:15

**T**

**tablet** [1] - 110:4
**tan** [3] - 42:10, 62:12,
63:15
**task** [7] - 68:11, 68:13,
68:14, 68:23,
108:17, 112:17
**Task** [2] - 1:21, 2:10
**tear** [2] - 25:13, 112:25
**television** [1] - 109:9
**temporarily** [2] -
101:21, 102:15,
103:4
**tempted** [1] - 109:12
**ten** [5] - 70:1, 70:9,
70:14, 114:3, 116:24
**ten-minute** [3] - 70:1,
70:9, 70:14
**tend** [1] - 68:20
**tendency** [1] - 68:22

**tends** [2] - 69:1, 104:2
**term** [22] - 8:18, 85:24,
86:4, 86:5, 88:20,
89:2, 89:6, 89:11,
89:15, 89:18, 89:21,
90:2, 92:19, 101:2,
102:12, 102:16,
103:25, 105:15,
105:25, 106:24,
118:23
**terms** [9] - 6:3, 6:5,
8:13, 8:19, 85:22,
101:11, 106:22,
107:4, 118:13
**terrace** [11] - 15:7,
26:3, 26:13, 29:25,
30:1, 42:7, 56:21,
56:22, 60:4, 72:11,
73:17
**terrifying** [1] - 39:7
**terrorism** [3] - 68:11,
68:23, 68:24
**testified** [15] - 29:11,
31:8, 31:18, 32:2,
32:25, 37:7, 40:19,
41:14, 42:4, 42:8,
80:1, 83:4, 83:8,
83:10, 83:21
**testify** [7] - 15:22,
31:17, 33:20, 85:10,
85:14, 93:12, 93:17
**testifying** [3] - 81:3,
83:17, 83:22
**testimony** [31] - 14:20,
18:18, 19:11, 22:12,
30:1, 30:3, 30:9,
30:24, 32:24, 39:4,
39:12, 52:2, 59:2,
77:10, 77:12, 79:21,
80:2, 80:6, 81:6,
81:8, 82:25, 83:3,
84:6, 84:7, 84:10,
84:15, 84:23, 84:25,
85:2, 85:5, 85:7
**text** [4] - 9:24, 10:15,
13:2, 110:5
**texts** [1] - 9:11
**TFO** [3] - 19:24, 26:18,
37:23
**THE** [75] - 1:1, 1:7,
1:10, 1:18, 2:2, 2:13,
2:17, 2:24, 3:9, 4:6,
10:22, 10:24, 11:4,
11:8, 11:10, 11:24,
12:2, 40:4, 65:14,
66:4, 66:7, 66:9,
66:16, 66:20, 66:25,
67:7, 69:25, 70:17,
70:20, 74:22,
113:15, 113:24,

114:11, 114:13,
114:15, 114:20,
114:23, 115:2,
115:8, 115:9,
115:10, 115:11,
115:12, 115:14,
115:15, 115:18,
115:19, 115:20,
115:21, 115:22,
115:23, 115:24,
115:25, 116:1,
116:2, 116:3, 116:4,
116:5, 116:9,
116:12, 117:2,
117:7, 117:13,
117:15, 117:19,
117:22, 117:23,
118:4, 118:5, 118:6,
119:2, 119:3, 119:6,
119:9, 119:11
**themselves** [2] -
25:17, 97:18
**theory** [1] - 51:16
**thereby** [2] - 57:16,
93:14
**thereof** [1] - 89:10
**thinking** [3] - 82:11,
90:23, 95:8
**third** [12] - 16:17, 17:1,
27:14, 27:17, 41:20,
42:4, 87:17, 92:10,
96:22, 99:11,
103:19, 105:11
**thoughtful** [1] - 79:9
**threat** [4] - 8:17,
100:23, 100:24,
101:3
**threaten** [1] - 101:7
**threatened** [2] - 31:11,
100:17
**threatening** [2] - 10:3,
62:23
**threatens** [3] - 30:16,
30:22, 100:22
**threats** [1] - 30:5
**three** [19] - 13:24,
21:9, 22:17, 23:7,
38:5, 38:21, 40:22,
40:24, 42:13, 42:14,
42:18, 44:8, 45:7,
46:15, 50:24, 53:21,
57:23, 63:2, 88:21
**threshold** [2] - 44:15,
44:16
**throughout** [4] - 16:2,
71:13, 78:3, 78:5
**throwing** [1] - 14:24
**thumb** [1] - 113:21
**Tia** [1] - 18:21
**tip** [1] - 29:23

19

**title** [2] - 24:8, 74:9
**today** [5] - 9:13, 11:21, 13:9, 38:18, 119:3
**together** [1] - 113:19
**tolerate** [3] - 47:8, 47:10, 71:9
**tolerating** [1] - 71:4
**took** [11] - 6:24, 25:18, 26:24, 30:2, 41:15, 46:1, 54:23, 71:10, 90:16, 91:4, 95:15
**top** [6] - 45:19, 47:9, 59:20, 62:13, 64:18, 64:22
**touch** [1] - 101:9
**tough** [1] - 56:13
**toward** [5] - 17:11, 64:4, 83:23, 90:16, 94:25
**towards** [8] - 5:12, 25:11, 27:9, 29:3, 38:16, 51:13, 52:7, 61:4
**town** [2] - 54:25, 55:2
**track** [5] - 9:22, 45:2, 49:6, 59:16, 64:9
**traffic** [1] - 52:8
**traitors** [21] - 12:5, 12:6, 12:9, 12:12, 12:13, 12:16, 20:1, 21:17, 24:18, 24:22, 26:13, 27:16, 35:1, 35:2, 35:8, 35:21, 37:17, 38:17, 45:16, 53:3
**transcript** [5] - 1:25, 8:7, 119:17, 119:17, 119:20
**TRANSCRIPT** [1] - 1:7
**transcription** [1] - 1:25
**travel** [2] - 13:4, 89:2
**treason** [1] - 23:20
**treatment** [1] - 76:17
**trespassing** [2] - 23:8, 33:12
**trespassing-type** [1] - 33:12
**TRIAL** [1] - 1:7
**trial** [30] - 12:24, 13:11, 14:17, 18:6, 20:23, 20:25, 23:2, 28:13, 32:23, 70:25, 71:13, 74:24, 75:4, 75:21, 75:22, 76:6, 77:9, 77:13, 78:3, 78:5, 78:17, 81:17, 81:20, 82:20, 83:11, 84:21, 85:16, 109:15, 109:24,

117:17
**tried** [2] - 35:15, 45:23
**triggers** [2] - 5:1, 5:3
**true** [10] - 10:5, 14:8, 36:11, 46:19, 58:3, 72:17, 78:21, 84:16, 119:16, 119:17
**Trump** [4] - 16:1, 35:15, 48:13
**truth** [4] - 48:24, 78:22, 83:19, 84:24
**truthfully** [1] - 83:8
**try** [9] - 23:9, 34:12, 37:10, 45:2, 56:17, 56:22, 57:5, 65:13, 111:13
**trying** [10] - 15:16, 23:10, 31:25, 35:6, 55:8, 56:24, 60:4, 62:19, 62:20, 64:13
**tunnel** [1] - 8:23
**tunnels** [1] - 24:2
**turned** [5] - 5:5, 25:9, 33:3, 37:1, 52:20
**turns** [4] - 51:12, 52:15, 52:19, 61:25
**TV** [2] - 49:22, 63:18
**Twelfth** [1] - 91:15
**Twitter** [1] - 110:7
**two** [31] - 17:18, 17:19, 17:20, 17:23, 21:11, 31:15, 34:13, 47:18, 51:10, 51:21, 55:2, 57:22, 57:24, 57:25, 60:7, 61:24, 63:2, 64:1, 65:9, 67:2, 79:17, 87:22, 88:2, 88:7, 88:8, 90:13, 90:16, 94:21, 112:20, 112:23, 113:13
**type** [2] - 33:12
**types** [2] - 79:17, 85:18
**typos** [1] - 114:5

## U

**U.S** [12] - 1:14, 4:6, 6:7, 7:14, 8:3, 10:8, 10:11, 57:4, 90:1, 90:3, 100:4, 109:11
**U.S.C** [15] - 3:5, 3:21, 4:12, 4:15, 9:7, 9:16, 86:22, 91:16, 91:17, 99:2, 101:22, 103:7, 104:23, 106:14
**ugly** [1] - 45:9
**ultimately** [2] - 4:14, 55:18

**unanimous** [2] - 107:19, 111:20
**unanimously** [1] - 87:24
**unclear** [1] - 11:2
**undeniable** [2] - 91:4, 95:15
**under** [1] - 4:15, 4:25, 5:8, 6:13, 7:16, 8:24, 46:2, 84:3, 89:7, 104:9, 111:17
**undermine** [1] - 104:3
**undertook** [1] - 42:17
**undisputed** [2] - 39:4, 77:15
**unfair** [1] - 57:12
**unfairly** [1] - 111:6
**uniformed** [1] - 98:22
**unintended** [1] - 94:9
**unit** [3] - 14:21, 15:2, 23:5
**UNITED** [4] - 1:1, 1:2, 1:8, 1:10
**United** [34] - 2:3, 2:9, 9:19, 12:10, 15:21, 19:3, 19:7, 34:25, 36:21, 41:11, 54:22, 55:9, 89:8, 89:9, 89:13, 89:17, 89:20, 89:22, 89:24, 91:16, 93:20, 98:20, 98:21, 99:9, 99:14, 99:16, 100:3, 101:19, 103:3, 104:17, 104:23, 105:5, 105:15, 106:20
**unlawful** [19] - 22:23, 22:24, 23:11, 23:6, 23:8, 23:11, 23:14, 23:15, 23:21, 24:5, 24:9, 24:15, 93:4, 93:5, 93:9, 93:18, 93:25, 94:5, 106:12
**unlawfully** [1] - 74:10
**unless** [1] - 78:3
**unlike** [1] - 48:6
**unlikely** [1] - 113:1
**unprepared** [1] - 48:10
**unreasonableness** [1] - 84:14
**unreasonably** [1] - 104:9
**unrepresentative** [1] - 43:6
**unspecified** [1] - 100:24
**up** [9] - 5:24, 6:24, 23:9, 24:15, 25:12, 25:19, 26:2, 31:6,

33:24, 35:12, 35:24, 37:2, 40:6, 40:7, 47:19, 50:21, 51:9, 51:23, 52:1, 52:22, 59:20, 61:23, 62:2, 62:4, 63:7, 64:20, 67:9, 72:22, 73:1, 73:19, 74:6, 75:7, 80:6, 82:18, 108:16, 108:22, 116:21, 118:10
**upper** [7] - 15:7, 26:3, 26:13, 29:25, 42:7, 56:21, 60:4
**urge** [1] - 56:24
**urgency** [1] - 49:15
**urges** [1] - 8:14
**useful** [3] - 112:2, 112:8, 112:11
**user** [2] - 20:16, 23:25
**uses** [5] - 15:0, 30:16, 100:16, 104:7

## V

**vantage** [3] - 57:21, 57:22
**variation** [1] - 10:13
**variety** [2] - 41:9, 81:24
**various** [3] - 6:5, 9:20, 58:19
**venture** [1] - 97:25
**verb** [1] - 72:19
**verbatim** [1] - 14:16
**verbs** [2] - 28:12, 28:14
**verdict** [39] - 16:25, 17:17, 27:3, 58:13, 58:16, 74:19, 74:20, 75:2, 75:19, 76:16, 77:2, 80:17, 80:22, 80:24, 81:1, 87:23, 107:13, 107:14, 107:16, 107:17, 107:18, 107:20, 107:24, 108:4, 108:11, 108:18, 109:5, 110:10, 111:20, 112:5, 113:7, 114:17, 114:19, 114:20, 114:24, 115:6, 115:8, 116:6
**verdicts** [3] - 107:10, 108:7, 113:8
**version** [7] - 4:11, 65:18, 66:10, 66:12, 66:17, 66:18, 114:4
**versus** [2] - 2:3, 5:2

**vest** [1] - 64:17
**Vice** [6] - 19:6, 59:3, 101:20, 102:17, 102:18, 103:4
**victim** [2] - 99:1, 100:10
**VICTORIA** [1] - 1:14
**Victoria** [1] - 2:10
**victoria.sheets@ usdoj.gov** [1] - 1:17
**video** [40] - 13:17, 14:20, 15:23, 18:8, 19:10, 24:10, 41:25, 42:3, 42:24, 42:25, 43:1, 43:5, 43:7, 43:8, 43:17, 43:18, 45:3, 50:3, 51:19, 51:21, 59:1, 59:2, 60:24, 61:2, 61:4, 62:8, 63:12, 65:11, 65:18, 66:14, 66:19, 67:8, 67:12, 67:15, 69:4, 71:21, 73:10, 74:1, 81:23
**videos** [7] - 42:21, 42:23, 45:8, 46:1, 48:7, 52:5, 72:3
**view** [3] - 7:16, 59:15, 65:12
**views** [1] - 108:23
**violate** [3] - 56:10, 118:12, 118:18
**violates** [1] - 59:9
**violating** [1] - 106:7
**violation** [10] - 3:21, 86:22, 91:17, 98:25, 99:1, 101:22, 103:7, 104:23, 106:14, 110:16
**violence** [12] - 22:15, 46:9, 48:10, 55:23, 60:15, 71:12, 71:15, 73:4, 73:16, 74:3, 88:21, 104:8
**violent** [3] - 29:21, 72:16, 72:20
**vision** [1] - 26:5
**visit** [1] - 25:24
**visiting** [3] - 101:21, 102:15, 103:4
**voice** [1] - 112:3
**void** [1] - 119:19
**voluntarily** [2] - 31:23, 99:11
**voluntary** [1] - 3:23
**vote** [5] - 12:17, 91:15, 92:21, 111:23, 112:9
**voters** [1] - 54:22
**votes** [1] - 27:7
**voting** [1] - 111:19

vs [1] - 1:3

# W

wait [1] - 116:23
waiving [1] - 64:11
Waldo [1] - 43:16
walk [1] - 52:5
walked [1] - 45:4
walking [4] - 47:4,
51:8, 51:11, 52:13
walks [3] - 51:9,
51:13, 73:19
wall [1] - 67:12
wandering [1] - 71:17
wanders [1] - 54:2
war [1] - 13:6
washed [1] - 48:23
Washington [7] - 1:5,
1:12, 1:16, 20:4,
48:4, 48:5, 105:17
watch [21] - 43:2,
43:6, 50:25, 53:24,
53:25, 60:8, 60:18,
61:3, 61:16, 61:20,
63:5, 63:8, 64:16,
67:9, 67:11, 72:2,
72:5, 73:25, 74:1,
109:12, 109:13
watched [7] - 24:10,
25:19, 33:2, 54:14,
57:21, 57:22
watching [3] - 18:22,
24:23, 35:22
wave [1] - 21:2
waving [3] - 38:14,
64:10, 64:11
ways [1] - 27:2
weapon [6] - 4:19,
4:20, 5:11, 5:22,
6:10
wearing [1] - 48:7
week [2] - 116:13,
116:17
weight [7] - 76:7,
77:21, 80:12, 80:14,
81:2, 84:25, 85:7
west [8] - 14:20,
18:24, 26:13, 33:3,
42:7, 56:21, 60:20,
72:25
whereas [1] - 5:25
whichever [1] - 28:2
White [1] - 4:14
white [1] - 29:17
whole [4] - 39:18,
41:16, 75:12, 76:2
wholly [1] - 89:5
Wickham [8] - 29:11,
30:3, 31:17, 32:25,

41:3, 55:1, 57:4,
57:5
willful [2] - 37:24,
38:23
willfully [9] - 37:19,
38:19, 104:16,
105:12, 106:3,
106:5, 106:12,
106:21, 107:5
William [1] - 2:15
WILLIAM [1] - 1:18
window [9] - 50:23,
52:12, 52:13, 52:22,
53:15, 53:17, 73:13,
79:25, 80:4
windows [4] - 26:10,
26:11, 51:5, 53:20
wing [17] - 15:23,
15:24, 21:10, 23:10,
24:16, 26:8, 34:5,
35:6, 35:11, 35:14,
37:1, 37:5, 41:13,
41:17, 49:21, 49:23,
73:19
wish [3] - 6:23,
109:23, 116:25
wished [1] - 98:13
witness [26] - 42:25,
79:19, 83:6, 83:8,
83:9, 83:10, 83:14,
83:16, 83:17, 83:18,
83:19, 83:21, 84:4,
84:8, 84:15, 84:17,
84:19, 84:23, 84:24,
84:25, 85:6, 85:7,
93:11, 93:17
witness's [7] - 79:21,
83:7, 83:16, 83:25,
84:6, 84:7, 84:9
witnesses [10] -
13:18, 76:8, 77:11,
81:3, 81:6, 81:7,
81:8, 83:3, 83:5,
83:12
woke [1] - 80:6
won [1] - 47:22
wonder [1] - 72:24
word [3] - 28:11,
63:25, 85:24
words [29] - 13:15,
20:22, 22:4, 22:25,
36:7, 37:22, 37:24,
37:25, 38:13, 45:13,
45:14, 46:5, 46:6,
47:13, 47:25, 53:3,
68:6, 69:15, 69:17,
71:10, 81:23, 88:8,
97:22, 104:7,
107:18, 110:11
works [2] - 116:15,

117:11
worn [5] - 29:1, 29:5,
29:9, 30:25, 65:21
wow [1] - 54:15
write [3] - 14:15, 86:2,
112:25
writing [2] - 111:15,
111:21
written [5] - 88:5,
99:22, 102:5,
103:14, 105:6
wrongdoing [6] -
22:25, 25:1, 25:22,
26:21, 93:6, 93:7

# Y

years [1] - 6:12
yell [4] - 24:11, 32:1,
35:11, 52:5
yelled [4] - 15:3, 15:4,
15:20, 17:14
yelling [10] - 15:25,
16:1, 24:17, 26:13,
31:1, 35:21, 38:15,
39:19, 62:1, 62:3
yellow [3] - 62:11,
64:8, 64:17
yesterday [13] - 2:20,
3:6, 3:14, 7:24, 9:3,
9:23, 11:11, 43:17,
44:23, 53:13, 60:11,
62:16, 63:24
young [1] - 54:19
yourselves [2] - 2:6,
59:10
YouTube [1] - 110:7