UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,        )  Criminal Action
                                 )  No. 21-738
vs.                              )
                                 )
MICHAEL OLIVERAS,                )  October 3, 2024
                                 )  10:24 a.m.
              Defendant.         )  Washington, D.C.
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF SENTENCING**
**BEFORE THE HONORABLE BERYL A. HOWELL**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

<u>**APPEARANCES**</u>:

FOR THE UNITED STATES:

ASHLEY AKERS
DOJ-CIV
1100 L Street Northwest
Washington, DC 20530
(202) 353-0521
Email:  ashley.akers@usdoj.gov

FOR THE DEFENDANT:

WILLIAM L. SHIPLEY, JR.
PO BOX 745
Kailua, HI 96734
(808) 228-1341
Email:  808Shipleylaw@gmail.com

ALSO PRESENT:        JESSICA REICHLER, U.S. Probation Office

Court Reporter:      ELIZABETH DAVILA, RPR, FCRR
                     Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

```
 1              P R O C E E D I N G S

 2              THE COURT:  Your Honor, this is Criminal Case

 3    21-738, United States of America versus Michael Oliveras.

 4              Would the parties please come forward to the

 5    lectern and identify yourselves for the record this morning.

 6    We'll start with government counsel first.

 7              MS. AKERS:  Good morning, Your Honor.

 8    Ashley Akers on behalf of the United States.

 9              THE COURT:  Good morning, Ms. Akers.

10              MR. SHIPLEY:  My apologies, Your Honor.

11              Good morning, William Shipley on behalf of

12    Defendant Michael Oliveras, delayed by a plea that went

13    sideways with Judge Friedrich.

14              THE COURT:  I have already heard from Judge

15    Friedrich.

16              MR. SHIPLEY:  I really wanted to do this at 9:30.

17    I wish I could have.

18              THE COURT:  Okay.  Thank you.

19              MS. REICHLER:  Good morning, Your Honor.

20    Jessica Reichler on behalf of the United States Probation

21    Office.

22              THE COURT:  Yes.  Good morning.

23              Good morning, Mr. Oliveras.

24              THE DEFENDANT:  Good morning, Your Honor.

25              THE COURT:  How are you this morning?
```

1           THE DEFENDANT:  I am well.  Thank you for asking.

2           THE COURT:  Okay.

3           So we're here this morning for Mr. Oliveras's

4    sentencing after he was found guilty at a jury trial on

5    November 16, 2023, of all seven counts in the superseding

6    indictment against him, including three felony convictions,

7    two Class A misdemeanors, and two Class B misdemeanors.

8           His conviction on Count 2, charging obstruction of

9    an official proceeding, in violation 18 U.S.C. Section

10   1512(c)(2), was dismissed on the government's motion on

11   September 30th; but he remains convicted of the six counts,

12   and that's what he is going to be sentenced on today.

13          Those charges are civil disorder, in violation of

14   18 U.S.C. Section 231(a)(3); assisting [sic], resisting, or

15   impeding certain officers, in violation of 18 U.S.C. Section

16   111(a)(1); entering, remaining, and disorderly and

17   disruptive conduct in a restricted building or grounds, in

18   violation of 18 U.S.C. Sections 1752(a)(1) and (2);

19   disorderly conduct and parading, demonstrating, or picketing

20   in a Capitol Building, in violation of 40 U.S.C. Section

21   5104(e)(2)(D) and (e)(2)(G).

22          So let me just start by saying, I like to have as

23   fairly prompt sentences as possible after convictions,

24   generally, to move the cases along and get defendants, if

25   they're going to be incarcerated, into a designated BOP

1  facility as soon as possible to take advantage of BOP

2  programming, which now has an impact to be able to reduce

3  defendant's sentences under the First Step Act.  But by my

4  count, this is the ninth sentencing date I have scheduled in

5  Mr. Oliveras's case.

6          Have you been keeping track, Mr. Oliveras?

7          THE DEFENDANT:  Specifically, no.  But I know

8  there is numerous for various different reasons, Your Honor.

9          THE COURT:  Right.

10          So the first time he was supposed to be sentenced

11  in April 2023 on his guilty plea that was entered on

12  January 7, 2023, but then he withdrew his plea.  And then,

13  after he was convicted of the jury trial, his sentencing

14  date has been changed from March 2024 all the way until we

15  get to today for, as you said, Mr. Oliveras for various

16  reasons.

17          But given all of these changing dates for the

18  sentencing, it makes it even more important to review all of

19  the documents I have looked at in connection with sentencing

20  here today to make sure everybody has the same set of

21  documents.

22          So in connection with Mr. Oliveras's sentencing

23  today, I have looked at the probation office's final

24  presentence report docketed at ECF 104, and the sentencing

25  recommendation docketed at ECF 105; the government's

1    sentencing memo and supplemental sentencing memo docketed at

2    ECFs 106 and 126; the defendant's sentencing memo and

3    supplemental memo docketed at ECFs 110 and 127.

4          The government has also submitted various video

5    exhibits, one docketed at ECF 56 listing about 14 videos,

6    that was submitted in support of the defendant's prior plea

7    at ECF 75-1; that was submitted on July 3, 2023, listing

8    extra photos, videos, and some social media posts; then the

9    government's exhibit list at trial where I saw all of the

10   exhibits, since I presided over that trial, that was

11   docketed at ECF 90.  And then this morning the government --

12   either late last night or -- this morning is when I saw it,

13   the government's victim impact statement that was docketed

14   at ECF 129.

15         Ms. Akers, could you just tell me, is 129, the

16   author of that victim impact statement, one of the

17   officers -- Officer Robert Heaney or Christopher Wickham who

18   testified at trial?

19              MS. AKERS:  Yes, Your Honor.  Yes, Your Honor.

20              THE COURT:  It's one of those two?

21              MS. AKERS:  Correct.

22         He asked to not have his identity disclosed due to

23   safety and fears of that nature, but he was a testifying

24   witness in this trial.

25              THE COURT:  Okay.  It wasn't clear from the victim

1   impact statement or your cover sheet, so I just wanted to

2   make sure about that.

3                   MS. AKERS:  Yes.

4                   THE COURT:  All right.  So does the government

5   have all of those documents that I have just reviewed?

6                   MS. AKERS:  Yes, Your Honor.

7                   THE COURT:  Mr. Shipley?

8                   MR. SHIPLEY:  Yes, Your Honor.

9                   THE COURT:  And have you reviewed with

10  Mr. Oliveras the victim impact statement that was submitted?

11                  MR. SHIPLEY:  Your Honor, we just received that

12  this morning.  He just asked me what it was; I explained

13  what that was.

14                  THE COURT:  Well, do you have a copy that you can

15  have him read?

16                  MR. SHIPLEY:  He has not seen a copy of it.  I

17  received it this morning.

18                  MS. AKERS:  I have a copy, Your Honor.

19                  THE COURT:  All right.

20                  MR. SHIPLEY:  As I understand it, from reading it,

21  maybe the government can confirm, this is an officer who was

22  down on the West Front?

23                  THE COURT:  Okay.  I can't hear you.  You need to

24  speak into the microphone or step forward to the podium.

25                  MR. SHIPLEY:  I'm sorry.

1          This is an officer who is down at the West Front

2     when the officers were coming through the crowd and there

3     was a pushing episode moving through the crowd on both

4     sides.

5          MS. AKERS:  No.  As described in the victim impact

6     statement, it's an officer who was in the northwest

7     courtyard during the charged 18 U.S.C. 111 conduct.

8          MR. SHIPLEY:  Okay.  So this later in the

9     afternoon, 4:25, when they are clearing the Upper West

10    Terrace?

11         MS. AKERS:  That is correct, Your Honor.

12         MR. SHIPLEY:  Okay.  Thank you.

13         THE COURT:  All right.  So, Mr. Oliveras, you can

14    read that while we're having some legal discussions.

15         But if you could stand right where you are, I am

16    going to explain to you what is going to be happening during

17    the course of the plea hearing.

18         I conduct my plea hearings in four different

19    steps.  I like to tell defendants what is going to be

20    happening during the course of the hearing so you know what

21    step we're at and the subject matter of what we're

22    discussing because some of it may sound legalistic.

23         At the first step, it is determined whether the

24    government or your counsel, on your behalf, has any

25    objections to the presentence investigation report.  And if

1    there are objections, I will resolve those objections.

2            At the second step, I will determine how the

3    advisory guidelines apply in your case and what the

4    recommended sentencing range under the guidelines manual

5    is given your criminal history and offense conduct.

6            At the third step, I will hear first from the

7    government; then I will hear from your lawyer; and then I

8    will hear directly from you, Mr. Oliveras, if you wish to

9    speak directly to me about sentencing in your case.

10            And then, at the fourth step, I will explain the

11    sentence I am about to impose, and impose sentence.

12            Do you understand what is going to happen over the

13    next 45 minutes or so?

14            THE DEFENDANT:  Yes, ma'am.

15            THE COURT:  All right.  You may be seated.

16            Okay.  Starting with the first step, I understand

17    from the PSR that the government has no objections to the

18    presentence investigation report; is that correct?

19            MS. AKERS:  That's correct, Your Honor.

20            THE COURT:  And turning to, Mr. Oliveras, if you

21    could just stand right where you are.

22            Have you, Mr. Oliveras, had an opportunity to talk

23    to your lawyer about the presentence investigation report?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  And do you feel that you have had

1    enough time to talk to Mr. Shipley about the papers

2    submitted in connection with your sentencing here today?

3              MR. SHIPLEY:  I do concur, yes, that I have had

4    enough time, yes.

5              THE COURT:  All right.  And are you fully

6    satisfied with the services of Mr. Shipley in your case?

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  All right.  Thank you.

9              You may be seated.

10              Mr. Shipley, have you and your client reviewed and

11    discussed the presentence investigation report?

12              MR. SHIPLEY:  We have, Your Honor.

13              THE COURT:  And given Mr. Oliveras's prior mental

14    health challenges, do you have any question about his

15    competency to proceed with the sentencing today?

16              MR. SHIPLEY:  No, Your Honor.  He is much

17    improved.

18              THE COURT:  All right.  And does the government

19    agree?

20              MS. AKERS:  Yes, Your Honor.

21              THE COURT:  All right.  Does the defendant have

22    objections to the presentence investigation report?

23              MR. SHIPLEY:  Your Honor, I think the objections I

24    have lodged, simply, were to the extent that the trial

25    testimony was different than as characterized by the

1  probation officer who I do not think read the trial

2  transcript.  I don't think it's reflected that the Court --

3  whatever factual findings the Court makes would --

4  consistent with trial testimony, would supersede the factual

5  representations.

6          I don't recall anything there being -- because we

7  had done a factual statement as part of the prior plea, and

8  the testimony at trial was largely consistent with the prior

9  plea, I don't know that there was anything substantive that

10 stood out to me but -- simply because we have a trial

11 record.

12         THE COURT:  Well, that doesn't help me,

13 Mr. Shipley.

14         MR. SHIPLEY:  I understand.

15         THE COURT:  Because what you are saying -- I mean,

16 I have in the PSR objections, which I am obliged to resolve.

17         MR. SHIPLEY:  Correct.

18         THE COURT:  You have objected to paragraphs 23

19 through 39 saying, basically, he maintains his innocence,

20 and his failure to offer specific factual objections should

21 not be deemed a waiver of any claims he might have on appeal

22 with regard to the accuracy of the offense conduct as

23 alleged.

24         So my question to you is:  What are you expecting

25 me to do about that objection, which is -- you just

 1    generally object, but with no specifics?

 2             Is it just because he proclaims that he is

 3    innocent, which he is entitled to do?

 4             What are you expecting me to do with that, go

 5    through each of those paragraphs, 23 through 39, and say:

 6    What facts are you specifically objecting to in each of them

 7    so I have something to rule on?

 8             MR. SHIPLEY:  No.  I expect you to overrule the

 9    objections, as stated, on the basis of the trial testimony;

10    you don't have to go through every one of them.

11             But I have had occasions in the past where you

12    made concessions to the PSR's accuracy that's been held up

13    later on as a confession, so to speak.  You didn't object to

14    this, therefore, you know, it's a concession to that.

15             So in a trial circumstance he maintains his

16    innocence, he intends to appeal, he intends to assert

17    factual innocence on appeal.  So I don't want it to be a

18    situation where I don't object to something that's a

19    concession that I --

20             THE COURT:  Okay.  So you are really just

21    expecting me to say:  The objections to paragraphs 23

22    through 39, based on his general innocence, is overruled

23    because those paragraphs are consistent with the testimony

24    at trial and are going to be considered as factual findings

25    for purposes of sentencing?

```
 1              MR. SHIPLEY:  Exactly.

 2              THE COURT:  Okay.  That's different, Mr. Shipley,

 3    from what you were beginning to say, which you thought some

 4    of those paragraphs were different from the trial testimony

 5    and you expected me to go through and make modifications.

 6              MR. SHIPLEY:  I apologize, Your Honor.  That was

 7    not my intention.

 8              My intention was simply that I expect the Court,

 9    based on the testimony the Court heard, to overrule the

10    objections, that the PSR is consistent with the testimony,

11    and then we move forward.

12              THE COURT:  Okay.  Well, thank you for that

13    clarification.

14              Let me ask you one other question.

15              Because I do -- Mr. Oliveras did enter a plea of

16    guilty.  He went through the whole entire plea colloquy

17    under oath; he agreed to the statement of facts, which he

18    signed; the plea agreement he executed had in it a waiver of

19    Federal Rule of Criminal Procedure 11(f) and Rule 410 in the

20    event the defendant withdrew from the plea agreement, which

21    he did.

22              So based on that waiver of both Criminal Procedure

23    11(f) and Rule 410, why shouldn't I, in addition to the

24    trial testimony, rely on his admissions under oath in front

25    of me as -- in answer to my questions, one by one, through
```

1    each paragraph of the statement of facts that he admits to

2    everything in paragraphs 23 through 39 in the PSR?

3              MR. SHIPLEY:  Your Honor, I think that subject was

4    covered with him by Your Honor, it was covered with him by

5    me in advance of him choosing to go forward with the motion

6    to withdraw.

7              THE COURT:  I mean, the government just basically

8    said:  We agree, we'll go to trial.  I mean -- so that

9    doesn't happen all the time.

10             MR. SHIPLEY:  No.

11             THE COURT:  And, you know, it sort of spared me

12   from having to issue a decision on the applicability of

13   Rule 11(f) and 410; but by the plain terms of the plea

14   agreement, he waived those protections --

15             MR. SHIPLEY:  Right.  And then the government

16   didn't use it at trial either.

17             THE COURT:  No, the government didn't.

18             MR. SHIPLEY:  Correct.  So I think --

19             THE COURT:  It spared themselves an appellate

20   issue.

21             MR. SHIPLEY:  -- within the context of the Court's

22   ability to consider a wide variety of evidence at

23   sentencing, beyond simply the trial record, I don't have a

24   legal objection that I can lodge.

25             That issue was covered.  Mr. Oliveras knew when he

1    withdrew his plea that that was a risk, and so it's part of

2    the trial record.  But I think for purposes sentencing --

3            THE COURT:  Well, not the "trial record" because,

4    as you said, Ms. Akers decided not to use the admissions --

5            MR. SHIPLEY:  Right.

6            THE COURT:  -- and exploit the waiver and the plea

7    agreement, but it's certainly part of the case record.

8            MR. SHIPLEY:  Right.  And I think, though, that

9    the Court, after the trial, has a fuller view of all of the

10   evidence and not just the way the evidence was characterized

11   by the government in the factual basis that Mr. Oliveras

12   agreed to, no question about it.  But the trial --

13           THE COURT:  Question by question.

14           MR. SHIPLEY:  Right.

15           -- the trial record is fuller and more

16   comprehensive, and gives the Court more context; and I think

17   that's probably the superior reference point for the Court's

18   decision-making at sentencing.

19           THE COURT:  All right.

20           MR. SHIPLEY:  That's the best I can characterize

21   it.

22           THE COURT:  Okay.

23           Well, let me -- I don't want to leave Ms. Akers

24   out of the discussion.

25           But does the government have a position on whether

1    I can rely on the defendant's own admissions under oath

2    before me during the plea colloquy to agreeing to everything

3    in the statement of offense facts, which are generally

4    summarized in paragraphs 23 through 39 of the presentence

5    investigation report, to overrule this objection?

6              MS. AKERS:  It's the government's view that the

7    Court can, by the plain terms of the plea agreement.

8              As Your Honor noted, we have not relied on that

9    during the course of the trial; we didn't need to, there was

10   sufficient video evidence.  But as far as overruling the

11   defendant's objections now, it's certainly appropriate to

12   consider.

13             THE COURT:  All right.

14             All right.  So with respect to the objections

15   lodged by defendant, as summarized on page 30 of the

16   presentence investigation report docketed at ECF 104, his

17   objections to paragraphs 23 through 39 are overruled for the

18   reasons we have just discussed.  And in addition, paragraphs

19   23 through 39 essentially summarize what the defendant

20   agreed to under oath during his plea colloquy, pursuant to a

21   plea agreement, where he waived his procedural rights under

22   Federal Rule of Evidence 410 and Federal Rule of Criminal

23   Procedure 11(f) to allow all those statements to be used.

24             Those objections are overruled.

25             Now, to go to paragraph 52, I think, Mr. Shipley,

1    page 30 of the PSR also has an objection to paragraph 52,

2    which is the PSR section that addresses the guideline for

3    Count 1 that I am going to address in the next step of this

4    discussion, as well as your objections to paragraph 60 and

5    61 having to do with application of a specific offense

6    characteristic.

7            I think that those -- your objections on

8    paragraphs 60 through 61 are no longer relevant since those

9    objections were to specific offense characteristics under

10   2J1.2, which only applies to obstruction count, which has

11   now been dismissed.

12           So with that -- those are the objections I was

13   aware of, Mr. Shipley, based on the presentence

14   investigation report.

15           Do you have any other objections to the PSR?

16           MR. SHIPLEY:  No, Your Honor.

17           THE COURT:  All right.

18           Okay.  So upon hearing no further objections to

19   the presentence investigation report and overruling the

20   specific objections for the reasons stated to paragraphs 23

21   to 39 posed by the defendant, I will accept the factual

22   portions of the presentence report as my findings of fact at

23   sentencing, as supplemented by the evidence at trial over

24   which I presided, and my own review of exhibits in the case.

25           All right.  Now we're at the next step of the

 1    hearing where I will determine the guidelines apply in this

 2    case.  I am going to start with Mr. Oliveras's criminal

 3    history, and then I will turn to the offense-level

 4    determination.

 5            The presentence investigation found that although

 6    Mr. Oliveras was arrested twice in his 20s, in 1996 and

 7    1998, he was not convicted of any offense, and he has no

 8    prior criminal convictions; consequently, his criminal

 9    history score is zero, and he is in Criminal History

10    Category I.

11            With respect to the offense level, I just want to

12    make sure, with the dismissal of the felony obstruction

13    offense in Count 2, that the parties agree that the

14    defendant's convictions are grouped for guidelines purposes

15    into two separate groups:  Count 1 for civil disorder,

16    Count 3 for assaulting or resisting law enforcement officers

17    are grouped together because they involve the same victim,

18    law enforcement; and Counts 4 and 5 for entering and

19    remaining and disorderly conduct in a restricted building

20    are grouped together because they involve a different

21    victim, Congress.

22            Counts 6 and 7, of course, are the petty offenses,

23    so they're not -- the guidelines don't apply to them, and

24    they're not grouped.

25            So do the parties agree about the grouping of the

1    four counts subject to the guidelines in that manner?

2              MS. AKERS:  Yes, Your Honor.

3              THE COURT:  And, Mr. Shipley?

4              MR. SHIPLEY:  Yes, Your Honor.

5              THE COURT:  All right.  So I am going to deal with

6    each of those groups separately.

7              With respect to the Group 1 -- starting with

8    Count 1, the civil disorder, that statute does not refer to

9    any guideline and, thus, Guideline 2X5.1 applies, directs

10   the use of the most analogous guideline, which is the

11   guideline at Section 2A2.4, obstructing or impeding

12   officers.

13             Count 3, assaulting, impeding officers is directly

14   referred to the guideline at either Section 2A2.4 or 2A2.2.

15             As to both counts, 1 and 3, the guideline at

16   2A2.4(c)(1) provides a cross-reference to Section 2A2.2,

17   quote:  If the conduct constituted aggravated assault.

18             If the Guideline 2A2.4 applies, of course, the

19   base offense level is 10.  If the cross-reference for

20   aggravated assault applies, then Guideline 2A2.2 provides a

21   base offense level of 14, four offense levels higher.

22             Mr. Shipley, do you still object to application of

23   the cross-reference and application of the guideline at

24   2A2.2 for aggravated assault?

25             MR. SHIPLEY:  Yes, Your Honor.  On the basis of

1    the definition of aggravated assault provided in the

2    application of 1.

3              THE COURT:  All right.  I have read your

4    sentencing memo on this.  And do you have anything to add to

5    your papers on that?

6              MR. SHIPLEY:  No, Your Honor.

7              THE COURT:  And let me ask you again -- why don't

8    you step forward to the podium.

9              The defendant's plea agreement, for which he

10   ultimately withdrew, that was dated January 3, 2023, stated

11   in the plea agreement that the guideline at Section 2A2.2

12   applied to the guilty plea that he was entering, or did

13   enter, to a violation of 18 U.S.C. Section 111(a)(1).

14             And what, if anything, should I make of that fact?

15             MR. SHIPLEY:  It's not a factual basis -- it's not

16   a factual statement -- the defendant, you know, agrees to --

17   I understand it's a term of the plea agreement, he signs the

18   plea agreement.  If that's an error, that likely would be --

19   if it's an error, it would be cognizable as ineffective

20   assistance of counsel; not necessarily something that a lay

21   defendant would know.

22             I think it really comes down to the expansive

23   definition of 111(a), which is not simply an assault count,

24   it is a count that involves a variety of ways to interfere

25   with officers involved, you know, in conduct beyond 231.

1          THE COURT:  And if I am understanding your

2    argument correctly, you are saying 2A2.2 can't apply for

3    aggravated assault because there was no assault here at all?

4          MR. SHIPLEY:  Exactly; because the definition in

5    the guidelines, which I would also note is not binding on

6    the Court -- you know, the definition of the guidelines is

7    advisory just as the guidelines are advisory.

8          The definition of the guidelines begins with:

9    It's a felonious assault.

10          So a presupposition to finding aggravated assault

11    is finding assault in Section 111(a), a conviction under

12    Section 111(a).  I went back and pulled the verdict form; it

13    did not have a special interrogatory about what the jury

14    found as to the nature of the assault or the nature of the

15    111(a) violation in this particular case, and we have a lack

16    of physical -- actual physical conduct or actual physical

17    contact between Mr. Oliveras and any officer.

18          THE COURT:  And that's your perception of the

19    facts?

20          MR. SHIPLEY:  Yes.

21          THE COURT:  All right.

22          Ms. Akers, do you want to respond?

23          MS. AKERS:  Yes, Your Honor.

24          "Felonious assault" entails physical contact or

25    the intent to commit another felony.  In this case, the

1    government proved both beyond a reasonable doubt and,

2    certainly, by a preponderance.

3             First, his conduct involved physical contact.

4    Your Honor will remember, from the trial evidence on the

5    northwest courtyard, the brawl that Mr. Oliveras was

6    directly in the middle of.

7             I would cite Your Honor to body-worn camera

8    footage in Exhibits 1002, 1005, 1006, 1009, all which were

9    presented to the jury, as well as open-source footage in

10    Government Exhibits 513 and 518, all of which show

11    Mr. Oliveras standing face-to-face with several police

12    officers when a brawl breaks out.

13             Your Honor also heard testimony from Officer

14    Wickham who testified that the officers and rioters at the

15    front of the line, including Mr. Oliveras --

16             THE DEFENDANT:  Incorrect.

17             MS. AKERS:  -- were in a physical altercation, and

18    that he watched that with his own eyes and was recorded on

19    numerous body-worn camera footage --

20             THE DEFENDANT:  That's a lie.

21             MS. AKERS:  -- of Mr. Oliveras.

22             And so there's not --

23             THE COURT:  Mr. Oliveras -- excuse me, Ms. Akers.

24             Mr. Oliveras.

25             THE DEFENDANT:  That's a lie.

```
 1                    THE COURT:  You --

 2                    THE DEFENDANT:  Forgive me, Your Honor.

 3                    THE COURT:  -- are not helping yourself at all,

 4       which was why Mr. Shipley is telling you to please be quiet.

 5                    THE DEFENDANT:  Yes, ma'am.

 6                    THE COURT:  Based on a lot of your postconviction

 7       statements, I know you have talked quite vocally to a lot of

 8       different press people, and so you may be accustomed to

 9       speaking when and where you like; not in this courtroom.

10                    THE DEFENDANT:  Your Honor, I am not --

11                    THE COURT:  So you will please be quiet.

12                    Please continue, Ms. Akers.

13                    MS. AKERS:  Thank you, Your Honor.

14                    So in addition to all of the trial exhibits and

15       the trial testimony, those show beyond a reasonable doubt,

16       and, again, certainly by a preponderance, that there was a

17       physical contact.

18                    Second, there was an intent to commit another

19       felony, that is, 18 U.S.C. 231, which the jury also

20       convicted Mr. Oliveras of.

21                    And then, finally, Your Honor need not rely on the

22       plea documents, but certainly could, to apply this guideline

23       as well; although, there is the independent support that the

24       government presented at trial.

25                    THE COURT:  All right.
```

1          Okay.  I am going to rule on this objection as to

2     whether the cross-reference in 2A2.4 to 2A2.2, the

3     aggravated assault guideline, applies here.

4          The presentence investigation report at

5     paragraph 52 recommends application of the guideline at

6     Section 2A2.2 to both Counts 1 and 3 because defendant's

7     conduct constituted aggravated assault, making this

8     guideline applicable and providing a base offense level

9     of 14.

10          Commentary in Note 1 to the guideline at 2A2.2

11     defines aggravated assault as:  A felonious assault that

12     involves, A, a dangerous weapon with intent to cause bodily

13     injury, i.e., not meant to merely frighten with that weapon;

14     B, serious bodily injury; C, strangling, suffocating, or

15     attempting to strangle or suffocate; or D, an intent to

16     commit another felony.

17          I agree with the probation office that the

18     aggravated assault guideline at 2A2.2 applies here under the

19     definition, Part D, because defendant committed an assault

20     with the intent to commit another felony, here, civil

21     disorder.

22          Now, the defendant argues his conduct did not

23     amount to an aggravated assault or even a simple assault

24     because he never physically assaulted law enforcement

25     efforts to execute their duties while he was on the Upper

 1    West Terrace of the Capitol or inside the Capitol.  As he

 2    puts it in his supplemental memo docketed at ECF 127, and I

 3    quote:  The violation of Section 111(a) in this case does

 4    not involve actual physical contact by Mr. Oliveras with any

 5    law enforcement officer, and his conviction on this charge

 6    could have been based -- meaning of 111 -- could have been

 7    based merely resisting, imposing, impeding, intimidating, or

 8    interfering with law enforcement officers.

 9              He said that at pages 3 through 4 of a

10    supplemental memo.

11              He points out the verdict form did not include any

12    special interrogatory asking the jury to specify the

13    location or nature of the specific conduct by Mr. Oliveras

14    that was the basis of their guilty verdict on Count 3, nor

15    that it involved any form of assault at all.

16              The defendant is incorrect on the facts that his

17    conduct did not constitute an assault, starting with his

18    admissions.  In his statement of offense, to which he agreed

19    under oath, following his plea of guilty to a violation of

20    18 U.S.C. Section 111(a), where he admitted in the statement

21    of offense at paragraph 12:  Around 2:00 p.m., as tensions

22    among the increasingly large mass of rioters grew, a squad

23    of police officers responded to the Capitol.  As the

24    officers attempted to move through the crowd of rioters and

25    ascend to the steps of the Capitol, a mob of rioters,

1    defendant included, swarmed the officers and violently

2    pushed into them.  Defendant pushed into a rioter who was

3    pushing into the police officers and yelled:  "Hold the

4    fucking line."

5            Paragraph 19 of the statement of offense, which is

6    docketed at ECF 60, proceeds to say, quote:  Around

7    4:20 p.m., the police officers circled the rioters and

8    corralled them away from the Senate Wing Door.  A line of

9    police officers collectively yelled "move" and progressed

10   forward, attempting to clear the rioters away from the

11   Capitol Building and off the Capitol grounds.  Some rioters,

12   like defendant, refused to leave.  Defendant stood at the

13   front of the pack of rioters resisting the police line.  As

14   rioters continued to hold their ground, the police line

15   progressed forward and a violent clash broke out between the

16   police officers and the group of rioters who refused to

17   leave, including the defendant.  At least one police officer

18   was pushed to the ground, and other officers were pushed,

19   hit, and kicked by rioters.  Shortly thereafter, police

20   officers sprayed chemical irritants toward the rioters in

21   attempt to break up the violent altercation.  At that point,

22   defendant moved away from the officers.

23           The video evidence bears out the defendant's

24   admitted assault on police on January 6, 2021, on these two

25   separate occasions:  Around 2:00 p.m. on the Capitol

1    grounds, and, again, at around 4:20 p.m. on the Upper West

2    Terrace.

3         At 2:00 p.m. on the Capitol grounds -- and I am

4    using the Video Exhibit 2 on the ECF 56 list -- it shows a

5    line of police officers attempting to walk through a crowd

6    of rioters and climb up the Capitol steps.  As the officers

7    tried to move forward through the crowd, the video shows the

8    rioters were stopping their progress, and then physically

9    pushing the officers backwards.  They were trapped into a

10   small area.  The officers tried to force the crowd back, but

11   the rioters kept pushing in on them from multiple direction,

12   crushing up against them, creating a dangerous situation for

13   the officers.

14        The police tried to push through the crowd, the

15   crowd pushes back, continuing to physically resist and

16   impede the officers and trap them in the center of the

17   pushing crowd.  And in the middle of this highly dangerous

18   situation, the defendant literally brought his weight to

19   bear to help physically resist and impede the officers,

20   pushing them with both hands into the back of one fellow

21   rioter who was making contact with the police officers and

22   helping to push the officers back.  And in case his

23   intentions were not clear, Mr. Oliveras was yelling for the

24   rioters to:  "Hold the fucking line."

25        The guideline at Section 1B1.3(a) instructs that

1    the applicable base offense level for a conviction should be

2    determined on the basis of:  All acts and omissions

3    committed, aided, abetted, counseled, induced, procured, or

4    willfully caused by the defendant.  And through his actions,

5    the defendant was aiding a physical assault on the officers

6    by helping those rioters physically pushing and trapping the

7    officers with the force of his strength; this is enough to

8    constitute an assault against the trapped officers.

9           But then there is the second incident at 4:20 p.m.

10   on the Upper West Terrace.  There was defendant's

11   involvement in this violent face-off and struggle with the

12   police officers, where a video from that afternoon, from a

13   body-worn camera that had fallen off an officer and just

14   continued to film in the middle of the scrum, it shows the

15   defendant in the middle of that violent confrontation and an

16   intense fight between the police and rioters.  And although

17   this video is on the ground, it's difficult to make out

18   precisely who the defense was reaching out to strike or

19   push; but it confirms that he was in the middle of this

20   violent shoving match with an officer, and he can be seen on

21   the upper left-hand corner of the video at about 43 seconds

22   pushing forward, either against the officer directly or

23   against his fellow rioters who were making contact with the

24   officer.

25           This also shows that he took physical action to

1    aid other rioters or directly against the police and

2    physically assaulting and impeding the officers trying to

3    clear the Capitol plaza of rioters.

4            The D.C. Circuit's holding in *U.S. v. Stevens*, 105

5    F.4th 473, jump cite 480, 2024, makes clear that a defendant

6    who took actions aiding other rioters whose assaults on the

7    officers involved physical contact or the intent to commit

8    another felony constitute felony assault.

9            In that case, the district court found the

10   defendant engaged in the heave-ho pushes in the lower west

11   tunnel to aid those rioters ahead of him who were engaged

12   with the police, and the rioters were coordinating their

13   pushes to exert the greatest amount of force in the police

14   line and trying to push through the officers.  The circuit

15   concluded the district court did not err by applying 2A2.2,

16   the guideline for aggravated assault, even though the

17   defendant may not have personally assaulted or aided and

18   abetted the assaulting of law enforcement officers.

19           This description is similar to the one shown -- to

20   videos shown in this case and body-worn camera footage where

21   the rioters coordinated their efforts on the -- near the

22   Capitol steps to surge forward against the police line and

23   push the officers away from the steps of the Capitol, trap

24   them in a small group and, then, keep pushing them from all

25   sides, creating this dangerous situation with the defendant

1    directing instructions to the rioters to:  "Hold the fucking

2    line."

3              The Court finds that by physically pushing against

4    other rioters to aid in this physical assault and resistance

5    to the officers he committed assault against those officers

6    within the D.C. Circuit's holding in *Stevens* and the

7    specific terms of the applicable guidelines.

8              These assaults were committed with intent to

9    commit another felony, civil disorder, in violation of

10    18 U.S.C. Section 231(a)(3), and that satisfies the

11    definition for "aggravated assault."

12              Accordingly, defendant committed the felony

13    assault against the officers with intent to commit another

14    felony, qualifying as an aggravated assault, under the

15    guideline at 2A2.2, and as supported by the D.C. Circuit's

16    holding in *Stevens*.

17              And accordingly, his objection to application of

18    the guideline at Section 2A2.2 is overruled, and that

19    applies to both counts in 1 and 3, in Group 1, providing a

20    base offense level of 14; 6 offense levels are added by

21    application of the official victim adjustment at

22    Section 3A1.2 because the victims of the assault were law

23    enforcement officers, resulting in a total offense level of

24    20 for Group 1.

25              For Group 2, Counts 4 and 5 are grouped.  As I

1    have already said, they refer to the guideline at 2B2.3 for

2    trespass, which provides a base offense level of 4 points.

3          The government argues that the cross-reference at

4    2B2.3(c)(1) applies, which says that if the trespass offense

5    was committed with the intent to commit a felony, apply

6    2X1.1, which, in turn, would apply the base offense level

7    for the felony.

8          This means the government argues that the 14-point

9    base offense level for Count 1 applies to this grouping as

10   well, since his trespass onto the Capitol grounds were

11   committed with the intent to commit the felony in Count 1,

12   civil disorder.

13         Is that fairly -- is that a correct summation of

14   your argument?

15         MS. AKERS:  Yes, Your Honor.

16         THE COURT:  And does the defense have any

17   objection to that?

18         MR. SHIPLEY:  No, Your Honor.

19         THE COURT:  All right.  Hearing no objection, the

20   Court finds that the base offense Level 14 applies to the

21   group 14 charges because the defendant's trespass was

22   committed with the intent to commit the felony, namely the

23   felony in Count 1, civil disorder, because his ongoing

24   trespass on the restricted grounds of the Capitol was done,

25   at least in part, with the intent to -- well, and also

1      Count 3 because his trespass on the restricted grounds

2      contributed both to the civil disorder and also to obstruct

3      law enforcement efforts to clear and resecure the Capitol

4      and its grounds.

5              No other specific offense characteristics apply to

6      Group 2; meaning, the total offense level for Group 2 is 14.

7              So for Group 1, total offense level is 20; for

8      Group 2, the total offense level is 14.  And to obtain the

9      combined offense level, the group -- which is Group 1 --

10     with the highest total offense level is Group 1.  Because

11     the total offense level for Group 2 is 14, 6 levels less

12     than Group 1, that requires the addition of half of a unit;

13     and Group 1, with the highest total offense level, is

14     counted as one full unit, with a total additional units of

15     1.5.  Under the guidelines, that increases the total offense

16     level by one point, under the guideline at 3D1.4(a).

17             So the total offense level applicable to the

18     defendant is 21, which, in combination with a Criminal

19     History Category of I, produces an advisory guidelines range

20     of 37 to 46 months' incarceration; that applies to Counts 1

21     and 3.

22             This sentencing range is higher than the statutory

23     maximum sentence available for Counts 4 and 5, which is one

24     year; and therefore, the applicable guidelines range for

25     Counts 4 and 5 is the statutory maximum of 12 months.

1    The guidelines further recommend 1 to 3 years of

2    supervised release on Counts 1 and 3 following any period of

3    incarceration, and up to one year on Counts 4 and 5, and a

4    fine range of 15,000 to $150,000.  There is also a special

5    assessment of $100 for each of the two felony convictions,

6    $25 on each of the two Class A misdemeanor convictions, and

7    $10 for each of the two Class B misdemeanor convictions, for

8    a total special assessment of $270.

9    Are there any objections for the record about this

10   guideline determination, from the government?

11   MS. AKERS:  No, Your Honor.

12   THE COURT:  Okay.  And from the defense?

13   MR. SHIPLEY:  Not other than otherwise stated.

14   THE COURT:  Thank you, Mr. Shipley.

15   Now, the government has asked for an upward

16   departure under the guideline at 2K2.7 as a result of the

17   significant disruption of a governmental function caused by

18   the defendant's criminal conduct.

19   As the government summarizes, what happened on

20   January 6th was a crime of historic magnitude; and

21   defendant's current guidelines don't reflect the seriousness

22   of the risks of the crimes committed imposed to the

23   democratic process or the peaceful transition of power, and

24   so is asking for an upward departure under 5K2.7.

25   Does the government want to add anything to its

1    papers on that upward departure provision?

2          MS. AKERS:  Yes, Your Honor.

3          As Your Honor knows, the guidelines explicitly

4    state that if a defendant's conduct results in a significant

5    disruption of a governmental function and that has

6    adequately not been taken into consideration in determining

7    the ultimate guidelines range, the Court can increase the

8    sentence above the authorized guidelines to account for both

9    the nature and extent of the disruption and the importance

10   of the governmental function.

11         As Your Honor has noted in other cases, there was

12   indisputably a significant disruption of the governmental

13   function, that is, the congressional proceeding on

14   January 6th.  Mr. Oliveras was an avid and willing

15   participant in that disruption, and this disruption and

16   those considerations have not been adequately taken into

17   account in his guidelines.  Simply put, there is nothing in

18   his guidelines that account for the fact that Mr. Oliveras

19   intended to use force against the United States to attack

20   our democracy.

21         There is undisputed evidence and a jury finding

22   that Mr. Oliveras's specific corrupt intent was to stop the

23   congressional proceeding.

24         The congressional proceeding, as Your Honor knows,

25   is really the core of our democracy; without it, and without

1    a peaceful transition of power our system of government

2    fails.  It was Mr. Oliveras's intent, beginning far before

3    January 6, 2021, to target the congressional proceeding; and

4    he did.  And his guidelines, as they stand calculated by

5    Your Honor, take into account that he assaulted a law

6    enforcement officer; but it does not take into account that

7    he did so as part of a mob who was intent on not only

8    stopping Congress, but Mr. Oliveras's intent in harming our

9    lawmakers.

10            So because these very compelling and unique

11    circumstances are not taken into account under the

12    guidelines, the government urges the Court to depart upward

13    to our ultimate recommendation.  And during the 3553(a)

14    colloquy I will ask, in the alternative, for an upward

15    variance.

16            THE COURT:  Thank you.

17            Mr. Shipley, do you want to address the policy

18    statement at 5K2.7?

19            MR. SHIPLEY:  Thank you, Your Honor.

20            It's not lost to anybody in this courtroom, the

21    government has now resorted to 5K2.7 in the aftermath of

22    *Fischer* and *Brock*.  Not necessarily --

23            THE COURT:  Oh, excuse me just a second.

24            By its terms, you cannot use 5K2.7 if a defendant

25    is convicted of obstruction; you can't.

1    It says:  Departure from the guidelines ordinarily

2    would not be justified when the offense of conviction is an

3    offense such as bribery or obstruction of justice; in such

4    cases, interference with a governmental function is inherent

5    in the offense.  Unless the circumstances are unusual, the

6    guidelines will reflect the appropriate punishment for such

7    interference.

8    So all the defendants who were convicted of

9    1512(c)(2) because they were obstructing an official

10    proceeding -- by that conviction, either by plea or by jury

11    trial -- were rendered -- they weren't qualified anymore for

12    the 5K2.7 upward departure.

13    But now that they're not convicted of that, this

14    upward departure provision or policy statement now plainly

15    applies, particularly for those defendants who had a

16    conviction that was vacated post *Fischer*.

17    MR. SHIPLEY:  Yes.  And Judge Cooper asked me --

18    THE COURT:  So don't criticize the government or

19    the judges on this court for not relying on 5K2.7 before

20    because it was all -- that conduct that that policy

21    statement is supposed to reflect was already incorporated

22    into the offense of conviction.

23    MR. SHIPLEY:  And Judge Cooper asked me the same

24    question yesterday; and my full answer was:  But based on

25    the language of 5K2.7, it clearly contemplates circumstances

1    such as were involved on January 6th; though, it is an

2    appropriate guideline for the Court to consider and it is an

3    appropriate guideline for the government to assert.

4           But prior to *Fischer*, the government was typically

5    seeking the 11 levels, which *Brock* did away with.  But the

6    government was seeking those, and courts were imposing them;

7    and we had guideline ranges generally in the high 30s to low

8    40s.

9           Now we have the government arguing for 68 months

10   using 5K2.7.  And there seems to be some incongruity there

11   in the government's rationalization or rationale for driving

12   the guidelines ranges higher on an upward variance.

13          We have a guideline range here based upon the

14   Court's calculation put forth by the probation officer of 37

15   to 46 months, but we have a government request for 68

16   months.  And the government's request for 68 months is

17   driven purely by its reliance on 5K2.7, which I understand;

18   but they are asking, in effect, for sentences almost double

19   pre-*Fischer*.

20          So my point simply was:  The government is now

21   using 5K2.7, which is available to them post-*Fischer,* but

22   asking for sentences that were double the sentences that it

23   was asking for six, eight months, a year ago.

24          THE COURT:  Mr. Shipley, I think you are totally

25   wrong.

1          If the Count 2 obstruction conviction had not been

2    vacated post-*Fischer* -- if that had been incorporated into

3    his guidelines, his guideline range would have been 57 to

4    71 months.

5          So that's, I think, the basis for the government

6    to say:  When obstruction was actually counted under the

7    guidelines, his guideline range would have been 57 to 71

8    months.  And so their request for 68 months would, under the

9    guidelines -- if applicable, their recommendation would be

10   within that guideline range and, in fact, not even at the

11   highest level or the highest part of that guideline range

12   but somewhere in the middle.

13        MR. SHIPLEY:  Yeah.  I guess, probably, my

14   explanation would be:  To some degree I have internalized

15   sentence ranges that included acceptance because they

16   generally were coming through the plea agreements.

17        THE COURT:  I think you are right.  I think you

18   are right.

19        MR. SHIPLEY:  Thinking back through sentencing

20   ranges through plea agreements -- and so that would be the

21   distinction here, as opposed to a typical guideline range

22   under a 1512(c)(2) offer pre-*Fischer*.

23        So setting that aside --

24        THE COURT:  So the government's -- I know how the

25   government came up with the 68 months.  They based it within

1    a range that if obstruction was -- in the guidance, under

2    the guidelines, for obstruction were used, his range would

3    have been between 57 and 71 months, and so their request for

4    an upward departure, guided by guidelines that are no longer

5    applicable post-*Fischer*, despite the fact that the

6    defendant's conduct was obstructive of an official

7    proceeding -- that's the basis for it.  It's not out of line

8    at all with either the guidelines nor with other sentences

9    that have been imposed on defendants convicted, quite

10   frankly, of 111(a) and 231.

11              I personally have given sentences in the 72-month

12   arena for defendants.  I mean, I don't remember precisely

13   what the criminal history category was that may have pushed

14   it up posttrial, but that's not -- their sentencing

15   recommendation is not so out of line.

16              MR. SHIPLEY:  But turning to --

17              THE COURT:  Let's go back to the original -- if I

18   understand what you are saying -- correct me if I'm wrong --

19   you think consideration of Section 5K2.7 is totally

20   appropriate and within my discretion here?

21              MR. SHIPLEY:  Yes.  I mean, I --

22              THE COURT:  And then with respect to:  If I decide

23   to grant an upward departure under 5K2.7 to take account of

24   the clear intent to obstruct the official proceeding of

25   certification of the Electoral College vote, what should I

1  use to guide that upward departure?

2           I know what the government is using.

3           What would you have me use?

4           MR. SHIPLEY:  Turning to the facts, the flip side

5  of the argument -- I made this point in the closing, and I

6  will repeat it to the Court because I think it's accurate.

7           If you will recall, Mr. Oliveras moves from the

8  ground plaza level up to the Upper West Terrace level while

9  a large crowd is proceeding to go inside through the broken

10 Senate Wing Doors and the two broken Senate Wing windows

11 next to the doors.

12          And if you recall, because I pointed this out at

13 the time, there is a video that shows Mr. Oliveras just

14 lingering outside for nearly ten minutes before he then

15 joins in the long line of people that are going through the

16 doors.  And I argued at the time, and I think it's perfectly

17 accurate, that that showed a lack of urgency on his part to

18 go inside and do anything.

19          He hung around outside.  We have the video of the

20 officer standing at the Parliamentarian Door to his left

21 watching the crowd and doing nothing, but, you know, there

22 wasn't much they could do; I am not faulting him.  There

23 wasn't much they could do under the circumstances.  And

24 Mr. Oliveras just watched himself; he watched the officers;

25 he watched the crowd.

1          After watching for ten minutes, as people went

2     inside and came outside, he then joined the line and went

3     inside.  I think that undercuts the argument that he was

4     attending or intending or wanting to go inside and interfere

5     with whatever was going on.  Had that been his intention, he

6     would have done so immediately.  Once he got the

7     opportunity, once he got to the level, once he saw people

8     going inside he would have immediately joined in.

9          It was curiosity that led him to go inside, which

10    is also reflected by what he did when he went inside which

11    was, in effect, nothing.  He walked around for 20 minutes,

12    and then he left.

13          So to --

14          THE COURT:  Wasn't he saying things when he was

15    inside?

16          MR. SHIPLEY:  Everybody is saying things once

17    they're inside.  So if we're going to hang that moniker on

18    one, we have got to hang it on 2,000 people.

19          But there were others that were clearly acting in

20    a much different fashion such as, you know, Mr. Sparks, who

21    the government cites to this Court as a comparable case.  I

22    mean, I have seen these same few cases now cited under this

23    context over and over again.

24          Mr. Sparks, the first person through the broken

25    window.  The 2-by-4 was used to break out the window.

1    Dominic Pezzola uses his shield to continue breaking out the

2    window, and Mr. Sparks was the first one through it.  And

3    then Mr. Sparks helps opens the doors, which allows the

4    crowd to come flooding in.  Then Mr. Sparks chases one of

5    the officers up the stairs.

6          So Mr. Sparks is not Mr. Oliveras; it is not a

7    comparable case.  You know, the people who were right at the

8    front breaking the doors, breaking the windows, trying to

9    get inside, they clearly had a purpose in mind.

10   Mr. Oliveras, his objective conduct doesn't reflect that he

11   shared that --

12          THE COURT:  I'm sorry, Mr. Shipley.

13          While he was inside the Capitol, he was repeatedly

14   yelling violent and threatening rhetoric.  He was walking

15   around saying:  "Where are the fucking traitors?"  "Drag

16   them out by their fucking hair."  "Where are the fucking

17   traitors?"  "Drag the fucking traitors out."  "We want those

18   traitors."

19          I'm sorry.  You think he was doing nothing?

20          You think that wasn't expressive of his intent?

21   The "traitors" were, you know, members of Congress.

22          MR. SHIPLEY:  Your Honor, the unfortunate -- well,

23   unfortunate -- the fact is -- not "unfortunate" --

24          THE COURT:  He wasn't just walking around, you

25   know, looking at the sights.

1          MR. SHIPLEY:  Fortunate or unfortunate, the fact

2     is:  We are all stuck with our words.

3          THE COURT:  Exactly.

4          MR. SHIPLEY:  And I don't --

5          THE COURT:  Captured on video by multiple sources.

6          MR. SHIPLEY:  I am not here to deny the obvious.

7     But, you know, the heat of the moment, you know, tends to

8     let the rhetoric in, the bombast, and the hyperbole get out

9     of control, especially when you are hearing it from people

10    all around you.

11         THE COURT:  Well, Mr. Shipley, that's an

12    interesting argument to make given your client's public

13    statements and quotes in *The Washington Post*.  I have been

14    saving them.  So, yeah, it wasn't the heat of that moment.

15    It's continued.

16         MR. SHIPLEY:  It's not -- you know, doing what

17    I have been doing now for three years --

18         THE DEFENDANT:  (Inaudible utterance.)

19         MR. SHIPLEY:  -- in large measure, it's like

20    trying to hold back the ocean with a bucket.  In reality,

21    you can caution clients that they should not be talking,

22    they should not be saying things, but it's up to them to

23    follow that advice or not.

24         THE COURT:  Of course it is.

25         MR. SHIPLEY:  So I have no answer for you on that

1    question.  Like I just said, not fortunately,

2    unfortunately --

3            THE DEFENDANT:  I have never spoken to *The*

4    *Washington Post*, Your Honor, or any other media outlet, as

5    you assert.

6            THE COURT:  Okay.

7            MR. SHIPLEY:  But I want to focus, and I hope the

8    Court would focus, and I think the Court will focus, on what

9    it is that Mr. Oliveras actually did that day within the

10   spectrum -- that all the judges in this courthouse have now

11   developed over two and a half years of sentencing in these

12   cases.  You have now sentenced dozens of cases where you

13   have internalized the spectrum of the bad actors from the

14   more benign actors who, nevertheless, you know, have engaged

15   in criminal conduct.

16           And just yesterday Judge Cooper said:  You know,

17   you're on the more benign end of the circumstances.  And I

18   am sure you have confronted that same question in other

19   cases yourself.

20           Mr. Oliveras's involvement, as reflected in the

21   videos, as reflected in the verdicts, is essentially those

22   two episodes at 2:00 down on the West Front and at 4:25.  He

23   is hanging around between those two time periods.

24           And, you know, the one at 4:25, is -- and I want

25   to address this just for a moment.  The one at 4:25 is

1    really sort of emblematic of how he found himself here in a

2    jury trial.

3            I advised him to stay with the initial plea.  The

4    Court admonished him and spent a lot of time giving him, you

5    know, the facts of life of what happens when you withdraw a

6    plea or attempt to withdraw a plea.  I had a long

7    conversation with him after that, it's his rationale for why

8    he wanted to.

9            And, you know, I wouldn't say it's not defiance,

10   it's not self-righteousness.  But I think if you look at his

11   history, which you have seen as reflected, you know, it's

12   just:  His attitude was what you see reflected when he's

13   standing there holding the flag up at the end of the day.

14   It's like:  I did what I did, and I am willing to stand and

15   be accounted.  And that was his choice.

16           His choice was:  I don't want to admit to things

17   that I don't necessarily believe in.  It wasn't a factual

18   issue.

19           He didn't take the stand.  He didn't try to evade

20   his way out of what was shown on the video; he simply was

21   willing to be stand and judged by 12.  And the symbolism is

22   you see -- where he is standing there at the end of the day,

23   one foot forward, bracing himself, holding his flag.  That's

24   Michael Oliveras.  I don't think there is malice there.

25           You know, again, I always have to approach some of

1   these clients -- and they don't all fall into Mr. Oliveras's

2   category; how much of this is bombast and rhetoric or

3   hyperbole, and how much of it was -- you know, such as

4   Mr. Robertson.  You know, that's -- Mr. Robertson -- this

5   came up with Judge Cooper yesterday.  Mr. Robertson is the

6   law enforcement officer from Virginia who basically said, in

7   the aftermath of the event, that he was willing to kill as

8   many FBI agents as was necessary to avoid arrest.  A police

9   officer.  And so that's not Mr. Oliveras.  You know, you can

10  see the hyperbole --

11          THE COURT:  How much time did he get?

12          MR. SHIPLEY:  Seventy-two months, down from

13  eighty-four.  But that's not Mr. Oliveras.  Mr. Oliveras's

14  conduct doesn't reflect that.  Mr. Oliveras's words are --

15  you know, they are what they are.

16          THE COURT:  Just so you know, like, we haven't

17  gotten to the 3553(a) factors step.  I am just on the 5K2.7

18  and whether I am going to grant --

19          MR. SHIPLEY:  Okay.  So if the Court would rather

20  wait on that --

21          THE COURT:  -- an upward departure.

22          MR. SHIPLEY:  I understand that 5K2.7 says what it

23  says, the circumstances are such that it is something the

24  Court can consider.  But I think, when taking into

25  consideration that Mr. Oliveras lingered outside, didn't

1    seem to be in a hurry to go inside and, once he was inside,

2    didn't do anything other than engage in, you know, offensive

3    language, that that mitigates against, you know, any overly

4    harsh use of 5K2.7 such as being requested by the

5    government.

6              THE COURT:  All right.

7              I am going to grant the government's request for

8    an upward departure under Section 5K2.7, which provides,

9    quote:  If the defendant's conduct resulted in a significant

10   disruption of a governmental function, the Court may

11   increase the sentence above the authorized guideline range

12   to reflect the nature and extent of the disruption and the

13   importance of the governmental function affected.

14             As I have already mentioned, this is a departure

15   that is not available if the defendant is convicted of an

16   offense of obstruction of justice; so this was not available

17   when his obstruction count in violation of 18 U.S.C. Section

18   1512(c)(2) stood, but it no longer stands.  It's been

19   vacated post *Fisher*.  Therefore, I will grant an upward

20   departure under this policy statement 5K2.7.

21             This defendant was an active part of a mob of

22   rioters on January 6, 2021, that put a stop to the essential

23   work of Congress to certify the Electoral College vote and

24   certify the election of President Biden as our President.

25   This was a mob that he was part of that overwhelmed the

1   police, breached the security of the Capitol Building for

2   hours.  This defendant was himself inside the building at

3   two separate times, and then tried to enter a third time.

4   This was activity that forced the evacuation of the Vice

5   President, members of Congress, staff, and other people

6   legitimately within the Capitol; it injured over 100 police

7   officers; resulted in more than $2 point -- $2 million

8   dollars in losses and damages to the Capitol Building.

9          I cannot think of many disruptions to government

10  business more substantial than what occurred on January 6,

11  2021.

12         And the defendant's guidelines do not adequately

13  reflect the gravity of the impact of defendant's conduct on

14  that day.

15         As the government says, he would face the same

16  offense level if his crimes had not endangered the

17  democratic process or interfered with the peaceful

18  transition of power if the mob had not threatened the lives

19  of the Vice President, the Speaker of the House, members of

20  Congress, and their staffs.

21         This was a defendant who was not just a casual

22  member of this mob; he entered the Capitol twice, tried a

23  third time.  He expressed a clear intent to obstruct the

24  proceedings before Congress.

25         Prior to traveling to D.C. on December 27, 2020,

1    he wrote on Parlor:  "I can think of one other course of

2    action.  When you get a Capitol full of patriots who have

3    had enough and they decide on their own to rip them out of

4    their chairs by their hair and drag them down the steps

5    would be very effective, indeed."

6        He was referring to members of Congress.

7        While at the Capitol, he repeatedly yelled these

8    violent -- threatening rhetoric along the same lines,

9    saying:  "Where are the fucking traitors?  Drag them out by

10   the fucking hair.  Where are the fucking traitors?  Drag the

11   fucking traitors out."

12       He also -- when he tried to reenter the Capitol

13   for a third time, he yelled:  "We want those fucking

14   traitors," as he urged other rioters to push past police

15   lines guarding the door.

16       After January 6th he posted on Parlor:  "Were we

17   red-blooded Americans pissed the fuck off?  Yes.  Did we

18   want to get our bare hands on the flesh of those who have

19   committed treason?  Yes.  Would I, as one of those

20   red-blooded Americans, if the opportunity presented itself,

21   grasped and removed one of those traitors?  Yes."

22       He also posted:  "Patriots, are any of you

23   discouraged what you saw in the Senate?  Was precisely what

24   we want, insurrection acts in motion."

25       During his December 2021 interview with the FBI,

1    he said he went to Washington D.C. on January 6, 2021,

2    because he knew, quote, "That the election was stolen and

3    that our republic had been robbed of its sovereign ability

4    and privilege to vote honestly for our commander-in-chief."

5         And after *Fischer*, with the dismissal of his

6    1512(c)(2) conviction, none of the conduct that goes into

7    determining defendant's sentencing guidelines reflect his

8    intent to engage in political violence that poses such a

9    threat to our American democracy.  His intention and actions

10   on January 6th were serious.

11        His intent to obstruct Congress in the Electoral

12   College certification by violence, if necessary, go above

13   and beyond what any of his current convictions now take into

14   account.  None of those are adequately reflected or take

15   into account his guidelines range, so I do find that an

16   upward departure under 5K2.7 is fully warranted.

17        In assessing the extent of the departure, review

18   of how the guidelines for obstruction of an official

19   proceeding at 2J1.2 would have applied to defendant provide

20   a general guide.  As the PSR indicates, had this guideline

21   applied to the defendant, taking into account his offense

22   conduct of causing or threatening physical injury to a

23   person or property damage in order to obstruct the official

24   proceeding, and the fact that his offense conduct did, in

25   fact, result in a substantial interference with the

1    proceedings before Congress to certify the Electoral College

2    vote, his sentencing range would have been 57 to 71 months

3    at a total offense level of 25, with his criminal history

4    category of I.  So an upward departure within that range is

5    appropriate.

6              Now we're at the third step, where I will hear

7    from the parties to discuss applications of the 3553(a)

8    factors.  I like to lay out what people have asked for in

9    terms of the recommended sentences here.

10             The government has recommended 68 months'

11   incarceration as an upward departure, or a variance from the

12   37- to 46-month guidelines range, 3 years of supervised

13   release, $2,000 in restitution, plus the mandatory special

14   assessment.

15             The probation office has recommended 37 months'

16   incarceration, at the bottom of the guideline range;

17   12 months' incarceration on Counts 4 and 5; and 6 months'

18   incarceration, the max, on the petty offenses; 24 months of

19   supervised release on Counts 1 and 3; and 12 months'

20   supervised release on Counts 4 and 5.

21             Mr. Oliveras has asked for a sentence of time

22   served which, by my count, is roughly 6 months; and

23   24 months of supervised release, with the first 6 months, I

24   guess, to be served on home confinement.

25             Those are the recommendations for sentencing

1    before me.

2                    I will turn to the government first.

3                    MS. AKERS:  Thank you, Your Honor.

4                    If I could have the screen, please.

5                    Your Honor, I will be brief because you have

6    already summarized much of the aggravating factors in this

7    case.  But I do think it's important, particularly in this

8    case, and given the defendant's continued reluctance to

9    accept the facts, to go through what the government believes

10   to be the aggravated facts under 3553(a).

11                   This defendant has displayed a troubling pattern

12   of disrespect for the law, of encouraging violence against

13   our elected officials, engaging in violence against law

14   enforcement, and of taking pride in his actions from

15   January 6th.  For those reasons, the government requests and

16   recommends that the Court sentence Mr. Oliveras to 68 months

17   of incarceration.

18                   I will go through briefly some of the aggravating

19   facts that the government believes the Court should consider

20   in fashioning its sentence.

21                   The first is that Mr. Oliveras's intent was not

22   formed on January 6th.  This was not sporadic.  He was not

23   caught up in the crowd; he was not part of just the mob

24   mentality.

25                   Rather, the evidence in this case shows that

1    Mr. Oliveras's intent began essentially right after the 2020

2    presidential election.  At that point, he started engaging

3    prolifically on Parlor, as Your Honor has seen; making posts

4    not only about the Capitol and the certification, but about

5    violence.

6              And in this case we saw that his target was the

7    Capitol; his goal was to stop the certification, and his

8    means were violence.  Your Honor saw that starting in

9    early -- or, excuse me -- in late December when he claimed,

10   for example, that "it is time for war on January 6th."

11             His rhetoric continued, and he identified his

12   target as the Capitol in late December as well, when another

13   user said:  To be as close to the Capitol as possible on

14   January 6th.

15             Mr. Oliveras indicated his agreement with that.

16             Just a few days later, also in late December,

17   Mr. Oliveras identified the Capitol; identified that it

18   would be full of patriots, and expressed his violent intent,

19   saying -- as Your Honor has already noted and as

20   Mr. Oliveras has said many times, that his goal was to "rip

21   them" -- and you can see in the post above, talking about

22   lawmakers -- "out of their chairs by their hair and drag

23   them down the steps."  He thought that that would be very

24   effective indeed.

25             He continued, Your Honor, at identifying what his

1    goal was, to stop the certification.

2            Also, in late December, another user identified

3    January 6th as the date of the certification; and he

4    responded that he would be there bright and early in

5    response to the user saying:  Congress cannot certify this

6    fraudulent election.

7            And very concerning as well, Mr. Oliveras then

8    traveled to Washington, D.C., a day early, on January 5th,

9    from Philadelphia.

10            He responded to a user who said that they needed

11    to make sure to block the tunnels out of the Capitol, slash,

12    Congress.

13            And Mr. Oliveras responded that his hotel was on

14    Jersey Avenue -- which Your Honor heard during trial from

15    the special agent, was true -- and he would be able, ahead

16    of time, to generate a realtime understanding of access to

17    the Capitol physically.

18            So, again, his target was the Capitol, his goal

19    was to stop the certification, and his means were violence.

20            Your Honor saw, during the course of trial, that

21    his intent was borne out.  As soon as he reached the Capitol

22    grounds, in the first group of rioters on the West Front, he

23    engages in violence against law enforcement.  As Your Honor

24    knows, this was a CDU platoon trying to make their way to

25    help Capitol Police officers.  They were swarmed and

1    attacked by people, including Mr. Oliveras.

2         As though his intent wasn't clear by his actions,

3    he was very vocal during his time on Capitol grounds,

4    continually berating law enforcement officers for doing

5    their jobs and protecting the building.

6         And despite all of the signs on the West Front,

7    the gas in the air, the sirens, the police presence,

8    Mr. Oliveras made his way to the Senate Wing Door.

9         He climbed a bike rack turned into a makeshift

10   ladder.  He walked directly past police officers in riot

11   gear, and he entered the Capitol Building less than ten

12   minutes after the initial breach.

13        Now, Mr. Shipley has described for the Court

14   Mr. Oliveras lingering outside the Senate Wing Door for at

15   least ten minutes and has provided the Court that that might

16   be an indication that he wasn't intent on getting inside.

17   That incident, Your Honor, was before the second breach,

18   before the second time Mr. Oliveras went in.

19        Mr. Oliveras entered at 2:22 p.m., within ten

20   minutes of the first breach of the Senate Wing Doors, while

21   the West Front was still being guarded by the Capitol

22   Police.  He made it there far before most of the rioters

23   did.

24        And as Your Honor knows, he roamed the halls.  He

25   was not a passive participant walking or milling around like

1    a tourist, like the defendants love to say.  Mr. Oliveras

2    was calling for violence.  He called so for violence here.

3              (Whereupon, a video was published.)

4              MS. AKERS:  Now, Mr. Shipley and the defense

5    counsel -- I don't mean to call you out specifically -- the

6    defense has argued in trial and here, at sentencing today,

7    that Mr. Oliveras's words were hyperbole or were a joke.

8              Your Honor, Mr. Oliveras said these words before

9    January 6th.  He made good on them by making it into the

10   Capitol.  And by the grace of God, he didn't find any

11   Congresspeople because they were in emergency evacuation,

12   hiding in fear and in danger.  But there is no doubt in my

13   mind that if this person had reached them, he would have

14   made good on his promise because he planned for this before

15   January 6th.  And he roamed the Capitol not only in this

16   instance but, in multiple areas of the Capitol Building,

17   calling for the Congresspeople, calling them traitors, and

18   encouraging his fellow rioters, who also violently breached

19   the Capitol, to:  "Drag the fucking traitors out."

20             (Whereupon, a video was published.)

21             MS. AKERS:  Mr. Oliveras, after being forced out

22   of the Capitol Building the first time, as Your Honor knows,

23   entered a second time and intended to enter a third time;

24   these are highly aggravating factors and really indicate his

25   intent.  One who makes it into the Capitol Building and is

1    forced out does not come back a second and a third time

2    unless there is a reason and a purpose.

3         Mr. Oliveras's reason was to stop the

4    certification.  He stood before law enforcement officers

5    guarding the door and yelled things consistent with his

6    prior comments, like:  Let's go.  "We want those fucking

7    traitors!"

8         (Whereupon, a video was published.)

9         MS. AKERS:  Your Honor, Mr. Oliveras was

10   relentless.

11        After the third time of being pushed out of the

12   Senate Wing Door area, Your Honor knows that he was engaged

13   in a brawl, essentially.  Officers repeatedly yelled:  "Move

14   back, move back"; you heard that on numerous body-worn

15   camera footages.  And Mr. Oliveras refused.  He brazenly

16   stood in the face of police officers holding his flag and

17   yelling things like:  "Hold the fucking line!"

18        It was only then, when the officers decided to

19   push forward and try to clear the rioters off of the

20   northwest courtyard so that Congress could resume its

21   constitutional duties, that a brawl broke out; and

22   Mr. Oliveras was in the front.

23        You heard testimony at trial about the

24   dangerousness of this brawl, particularly when officers,

25   like on the right-hand side of the screen here (indicating),

1    fell because of the violent combative nature of the rioters

2    who refused to leave; Mr. Oliveras at the forefront.

3          And then, even after he was finally pushed out, he

4    didn't leave the Capitol grounds; he went to the East Front.

5    He went and watched as rioters destroyed media equipment,

6    continued his violent and aggressive rhetoric, this time

7    against our members of the media, as other people destroyed

8    the equipment.

9          And the last aggravating fact from January 6th was

10   that Mr. Oliveras remained on Capitol grounds for more than

11   five hours.  He was one of the first members of the mob on

12   the West Front and one of the very last members of the mob

13   on the East Front when the Capitol was being cleared.  He

14   was there when it was dark.

15         His aggravation only continued after January 6th.

16   He immediately took to Twitter -- excuse me -- took to

17   Parlor, again, and expressed his intent.  It was not

18   hyperbole, Your Honor.  Mr. Oliveras said that he was a

19   red-blooded American, pissed the fuck off, and wanted to get

20   his bare hands on the flesh of those who committed treason.

21   And he would have, as one of those red-blooded Americans, if

22   the opportunity presented itself, grasped and removed one of

23   those traitors.

24         He did everything he could to permit for that

25   opportunity by entering the Capitol once, by entering a

1    second time, and by trying to enter a third time.

2         He continued this rhetoric shortly after

3    January 6th, confirming his purpose; and his intent was to

4    extract traitors.

5         And even after -- I mean, shockingly, even after

6    he was arrested by the Federal Bureau of Investigation and

7    he was interviewed by them, he maintained that he wouldn't

8    change a thing; he would do it again.

9         (Whereupon, a video was published.)

10        MS. AKERS:  Mr. Oliveras has continued this same

11   rhetoric from all the way back when he was arrested to the

12   present day, saying things, for example, on YouTube recently

13   that it was a "badge of honor."

14        THE COURT:  When you say "recently," when was

15   that?

16        MS. AKERS:  This, Your Honor, was the summer.  But

17   Mr. Oliveras has been on these YouTube channels as recently

18   as about three weeks ago, to my checking; although, it could

19   be more recent.  I only have so much time to review these

20   YouTubes.  But this summer --

21        THE COURT:  How does he, when he is sitting in

22   D.C. Jail, get on YouTube?

23        MS. AKERS:  Well, Your Honor, what happens, is

24   Mr. Oliveras uses his phone call.  He calls a number; that

25   number is a person, typically, sitting outside the D.C.

1    Jail, has a microphone; puts the microphone next to the

2    phone and interviews January 6th defendants.  They do this

3    on almost a daily basis.  Since Mr. Oliveras has been

4    detained, he has been a regular caller.

5                And then that person --

6                THE COURT:  These are the groups of people who

7    stand outside the D.C. Jail sometimes accompanied by members

8    of Congress?

9                MS. AKERS:  Yes, Your Honor.

10               THE COURT:  And these are people who are being

11   sympathetically portrayed in magazine articles, like in *The*

12   *Atlantic*.

13               MS. AKERS:  Yes, Your Honor.

14               THE COURT:  Okay.  So let's go back.

15               What is he saying?

16               MS. AKERS:  And in his YouTube appearances,

17   Mr. Oliveras regularly takes pride in his actions on

18   January 6th.  He says things, calling out the DOJ and

19   everyone else involved in this bullshit --

20               THE DEFENDANT:  Absolutely.

21               MS. AKERS:  -- that he has got news for us; that

22   it's a badge of honor that he is a January 6th defendant.

23   That what happened happened; and most of us got caught up in

24   the fray, and I'd do it again.

25               Your Honor, this is an example -- Mr. Oliveras has

1    said this numerous times, starting the day he was arrested

2    by the FBI, up until the present.

3        He says things like -- when the person who was

4    interviewing him on the phone warned him:  Don't say

5    anything like you would do it again because you have an

6    upcoming sentence.

7        Mr. Oliveras said:  "I am not worried"; and,

8    instead, repeated that he would do it again.

9        Even more recently, Mr. Oliveras said that it was

10   an honor for him to be a J6 defendant; he wouldn't have it

11   any other way.  He is not going to say he is sorry.  Quote:

12   "I didn't do anything wrong, and I'd do it again."

13       Your Honor, this defendant's utter lack of remorse

14   from before he was arrested, to when he was arrested, to the

15   present day is a highly aggravating factor that demands a

16   great amount of specific deterrence.

17       Mr. Oliveras, frankly, is a danger to the

18   community, particularly in the time of an election season.

19   Particularly because he still -- even after sitting through

20   three days of trial and watching video after video of him

21   engaging in violence against law enforcement, of him call

22   for violence against our elected officials, still maintains

23   that he was in the right and that he did nothing wrong.

24       The defense has -- I mean, respectfully -- the

25   audacity to ask for home confinement in a case like this.

1     And the government believes that this case, more so than

2     many others, demands not only general deterrence, but

3     specific deterrence because of his current and continued

4     attitude and because the nature and circumstances of his

5     crimes are, quite simply, egregious and warrant a

6     significant term of incarceration.

7              Thank you.

8              THE COURT:  Thank you, Ms. Akers.

9              Mr. Shipley?

10             Wait just one second.  My court reporter has to

11    fix something.

12             All right.  Mr. Shipley, you may proceed.

13             MR. SHIPLEY:  If I may back up just a second, Your

14    Honor, to the Court's explanation of what the guidelines

15    would have been pre-*Fischer*, to then use 5K2.7 to take into

16    account the loss of that obstruction.

17             I think the Court said that the guidelines would

18    have been 57 to 71 months; that would have been pre-*Brock.*

19    Post-*Brock*, the guidelines would have been 18 to 24 months,

20    because those plus 8- and plus 3-level enhancements under

21    1512 were no longer appropriate post-*Brock*.

22             So to get from 57 to 71 would have required an

23    11-level variance up from Level 15.  The guideline for

24    post-*Brock* would have been Level 14, plus 1 for grouping,

25    for 15.  And then that would have been 18 to 24 months.

1          THE COURT:  Let me just ask the probation officer.

2    I don't think that's correct, Mr. Shipley.

3          Could the probation officer just clarify?

4          MS. REICHLER:  Yes.

5          Please repeat your inquiry again.

6          MR. SHIPLEY:  I am saying post-*Brock* -- the *Brock*

7    decision eliminated 11 levels, so it didn't involve the

8    administration of justice.

9          MS. REICHLER:  Correct.

10          MR. SHIPLEY:  So after *Brock*, we would have only

11    had a base offense level of 14, plus 1 for grouping; so we

12    would have had an adjusted offense level of 15.  And to get

13    to level 25, which is 57 to 71 months, would have required

14    an 11-level variance.

15          MS. REICHLER:  My understanding is that is

16    incorrect.

17          THE COURT:  Correct.  Yes.  So why don't you just

18    lay that out.

19          MR. SHIPLEY:  That would have been on a 1512.

20    Obviously, we're not on a 1512 now.

21          MS. REICHLER:  Right.  I am trying to understand

22    your inquiry.

23          THE COURT:  I'll just do it right now.

24          Under 2J1.2, the base offense level would have

25    been 14; the following specific offense levels would have

1    applied post -- post-*Brock* -- I think you would have

2    applied, under 2J1.2 -- well, let me just get the government

3    to tell me how they got to the 57 to 71, under 2J1.2.

4            You start with the base offense level, plus 6.

5            MS. AKERS:  Correct, Your Honor.

6            It was essentially the guidelines calculation

7    prior to *Brock,* with the plus 8 and the plus 3.

8            THE COURT:  So it would be 2J1.2 with a base

9    offense level of, what --

10            MS. AKERS:  14.

11            MR. SHIPLEY:  14.

12            THE COURT:  -- 14.  (b)(1)(B), with a plus 8, for

13    the offense:  Involved causing or threatening to cause

14    physical injury to a person or property damage --

15            MS. AKERS:  Correct.

16            THE COURT:  -- in order to obstruct the

17    administration of justice.

18            But does *Brock* deal with that?

19            MS. AKERS:  Yes, Your Honor.

20            *Brock* took away the plus 8 and the plus 3, which

21    is under (b)(2).

22            So originally, our 1512 guidelines' calculations

23    had the 14, plus 8, and then plus 3.  Post-*Brock*, the plus 8

24    and plus 3 dropped.  And so we requested in this, and many

25    other cases, for an upward departure to add the plus 8 and

1    the plus 3, even though the administration of justice didn't

2    technically include the congressional proceeding, we

3    believed that the intent of these defendants still

4    encompassed that same conduct.

5         I think a good comparable note here is, for

6    example, Judge McFadden never applied the plus 8 and the

7    plus 3 but did, oftentimes, depart and vary upward because

8    he still acknowledged that there was the substantial

9    interference with a government function, even though it

10   didn't necessarily fall directly within the guidelines.

11        And so, in this case, we got to that using the 14

12   base offense level, plus 8, plus 3; and that's described on

13   our original sentencing memo at page 22, Note 7.

14        THE COURT:  Okay.

15        MR. SHIPLEY:  And I would add to Ms. Akers'

16   comments, because it was a case we handled together -- and I

17   think the case she was referring to was *United States versus*

18   *Mehaffie*, where Judge McFadden upward departed by two

19   levels, not 11.  The government is asking for 11 here,

20   basically.  So I just wanted to, you know, backtrack a

21   little bit to make that clarification.

22        So what the government is asking for here under

23   5K2.7 is 11 levels.

24        I am not -- it does neither my client nor myself

25   any good to deny the obvious and call our credibility into

1    question.  The Court saw and heard the evidence.  The Court,

2    through the prior change of plea hearing where, you know,

3    statements were made under oath that the Court has before

4    it, but I keep going back to --

5                THE COURT:  I mean, this is a defendant who has

6    said, I mean, he doesn't regret anything he has done; he

7    would do it again.  I am obliged to consider specific

8    deterrence and to protect the public from further crimes by

9    this defendant.

10               How -- he is so insistent that he is right.  He is

11   so persistent in his beliefs and so not regretful about the

12   harm he has done on January 6th.

13               The specific deterrence here is among the more

14   significant of any of the January 6th cases I've had to deal

15   with.

16               Mr. Shipley, I would address that factor.

17               MR. SHIPLEY:  Your Honor, again, I would call the

18   Court's attention to the divergence between his words and

19   his actions.  I think the words are wildly overblown for

20   what he was actually willing to do.

21               You know, Ms. Akers -- you know, she raised a

22   couple of times the fact that within ten minutes of the

23   first breach he went through the doors.  Within ten minutes

24   of the first breach a few hundred people went through the

25   doors.  Once those doors were open, there was a large crowd

1    standing right outside, and there was nothing preventing

2    them from going inside.

3         He was not in the vanguard going through those

4    doors; hundreds of people went through before he did.  The

5    building was filled up pretty much before he did.  Multiple

6    other entrances were created before he went through.

7         Ten minutes -- I mean, I have done this before in

8    closing argument, I won't do it to you.  But if we just

9    stood here for ten minutes in silence and waited for ten

10   minutes to lapse off the clock, and considered the number of

11   people that could just walk through that door if there was a

12   steady line, this room would fill up multiple times over.

13   Ten minutes is a long time.  And during that ten minutes, he

14   just stood outside and watched.  He stood right there next

15   to those officers by the Parliamentary Door, and he didn't

16   do anything.  He just watched.  And finally, he just joined

17   the crowd.

18        He can't get away from his words, I understand

19   that.

20        THE COURT:  Why do you think that that is such a

21   mitigating factor?

22        Because during the whole time he was seeing guards

23   in riot gear, he was -- I mean, I have seen enough of this

24   footage to know that there were flash-bangs; there were

25   people yelling obscene things --

```
 1                MR. SHIPLEY:  That's why --

 2                THE COURT:  -- about law enforcement.  They were

 3     going into the Capitol Building that was restricted.

 4                I mean, any rational person waiting there for one

 5     minute and seeing that scene should have known they weren't

 6     allowed there and turn tail and run.  The fact that he was

 7     there for two minutes, three minutes, four minutes, five

 8     minutes -- count them up to ten, to me is an aggravating

 9     factor, not a mitigating factor.

10                You are losing me, Mr. Shipley.

11                MR. SHIPLEY:  Your Honor, I think --

12                THE COURT:  Why is the fact that he stood outside

13     and watched this illegal criminal conduct for ten minutes a

14     mitigator?

15                I am not getting it.

16                MR. SHIPLEY:  Because there were no flash-bangs

17     where he was; there were police standing there doing

18     nothing.  The crowd -- there was no violence.  He arrived

19     after the windows broken.

20                Yes, there were alarms going on --

21                THE COURT:  I would move on from the ten minutes.

22     To me, it is not a mitigating factor; that is an aggravating

23     factor.

24                Given what he had seen on his way there and what

25     he had done on his way there to try and stop rioter-geared
```

1    guard -- police from trying to keep people away from the

2    Capitol and his action to impede them, and then he stood

3    there for ten minutes -- aggravating factor to my mind, not

4    a mitigator.

5            So let's move on from how long he stood there --

6            MR. SHIPLEY:  I understand.  But what I'm

7    asking --

8            THE COURT:  -- let alone the five hours he was

9    there on restricted grounds at the Capitol.

10           MR. SHIPLEY:  What I am asking the Court to take

11   into consideration is the thought process that is reflected

12   in just standing and doing nothing, the lack of urgency,

13   yes, as compared to what the government wants to attribute

14   his motives to be.

15           Now, would somebody exercising good judgment have

16   made other choices?  The answer to that question applies to

17   hundreds of people, if not thousands.  So in that sense, he

18   is not exceptional at all.

19           So once he is inside, you know, you have the

20   mentality of crowds.  He is caught on --

21           THE COURT:  And every single one of those

22   exceptional people who did what this defendant did -- some

23   more, some less -- are all being investigated, found,

24   arrested, and brought to this court for sentencing because

25   their conduct was criminal.

1        The fact that there were hundreds of them,

2   thousands of them doesn't -- isn't a mitigating factor.  It

3   is a disturbing factor, but it's not a mitigator either.

4        MR. SHIPLEY:  Well, I understand.  But the role of

5   the Court, which I -- you know, is to kind of sort the wheat

6   from the chaff; you know, the individuals that are chasing

7   police officers around, such as Mr. Sparks; the Oath Keeper

8   defendants who were faulted for confronting Officer Harry

9   Dunn; you have Mr. Sandlin that assaulted an officer at the

10  doors to the Senate.

11       So there are many people inside engaged in much

12  more egregious conduct than anything Mr. Oliveras did.

13       While inside, Mr. Oliveras's most egregious

14  conduct were his words.  He does nothing else while he is in

15  there; he was just loud and offensive.

16       And then, when he comes back out -- yeah, he stuck

17  around for two more hours.  He comes out, you know, just

18  before three o'clock, and he is out there until after 4:30.

19  In fact, we see the video; he is out on the east side until

20  it is dark.

21       Again, good judgment would have led to different

22  choices.  Bad judgment led to the choices he made.  But, you

23  know, bad judgment is not a 10-year prison sentence in most

24  instances.  He had a lot of chances along the course of the

25  day to exercise better judgment, and he has had a lot of

1    chances since then to expression himself in a different

2    fashion.

3              THE COURT:  But he hasn't, has he?

4              MR. SHIPLEY:  He has had a lot of choices to.

5              THE COURT:  He has had many opportunities after

6    January 6, 2021, to express himself differently and to

7    reflect on his conduct on that day and the harm that it's

8    done to this country, generally.

9              And instead -- and I am reading from *The*

10   *Washington Post* from Sunday, June 16, 2024 -- and it was

11   such a significant comment, they quoted him at the very end

12   of the article saying:  "It's a badge of honor," Michael

13   Oliveras, a New Jersey man convicted of charges, including

14   assaulting officers, said over the phone at an evening vigil

15   in May.  "Most of us got caught up in the fray, and I'd do

16   it again."

17             So, I mean, as the government pointed out -- I

18   mean, I saw this in June when it was published in *The*

19   *Washington Post*.  He said it on YouTube, apparently.

20             MR. SHIPLEY:  No.  It's the same thing --

21             THE COURT:  Still, the same thing:  I would do it

22   again.  I would do it again.

23             So even after opportunity for reflection --

24             MR. SHIPLEY:  No, no.  My point is --

25             THE COURT:  -- he said he would do it again.

```
 1                 MR. SHIPLEY:  It's the same interview.

 2                 The Washington Post reporter listened to the same

 3        audio that was taken by somebody interviewing him from the

 4        outside.

 5                 He never talked to The Washington Post reporter.

 6        That's not a comment he made to The Washington Post --

 7                 THE COURT:  No.  It says he said it on the phone

 8        at an evening vigil.

 9                 MR. SHIPLEY:  Right.  Not to The Washington Post

10        reporter.  This is what Ms. Akers and me were talking about.

11        And, you know, I could go on and on about the group that

12        stands outside DOC --

13                 THE COURT:  Who are those people?

14                 MR. SHIPLEY:  They're the group of people that

15        thinks that this is all a setup and nothing is what it

16        appears to be.

17                 THE COURT:  Well, they are now being glamorized,

18        like, in the media.

19                 MR. SHIPLEY:  Unfortunately, you know, within DOC,

20        the J6 defendants are all housed together, and you have a

21        little bit of a hive mentality.  And, you know, people from

22        the outside --

23                 THE COURT:  What do you mean by "hive mentality"?

24                 MR. SHIPLEY:  Common thoughts, common beliefs,

25        common themes run through their conversations.  They're
```

1    trapped all day with each other, and nobody else.  They are

2    not in general population.  They only have the point of view

3    that they share with each other and that they hear from

4    people from the outside they communicate with.

5            It's a somewhat, you know, one-dimensional view of

6    the outside and what's happening.  And so there is no --

7            THE COURT:  This egg each other on, you mean?

8            MR. SHIPLEY:  Feed off of each other, correct.

9            And so, you know, I am not going to speak to that.

10   You know, Mr. Oliveras is living that life right now; I am

11   not.  But I --

12           THE COURT:  Well, it may be a strong community for

13   him there of friends that he has found somebody; he is

14   estranged from his family.  I mean, he seemed like he was

15   living a fairly solitary life before he was put in D.C. Jail

16   with all of the J6 defendants.

17           MR. SHIPLEY:  Well, I think that is sort of

18   probably the last subject here; there is quite a

19   biographical sketch provided for you about him.  You know,

20   he has gone through many difficulties -- not just in his

21   childhood, up through his young adult life; getting married;

22   having a child, having that come apart, losing contact with

23   him; not having contact with his siblings; not having

24   contact with his mother.  And the end result was, you know,

25   a life in New Jersey, roughly, alone; working when he could;

1    and, you know, occupying himself in the news.

2                And now he is in a community --

3                THE COURT:  Which may not be the best influence

4    for him.

5                MR. SHIPLEY:  I'm sorry?

6                THE COURT:  Which may not be the best influence on

7    him.

8                MR. SHIPLEY:  I think it is, in that --

9                THE COURT:  Particularly now that the popular

10   press, like *The Atlantic* and other magazines are, like,

11   profiling them like they're heros of some kind.

12               MR. SHIPLEY:  There are certainly some far beyond

13   Mr. Oliveras in the way they're managing their press

14   coverage on the outside world.

15               THE COURT:  Interesting.

16               MR. SHIPLEY:  There are a handful who have been in

17   there -- going back, you know, three years -- that,

18   essentially -- you know, I will just say it out loud -- this

19   is not Mr. Oliveras -- there's a handful in there that have

20   turned it into a money-making opportunity.  They have

21   focused on it --

22               THE COURT:  How do they do that when they're

23   sitting in D.C. Jail?

24               I'm very curious.  I'm curious, Mr. Shipley.  How

25   do they turn it into a money-making opportunity?

1          MR. SHIPLEY:  They're raising money online,

2     outside.  You know, they're building up a persona that will

3     allow them to go on the lecture circuit, you know, later in

4     life and use their -- what they have built up in a certain

5     community of like-minded political supporters.  Yeah.

6          I am not -- I mean, it is what it is.  You know,

7     but it is something that has its roots in June of 2021 and

8     has gone forward almost unabated since.  Now --

9          THE COURT:  It has its roots in June of 2021.

10    What did I miss that happened in June 2021?

11         MR. SHIPLEY:  There was a letter -- and a lot of

12    people refer to it -- you know, famously referring to Martin

13    Luther King, Jr.'s letter from Birmingham Jail.  And there

14    was a particular letter written from DOC by a particular

15    defendant that got widespread circulation about the

16    nature -- the environment, the nature of the physical plan

17    in the early months was controversial --

18         THE COURT:  You are educating me.  I missed that

19    big event.

20         MR. SHIPLEY:  The letter?

21         THE COURT:  The letter that you are referring to.

22         MR. SHIPLEY:  Yeah.  It got widespread

23    circulation.  And six figures was raised by a particular

24    defendant based upon his complaints about the physical

25    conditions of the jail.  And several judges in this court

1    took a hand in getting those addressed, I believe yourself

2    being one of them.

3                THE COURT:  Did what?

4                MR. SHIPLEY:  The physical conditions.

5                I believe Judge Lamberth had --

6                THE COURT:  Oh, well, there were problems that our

7    then-acting marshal looked at --

8                MR. SHIPLEY:  Right.

9                THE COURT:  -- none of those conditions were at

10   CTF where the J6 defendants were housed; they were at

11   another part of D.C. Jail.

12               MR. SHIPLEY:  CTF.  Which were --

13               THE COURT:  Those conditions that were reported by

14   our acting marshal at the time, Lamont Ruffin, were not at

15   CTF, where the January 6th defendants are housed.

16               MR. SHIPLEY:  I don't think that's correct.  There

17   was -- I have seen video of --

18               THE COURT:  I have read the report.  So that was a

19   total disconnect and misconception of the report from the

20   marshal.

21               MR. SHIPLEY:  It was a letter written by a

22   particular defendant describing the conditions of

23   confinement that led to an outpouring of support that led to

24   financial contributions for January 6th legal defense, and

25   other things.

```
1              THE COURT:  Interesting.

2              But back to Mr. Oliveras.

3              MR. SHIPLEY:  A handful of individuals saw that,

4     and thought:  Well, I am stuck in here, I might as well turn

5     it to my advantage.

6              I think Ms. Akers can back this up.  I believe you

7     and others have taken, you know, a dim view of some of this

8     fundraising, you know, and focused on it as an opportunity

9     to profit on their celebrity.  And then, you know, once you

10    are a convicted defendant, now you are profiting from your

11    crime, you know --

12             THE COURT:  Well, yes.  And so when they have the

13    GoFundMe contributions from the public --

14             MR. SHIPLEY:  Right.  So --

15             THE COURT:  -- I think many judges on this court

16    are looking at those funds as a part of the restitution and

17    forfeiture that can be taken to help, you know, remedy the

18    shortfall between the restitution payments from defendants

19    and what the taxpayers are paying to remedy the damage to

20    the Capitol Building.

21             MR. SHIPLEY:  And we're going down this little

22    rabbit hole because I am trying to describe to you this

23    little community that now exists, and Mr. Oliveras has been

24    living among them for six months, and it leads to these

25    unmonitored, unauthorized, unapproved phone interviews.
```

1          I had to deal with this yesterday with a client

2     before Judge Cooper who gave kind of a benign interview but

3     said just enough to call his, you know, contrition into

4     doubt before Judge Cooper.  But, you know, the defendants,

5     such as Mr. Oliveras and others, are sought out, and

6     questions are put to them when they probably shouldn't be

7     talking to anybody, but it's -- it's like I said, sometimes

8     it feels like holding back the ocean with a bucket.

9          I can't really account for it.  There is no real

10    argument that I am prepared to make to dismiss it, discount

11    it.  And so if you are asking me why I am focusing on his

12    conduct outside, the answer is probably in that question.

13         So -- but I actually -- I do think that it is a

14    reasonable judgment to look at Mr. Oliveras's actual conduct

15    on that day, juxtapose it against his rhetoric -- even

16    Ms. Akers referred to it as "rhetoric."  You know, it's

17    hyperbolic, it's bombastic, it's offensive, but did he do

18    anything?

19         And I understand, you know, the incident at two

20    o'clock; I understand the incident at 4:25.  Both of them on

21    the spectrum, you know, relatively benign compared to what a

22    lot of other defendants involved in violence --

23         THE COURT:  I have heard testimony from the group

24    of MPD -- the CDU unit people walking through that crowd

25    and -- you know, testimony about how some of them thought

1    they weren't going to survive and get out of that mob alive.

2    It is not benign.

3            MR. SHIPLEY:  Yeah.  I think that -- the

4    Metropolitan Police are interesting; you know, I have

5    cross-examined several of them.  You know, they had never

6    trained on the Capitol grounds.  They had never worked with

7    Capitol Police in any kind of training facility.  So that

8    was all -- you know, they didn't know where they were going,

9    was their first big problem.  They were just going in the

10    direction of the crowd and, as a result, some of them,

11    including that unit, found themselves in a spot they'd

12    prefer not to have been in but, you know, it was too late to

13    avoid it at that point.  So, you know, they had an

14    interesting perspective.

15            But again, though, even at that point,

16    Mr. Oliveras -- you know, you can see him on the videotape;

17    he is not physically engaging with an officer.  He has not

18    put his hands on any officer.  He is not using any kind of

19    implement or weapon or item against any officer.  He is --

20    you know, he is part of the crowd, and the crowd is menacing

21    the officers.  I don't think any officer in that group was

22    injured in any way.  They were pretty well padded up; I

23    mean, that's sort of what they were prepared for, as a

24    general proposition.

25            So, you know, again, I think for Mr. Oliveras -- I

1    have certainly seen dozens of hours of videotape of dozens

2    of other defendants doing far worse conduct, using all kinds

3    of different, either, makeshift weapons or actual weapons

4    against police officers.  We just don't have that with

5    Mr. Oliveras.  And I think that's -- you know, that's

6    meaningful, and the Court should take it into consideration

7    in placing him on that spectrum of, you know, threat or

8    menace.  But, you know, his commentary is there, too.

9              So while my recommendation was based upon the

10   guideline calculation that I put forward, which the Court

11   has rejected, I still think that for Mr. Oliveras, given all

12   of the other factors -- all of the other mitigating factors

13   under 3553, which the Court is well aware of, I think he has

14   found a level of healthiness that is much different than

15   where he likely was back in 2021.

16             THE COURT:  And we are all happy to see that,

17   Mr. Oliveras.

18             MR. SHIPLEY:  He is combative.  I think he still

19   has a sense of righteousness about, you know, how he has

20   found himself here today and the choices he has made.  You

21   know, I don't --

22             THE COURT:  But he is no longer in the situation

23   that he was in when he was detained.

24             MR. SHIPLEY:  Right.

25             When we spoke shortly after the -- I don't want to

1    betray confidence.  But when we spoke shortly after his

2    decision to withdraw his plea, he understood that that

3    decision would likely end up with a longer sentence; so he

4    was prepared for that.  But there was a volitional mature

5    choice for him based upon the life he'd led and where he's

6    found himself at, at that juncture.  At that juncture, if

7    you look at his history, it was -- once again, just allow

8    myself to be steamrolled by the process, as it always

9    happened to me in the past, or just stand up, keep my head

10   up and my chin up, and go through the process.  That's where

11   we are.

12           THE COURT:  All right.  Mr. Oliveras, this is your

13   opportunity to speak directly to me, if you wish.

14           You can stand up and stand next to Mr. Shipley.

15           THE DEFENDANT:  Thank you, Your Honor.  I

16   appreciate the opportunity.

17           My comments will be brief.

18           I have mulled over this opportunity before you

19   this morning for some time now, and I have been back and

20   forth.

21           I have contemplated putting together a nice

22   history lesson for the courtroom and some things that you

23   and I can have an incredible dialogue about.  I chose not to

24   do that.

25           I will say this, despite -- I will revert back to

1    the trial.

2          Despite the theatrical charade, as I describe it,

3    as the prosecution's case against Mr. Oliveras being an

4    insurrectionist, right, and a domestic and international

5    terrorist --

6          THE COURT:  I don't think those words -- the word

7    "terrorist" was never used during your trial.

8          THE DEFENDANT:  Well, ATF -- or, excuse me -- CTF,

9    the FBI witness, right, that was his --

10          THE COURT:  Oh, from the unit.

11          THE DEFENDANT:  Correct.  Pardon me for not

12    recalling her title.

13          I will say, admittedly, as I have admitted to

14    Mr. Shipley in the past, I could have done a better job with

15    some of my commentary on my videos.

16          I think Your Honor will recall also in our last

17    major dialogue, before Mr. Shipley stepped in, in the plea

18    hearing I believe, I was very honest with Your Honor.  I am

19    always honest, and that will not change here today.

20          Yes, I said some pretty inflammatory things, there

21    is no question about that; and perhaps I chose the wrong

22    time to state those things.  But if I were to step before

23    you today and attempt to offer you some fabricated,

24    remorseful rendition to try and gain favoritism from Your

25    Honor to precipitate a lesser sentence than the Court maybe

1    would see it necessary, I'm not going to do that; that would

2    be blowing smoke across Your Honor's bow.  And I

3    understand -- and I know for a fact that Your Honor's

4    bullshit meter is one of the best, okay.  So that stuff is

5    not going to come from me.

6          I will say this now.  To that day of January 6th,

7    a lot of the video the prosecution presented to the Court,

8    to the jury, to Your Honor, to everyone paying attention and

9    in the courtroom during the trial -- was not in full; it was

10   very select.

11         If I may just take the moment, Ms. Akers

12   references the "melee" there at the end on the West Terrace

13   that Mr. Oliveras was involved in and very active in when

14   his back -- when his back was to the police line, Your

15   Honor -- not facing the police line, when his back was to

16   the police line and the crowd rushed the police line right

17   at Mr. Oliveras, Mr. Oliveras did not engage in any

18   interactive, forceful battles with the police.

19         As soon as that engagement occurred, I did my best

20   to hand my flag to the police.  First I held it straight up

21   in the air so no one could grab it as a weapon, and then I

22   rendered it back to the police.  It got ripped from me --

23   the flag came off.  I then -- when I made myself away from

24   that crowd, I ran down the lower terrace, around to the back

25   of the police line, I offered my flagpole to the police so

1    no one could use it as a weapon moving forward.

2            In addition, there were three other instances, or

3    four, where I was engaged with law enforcement personnel in

4    a helpful manner.  One, I was addressing an injured person.

5    And I didn't want to see the officers -- because they were

6    clearing a section of people and I didn't want to see these

7    officers grab somebody by the neck who is injured and drag

8    them and cause further injury and, perhaps, trouble

9    themselves in the process.

10           There is video of me telling people to stop

11   throwing water bottles at the police.  That video just

12   miraculously blew away in the wind.

13           There is video, CCT -- should be body cam and CCTV

14   footage of me diffusing a situation where a gentleman is

15   physically -- or, excuse me -- verbally with -- profanely

16   addressing an officer, several of them.  I diffused that

17   situation.  I tapped the man on the shoulder, and I said:

18   You don't have a quarrel with them.  You have no fight with

19   these guys, step it aside; and the man moved on.

20           So, again, I realize that even though I expressed

21   some thoughts and used some pretty choice language that

22   day -- and, again, I -- I could have done a better job in --

23   in deciding whether to use that language or not.  At the

24   same time, the case put forth in your court, portraying me

25   as a violent individual with intent to -- drove to

1    Washington, D.C., to storm the Capitol -- well, I don't know

2    where everyone else comes from, but the day when we

3    prosecute a red-blooded American over a fucking traitor

4    there is something wrong in this nation, right?

5            I am not a U.S. citizen.  I am an American

6    citizen.  And I know Your Honor knows what I am saying.  I

7    know you CC [sic] in all of that stuff.

8            So I just want to say, Your Honor, I am not a man,

9    individual, crook, rioter that I am portrayed and was

10   portrayed in this trial and then additionally today, in this

11   sentencing hearing, by the prosecution.

12           I will sum up by saying:  I will accept with no

13   qualms any sentence Your Honor levies down to me today, with

14   no issues, with no animosity.  This I have expressed to

15   Mr. Shipley several times in the past also.  Whether it be

16   3, 4, 5, or 17 years.  I don't care.

17           When I showed up in Washington, D.C. that day -- I

18   am not going to lie, I am not going to apologize for being

19   there to support my commander-in-chief, Donald J. Trump.  I

20   am not going to -- I am not going to run from that.  Again,

21   that would be disingenuous.

22           I never expected to be at the Capitol that day,

23   never expected to be at the Capitol.  And, yes, it works out

24   perfectly that some of those things I said online and in

25   social media there just happen to fall in line and coincide

1    with the way things planned out.

2              But I will reiterate Mr. Shipley's comments.  Your

3    Honor, if -- and I will preface by saying, if we, those

4    rioters, wanted to take that building, I mean, we could

5    have.  As a whole, that could have happened, right?  It

6    didn't.

7              I didn't engage in any physical activity.  I

8    didn't engage in any assaults.

9              And I will -- now that I am reminded, I will

10   revert back and say:  Down on the lower portion of that West

11   Terrace, before I made my way up, I leaned on a pile of

12   individuals with officers.  I didn't know how many were

13   under there.  I addressed the officer and I said:  How many

14   do you guys have under there?

15             He said:  I don't know.

16             Yes, ma'am.  Yes, ma'am.

17             I said:  Which way do you want to take them out?

18             He said:  I don't know.  I don't know.

19             And I leaned down and I helped him because this

20   crowd -- this pile was doing this (indicating).  And there

21   was people walking by; and people were going to get

22   trampled, and it was going to be worse.  That's a fact, Your

23   Honor.  I would not stand here and make up something --

24   fabricate something like that to you.

25             The truth is, I am the humanitarian.  I am the

1    kid -- I am the guy that stops and helps teenage females

2    stuck in a left lane of a roadway -- when everybody is

3    cussing and honking their horns, I am the one that gets out

4    and pushes them off of the road, right?

5         I am the guy that stops and picks up the veteran

6    standing at the bus stop in the pouring rain when my vehicle

7    is spewing coolant, and I don't have a dollar to replace it.

8    And I don't have a dollar for my stomach to eat, right?  But

9    I stop and I pick that guy up, and I take him 10 miles where

10   he has got to go.  I am a humanitarian.

11        I am not an insurrectionist.  I am not a rioter.

12   I am not a terrorist, the domestic or the international

13   type.

14        There is -- a day will dawn when the truth of

15   January 6th rears its ugly head.  There will.  There will

16   come a day.  And there are a lot of folks who will eat crow

17   when that day dawns.  And there are a lot of -- truth will

18   come out that will verify what I have stated to Your Honor

19   here personally as it relates to me in this case.

20        And so, again, I don't care what sentence you levy

21   on me, Your Honor.  3, 4, 5, or 17 years, it doesn't matter.

22   Because I know in my heart of hearts, when I showed up that

23   day -- I apologize.

24        If I may.

25        When I -- when I decided to ascend to the West

1    Terrace, it was out of sheer needing to know what was going

2    on up on that terrace.  From that lower elevation, you can't

3    visual -- you can't make eye contact with the entrances, the

4    doors themselves.  All you can see is massive humanity.

5         I had to know what was going on up there.  I

6    scaled, and I saw what was going on.  I had no intentions of

7    going in that building.  I was absolutely -- I was

8    surprised, minimally, that those doors were open, and that

9    that occurred.  When I walked in those doors for the first

10   time, I was like a deer in headlights that I actually was

11   in.  I peeked down the hallway, both ways, just like that

12   (indicating).

13        Yes, I walked down the Rotunda.  Yes, you heard my

14   comments on my videos.  Granted, I can't take that back.  I

15   can certainly do better with it next time.  But I just want

16   Your Honor to know that in here (indicating), who I really

17   am is not the criminal that's been outlined in this

18   courtroom.

19        And with that, I appreciate everyone listening,

20   and I appreciate the opportunity to address the Court.

21   Thank you, Your Honor.

22        THE COURT:  You can stay right where you are.

23        THE DEFENDANT:  Yes, ma'am.

24        THE COURT:  I am going to explain the sentence I

25   am going to impose and impose sentence.

1          I would have liked to have heard, Mr. Oliveras,

2     that you do appreciate the damage that was done on

3     January 6, 2021.

4          THE DEFENDANT:  Oh.  No question.  No question.

5     No question.

6          THE COURT:  Not just to people who'd always

7     expected and assumed there would be a peaceful transition of

8     power, but to the extent that America does represent a model

9     of democracy around the world, how much damage it did to us

10    as a model democracy around the world.

11         THE DEFENDANT:  I cannot disagree with Your Honor,

12    and that's not something that I intentionally left out.  I

13    will say that my public speaking career is very minimal.  So

14    I am --

15         THE COURT:  That is not what I have heard in some

16    of these quotes from you.

17         THE DEFENDANT:  Oh, public speaking.  That's --

18    that's easy hiding behind the keyboard, Your Honor.

19         THE COURT:  I am not sure I understand what you

20    are saying.  But all I know is that --

21         THE DEFENDANT:  Sure.

22         THE COURT:  -- everybody wants to be the hero in

23    their own story.  And you talking about how you help people

24    on the road and gave people rides -- you call it being a

25    humanitarian.  People want to be a hero --

1          THE DEFENDANT:  Sure.

2          THE COURT:  -- in their own story.

3          And I have to tell you the basic fundamental fact:

4   You were no hero on January 6, 2021, you were engaged in

5   criminal conduct.

6          THE DEFENDANT:  Oh.  That's fine.  That's fine.

7   That's fine.

8          THE COURT:  Whether you believe that or not,

9   that's the fact --

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  -- under our legal system.

12          THE DEFENDANT:  The real insurrection took place

13   inside, not outside.

14          THE COURT:  Well, it's clear that's what you

15   believed then and you still believe.

16          One of the things I have to consider in fashioning

17   an appropriate sentence in your case, Mr. Oliveras, is the

18   purposes of sentencing.  I do like to review the purposes of

19   sentencing at every sentencing because I think it's

20   important for defendants to hear this, as the overarching

21   consideration for every sentencing judge -- not only to

22   ensure that I impose a sentence that's sufficient but not

23   greater than necessary to comply with the purposes of

24   sentencing, but what those purposes actually are -- which

25   includes:  The need for the sentence to reflect the

1    seriousness of the offense; promote respect for the law;

2    provide just punishment; deter criminal conduct generally by

3    anybody who might be thinking:  That looked fun, let's do

4    that again.

5         You have to deter criminal conduct so people that

6    get the idea --

7         THE DEFENDANT:  I'm thankful that I don't apply to

8    that criteria.

9         THE COURT:  -- if you do that, you are going to be

10    punished.

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Also to protect the public from future

13    crimes by you, Mr. Oliveras, and to promote rehabilitation.

14         So in considering all of those purposes, I also

15    have to consider the nature and circumstances of the

16    offense, your history and characteristics, the types of

17    sentences available, the need to avoid unwarranted sentence

18    disparities among defendants with similar records found

19    guilty of similar conduct, and the need to provide any

20    restitution.

21         I am going to begin with the restitution amount

22    here.  The defendant doesn't contest the $2,000 restitution

23    sought by the government; that is generally the amount of

24    restitution that the government has been requesting among

25    defendants, whether convicted at trial or by plea, of felony

 1    offenses.

 2           Based on the record in front of me, that appears

 3    to be the best available estimate of damages that would be

 4    fairly imposed on this defendant for the amount of damages

 5    of almost $3 million that the building incurred from all of

 6    the events that occurred on January 6, 2021.  So I will

 7    impose and order a restitution amount of $2,000, pursuant to

 8    18 U.S.C. Section 3663(a)(1)(A).

 9           Regarding the nature and circumstances of the

10    offense, as we have already detailed at this hearing -- both

11    through the government's presentation and in other

12    discussion -- this was among the more serious offenses that

13    have been prosecuted in this District and, literally,

14    occurred in this country with the disruption of the peaceful

15    transfer of power.

16           Mr. Oliveras, your posts beforehand were

17    insightful about what you were anticipating and anticipating

18    violence on that day, saying:  It was time for war on

19    January 6th.

20           You started using this description that you used

21    at the time on January 6th, and captured yourself on your

22    own videos, of finding members of Congress; ripping them out

23    of their chairs by their hair and dragging them down the

24    steps -- that you repeated, in terms of what, as I said, you

25    videotaped yourself saying on January 6th.

1          You went to the rally of the former President and

2    then went down to the Capitol Building.  We have already

3    gone into some detail about what happened there.

4          What stands out to me is that you engaged in two

5    separate physical confrontations with law enforcement in two

6    different areas on the Capitol grounds; both with the riot

7    gear MPD CDU officers who were trying to help -- having been

8    called in by the overwhelmed Capitol Police -- trying to get

9    to the Capitol, when you were helping other rioters in this

10   huge mob trying to stop them, and shouting at them.  That

11   was one time.

12         Then the other physical altercation at about 4:20

13   on the West Plaza, where you got into a very violent scrum

14   with police officers because you refused to follow their

15   directions and leave the Capitol grounds.

16         THE DEFENDANT:  That's incorrect, Your Honor.

17   Respectfully to Your Honor, that's --

18         THE COURT:  But I have seen the videos, and I have

19   heard the evidence.

20         THE DEFENDANT:  We haven't seen all of the video,

21   though, Your Honor.

22         THE COURT:  Uh-huh.

23         THE DEFENDANT:  I didn't attack the police --

24         THE COURT:  You also entered the Capitol on two

25   separate occasions and tried to enter a third time, all

1    while alarms were blaring; there was broken glass all around

2    the Senate Wing Doors; the windows were broken.  It was

3    clear that nobody in his right mind would know that they

4    were not lawfully allowed to be there.

5         And then, when you were inside the Capitol

6    Building in various places, you were walking around saying,

7    "Where are the fucking traitors?  Drag them out by their

8    fucking hair.  Where are the fucking traitors?" -- referring

9    to members of Congress -- all normalizing that this conduct

10   of trying to disrupt the legitimate business of Congress was

11   something that should be encouraged and normalized by all of

12   these rioters who were engaged in a riot at the U.S.

13   Capitol.

14        Then, when you were not allowed in the third time

15   into the Capitol, instead of -- having gotten into an

16   altercation with the police on the Upper West Plaza, you

17   didn't leave the Capitol grounds.  Even after all of that,

18   and having been shoved out of the Capitol by police twice,

19   you stuck around.

20        You joined a whole group of -- this mob, looking

21   at a pile of media equipment that was being damaged, saying:

22   That's what happens when the fucking news -- fake news shows

23   up at a patriot rally.

24        People who were there were not patriots that

25   day --

1          THE DEFENDANT:  There were many, Your Honor.

2          THE COURT:  -- at all.

3          And I know -- and none of them who were there that

4     day, trespassing and disrupting the peaceful transfer of

5     power, are patriots.  It was very unAmerican what was

6     happening on January 6, 2021, at the Capitol.

7          THE DEFENDANT:  Perhaps I was mistaken when we --

8     when I was under the impression there were permits to be

9     there, Your Honor.

10         THE COURT:  You were mistaken.

11         THE DEFENDANT:  Perhaps.

12         THE COURT:  Then, after January 6, 2021, you

13    bragged about what you did and told people you would do it

14    again.  And you said that again and again.

15         You said it was a badge of honor to be where you

16    are, to be arrested and charged in connection with the

17    attack on the Capitol on January 6th.  You said:  Nobody is

18    ever going to get you to admit, I'm sorry; and you still

19    believe you didn't do anything wrong, and you would do it

20    again.

21         Because you would do it again is a very serious

22    thing to hear from a defendant and is something I will take

23    into account in deciding where an appropriate sentence in

24    your case is.

25         Regarding your history and characteristics, you

1    have lived in New Jersey; you have worked as a commercial

2    carpenter for most of your life.  You do appear to be

3    estranged from your family members, including your siblings,

4    your own children.  It's unfortunate that even during this

5    period of time where you have been incarcerated that you

6    haven't tried to remedy some of your alienation from your

7    family members.

8            You have no criminal history.  But I have to say,

9    while you were on pretrial release in this case, you had

10   issues with being compliant with your pretrial release

11   conditions; showing as if what occurred on January 6, 2021,

12   wasn't enough of a showing of disrespect for the law,

13   failing to comply with pretrial release conditions was

14   another way of showing lack of respect for the law.

15           Regarding the types of sentences available, the

16   guidelines recommend a period of incarceration; I think that

17   is amply reasonable in this case, both to deter any future

18   malcontents who are disappointed with election results, to

19   discourage them from disrupting the peaceful transfer of

20   power --

21           THE DEFENDANT:  I wasn't disappointed, Your Honor.

22           THE COURT:  -- and also to specific deterrence

23   here, given your repeated comments including, before the

24   Court, that you are not regretful about what you did or

25   sorry and would do it again.

1    Regarding the need to avoid unwarranted sentence

2    disparities, as I have already said in granting the

3    government's motion for an upward departure, his guidelines

4    range does not adequately capture all of the criminal

5    conduct that he committed on January 6th, and so an upward

6    departure is warranted here.

7    In determining how much of an upward departure in

8    this case, the government has cited the comparators of

9    *Gillespie* and *Sturgeon*.  I do find looking at comparators

10   has some probative value but, ultimately, has some limited

11   utility.

12   About *Gillespie*, this is a defendant for whom I

13   sentenced to 68 months' incarceration.  But, to my mind, he

14   did participate in more direct violence against officers

15   than this defendant because he used a stolen riot shield and

16   hands to directly pull an officer out of a police line and

17   into the mob, at enormous danger to the officer.  He also

18   testified under oath at his trial and gave false testimony

19   but, at the same time, he never got into the Capitol even

20   once.  But I do find that Mr. Gillespie's violence, use of

21   the heavy riot shield, the effort to pull an isolated

22   individual police officer and pulling him into the mob,

23   which was life-threatening, does make his conduct more

24   egregious than the defendant's.

25   With respect to *Sturgeon*, 21-CR-91, who was

1    sentenced by another judge to 72 months' incarceration, I do

2    find that his conduct as described by the government even --

3    and forcibly grabbing a bike rack and throwing it against a

4    police line, injuring at least one of the officers, was also

5    more significant than this particular defendant.

6         So I will upwardly depart, as a result of the

7    significant disruption of a governmental function caused by

8    the defendant's criminal conduct, from the guideline's range

9    of 37 to 46 months' incarceration.  I do plan to depart

10   upwards, and would impose the same sentence with the upward

11   departure under 5K2.7, with an upward variance for the same

12   reasons that are outlined in 5K2.7 and consideration of the

13   3553(a) factors.

14        Based on my consideration of these and other

15   factors, I will now state the sentence to be imposed on

16   Mr. Oliveras.

17        Pursuant to the Sentencing Reform Act of 1984 and

18   in consideration of the provisions of 18 U.S.C. Section

19   3553(a), as well as the advisory sentencing guidelines:  It

20   is the judgment of the Court that you, Michael Oliveras, are

21   hereby committed to the custody of the Bureau of Prisons for

22   a term of 60 months' incarceration on Counts 1 and 3;

23   12 months' incarceration on Counts 4 and 5; and 6 months'

24   incarceration on Counts 6 and 7, all of which will run

25   concurrently.

1          You are further sentenced to serve a term of 36

2   months, or 3 years, supervised release as to Counts 1 and 3;

3   12 months supervised release as to Counts 4 and 5, again, to

4   be served concurrently.

5          In addition, you are ordered to pay a special

6   assessment of $270 in accordance with 18 U.S.C. Section

7   3013.

8          While on supervision, you shall abide by the

9   following mandatory conditions as well as all discretionary

10  conditions recommended by the probation office in Part D,

11  Sentencing Options, of the presentence report, which are

12  imposed to establish the basic expectations for your conduct

13  while on supervision.

14         The mandatory conditions include:

15         One, you must not commit another federal, state,

16  or local crime.

17         Two, you must not unlawfully possess a controlled

18  substance.

19         Three, you must refrain from any unlawful use of a

20  controlled substance and submit to one drug test within

21  15 days of placement on supervision and at least two

22  periodic drug tests thereafter, as determined by the Court.

23         Four, you must cooperate in the collection of DNA

24  as directed by the probation officer.

25         Five, you must make restitution in accordance with

1    18 U.S.C. Section 3663 and 3663(a) or any other statute

2    authorizing a sentence of restitution.

3          You shall comply with the following special

4    conditions:

5          You are ordered to make restitution to the

6    Architect of the Capitol in the amount of $2,000.  The Court

7    determined you do not have the ability to pay interest and,

8    therefore, waives any interest or penalties that may accrue

9    on the balance.  Restitution payments shall be made to the

10   Clerk of the Court for the U.S. District Court, District of

11   Columbia, for disbursement to the Architect of the Capitol,

12   Office of the Chief Financial Officer, Ford House Office

13   Building, Room H2-205B, Washington, D.C. 20515, in the

14   amount of the loss of $2,000.

15         You must provide the probation officer access to

16   the requested financial information and authorize release of

17   any financial information.  The probation office may share

18   financial information with the U.S. Attorney's Office.

19         The Court finds you do not have the ability to pay

20   a fine and, therefore, waives imposition of a fine in this

21   case.

22         The financial obligations are immediately payable

23   to the Clerk of the Court for the U.S. District Court,

24   333 Constitution Avenue Northwest, Washington, D.C. 20001.

25   Within 30 days of any change of address, you shall notify

1    the Clerk of the Court of the change until such time as the

2    financial obligation is paid in full.

3           The probation office shall release the presentence

4    investigation report to all appropriate agencies, which

5    includes the U.S. Probation Office in the approved district

6    of residence in order to execute the sentence of the Court.

7    Any treatment agencies shall return the presentence report

8    to the probation office upon the defendant's completion or

9    termination from treatment.

10          You have the right to appeal your convictions of

11   guilt to the U.S. Court of Appeals for the D.C. Circuit.

12          Pursuant to 18 U.S.C. Section 3742(a), you also

13   have the statutory right to appeal your sentence to the

14   D.C. Circuit under certain circumstances, including if you

15   think the sentence was imposed in violence of law or as a

16   result of an incorrect application of the sentencing

17   guideline or is more severe than the maximum established in

18   the guideline range.  You may also appeal your sentence if

19   you believe you received ineffective assistance of counsel

20   at sentencing.

21          Pursuant to 28 U.S.C. Section 2255, you also have

22   the right to challenge the conviction entered or sentence

23   imposed to the extent permitted by that statute.

24          Any notice of appeal must be filed within 14 days

25   of the entry of judgment or within 4 days of the filing of a

1    notice of appeal by the government.  If you are unable to

2    afford the cost of an appeal, you may request permission

3    from the Court to file an appeal without cost to you.  On

4    appeal, you may also apply for court-appointed counsel.

5            Are there any objections to the sentence imposed

6    not already noted on the record from the government?

7            MS. AKERS:  No, Your Honor.

8            THE COURT:  And, Mr. Shipley?

9            MR. SHIPLEY:  Not other than already stated.

10           THE COURT:  I'm sorry, I didn't hear you.

11           MR. SHIPLEY:  Not other than already stated.

12           THE COURT:  All right.  Do you have a

13   recommendation that you want to make for Bureau of Prisons'

14   designated facility?

15           MR. SHIPLEY:  Can I ask for two things, Your

16   Honor.

17           One, I would like the Court to recommend RDAP for

18   Mr. Oliveras.  I think some of his historical problems might

19   be related to --

20           THE COURT:  Yes.  I will recommend RDAP.

21           And do you want any other drug abuse treatment

22   program available?

23           MR. SHIPLEY:  Yes, Your Honor.

24           THE COURT:  I will make that recommendation.

25           MR. SHIPLEY:  And he intends to relocate away from

1    the New Jersey area post release.  He has his eye on

2    Georgia, so I would ask for FCI Jesup in Georgia.

3            THE COURT:  FCI Jesup?

4            MR. SHIPLEY:  Correct.

5            THE COURT:  Do you know how to spell that?

6            MR. SHIPLEY:  J-E-S-S-U-P [sic].

7            THE COURT:  All right.  I will make that

8    recommendation.

9            All right.  With that, you are all excused.

10           (Whereupon, the proceeding concludes, 12:47 p.m.)

11                        * * * * *

12                      **CERTIFICATE**

13

14           I, ELIZABETH DAVILA, RPR, FCRR, do hereby certify

15    that the foregoing constitutes a true and accurate

16    transcript of my stenographic notes, and is a full, true,

17    and complete transcript of the proceedings to the best of my

18    ability.

19           This certificate shall be considered null and void

20    if the transcript is disassembled and/or photocopied in any

21    manner by any party without authorization of the signatory

22    below.

23           Dated this 11th day of October, 2024.

24           /s/ Elizabeth Davila, RPR, FCRR
             Official Court Reporter
25

## $

**$10** [1] - 32:7
**$100** [1] - 32:5
**$150,000** [1] - 32:4
**$2,000** [5] - 50:13, 90:22, 91:7, 99:6, 99:14
**$25** [1] - 32:6
**$270** [2] - 32:8, 98:6

## /

**/s** [1] - 102:24

## 1

**1** [27] - 16:3, 17:15, 18:7, 18:8, 18:15, 19:2, 23:6, 23:10, 29:19, 29:24, 30:9, 30:11, 30:23, 31:7, 31:9, 31:10, 31:12, 31:13, 31:20, 32:1, 32:2, 50:19, 61:24, 62:11, 97:22, 98:2
**1.5** [1] - 31:15
**10** [2] - 18:19, 86:9
**10-year** [1] - 69:23
**100** [1] - 47:6
**1002** [1] - 21:8
**1005** [1] - 21:8
**1006** [1] - 21:8
**1009** [1] - 21:8
**104** [2] - 4:24, 15:16
**105** [2] - 4:25, 28:4
**106** [1] - 5:2
**10:24** [1] - 1:5
**11** [5] - 36:5, 62:7, 64:19, 64:23
**11(f** [4] - 12:19, 12:23, 13:13, 15:23
**11-level** [2] - 61:23, 62:14
**110** [1] - 5:3
**1100** [1] - 1:13
**111** [2] - 7:7, 24:6
**111(a** [6] - 19:23, 20:11, 20:15, 24:3, 24:20, 38:10
**111(a)** [1] - 20:12
**111(a)(1** [1] - 3:16
**111(a)(1)** [1] - 19:13
**11th** [1] - 102:23
**12** [7] - 24:21, 31:25, 44:21, 50:17, 50:19, 97:23, 98:3
**126** [1] - 5:2
**127** [2] - 5:3, 24:2
**129** [2] - 5:14, 5:15

## 2

**12:47** [1] - 102:10
**14** [18] - 5:5, 18:21, 23:9, 29:20, 30:20, 30:21, 31:6, 31:8, 31:11, 61:24, 62:11, 62:25, 63:10, 63:11, 63:12, 63:23, 64:11, 100:24
**14-point** [1] - 30:8
**15** [4] - 61:23, 61:25, 62:12, 98:21
**15,000** [1] - 32:4
**1512** [4] - 61:21, 62:19, 62:20, 63:22
**1512(c)(2** [5] - 3:10, 35:9, 37:22, 46:18, 49:6
**16** [2] - 3:5, 70:10
**17** [2] - 84:16, 86:21
**1752(a)(1** [1] - 3:18
**18** [17] - 3:9, 3:14, 3:15, 3:18, 7:7, 19:13, 22:19, 24:20, 29:10, 46:17, 61:19, 61:25, 91:8, 97:18, 98:6, 99:1, 100:12
**19** [1] - 25:5
**1984** [1] - 97:17
**1996** [1] - 17:6
**1998** [1] - 17:7
**1B1.3(a** [1] - 26:25

## 2

**2** [12] - 3:8, 3:18, 17:13, 26:4, 29:25, 31:6, 31:8, 31:11, 37:1, 47:7
**2,000** [1] - 40:18
**2-by-4** [1] - 40:25
**20** [3] - 29:24, 31:7, 40:11
**20001** [1] - 99:24
**202** [1] - 1:14
**2020** [2] - 47:25, 52:1
**2021** [17] - 25:24, 34:3, 46:22, 47:11, 48:25, 49:1, 70:6, 74:7, 74:9, 74:10, 79:15, 88:3, 89:4, 91:6, 94:6, 94:12, 95:11
**2023** [5] - 3:5, 4:11, 4:12, 5:7, 19:10
**2024** [5] - 1:5, 4:14, 28:5, 70:10, 102:23
**20515** [1] - 99:13
**20530** [1] - 1:14
**20s** [1] - 17:6
**21** [1] - 31:18
**21-738** [2] - 1:3, 2:3

## 3

**21-CR-91** [1] - 96:25
**22** [1] - 64:13
**2255** [1] - 100:21
**228-1341** [1] - 1:19
**23** [8] - 10:18, 11:5, 11:21, 13:2, 15:4, 15:17, 15:19, 16:20
**231** [3] - 19:25, 22:19, 38:10
**231(a)(3** [2] - 3:14, 29:10
**24** [4] - 50:18, 50:23, 61:19, 61:25
**25** [2] - 50:3, 62:13
**27** [1] - 47:25
**28** [1] - 100:21
**2:00** [4] - 24:21, 25:25, 26:3, 43:22
**2:22** [1] - 54:19
**2A2.2** [13] - 18:14, 18:16, 18:20, 18:24, 19:11, 20:2, 23:2, 23:6, 23:10, 23:18, 28:15, 29:15, 29:18
**2A2.4** [4] - 18:11, 18:14, 18:18, 23:2
**2A2.4(c)(1** [1] - 18:16
**2B2.3** [1] - 30:1
**2B2.3(c)(1** [1] - 30:4
**2J1.2** [6] - 16:10, 49:19, 62:24, 63:2, 63:3, 63:8
**2K2.7** [1] - 32:16
**2X1.1** [1] - 30:6
**2X5.1** [1] - 18:9

## 3

**3** [29] - 1:5, 5:7, 17:16, 18:13, 18:15, 19:10, 23:6, 24:9, 24:14, 29:19, 31:1, 31:21, 32:1, 32:2, 50:12, 50:19, 63:7, 63:20, 63:23, 63:24, 64:1, 64:7, 64:12, 84:16, 86:21, 91:5, 97:22, 98:2
**3-level** [1] - 61:20
**30** [3] - 15:15, 16:1, 99:25
**3013** [1] - 98:7
**30s** [1] - 36:7
**30th** [1] - 3:11
**333** [1] - 99:24
**353-0521** [1] - 1:14
**3553** [1] - 79:13
**3553(a** [5] - 34:13, 45:17, 50:7, 97:13, 97:19

**3553(a)** [1] - 51:10
**36** [1] - 98:1
**3663** [1] - 99:1
**3663(a** [1] - 99:1
**3663(a)(1)(A)** [1] - 91:8
**37** [5] - 31:20, 36:14, 50:12, 50:15, 97:9
**3742(a** [1] - 100:12
**39** [8] - 10:19, 11:5, 11:22, 13:2, 15:4, 15:17, 15:19, 16:21
**3A1.2** [1] - 29:22
**3D1.4(a)** [1] - 31:16

## 4

**4** [14] - 17:18, 24:9, 29:25, 30:2, 31:23, 31:25, 32:3, 50:17, 50:20, 84:16, 86:21, 97:23, 98:3, 100:25
**40** [1] - 3:20
**40s** [1] - 36:8
**410** [4] - 12:19, 12:23, 13:13, 15:22
**43** [1] - 27:21
**45** [1] - 8:13
**46** [3] - 31:20, 36:15, 97:9
**46-month** [1] - 50:12
**473** [1] - 28:5
**480** [1] - 28:5
**4:20** [4] - 25:7, 26:1, 27:9, 92:12
**4:25** [5] - 7:9, 43:22, 43:24, 43:25, 77:20
**4:30** [1] - 69:18

## 5

**5** [11] - 17:18, 29:25, 31:23, 31:25, 32:3, 50:17, 50:20, 84:16, 86:21, 97:23, 98:3
**5104(e)(2)(D** [1] - 3:21
**513** [1] - 21:10
**518** [1] - 21:10
**52** [3] - 15:25, 16:1, 23:5
**56** [2] - 5:5, 26:4
**57** [8] - 37:3, 37:7, 38:3, 50:2, 61:18, 61:22, 62:13, 63:3
**5K2.7** [22] - 32:24, 34:18, 34:21, 34:24, 35:12, 35:19, 35:25, 36:10, 36:17, 36:21, 38:19, 38:23, 45:17, 45:22, 46:4, 46:8,

46:20, 49:16, 61:15, 64:23, 97:11, 97:12
**5th** [1] - 53:8

## 6

**6** [21] - 17:22, 25:24, 29:20, 31:11, 34:3, 46:22, 47:10, 49:1, 50:17, 50:22, 50:23, 63:4, 70:6, 88:3, 89:4, 91:6, 94:6, 94:12, 95:11, 97:23, 97:24
**60** [4] - 16:4, 16:8, 25:6, 97:22
**61** [2] - 16:5, 16:8
**68** [8] - 36:9, 36:15, 36:16, 37:8, 37:25, 50:10, 51:16, 96:13
**6th** [29] - 32:20, 33:14, 36:1, 48:16, 49:10, 51:15, 51:22, 52:10, 52:14, 53:3, 55:9, 55:15, 57:9, 57:15, 58:3, 59:2, 59:18, 59:22, 65:12, 65:14, 75:15, 75:24, 82:6, 86:15, 91:19, 91:21, 91:25, 94:17, 96:5

## 7

**7** [4] - 4:12, 17:22, 64:13, 97:24
**71** [8] - 37:4, 37:7, 38:3, 50:2, 61:18, 61:22, 62:13, 63:3
**72** [1] - 97:1
**72-month** [1] - 38:11
**745** [1] - 1:18
**75-1** [1] - 5:7

## 8

**8** [9] - 61:20, 63:7, 63:12, 63:20, 63:23, 63:25, 64:6, 64:12
**808** [1] - 1:19
**808Shipleylaw@ gmail.com** [1] - 1:19

## 9

**90** [1] - 5:11
**96734** [1] - 1:18
**9:30** [1] - 2:16

## A

**a.m** [1] - 1:5

**abetted** [2] - 27:3, 28:18
**abide** [1] - 98:8
**ability** [5] - 13:22, 49:3, 99:7, 99:19, 102:18
**able** [2] - 4:2, 53:15
**absolutely** [2] - 59:20, 87:7
**abuse** [1] - 101:21
**accept** [3] - 16:21, 51:9, 84:12
**acceptance** [1] - 37:15
**access** [2] - 53:16, 99:15
**accompanied** [1] - 59:7
**accordance** [2] - 98:6, 98:25
**accordingly** [2] - 29:12, 29:17
**account** [13] - 33:8, 33:17, 33:18, 34:5, 34:6, 34:11, 38:23, 49:14, 49:15, 49:21, 61:16, 77:9, 94:23
**accounted** [1] - 44:15
**accrue** [1] - 99:8
**accuracy** [2] - 10:22, 11:12
**accurate** [3] - 39:6, 39:17, 102:15
**accustomed** [1] - 22:8
**acknowledged** [1] - 64:8
**Act** [2] - 4:3, 97:17
**acting** [3] - 40:19, 75:7, 75:14
**Action** [1] - 1:3
**action** [3] - 27:25, 48:2, 68:2
**actions** [7] - 27:4, 28:6, 49:9, 51:14, 54:2, 59:17, 65:19
**active** [2] - 46:21, 82:13
**activity** [2] - 47:4, 85:7
**actors** [2] - 43:13, 43:14
**acts** [2] - 27:2, 48:24
**actual** [5] - 20:16, 24:4, 77:14, 79:3
**add** [4] - 19:4, 32:25, 63:25, 64:15
**added** [1] - 29:20
**addition** [6] - 12:23, 15:18, 22:14, 31:12, 83:2, 98:5
**additional** [1] - 31:14
**additionally** [1] -

84:10
**address** [6] - 16:3, 34:17, 43:25, 65:16, 87:20, 99:25
**addressed** [2] - 75:1, 85:13
**addresses** [1] - 16:2
**addressing** [2] - 83:4, 83:16
**adequately** [5] - 33:6, 33:16, 47:12, 49:14, 96:4
**adjusted** [1] - 62:12
**adjustment** [1] - 29:21
**administration** [3] - 62:8, 63:17, 64:1
**admissions** [4] - 12:24, 14:4, 15:1, 24:18
**admit** [2] - 44:16, 94:18
**admits** [1] - 13:1
**admitted** [3] - 24:20, 25:24, 81:13
**admittedly** [1] - 81:13
**admonished** [1] - 44:4
**adult** [1] - 72:21
**advance** [1] - 13:5
**advantage** [2] - 4:1, 76:5
**advice** [1] - 42:23
**advised** [1] - 44:3
**advisory** [5] - 8:3, 20:7, 31:19, 97:19
**affected** [1] - 46:13
**afford** [1] - 101:2
**aftermath** [2] - 34:21, 45:7
**afternoon** [2] - 7:9, 27:12
**agencies** [2] - 100:4, 100:7
**agent** [1] - 53:15
**agents** [1] - 45:8
**aggravated** [15] - 18:17, 18:20, 18:24, 19:1, 20:3, 20:10, 23:3, 23:7, 23:11, 23:18, 23:23, 28:16, 29:11, 29:14, 51:10
**aggravating** [8] - 51:6, 51:18, 55:24, 57:9, 60:15, 67:8, 67:22, 68:3
**aggravation** [1] - 57:15
**aggressive** [1] - 57:6
**ago** [2] - 36:23, 58:18
**agree** [5] - 9:19, 13:8, 17:13, 17:25, 23:17

**agreed** [4] - 12:17, 14:12, 15:20, 24:18
**agreeing** [1] - 15:2
**agreement** [11] - 12:18, 12:20, 13:14, 14:7, 15:7, 15:21, 19:9, 19:11, 19:17, 19:18, 52:15
**agreements** [2] - 37:16, 37:20
**agrees** [1] - 19:16
**ahead** [2] - 28:11, 53:15
**aid** [3] - 28:1, 28:11, 29:4
**aided** [3] - 1:25, 27:3, 28:17
**aiding** [2] - 27:5, 28:6
**air** [2] - 54:7, 82:21
**AKERS** [36] - 1:12, 2:7, 5:19, 5:21, 6:3, 6:6, 6:18, 7:5, 7:11, 8:19, 9:20, 15:6, 18:2, 20:23, 21:17, 21:21, 22:13, 30:15, 32:11, 33:2, 51:3, 55:4, 55:21, 56:9, 58:10, 58:16, 58:23, 59:9, 59:13, 59:16, 59:21, 63:5, 63:10, 63:15, 63:19, 101:7
**Akers** [14] - 2:8, 2:9, 5:15, 14:4, 14:23, 20:22, 21:23, 22:12, 61:8, 65:21, 71:10, 76:6, 77:16, 82:11
**Akers'** [1] - 64:15
**alarms** [2] - 67:20, 93:1
**alienation** [1] - 95:6
**alive** [1] - 78:1
**alleged** [1] - 10:23
**allow** [3] - 15:23, 74:3, 80:7
**allowed** [3] - 67:6, 93:4, 93:14
**allows** [1] - 41:3
**almost** [4] - 36:18, 59:3, 74:8, 91:5
**alone** [2] - 68:8, 72:25
**ALSO** [1] - 1:21
**altercation** [4] - 21:17, 25:21, 92:12, 93:16
**alternative** [1] - 34:14
**America** [2] - 2:3, 88:8
**AMERICA** [1] - 1:3
**American** [4] - 49:9, 57:19, 84:3, 84:5
**Americans** [3] - 48:17, 48:20, 57:21

**amount** [9] - 23:23, 28:13, 60:16, 90:21, 90:23, 91:4, 91:7, 99:6, 99:14
**amply** [1] - 95:17
**analogous** [1] - 18:10
**animosity** [1] - 84:14
**answer** [5] - 12:25, 35:24, 42:25, 68:16, 77:12
**anticipating** [1] - 91:17
**apart** [1] - 72:22
**apologies** [1] - 2:10
**apologize** [3] - 12:6, 84:18, 86:23
**appeal** [11] - 10:21, 11:16, 11:17, 100:10, 100:13, 100:18, 100:24, 101:1, 101:2, 101:3, 101:4
**Appeals** [1] - 100:11
**appear** [1] - 95:2
**APPEARANCES** [1] - 1:10
**appearances** [1] - 59:16
**appellate** [1] - 13:19
**applicability** [1] - 13:12
**applicable** [7] - 23:8, 27:1, 29:7, 31:17, 31:24, 37:9, 38:5
**application** [8] - 16:5, 18:22, 18:23, 19:2, 23:5, 29:17, 29:21, 100:16
**applications** [1] - 50:7
**applied** [6] - 19:12, 49:19, 49:21, 63:1, 63:2, 64:6
**applies** [13] - 16:10, 18:9, 18:18, 18:20, 23:3, 23:18, 29:19, 30:4, 30:9, 30:20, 31:20, 35:15, 68:16
**apply** [10] - 8:3, 17:1, 17:23, 20:2, 22:22, 30:5, 30:6, 31:5, 90:7, 101:4
**applying** [1] - 28:15
**appointed** [1] - 101:4
**appreciate** [4] - 80:16, 87:19, 87:20, 88:2
**approach** [1] - 44:25
**appropriate** [10] - 15:11, 35:6, 36:2, 36:3, 38:20, 50:5, 61:21, 89:17, 94:23,

100:4
**approved** [1] - 100:5
**April** [1] - 4:11
**Architect** [2] - 99:6, 99:11
**area** [3] - 26:10, 56:12, 102:1
**areas** [2] - 55:16, 92:6
**arena** [1] - 38:12
**argued** [2] - 39:16, 55:6
**argues** [3] - 23:22, 30:3, 30:8
**arguing** [1] - 36:9
**argument** [7] - 20:2, 30:14, 39:5, 40:3, 42:12, 66:8, 77:10
**arrest** [1] - 45:8
**arrested** [8] - 17:6, 58:6, 58:11, 60:1, 60:14, 68:24, 94:16
**arrived** [1] - 67:18
**article** [1] - 70:12
**articles** [1] - 59:11
**ascend** [2] - 24:25, 86:25
**Ashley** [1] - 2:8
**ASHLEY** [1] - 1:12
**ashley.akers@usdoj .gov** [1] - 1:15
**aside** [2] - 37:23, 83:19
**assault** [33] - 18:17, 18:20, 18:24, 19:1, 19:23, 20:3, 20:9, 20:10, 20:11, 20:14, 20:24, 23:3, 23:7, 23:11, 23:18, 23:19, 23:23, 24:15, 24:17, 25:24, 27:5, 27:8, 28:8, 28:16, 29:4, 29:5, 29:11, 29:13, 29:14, 29:22
**assaulted** [4] - 23:24, 28:17, 34:5, 69:9
**assaulting** [5] - 17:16, 18:13, 28:2, 28:18, 70:14
**assaults** [3] - 28:6, 29:8, 85:8
**assert** [3] - 11:16, 36:3, 43:5
**assessing** [1] - 49:17
**assessment** [4] - 32:5, 32:8, 50:14, 98:6
**assistance** [2] - 19:20, 100:19
**assisting** [1] - 3:14
**assumed** [1] - 88:7
**ATF** [1] - 81:8

3

Atlantic [2] - 59:12, 73:10
attack [3] - 33:19, 92:23, 94:17
attacked [1] - 54:1
attempt [3] - 25:21, 44:6, 81:23
attempted [1] - 24:24
attempting [3] - 23:15, 25:10, 26:5
attending [1] - 40:4
attention [2] - 65:18, 82:8
attitude [2] - 44:12, 61:4
Attorney's [1] - 99:18
attribute [1] - 68:13
audacity [1] - 60:25
audio [1] - 71:3
author [1] - 5:16
authorization [1] - 102:21
authorize [1] - 99:16
authorized [2] - 33:8, 46:11
authorizing [1] - 99:2
available [8] - 31:23, 36:21, 46:15, 46:16, 90:17, 91:3, 95:15, 101:22
Avenue [2] - 53:14, 99:24
avid [1] - 33:14
avoid [4] - 45:8, 78:13, 90:17, 96:1
aware [2] - 16:13, 79:13

B

b)(1)(B [1] - 63:12
b)(2) [1] - 63:21
backtrack [1] - 64:20
backwards [1] - 26:9
bad [3] - 43:13, 69:22, 69:23
badge [4] - 58:13, 59:22, 70:12, 94:15
balance [1] - 99:9
bangs [2] - 66:24, 67:16
bare [2] - 48:18, 57:20
base [14] - 18:19, 18:21, 23:8, 27:1, 29:20, 30:2, 30:6, 30:9, 30:20, 62:11, 62:24, 63:4, 63:8, 64:12
based [15] - 11:22, 12:9, 12:22, 16:13,

22:6, 24:6, 24:7, 35:24, 36:13, 37:25, 74:24, 79:9, 80:5, 91:2, 97:14
basic [2] - 89:3, 98:12
basis [9] - 11:9, 14:11, 18:25, 19:15, 24:14, 27:2, 37:5, 38:7, 59:3
battles [1] - 82:18
bear [1] - 26:19
bears [1] - 25:23
BEFORE [1] - 1:8
beforehand [1] - 91:16
began [1] - 52:1
begin [1] - 90:21
beginning [2] - 12:3, 34:2
begins [1] - 20:8
behalf [4] - 2:8, 2:11, 2:20, 7:24
behind [1] - 88:18
beliefs [2] - 65:11, 71:24
believes [3] - 51:9, 51:19, 61:1
below [1] - 102:22
benign [5] - 43:14, 43:17, 77:2, 77:21, 78:2
berating [1] - 54:4
BERYL [1] - 1:8
best [7] - 14:20, 73:3, 73:6, 82:4, 82:19, 91:3, 102:17
betray [1] - 80:1
better [4] - 69:25, 81:14, 83:22, 87:15
between [7] - 20:17, 25:15, 27:16, 38:3, 43:23, 65:18, 76:18
beyond [6] - 13:23, 19:25, 21:1, 22:15, 49:13, 73:12
Biden [1] - 46:24
big [2] - 74:19, 78:9
bike [2] - 54:9, 97:3
binding [1] - 20:5
biographical [1] - 72:19
Birmingham [1] - 74:13
bit [2] - 64:21, 71:21
blaring [1] - 93:1
blew [1] - 83:12
block [1] - 53:11
blooded [5] - 48:17, 48:20, 57:19, 57:21, 84:3

blowing [1] - 82:2
bodily [2] - 23:12, 23:14
body [6] - 21:7, 21:19, 27:13, 28:20, 56:14, 83:13
body-worn [5] - 21:7, 21:19, 27:13, 28:20, 56:14
bombast [2] - 42:8, 45:2
bombastic [1] - 77:17
BOP [2] - 3:25, 4:1
borne [1] - 53:21
bottles [1] - 83:11
bottom [1] - 50:16
bow [1] - 82:2
BOX [1] - 1:18
bracing [1] - 44:23
bragged [1] - 94:13
brawl [5] - 21:5, 21:12, 56:13, 56:21, 56:24
brazenly [1] - 56:15
breach [5] - 54:12, 54:17, 54:20, 65:23, 65:24
breached [2] - 47:1, 55:18
break [2] - 25:21, 40:25
breaking [3] - 41:1, 41:8
breaks [1] - 21:12
bribery [1] - 35:3
brief [2] - 51:5, 80:17
briefly [1] - 51:18
bright [1] - 53:4
Brock [14] - 34:22, 36:5, 61:18, 61:19, 61:21, 61:24, 62:6, 62:10, 63:1, 63:7, 63:18, 63:20, 63:23
broke [2] - 25:15, 56:21
broken [6] - 39:9, 39:10, 40:24, 67:19, 93:1, 93:2
brought [2] - 26:18, 68:24
bucket [2] - 42:20, 77:8
building [9] - 3:17, 17:19, 47:2, 54:5, 66:5, 74:2, 85:4, 87:7, 91:5
Building [3] - 3:20, 25:11, 47:1, 47:8, 54:11, 55:16, 55:22, 55:25, 67:3, 76:20, 92:2, 93:6, 99:13

built [1] - 74:4
bullshit [2] - 59:19, 82:4
Bureau [3] - 58:6, 97:21, 101:13
bus [1] - 86:6
business [2] - 47:10, 93:10

C

calculated [1] - 34:4
calculation [3] - 36:14, 63:6, 79:10
calculations [1] - 63:22
caller [1] - 59:4
cam [1] - 83:13
camera [5] - 21:7, 21:19, 27:13, 28:20, 56:15
cannot [4] - 34:24, 47:9, 53:5, 88:11
Capitol [72] - 3:20, 24:1, 24:23, 24:25, 25:11, 25:25, 26:3, 26:6, 28:3, 28:22, 28:23, 30:10, 30:24, 31:3, 41:13, 47:1, 47:6, 47:8, 47:22, 48:2, 48:7, 48:12, 52:4, 52:7, 52:12, 52:13, 52:17, 53:11, 53:17, 53:18, 53:21, 53:25, 54:3, 54:11, 54:21, 55:10, 55:15, 55:16, 55:19, 55:22, 55:25, 57:4, 57:10, 57:13, 57:25, 67:3, 68:2, 68:9, 76:20, 78:6, 78:7, 84:1, 84:22, 84:23, 92:2, 92:6, 92:8, 92:9, 92:15, 92:24, 93:5, 93:13, 93:15, 93:17, 93:18, 94:6, 94:17, 96:19, 99:6, 99:11
capture [1] - 96:4
captured [2] - 42:5, 91:21
care [2] - 84:16, 86:20
career [1] - 88:13
carpenter [1] - 95:2
case [33] - 4:5, 8:3, 8:9, 9:6, 14:7, 16:24, 17:2, 20:15, 20:25, 24:3, 26:22, 28:9, 28:20, 40:21, 41:7, 51:7, 51:8, 51:25, 52:6, 60:25, 61:1,

64:11, 64:16, 64:17, 81:3, 83:24, 86:19, 89:17, 94:24, 95:9, 95:17, 96:8, 99:21
Case [1] - 2:2
cases [9] - 3:24, 33:11, 35:4, 40:22, 43:12, 43:19, 63:25, 65:14
casual [1] - 47:21
category [3] - 38:13, 45:2, 50:4
Category [2] - 17:10, 31:19
caught [4] - 51:23, 59:23, 68:20, 70:15
caused [3] - 27:4, 32:17, 97:7
causing [2] - 49:22, 63:13
caution [1] - 42:21
CC [1] - 84:7
CCT [1] - 83:13
CCTV [1] - 83:13
CDU [3] - 53:24, 77:24, 92:7
celebrity [1] - 76:9
center [1] - 26:16
certain [3] - 3:15, 74:4, 100:14
certainly [8] - 14:7, 15:11, 21:2, 22:16, 22:22, 73:12, 79:1, 87:15
CERTIFICATE [1] - 102:12
certificate [1] - 102:19
certification [8] - 38:25, 49:12, 52:4, 52:7, 53:1, 53:3, 53:19, 56:4
certify [5] - 46:23, 46:24, 50:1, 53:5, 102:14
chaff [1] - 69:6
chairs [3] - 48:4, 52:22, 91:23
challenge [1] - 100:22
challenges [1] - 9:14
chances [2] - 69:24, 70:1
change [5] - 58:8, 65:2, 81:19, 99:25, 100:1
changed [1] - 4:14
changing [1] - 4:17
channels [1] - 58:17
characteristic [1] - 16:6
characteristics [4] -

4

16:9, 31:5, 90:16, 94:25
**characterize** [1] - 14:20
**characterized** [2] - 9:25, 14:10
**charade** [1] - 81:2
**charge** [1] - 24:5
**charged** [2] - 7:7, 94:16
**charges** [3] - 3:13, 30:21, 70:13
**charging** [1] - 3:8
**chases** [1] - 41:4
**chasing** [1] - 69:6
**checking** [1] - 58:18
**chemical** [1] - 25:20
**chief** [2] - 49:4, 84:19
**Chief** [1] - 99:12
**child** [1] - 72:22
**childhood** [1] - 72:21
**children** [1] - 95:4
**chin** [1] - 80:10
**choice** [4] - 44:15, 44:16, 80:5, 83:21
**choices** [5] - 68:16, 69:22, 70:4, 79:20
**choosing** [1] - 13:5
**chose** [2] - 80:23, 81:21
**Christopher** [1] - 5:17
**circled** [1] - 25:7
**Circuit** [2] - 100:11, 100:14
**circuit** [2] - 28:14, 74:3
**Circuit's** [3] - 28:4, 29:6, 29:15
**circulation** [2] - 74:15, 74:23
**circumstance** [1] - 11:15
**circumstances** [10] - 34:11, 35:5, 35:25, 39:23, 43:17, 45:23, 61:4, 90:15, 91:9, 100:14
**cite** [2] - 21:7, 28:5
**cited** [2] - 40:22, 96:8
**cites** [1] - 40:21
**citizen** [2] - 84:5, 84:6
**CIV** [1] - 1:13
**civil** [8] - 3:13, 17:15, 18:8, 23:20, 29:9, 30:12, 30:23, 31:2
**claimed** [1] - 52:9
**claims** [1] - 10:21
**clarification** [2] - 12:13, 64:21
**clarify** [1] - 62:3

**clash** [1] - 25:15
**Class** [4] - 3:7, 32:6, 32:7
**clear** [12] - 5:25, 25:10, 26:23, 28:3, 28:5, 31:3, 38:24, 47:23, 54:2, 56:19, 89:14, 93:3
**cleared** [1] - 57:13
**clearing** [2] - 7:9, 83:6
**clearly** [3] - 35:25, 40:19, 41:9
**Clerk** [3] - 99:10, 99:23, 100:1
**client** [3] - 9:10, 64:24, 77:1
**client's** [1] - 42:12
**clients** [2] - 42:21, 45:1
**climb** [1] - 26:6
**climbed** [1] - 54:9
**clock** [1] - 66:10
**close** [1] - 52:13
**closing** [2] - 39:5, 66:8
**cognizable** [1] - 19:19
**coincide** [1] - 84:25
**collection** [1] - 98:23
**collectively** [1] - 25:9
**College** [4] - 38:25, 46:23, 49:12, 50:1
**colloquy** [4] - 12:16, 15:2, 15:20, 34:14
**COLUMBIA** [1] - 1:1
**Columbia** [1] - 99:11
**combative** [2] - 57:1, 79:18
**combination** [1] - 31:18
**combined** [1] - 31:9
**coming** [2] - 7:2, 37:16
**commander** [2] - 49:4, 84:19
**commander-in-chief** [2] - 49:4, 84:19
**comment** [2] - 70:11, 71:6
**commentary** [3] - 23:10, 79:8, 81:15
**comments** [6] - 56:6, 64:16, 80:17, 85:2, 87:14, 95:23
**commercial** [1] - 95:1
**commit** [11] - 20:25, 22:18, 23:16, 23:20, 28:7, 29:9, 29:13, 30:5, 30:11, 30:22, 98:15
**committed** [13] -

23:19, 27:3, 29:5, 29:8, 29:12, 30:5, 30:11, 30:22, 32:22, 48:19, 57:20, 96:5, 97:21
**common** [3] - 71:24, 71:25
**communicate** [1] - 72:4
**community** [5] - 60:18, 72:12, 73:2, 74:5, 76:23
**comparable** [3] - 40:21, 41:7, 64:5
**comparators** [2] - 96:8, 96:9
**compared** [2] - 68:13, 77:21
**compelling** [1] - 34:10
**competency** [1] - 9:15
**complaints** [1] - 74:24
**complete** [1] - 102:17
**completion** [1] - 100:8
**compliant** [1] - 95:10
**comply** [3] - 89:23, 95:13, 99:3
**comprehensive** [1] - 14:16
**computer** [1] - 1:25
**computer-aided** [1] - 1:25
**concerning** [1] - 53:7
**concession** [2] - 11:14, 11:19
**concessions** [1] - 11:12
**concluded** [1] - 28:15
**concludes** [1] - 102:10
**concur** [1] - 9:3
**concurrently** [2] - 97:25, 98:4
**conditions** [7] - 74:25, 75:4, 75:9, 75:13, 75:22, 95:11, 95:13, 98:9, 98:10, 98:14, 99:4
**conduct** [46] - 3:17, 3:19, 7:7, 7:18, 8:5, 10:22, 17:19, 18:17, 19:25, 20:16, 21:3, 23:7, 23:22, 24:13, 24:17, 32:18, 33:4, 35:20, 38:6, 41:10, 43:15, 45:14, 46:9, 47:13, 49:6, 49:22, 49:24, 64:4, 67:13, 68:25, 69:12, 69:14, 70:7, 77:12, 77:14, 79:2, 89:5, 90:2,

90:5, 90:19, 93:9, 96:5, 96:23, 97:2, 97:8, 98:12
**confession** [1] - 11:13
**confidence** [1] - 80:1
**confinement** [3] - 50:24, 60:25, 75:23
**confirm** [1] - 6:21
**confirming** [1] - 58:3
**confirms** [1] - 27:19
**confrontation** [1] - 27:15
**confrontations** [1] - 92:5
**confronted** [1] - 43:18
**confronting** [1] - 69:8
**Congress** [17] - 17:21, 34:8, 41:21, 46:23, 47:5, 47:20, 47:24, 48:6, 49:11, 50:1, 53:5, 53:12, 56:20, 59:8, 91:22, 93:9, 93:10
**congressional** [5] - 33:13, 33:23, 33:24, 34:3, 64:2
**Congresspeople** [2] - 55:11, 55:17
**connection** [4] - 4:19, 4:22, 9:2, 94:16
**consequently** [1] - 17:8
**consider** [8] - 13:22, 15:12, 36:2, 45:24, 51:19, 65:7, 89:16, 90:15
**consideration** [9] - 33:6, 38:19, 45:25, 68:11, 79:6, 89:21, 97:12, 97:14, 97:18
**considerations** [1] - 33:16
**considered** [3] - 11:24, 66:10, 102:19
**considering** [1] - 90:14
**consistent** [5] - 10:4, 10:8, 11:23, 12:10, 56:5
**constitute** [3] - 24:17, 27:8, 28:8
**constituted** [2] - 18:17, 23:7
**constitutes** [1] - 102:15
**Constitution** [1] - 99:24
**constitutional** [1] - 56:21
**contact** [12] - 20:17,

20:24, 21:3, 22:17, 24:4, 26:21, 27:23, 28:7, 72:22, 72:23, 72:24, 87:3
**contemplated** [1] - 80:21
**contemplates** [1] - 35:25
**contest** [1] - 90:22
**context** [3] - 13:21, 14:16, 40:23
**continually** [1] - 54:4
**continue** [2] - 22:12, 41:1
**continued** [11] - 25:14, 27:14, 42:15, 51:8, 52:11, 52:25, 57:6, 57:15, 58:2, 58:10, 61:3
**continuing** [1] - 26:15
**contributed** [1] - 31:2
**contributions** [2] - 75:24, 76:13
**contrition** [1] - 77:3
**control** [1] - 42:9
**controlled** [2] - 98:17, 98:20
**controversial** [1] - 74:17
**conversation** [1] - 44:7
**conversations** [1] - 71:25
**convicted** [12] - 3:11, 4:13, 17:7, 22:20, 34:25, 35:8, 35:13, 38:9, 46:15, 70:13, 76:10, 90:25
**conviction** [11] - 3:8, 20:11, 24:5, 27:1, 35:2, 35:10, 35:16, 35:22, 37:1, 49:6, 100:22
**convictions** [9] - 3:6, 3:23, 17:8, 17:14, 32:5, 32:6, 32:7, 49:13, 100:10
**coolant** [1] - 86:7
**Cooper** [6] - 35:17, 35:23, 43:16, 45:5, 77:2, 77:4
**cooperate** [1] - 98:23
**coordinated** [1] - 28:21
**coordinating** [1] - 28:12
**copy** [3] - 6:14, 6:16, 6:18
**core** [1] - 33:25
**corner** [1] - 27:21

5

**corralled** [1] - 25:8
**correct** [17] - 5:21,
7:11, 8:18, 8:19,
10:17, 13:18, 30:13,
38:18, 62:2, 62:9,
62:17, 63:5, 63:15,
72:8, 75:16, 81:11,
102:4
**correctly** [1] - 20:2
**corrupt** [1] - 33:22
**cost** [2] - 101:2, 101:3
**counsel** [6] - 2:6,
7:24, 19:20, 55:5,
100:19, 101:4
**counseled** [1] - 27:3
**Count** [13] - 3:8, 16:3,
17:13, 17:15, 17:16,
18:8, 18:13, 24:14,
30:9, 30:11, 30:23,
31:1, 37:1
**count** [7] - 4:4, 16:10,
19:23, 19:24, 46:17,
50:22, 67:8
**counted** [2] - 31:14,
37:6
**country** [2] - 70:8,
91:14
**Counts** [16] - 17:18,
23:6, 29:25, 31:20,
31:23, 31:25, 32:2,
32:3, 50:17, 50:19,
50:20, 97:22, 97:23,
97:24, 98:2, 98:3
**counts** [6] - 3:5, 3:11,
17:22, 18:1, 18:15,
29:19
**couple** [1] - 65:22
**course** [9] - 7:17,
7:20, 15:9, 17:22,
18:18, 42:24, 48:1,
53:20, 69:24
**court** [9] - 28:9, 28:15,
35:19, 61:10, 68:24,
74:25, 76:15, 83:24,
101:4
**Court** [54] - 1:22, 1:23,
10:2, 10:3, 12:8,
12:9, 14:9, 14:16,
15:7, 20:6, 29:3,
30:20, 33:7, 34:12,
36:2, 39:6, 40:21,
43:8, 44:4, 45:19,
45:24, 46:10, 51:16,
51:19, 54:13, 54:15,
61:17, 65:1, 65:3,
68:10, 69:5, 79:6,
79:10, 79:13, 81:25,
82:7, 87:20, 95:24,
97:20, 98:22, 99:6,
99:10, 99:19, 99:23,

100:1, 100:6,
100:11, 101:3,
101:17, 102:25
**COURT** [160] - 1:1,
1:9, 2:2, 2:9, 2:14,
2:18, 2:22, 2:25, 3:2,
4:9, 5:20, 5:25, 6:4,
6:7, 6:9, 6:14, 6:19,
6:23, 7:13, 8:15,
8:20, 8:25, 9:5, 9:8,
9:13, 9:18, 9:21,
10:12, 10:15, 10:18,
11:20, 12:2, 12:12,
13:7, 13:11, 13:17,
13:19, 14:3, 14:6,
14:13, 14:19, 14:22,
15:13, 16:17, 18:3,
18:5, 19:3, 19:7,
20:1, 20:18, 20:21,
21:23, 22:1, 22:3,
22:6, 22:11, 22:25,
30:16, 30:19, 32:12,
32:14, 34:16, 34:23,
35:18, 36:24, 37:17,
37:24, 38:17, 38:22,
40:14, 41:12, 41:24,
42:3, 42:5, 42:11,
42:24, 43:6, 45:11,
45:16, 45:21, 46:6,
58:14, 58:21, 59:6,
59:10, 59:14, 61:8,
62:1, 62:17, 62:23,
63:3, 63:12, 63:16,
64:14, 65:5, 66:20,
67:2, 67:12, 67:21,
68:8, 68:21, 70:3,
70:5, 70:21, 70:25,
71:7, 71:13, 71:17,
71:23, 72:7, 72:12,
73:3, 73:6, 73:9,
73:15, 73:22, 74:9,
74:18, 74:21, 75:3,
75:6, 75:9, 75:13,
75:18, 76:1, 76:12,
76:15, 77:23, 79:16,
79:22, 80:12, 81:6,
81:10, 87:22, 87:24,
88:6, 88:15, 88:19,
88:22, 89:2, 89:8,
89:11, 89:14, 90:9,
90:12, 92:18, 92:22,
92:24, 94:2, 94:10,
94:12, 95:22, 101:8,
101:10, 101:12,
101:20, 101:24,
102:3, 102:5, 102:7
**Court's** [5] - 13:21,
14:17, 36:14, 61:14,
65:18
**court-appointed** [1] -
101:4

**courthouse** [1] -
43:10
**courtroom** [5] - 22:9,
34:20, 80:22, 82:9,
87:18
**courts** [1] - 36:6
**courtyard** [3] - 7:7,
21:5, 56:20
**cover** [1] - 6:1
**coverage** [1] - 73:14
**covered** [3] - 13:4,
13:25
**created** [1] - 66:6
**creating** [2] - 26:12,
28:25
**credibility** [1] - 64:25
**crime** [3] - 32:20,
76:11, 98:16
**crimes** [5] - 32:22,
47:16, 61:5, 65:8,
90:13
**Criminal** [7] - 1:3, 2:2,
12:19, 12:22, 15:22,
17:9, 31:18
**criminal** [17] - 8:5,
17:2, 17:8, 32:18,
38:13, 43:15, 50:3,
67:13, 68:25, 87:17,
89:5, 90:2, 90:5,
95:8, 96:4, 97:8
**criteria** [1] - 90:8
**criticize** [1] - 35:18
**crook** [1] - 84:9
**cross** [6] - 18:16,
18:19, 18:23, 23:2,
30:3, 78:5
**cross-examined** [1] -
78:5
**cross-reference** [5] -
18:16, 18:19, 18:23,
23:2, 30:3
**crow** [1] - 86:16
**crowd** [24] - 7:2, 7:3,
24:24, 26:5, 26:7,
26:10, 26:14, 26:15,
26:17, 39:9, 39:21,
39:25, 41:4, 51:23,
65:25, 66:17, 67:18,
77:24, 78:10, 78:20,
82:16, 82:24, 85:20
**crowds** [1] - 68:20
**crushing** [1] - 26:12
**CTF** [4] - 75:10, 75:12,
75:15, 81:8
**curiosity** [1] - 40:9
**curious** [2] - 73:24
**current** [3] - 32:21,
49:13, 61:3
**cussing** [1] - 86:3
**custody** [1] - 97:21

**D**

**D.C** [19] - 1:6, 28:4,
29:6, 29:15, 47:25,
49:1, 53:8, 58:22,
58:25, 59:7, 72:15,
73:23, 75:11, 84:1,
84:17, 99:13, 99:24,
100:11, 100:14
**daily** [1] - 59:3
**damage** [5] - 49:23,
63:14, 76:19, 88:2,
88:9
**damaged** [1] - 93:21
**damages** [3] - 47:8,
91:3, 91:4
**danger** [3] - 55:12,
60:17, 96:17
**dangerous** [4] - 23:12,
26:12, 26:17, 28:25
**dangerousness** [1] -
56:24
**dark** [2] - 57:14, 69:20
**date** [3] - 4:4, 4:14,
53:3
**dated** [1] - 19:10
**Dated** [1] - 102:23
**dates** [1] - 4:17
**Davila** [1] - 102:24
**DAVILA** [2] - 1:22,
102:14
**dawn** [1] - 86:14
**dawns** [1] - 86:17
**days** [6] - 52:16,
60:20, 98:21, 99:25,
100:24, 100:25
**DC** [1] - 1:14
**deal** [4] - 18:5, 63:18,
65:14, 77:1
**December** [6] - 47:25,
48:25, 52:9, 52:12,
52:16, 53:2
**decide** [2] - 38:22,
48:3
**decided** [3] - 14:4,
56:18, 86:25
**deciding** [2] - 83:23,
94:23
**decision** [5] - 13:12,
14:18, 62:7, 80:2,
80:3
**decision-making** [1] -
14:18
**deemed** [1] - 10:21
**deer** [1] - 87:10
**Defendant** [2] - 1:6,
2:12
**defendant** [49] - 9:21,
12:20, 15:15, 15:19,
16:21, 19:16, 19:21,

23:19, 23:22, 24:16,
25:1, 25:2, 25:12,
25:17, 25:22, 26:18,
27:4, 27:5, 27:15,
28:5, 28:10, 28:17,
28:25, 29:12, 31:18,
34:24, 46:15, 46:21,
47:2, 47:21, 49:19,
49:21, 51:11, 59:22,
60:10, 65:5, 65:9,
68:22, 74:15, 74:24,
75:22, 76:10, 90:22,
91:4, 94:22, 96:12,
96:15, 97:5
**DEFENDANT** [37] -
1:17, 2:24, 3:1, 4:7,
8:14, 8:24, 9:7,
21:16, 21:20, 21:25,
22:2, 22:5, 22:10,
42:18, 43:3, 59:20,
80:15, 81:8, 81:11,
87:23, 88:4, 88:11,
88:17, 88:21, 89:1,
89:6, 89:10, 89:12,
90:7, 90:11, 92:16,
92:20, 92:23, 94:1,
94:7, 94:11, 95:21
**defendant's** [24] - 4:3,
5:2, 5:6, 15:1, 15:11,
17:14, 19:9, 23:6,
25:23, 27:10, 30:21,
32:18, 32:21, 33:4,
38:6, 46:9, 47:12,
47:13, 49:7, 51:8,
60:13, 96:24, 97:8,
100:8
**defendants** [21] -
3:24, 7:19, 35:8,
35:15, 38:9, 38:12,
55:1, 59:2, 64:3,
69:8, 71:20, 72:16,
75:10, 75:15, 76:18,
77:4, 77:22, 79:2,
89:20, 90:18, 90:25
**defense** [7] - 27:18,
30:16, 32:12, 55:4,
55:6, 60:24, 75:24
**defiance** [1] - 44:9
**defines** [1] - 23:11
**definition** [7] - 19:1,
19:23, 20:4, 20:6,
20:8, 23:19, 29:11
**degree** [1] - 37:14
**delayed** [1] - 2:12
**demands** [2] - 60:15,
61:2
**democracy** [5] -
33:20, 33:25, 49:9,
88:9, 88:10
**democratic** [2] -

32:23, 47:17
**demonstrating** [1] - 3:19
**deny** [2] - 42:6, 64:25
**depart** [4] - 34:12, 64:7, 97:6, 97:9
**departed** [1] - 64:18
**departure** [22] - 32:16, 32:24, 33:1, 35:1, 35:12, 35:14, 38:4, 38:23, 39:1, 45:21, 46:8, 46:14, 46:20, 49:16, 49:17, 50:4, 50:11, 63:25, 96:3, 96:6, 96:7, 97:11
**describe** [2] - 76:22, 81:2
**described** [4] - 7:5, 54:13, 64:12, 97:2
**describing** [1] - 75:22
**description** [2] - 28:19, 91:20
**designated** [2] - 3:25, 101:14
**despite** [4] - 38:5, 54:6, 80:25, 81:2
**destroyed** [2] - 57:5, 57:7
**detail** [1] - 92:3
**detailed** [1] - 91:10
**detained** [2] - 59:4, 79:23
**deter** [3] - 90:2, 90:5, 95:17
**determination** [2] - 17:4, 32:10
**determine** [2] - 8:2, 17:1
**determined** [4] - 7:23, 27:2, 98:22, 99:7
**determining** [3] - 33:6, 49:7, 96:7
**deterrence** [6] - 60:16, 61:2, 61:3, 65:8, 65:13, 95:22
**developed** [1] - 43:11
**dialogue** [2] - 80:23, 81:17
**different** [13] - 4:8, 7:18, 9:25, 12:2, 12:4, 17:20, 22:8, 40:20, 69:21, 70:1, 79:3, 79:14, 92:6
**differently** [1] - 70:6
**difficult** [1] - 27:17
**difficulties** [1] - 72:20
**diffused** [1] - 83:16
**diffusing** [1] - 83:14
**dim** [1] - 76:7
**dimensional** [1] - 72:5

**direct** [1] - 96:14
**directed** [1] - 98:24
**directing** [1] - 29:1
**direction** [2] - 26:11, 78:10
**directions** [1] - 92:15
**directly** [10] - 8:8, 8:9, 18:13, 21:6, 27:22, 28:1, 54:10, 64:10, 80:13, 96:16
**directs** [1] - 18:9
**disagree** [1] - 88:11
**disappointed** [2] - 95:18, 95:21
**disassembled** [1] - 102:20
**disbursement** [1] - 99:11
**disclosed** [1] - 5:22
**disconnect** [1] - 75:19
**discount** [1] - 77:10
**discourage** [1] - 95:19
**discouraged** [1] - 48:23
**discretion** [1] - 38:20
**discretionary** [1] - 98:9
**discuss** [1] - 50:7
**discussed** [2] - 9:11, 15:18
**discussing** [1] - 7:22
**discussion** [3] - 14:24, 16:4, 91:12
**discussions** [1] - 7:14
**disingenuous** [1] - 84:21
**dismiss** [1] - 77:10
**dismissal** [2] - 17:12, 49:5
**dismissed** [2] - 3:10, 16:11
**disorder** [8] - 3:13, 17:15, 18:8, 23:21, 29:9, 30:12, 30:23, 31:2
**disorderly** [3] - 3:16, 3:19, 17:19
**disparities** [2] - 90:18, 96:2
**displayed** [1] - 51:11
**disrespect** [2] - 51:12, 95:12
**disrupt** [1] - 93:10
**disrupting** [1] - 94:4, 95:19
**disruption** [10] - 32:17, 33:5, 33:9, 33:12, 33:15, 46:10, 46:12, 91:14, 97:7
**disruptions** [1] - 47:9

**disruptive** [1] - 3:17
**distinction** [1] - 37:21
**DISTRICT** [3] - 1:1, 1:1, 1:9
**District** [4] - 91:13, 99:10, 99:23
**district** [2] - 28:9, 28:15, 100:5
**disturbing** [1] - 69:3
**divergence** [1] - 65:18
**DNA** [1] - 98:23
**DOC** [3] - 71:12, 71:19, 74:14
**docketed** [10] - 4:24, 4:25, 5:1, 5:3, 5:5, 5:11, 5:13, 15:16, 24:2, 25:6
**documents** [4] - 4:19, 4:21, 6:5, 22:22
**DOJ** [2] - 1:13, 59:18
**DOJ-CIV** [1] - 1:13
**dollar** [2] - 86:7, 86:8
**dollars** [1] - 47:8
**domestic** [2] - 81:4, 86:12
**Dominic** [1] - 41:1
**Donald** [1] - 84:19
**done** [11] - 10:7, 30:24, 40:6, 65:6, 65:12, 66:7, 67:25, 70:8, 81:14, 83:22, 88:2
**Door** [6] - 25:8, 39:20, 54:8, 54:14, 56:12, 66:15
**door** [3] - 48:15, 56:5, 66:11
**Doors** [3] - 39:10, 54:20, 93:2
**doors** [12] - 39:11, 39:16, 41:3, 41:8, 65:23, 65:25, 66:4, 69:10, 87:4, 87:8, 87:9
**double** [2] - 36:18, 36:22
**doubt** [4] - 21:1, 22:15, 55:12, 77:4
**down** [16] - 6:22, 7:1, 19:22, 43:22, 45:12, 48:4, 52:23, 76:21, 82:24, 84:13, 85:10, 85:19, 87:11, 87:13, 91:23, 92:2
**dozens** [3] - 43:12, 79:1
**drag** [9] - 41:15, 41:17, 48:4, 48:9, 48:10, 52:22, 55:19, 83:7, 93:7

**dragging** [1] - 91:23
**driven** [1] - 36:17
**driving** [1] - 36:11
**dropped** [1] - 63:24
**drove** [1] - 83:25
**drug** [3] - 98:20, 98:22, 101:21
**due** [1] - 5:22
**Dunn** [1] - 69:9
**during** [16] - 7:7, 7:16, 7:20, 15:2, 15:9, 15:20, 34:13, 48:25, 53:14, 53:20, 54:3, 66:13, 66:22, 81:7, 82:9, 95:4
**duties** [2] - 23:25, 56:21

# E

**e)(2)(G)** [1] - 3:21
**early** [4] - 52:9, 53:4, 53:8, 74:17
**East** [2] - 57:4, 57:13
**east** [1] - 69:19
**easy** [1] - 88:18
**eat** [2] - 86:8, 86:16
**ECF** [10] - 4:24, 4:25, 5:5, 5:7, 5:11, 5:14, 15:16, 24:2, 25:6, 26:4
**ECFs** [2] - 5:2, 5:3
**educating** [1] - 74:18
**effect** [2] - 36:18, 40:11
**effective** [2] - 48:5, 52:24
**effort** [1] - 96:21
**efforts** [3] - 23:25, 28:21, 31:3
**egg** [1] - 72:7
**egregious** [4] - 61:5, 69:12, 69:13, 96:24
**eight** [1] - 36:23
**eighty** [1] - 45:13
**eighty-four** [1] - 45:13
**either** [8] - 5:12, 13:16, 18:14, 27:22, 35:10, 38:8, 69:3, 79:3
**elected** [2] - 51:13, 60:22
**election** [6] - 46:24, 49:2, 52:2, 53:6, 60:18, 95:18
**Electoral** [4] - 38:25, 46:23, 49:11, 50:1
**elevation** [1] - 87:2
**eliminated** [1] - 62:7
**Elizabeth** [1] - 102:24

**ELIZABETH** [2] - 1:22, 102:14
**Email** [2] - 1:15, 1:19
**emblematic** [1] - 44:1
**emergency** [1] - 55:11
**encompassed** [1] - 64:4
**encouraged** [1] - 93:11
**encouraging** [2] - 51:12, 55:18
**end** [7] - 43:17, 44:13, 44:22, 70:11, 72:24, 80:3, 82:12
**endangered** [1] - 47:16
**enforcement** [18] - 17:16, 17:18, 23:24, 24:5, 24:8, 28:18, 29:23, 31:3, 34:6, 45:6, 51:14, 53:23, 54:4, 56:4, 60:21, 67:2, 83:3, 92:5
**engage** [5] - 46:2, 49:8, 82:17, 85:7, 85:8
**engaged** [9] - 28:10, 28:11, 43:14, 56:12, 69:11, 83:3, 89:4, 92:4, 93:12
**engagement** [1] - 82:19
**engages** [1] - 53:23
**engaging** [4] - 51:13, 52:2, 60:21, 78:17
**enhancements** [1] - 61:20
**enormous** [1] - 96:17
**ensure** [1] - 89:22
**entails** [1] - 20:24
**enter** [6] - 12:15, 19:13, 47:3, 55:23, 58:1, 92:25
**entered** [7] - 4:11, 47:22, 54:11, 54:19, 55:23, 92:24, 100:22
**entering** [5] - 3:16, 17:18, 19:12, 57:25
**entire** [1] - 12:16
**entitled** [1] - 11:3
**entrances** [2] - 66:6, 87:3
**entry** [1] - 100:25
**environment** [1] - 74:16
**episode** [1] - 7:3
**episodes** [1] - 43:22
**equipment** [3] - 57:5, 57:8, 93:21
**err** [1] - 28:15

7

**error** [2] - 19:18, 19:19
**especially** [1] - 42:9
**essential** [1] - 46:22
**essentially** [6] - 15:19, 43:21, 52:1, 56:13, 63:6, 73:18
**establish** [1] - 98:12
**established** [1] - 100:17
**estimate** [1] - 91:3
**estranged** [2] - 72:14, 95:3
**evacuation** [2] - 47:4, 55:11
**evade** [1] - 44:19
**evening** [2] - 70:14, 71:8
**event** [3] - 12:20, 45:7, 74:19
**events** [1] - 91:6
**evidence** [11] - 13:22, 14:10, 15:10, 16:23, 21:4, 25:23, 33:21, 51:25, 65:1, 92:19
**Evidence** [1] - 15:22
**exactly** [3] - 12:1, 20:4, 42:3
**examined** [1] - 78:5
**example** [4] - 52:10, 58:12, 59:25, 64:6
**exceptional** [2] - 68:18, 68:22
**excuse** [6] - 21:23, 34:23, 52:9, 57:16, 81:8, 83:15
**excused** [1] - 102:9
**execute** [2] - 23:25, 100:6
**executed** [1] - 12:18
**exercise** [1] - 69:25
**exercising** [1] - 68:15
**exert** [1] - 28:13
**Exhibit** [1] - 26:4
**exhibit** [1] - 5:9
**Exhibits** [2] - 21:8, 21:10
**exhibits** [4] - 5:5, 5:10, 16:24, 22:14
**exists** [1] - 76:23
**expansive** [1] - 19:22
**expect** [2] - 11:8, 12:8
**expectations** [1] - 98:12
**expected** [4] - 12:5, 84:22, 84:23, 88:7
**expecting** [3] - 10:24, 11:4, 11:21
**explain** [3] - 7:16, 8:10, 87:24
**explained** [1] - 6:12

**explanation** [2] - 37:14, 61:14
**explicitly** [1] - 33:3
**exploit** [1] - 14:6
**express** [1] - 70:6
**expressed** [3] - 47:23, 52:18, 57:17, 83:20, 84:14
**expression** [1] - 70:1
**expressive** [1] - 41:20
**extent** [6] - 9:24, 33:9, 46:12, 49:17, 88:8, 100:23
**extra** [1] - 5:8
**extract** [1] - 58:4
**eye** [2] - 87:3, 102:1
**eyes** [1] - 21:18

**F**

**F.4th** [1] - 28:5
**fabricate** [1] - 85:24
**fabricated** [1] - 81:23
**face** [5] - 21:11, 27:11, 47:15, 56:16
**face-off** [1] - 27:11
**face-to-face** [1] - 21:11
**facility** [3] - 4:1, 78:7, 101:14
**facing** [1] - 82:15
**fact** [19] - 16:22, 19:14, 33:18, 37:10, 38:5, 41:23, 42:1, 49:24, 49:25, 57:9, 65:22, 67:6, 67:12, 69:1, 69:19, 82:3, 85:22, 89:3, 89:9
**factor** [10] - 60:15, 65:16, 66:21, 67:9, 67:22, 67:23, 68:3, 69:2, 69:3
**factors** [8] - 45:17, 50:8, 51:6, 55:24, 79:12, 97:13, 97:15
**facts** [11] - 11:6, 12:17, 13:1, 15:3, 20:19, 24:16, 39:4, 44:5, 51:9, 51:10, 51:19
**factual** [11] - 10:3, 10:4, 10:7, 10:20, 11:17, 11:24, 14:11, 16:21, 19:15, 19:16, 44:17
**failing** [1] - 95:13
**fails** [1] - 34:2
**failure** [1] - 10:20
**fairly** [4] - 3:23, 30:13, 72:15, 91:4

**fake** [1] - 93:22
**fall** [3] - 45:1, 64:10, 84:25
**fallen** [1] - 27:13
**false** [1] - 96:18
**family** [3] - 72:14, 95:3, 95:7
**famously** [1] - 74:12
**far** [5] - 15:10, 34:2, 54:22, 73:12, 79:2
**fashion** [2] - 40:20, 70:2
**fashioning** [2] - 51:20, 89:16
**faulted** [1] - 69:8
**faulting** [1] - 39:22
**favoritism** [1] - 81:24
**FBI** [4] - 45:8, 48:25, 60:2, 81:9
**FCI** [2] - 102:2, 102:3
**FCRR** [3] - 12:2, 102:14, 102:24
**fear** [1] - 55:12
**fears** [1] - 5:23
**federal** [1] - 98:15
**Federal** [4] - 12:19, 15:22, 58:6
**feed** [1] - 72:8
**fell** [1] - 57:1
**fellow** [3] - 26:20, 27:23, 55:18
**felonious** [3] - 20:9, 20:24, 23:11
**felony** [18] - 3:6, 17:12, 20:25, 22:19, 23:16, 23:20, 28:8, 29:9, 29:12, 29:14, 30:5, 30:7, 30:11, 30:22, 30:23, 32:5, 90:25
**females** [1] - 86:1
**few** [3] - 40:22, 52:16, 65:24
**fight** [2] - 27:16, 83:18
**figures** [1] - 74:23
**file** [1] - 101:3
**filed** [1] - 100:24
**filing** [1] - 100:25
**fill** [1] - 66:12
**filled** [1] - 66:5
**film** [1] - 27:14
**final** [1] - 4:23
**finally** [3] - 22:21, 57:3, 66:16
**Financial** [1] - 99:12
**financial** [6] - 75:24, 99:16, 99:17, 99:18, 99:22, 100:2
**findings** [3] - 10:3, 11:24, 16:22

**fine** [6] - 32:4, 89:6, 89:7, 99:20
**First** [1] - 4:3
**first** [20] - 2:6, 4:10, 7:23, 8:6, 8:16, 21:3, 40:24, 41:2, 50:23, 51:2, 51:21, 53:22, 54:20, 55:22, 57:11, 65:23, 65:24, 78:9, 82:20, 87:9
**Fischer** [10] - 34:22, 35:16, 36:4, 36:19, 36:21, 37:2, 37:22, 38:5, 49:5, 61:15
**Fisher** [1] - 46:19
**five** [4] - 57:11, 67:7, 68:8, 98:25
**fix** [1] - 61:11
**flag** [5] - 44:13, 44:23, 56:16, 82:20, 82:23
**flagpole** [1] - 82:23
**flash** [2] - 66:24, 67:16
**flash-bangs** [2] - 66:24, 67:16
**flesh** [2] - 48:18, 57:20
**flip** [1] - 39:4
**flooding** [1] - 41:4
**focus** [2] - 43:7, 43:8
**focused** [2] - 73:21, 76:8
**focusing** [1] - 77:11
**folks** [1] - 86:16
**follow** [2] - 42:23, 92:14
**following** [5] - 24:19, 32:2, 62:25, 98:9, 99:3
**foot** [1] - 44:23
**footage** [6] - 21:8, 21:9, 21:19, 28:20, 66:24, 83:14
**footages** [1] - 56:15
**FOR** [3] - 1:1, 1:11, 1:17
**force** [4] - 26:10, 27:7, 28:13, 33:19
**forced** [2] - 47:4, 55:21, 56:1
**forceful** [1] - 82:18
**forcibly** [1] - 97:3
**Ford** [1] - 99:12
**forefront** [1] - 57:2
**foregoing** [1] - 102:15
**forfeiture** [1] - 76:17
**forgive** [1] - 22:2
**form** [3] - 20:12, 24:11, 24:15
**formed** [1] - 51:22
**former** [1] - 92:1
**forth** [3] - 36:14,

80:20, 83:24
**fortunate** [1] - 42:1
**fortunately** [1] - 43:1
**forward** [15] - 2:4, 6:24, 12:11, 13:5, 19:8, 25:10, 25:15, 26:7, 27:22, 28:22, 44:23, 56:19, 74:8, 79:10, 83:1
**four** [7] - 7:18, 18:1, 18:21, 45:13, 67:7, 83:3, 98:23
**fourth** [1] - 8:10
**frankly** [2] - 38:10, 60:17
**fraudulent** [1] - 53:6
**fray** [2] - 59:24, 70:15
**Friedrich** [2] - 2:13, 2:15
**friends** [1] - 72:13
**frighten** [1] - 23:13
**front** [6] - 12:24, 21:15, 25:13, 41:8, 56:22, 91:2
**Front** [9] - 6:22, 7:1, 43:22, 53:22, 54:6, 54:21, 57:4, 57:12, 57:13
**fuck** [2] - 48:17, 57:19
**fucking** [20] - 25:4, 26:24, 29:1, 41:15, 41:16, 41:17, 48:9, 48:10, 48:11, 48:13, 55:19, 56:6, 56:17, 84:3, 93:7, 93:8, 93:22
**full** [7] - 31:14, 35:24, 48:2, 52:18, 82:9, 100:2, 102:16
**fuller** [2] - 14:9, 14:15
**fully** [2] - 9:5, 49:16
**fun** [1] - 90:3
**function** [9] - 32:17, 33:5, 33:10, 33:13, 35:4, 46:10, 46:13, 64:9, 97:7
**fundamental** [1] - 89:3
**fundraising** [1] - 76:8
**funds** [1] - 76:16
**future** [2] - 90:12, 95:17

**G**

**gain** [1] - 81:24
**gas** [1] - 54:7
**gear** [3] - 54:11, 66:23, 92:7
**geared** [1] - 67:25
**general** [5] - 11:22,

49:20, 61:2, 72:2, 78:24
**generally** [8] - 3:24, 11:1, 15:3, 36:7, 37:16, 70:8, 90:2, 90:23
**generate** [1] - 53:16
**gentleman** [1] - 83:14
**Georgia** [2] - 102:2
**Gillespie** [2] - 96:9, 96:12
**Gillespie's** [1] - 96:20
**given** [9] - 4:17, 8:5, 9:13, 38:11, 42:12, 51:8, 67:24, 79:11, 95:23
**glamorized** [1] - 71:17
**glass** [1] - 93:1
**goal** [4] - 52:7, 52:20, 53:1, 53:18
**God** [1] - 55:10
**GoFundMe** [1] - 76:13
**government** [57] - 2:6, 5:4, 5:11, 6:4, 6:21, 7:24, 8:7, 8:17, 9:18, 13:7, 13:15, 13:17, 14:11, 14:25, 21:1, 22:24, 30:3, 30:8, 32:10, 32:15, 32:19, 32:25, 34:1, 34:12, 34:21, 35:18, 36:3, 36:4, 36:6, 36:9, 36:15, 36:20, 37:5, 37:25, 39:2, 40:21, 46:5, 47:9, 47:15, 50:10, 51:2, 51:9, 51:15, 51:19, 61:1, 63:2, 64:9, 64:19, 64:22, 68:13, 70:17, 90:23, 90:24, 96:8, 97:2, 101:1, 101:6
**Government** [1] - 21:10
**government's** [11] - 3:10, 4:25, 5:9, 5:13, 15:6, 36:11, 36:16, 37:24, 46:7, 91:11, 96:3
**governmental** [8] - 32:17, 33:5, 33:10, 33:12, 35:4, 46:10, 46:13, 97:7
**grab** [2] - 82:21, 83:7
**grabbing** [1] - 97:3
**grace** [1] - 55:10
**grant** [4] - 38:23, 45:18, 46:7, 46:19
**granted** [1] - 87:14
**granting** [1] - 96:2
**grasped** [2] - 48:21,

57:22
**gravity** [1] - 47:13
**great** [1] - 60:16
**greater** [1] - 89:23
**greatest** [1] - 28:13
**grew** [1] - 24:22
**ground** [4] - 25:14, 25:18, 27:17, 39:8
**grounds** [17] - 3:17, 25:11, 26:1, 26:3, 30:10, 30:24, 31:1, 31:4, 53:22, 54:3, 57:4, 57:10, 68:9, 78:6, 92:6, 92:15, 93:17
**group** [10] - 25:16, 28:24, 30:21, 31:9, 53:22, 71:11, 71:14, 77:23, 78:21, 93:20
**Group** [13] - 18:7, 29:19, 29:24, 29:25, 31:6, 31:7, 31:8, 31:9, 31:10, 31:11, 31:12, 31:13
**grouped** [5] - 17:14, 17:17, 17:20, 17:24, 29:25
**grouping** [4] - 17:25, 30:9, 61:24, 62:11
**groups** [3] - 17:15, 18:6, 59:6
**guard** [1] - 68:1
**guarded** [1] - 54:21
**guarding** [2] - 48:15, 56:5
**guards** [1] - 66:22
**guess** [2] - 37:13, 50:24
**guidance** [1] - 38:1
**guide** [2] - 39:1, 49:20
**guided** [1] - 38:4
**Guideline** [3] - 18:9, 18:18, 18:20
**guideline** [38] - 16:2, 18:9, 18:10, 18:11, 18:14, 18:15, 18:23, 19:11, 22:22, 23:3, 23:5, 23:8, 23:10, 23:18, 26:25, 28:16, 29:15, 29:18, 30:1, 31:16, 32:10, 32:16, 36:2, 36:3, 36:7, 36:13, 37:3, 37:7, 37:10, 37:11, 37:21, 46:11, 49:20, 50:16, 61:23, 79:10, 100:17, 100:18
**guideline's** [1] - 97:8
**guidelines** [45] - 8:3, 8:4, 17:1, 17:14,

17:23, 18:1, 20:5, 20:6, 20:7, 20:8, 29:7, 31:15, 31:19, 31:24, 32:1, 32:21, 33:3, 33:7, 33:8, 33:17, 33:18, 34:4, 34:12, 35:1, 35:6, 36:12, 37:3, 37:7, 37:9, 38:2, 38:4, 38:8, 47:12, 49:7, 49:15, 49:18, 50:12, 61:14, 61:17, 61:19, 63:6, 64:10, 95:16, 96:3, 97:19
**guidelines'** [1] - 63:22
**guilt** [1] - 100:11
**guilty** [7] - 3:4, 4:11, 12:16, 19:12, 24:14, 24:19, 90:19
**guy** [3] - 86:1, 86:5, 86:9
**guys** [2] - 83:19, 85:14

## H

**H2-205B** [1] - 99:13
**hair** [6] - 41:16, 48:4, 48:10, 52:22, 91:23, 93:8
**half** [2] - 31:12, 43:11
**halls** [1] - 54:24
**hallway** [1] - 87:11
**hand** [4] - 27:21, 56:25, 75:1, 82:20
**handful** [3] - 73:16, 73:19, 76:3
**handled** [1] - 64:16
**hands** [5] - 26:20, 48:18, 57:20, 78:18, 96:16
**hang** [2] - 40:17, 40:18
**hanging** [1] - 43:23
**happy** [1] - 79:16
**harm** [2] - 65:12, 70:7
**harming** [1] - 34:8
**Harry** [1] - 69:8
**harsh** [1] - 46:4
**head** [2] - 80:9, 86:15
**headlights** [1] - 87:10
**health** [1] - 9:14
**healthiness** [1] - 79:14
**Heaney** [1] - 5:17
**hear** [9] - 6:23, 8:6, 8:7, 8:8, 50:6, 72:3, 89:20, 94:22, 101:10
**heard** [12] - 2:14, 12:9, 21:13, 53:14, 56:14, 56:23, 65:1, 77:23,

87:13, 88:1, 88:15, 92:19
**hearing** [10] - 7:17, 7:20, 16:18, 17:1, 30:19, 42:9, 65:2, 81:18, 84:11, 91:10
**hearings** [1] - 7:18
**heart** [1] - 86:22
**hearts** [1] - 86:22
**heat** [2] - 42:7, 42:14
**heave** [1] - 28:10
**heave-ho** [1] - 28:10
**heavy** [1] - 96:21
**held** [2] - 11:12, 82:20
**help** [6] - 10:12, 26:19, 53:25, 76:17, 88:23, 92:7
**helped** [1] - 85:19
**helpful** [1] - 83:4
**helping** [4] - 22:3, 26:22, 27:6, 92:9
**helps** [2] - 41:3, 86:1
**hereby** [2] - 97:21, 102:14
**hero** [3] - 88:22, 88:25, 89:4
**heros** [1] - 73:11
**HI** [1] - 1:18
**hiding** [2] - 55:12, 88:18
**high** [1] - 36:7
**higher** [3] - 18:21, 31:22, 36:12
**highest** [4] - 31:10, 31:13, 37:11
**highly** [3] - 26:17, 55:24, 60:15
**himself** [9] - 39:24, 44:1, 44:23, 47:2, 70:1, 70:6, 73:1, 79:20, 80:6
**historic** [1] - 32:20
**historical** [1] - 101:18
**history** [11] - 8:5, 17:3, 17:9, 38:13, 44:11, 50:3, 80:7, 80:22, 90:16, 94:25, 95:8
**History** [2] - 17:9, 31:19
**hit** [1] - 25:19
**hive** [2] - 71:21, 71:23
**ho** [1] - 28:10
**Hold** [1] - 25:3
**hold** [5] - 25:14, 26:24, 29:1, 42:20, 56:17
**holding** [7] - 28:4, 29:6, 29:16, 44:13, 44:23, 56:16, 77:8
**hole** [1] - 76:22

**home** [2] - 50:24, 60:25
**honest** [2] - 81:18, 81:19
**honestly** [1] - 49:4
**honking** [1] - 86:3
**honor** [5] - 58:13, 59:22, 60:10, 70:12, 94:15
**Honor** [100] - 2:2, 2:7, 2:10, 2:19, 2:24, 4:8, 5:19, 6:6, 6:8, 6:11, 6:18, 7:11, 8:19, 8:24, 9:12, 9:16, 9:20, 9:23, 12:6, 13:3, 13:4, 15:8, 16:16, 18:2, 18:4, 18:25, 19:6, 20:23, 21:4, 21:7, 21:13, 22:2, 22:10, 22:13, 22:21, 30:15, 30:18, 32:11, 33:2, 33:3, 33:11, 33:24, 34:5, 34:19, 41:22, 43:4, 51:3, 51:5, 52:3, 52:8, 52:19, 52:25, 53:14, 53:20, 53:23, 54:17, 54:24, 55:8, 55:22, 56:9, 56:12, 57:18, 58:16, 58:23, 59:9, 59:13, 59:25, 60:13, 61:14, 63:5, 63:19, 65:17, 67:11, 80:15, 81:16, 81:18, 81:25, 82:8, 82:15, 84:6, 84:8, 84:13, 85:3, 85:23, 86:18, 86:21, 87:16, 87:21, 88:11, 88:18, 92:16, 92:17, 92:21, 94:1, 94:9, 95:21, 101:7, 101:16, 101:23
**Honor's** [2] - 82:2, 82:3
**HONORABLE** [1] - 1:8
**hope** [1] - 43:7
**horns** [1] - 86:3
**hotel** [1] - 53:13
**hours** [5] - 47:2, 57:11, 68:8, 69:17, 79:1
**House** [2] - 47:19, 99:12
**housed** [3] - 71:20, 75:10, 75:15
**HOWELL** [1] - 1:8
**huge** [1] - 92:10
**humanitarian** [3] - 85:25, 86:10, 88:25
**humanity** [1] - 87:4

9

**hundred** [1] - 65:24
**hundreds** [3] - 66:4, 68:17, 69:1
**hung** [1] - 39:19
**hurry** [1] - 46:1
**hyperbole** [5] - 42:8, 45:3, 45:10, 55:7, 57:18
**hyperbolic** [1] - 77:17

**I**

**i.e** [1] - 23:13
**idea** [1] - 90:6
**identified** [4] - 52:11, 52:17, 53:2
**identify** [1] - 2:5
**identifying** [1] - 52:25
**identity** [1] - 5:22
**illegal** [1] - 67:13
**immediately** [4] - 40:6, 40:8, 57:16, 99:22
**impact** [7] - 4:2, 5:13, 5:16, 6:1, 6:10, 7:5, 47:13
**impede** [3] - 26:16, 26:19, 68:2
**impeding** [5] - 3:15, 18:11, 18:13, 24:7, 28:2
**implement** [1] - 78:19
**importance** [2] - 33:9, 46:13
**important** [3] - 4:18, 51:7, 89:20
**impose** [7] - 8:11, 87:25, 89:22, 91:7, 97:10
**imposed** [8] - 32:22, 38:9, 91:4, 97:15, 98:12, 100:15, 100:23, 101:5
**imposing** [2] - 24:7, 36:6
**imposition** [1] - 99:20
**impression** [1] - 94:8
**improved** [1] - 9:17
**inaudible** [1] - 42:18
**incarcerated** [2] - 3:25, 95:5
**incarceration** [15] - 31:20, 32:3, 50:11, 50:16, 50:17, 50:18, 51:17, 61:6, 95:16, 96:13, 97:1, 97:9, 97:22, 97:23, 97:24
**incident** [4] - 27:9, 54:17, 77:19, 77:20
**include** [3] - 24:11,

64:2, 98:14
**included** [2] - 25:1, 37:15
**includes** [2] - 89:25, 100:5
**including** [9] - 3:6, 21:15, 25:17, 54:1, 70:13, 78:11, 95:3, 95:23, 100:14
**incongruity** [1] - 36:10
**incorporated** [2] - 35:21, 37:2
**incorrect** [5] - 21:16, 24:16, 62:16, 92:16, 100:16
**increase** [2] - 33:7, 46:11
**increases** [1] - 31:15
**increasingly** [1] - 24:22
**incredible** [1] - 80:23
**incurred** [1] - 91:5
**indeed** [2] - 48:5, 52:24
**independent** [1] - 22:23
**indicate** [1] - 55:24
**indicated** [1] - 52:15
**indicates** [1] - 49:20
**indicating** [2] - 56:25, 87:15
**indicating)** [1] - 85:20, 87:12
**indication** [1] - 54:16
**indictment** [1] - 3:6
**indisputably** [1] - 33:12
**individual** [3] - 83:25, 84:9, 96:22
**individuals** [3] - 69:6, 76:3, 85:12
**induced** [1] - 27:3
**ineffective** [2] - 19:19, 100:19
**inflammatory** [1] - 81:20
**influence** [2] - 73:3, 73:6
**information** [3] - 99:16, 99:17, 99:18
**inherent** [1] - 35:4
**initial** [2] - 44:3, 54:12
**injured** [4] - 47:6, 78:22, 83:4, 83:7
**injuring** [1] - 97:4
**injury** [5] - 23:13, 23:14, 49:22, 63:14, 83:8
**innocence** [1] - 10:19,

11:16, 11:17, 11:22
**innocent** [1] - 11:3
**inquiry** [2] - 62:5, 62:22
**inside** [23] - 24:1, 39:9, 39:18, 40:2, 40:3, 40:4, 40:8, 40:9, 40:10, 40:15, 40:17, 41:9, 41:13, 46:1, 47:2, 54:16, 66:2, 68:19, 69:11, 69:13, 89:13, 93:5
**insightful** [1] - 91:17
**insistent** [1] - 65:10
**instance** [1] - 55:16
**instances** [2] - 69:24, 83:2
**instead** [3] - 60:8, 70:9, 93:15
**instructions** [1] - 29:1
**instructs** [1] - 26:25
**insurrection** [2] - 48:24, 89:12
**insurrectionist** [2] - 81:4, 86:11
**intended** [2] - 33:19, 55:23
**intending** [1] - 40:4
**intends** [3] - 11:16, 101:25
**intense** [1] - 27:16
**intent** [32] - 20:25, 22:18, 23:12, 23:15, 23:20, 28:7, 29:8, 29:13, 30:5, 30:11, 30:22, 30:25, 33:22, 34:2, 34:7, 34:8, 38:24, 41:20, 47:23, 49:8, 49:11, 51:21, 52:1, 52:18, 53:21, 54:2, 54:16, 55:25, 57:17, 58:3, 64:3, 83:25
**intention** [4] - 12:7, 12:8, 40:5, 49:9
**intentionally** [1] - 88:12
**intentions** [2] - 26:23, 87:6
**interactive** [1] - 82:18
**interest** [2] - 99:7, 99:8
**interesting** [5] - 42:12, 73:15, 76:1, 78:4, 78:14
**interfere** [2] - 19:24, 40:4
**interfered** [1] - 47:17
**interference** [4] - 35:4, 35:7, 49:25, 64:9

**interfering** [1] - 24:8
**internalized** [2] - 37:14, 43:13
**international** [2] - 81:4, 86:12
**interrogatory** [2] - 20:13, 24:12
**interview** [3] - 48:25, 71:1, 77:2
**interviewed** [1] - 58:7
**interviewing** [2] - 60:4, 71:3
**interviews** [2] - 59:2, 76:25
**intimidating** [1] - 24:7
**investigated** [1] - 68:23
**Investigation** [1] - 58:6
**investigation** [12] - 7:25, 8:18, 8:23, 9:11, 9:22, 15:5, 15:16, 16:14, 16:19, 17:5, 23:4, 100:4
**involve** [4] - 17:17, 17:20, 24:4, 62:7
**involved** [9] - 19:25, 21:3, 24:15, 28:7, 36:1, 59:19, 63:13, 77:22, 82:13
**involvement** [2] - 27:11, 43:20
**involves** [2] - 19:24, 23:12
**irritants** [1] - 25:20
**isolated** [1] - 96:21
**issue** [4] - 13:12, 13:20, 13:25, 44:18
**issues** [2] - 84:14, 95:10
**item** [1] - 78:19
**itself** [2] - 48:20, 57:22

**J**

**J6** [4] - 60:10, 71:20, 72:16, 75:10
**jail** [1] - 74:25
**Jail** [7] - 58:22, 59:1, 59:7, 72:15, 73:23, 74:13, 75:11
**January** [44] - 4:12, 19:10, 25:24, 32:20, 33:14, 34:3, 36:1, 46:22, 47:10, 48:16, 49:1, 49:10, 51:15, 51:22, 52:10, 52:14, 53:3, 53:8, 55:9, 55:15, 57:9, 57:15, 58:3, 59:2, 59:18,

59:22, 65:12, 65:14, 70:6, 75:15, 75:24, 82:6, 86:15, 88:3, 89:4, 91:6, 91:19, 91:21, 91:25, 94:6, 94:12, 94:17, 95:11, 96:5
**Jersey** [5] - 53:14, 70:13, 72:25, 95:1, 102:1
**Jessica** [1] - 2:20
**JESSICA** [1] - 1:21
**JESSUP** [1] - 102:6
**Jesup** [2] - 102:2, 102:3
**job** [2] - 81:14, 83:22
**jobs** [1] - 54:5
**joined** [4] - 40:2, 40:8, 66:16, 93:20
**joins** [1] - 39:15
**joke** [1] - 55:7
**JR** [1] - 1:17
**Jr.'s** [1] - 74:13
**Judge** [11] - 2:13, 2:14, 35:17, 35:23, 43:16, 45:5, 64:6, 64:18, 75:5, 77:2, 77:4
**JUDGE** [1] - 1:9
**judge** [2] - 89:21, 97:1
**judged** [1] - 44:21
**judges** [4] - 35:19, 43:10, 74:25, 76:15
**judgment** [8] - 68:15, 69:21, 69:22, 69:23, 69:25, 77:14, 97:20, 100:25
**July** [1] - 5:7
**jump** [1] - 28:5
**juncture** [2] - 80:6
**June** [5] - 70:10, 70:18, 74:7, 74:9, 74:10
**jury** [10] - 3:4, 4:13, 20:13, 21:9, 22:19, 24:12, 33:21, 35:10, 44:2, 82:8
**justice** [5] - 35:3, 46:16, 62:8, 63:17, 64:1
**justified** [1] - 35:2
**juxtapose** [1] - 77:15

**K**

**Kailua** [1] - 1:18
**keep** [4] - 28:24, 65:4, 68:1, 80:9
**Keeper** [1] - 69:7
**keeping** [1] - 4:6

**kept** [1] - 26:11
**keyboard** [1] - 88:18
**kicked** [1] - 25:19
**kid** [1] - 86:1
**kill** [1] - 45:7
**kind** [5] - 69:5, 73:11, 77:2, 78:7, 78:18
**kinds** [1] - 79:2
**King** [1] - 74:13
**known** [1] - 67:5
**knows** [7] - 33:3, 33:24, 53:24, 54:24, 55:22, 56:12, 84:6

## L

**lack** [5] - 20:15, 39:17, 60:13, 68:12, 95:14
**ladder** [1] - 54:10
**Lamberth** [1] - 75:5
**Lamont** [1] - 75:14
**lane** [1] - 86:2
**language** [4] - 35:25, 46:3, 83:21, 83:23
**lapse** [1] - 66:10
**large** [4] - 24:22, 39:9, 42:19, 65:25
**largely** [1] - 10:8
**last** [5] - 5:12, 57:9, 57:12, 72:18, 81:16
**late** [6] - 5:12, 52:9, 52:12, 52:16, 53:2, 78:12
**law** [23] - 17:16, 17:18, 23:24, 24:5, 24:8, 28:18, 29:22, 31:3, 34:5, 45:6, 51:12, 51:13, 53:23, 54:4, 56:4, 60:21, 67:2, 83:3, 90:1, 92:5, 95:12, 95:14, 100:15
**lawfully** [1] - 93:4
**lawmakers** [2] - 34:9, 52:22
**lawyer** [2] - 8:7, 8:23
**lay** [3] - 19:20, 50:8, 62:18
**leads** [1] - 76:24
**leaned** [2] - 85:11, 85:19
**least** [5] - 25:17, 30:25, 54:15, 97:4, 98:21
**leave** [7] - 14:23, 25:12, 25:17, 57:2, 57:4, 92:15, 93:17
**lectern** [1] - 2:5
**lecture** [1] - 74:3
**led** [6] - 40:9, 69:21, 69:22, 75:23, 80:5

**left** [5] - 27:21, 39:20, 40:12, 86:2, 88:12
**left-hand** [1] - 27:21
**legal** [4] - 7:14, 13:24, 75:24, 89:11
**legalistic** [1] - 7:22
**legitimate** [1] - 93:10
**legitimately** [1] - 47:6
**less** [3] - 31:11, 54:11, 68:23
**lesser** [1] - 81:25
**lesson** [1] - 80:22
**letter** [6] - 74:11, 74:13, 74:14, 74:20, 74:21, 75:21
**Level** [3] - 30:20, 61:23, 61:24
**level** [34] - 17:3, 17:11, 18:19, 18:21, 23:8, 27:1, 29:20, 29:23, 30:2, 30:6, 30:9, 31:6, 31:7, 31:8, 31:9, 31:10, 31:11, 31:13, 31:16, 31:17, 37:11, 39:8, 40:7, 47:16, 50:3, 62:11, 62:12, 62:13, 62:24, 63:4, 63:9, 64:12, 79:14
**levels** [8] - 18:21, 29:20, 31:11, 36:5, 62:7, 62:25, 64:19, 64:23
**levies** [1] - 84:13
**levy** [1] - 86:20
**lie** [3] - 21:20, 21:25, 84:18
**life** [6] - 44:5, 72:10, 72:15, 72:21, 72:25, 74:4, 80:5, 95:2, 96:23
**life-threatening** [1] - 96:23
**like-minded** [1] - 74:5
**likely** [3] - 19:18, 79:15, 80:3
**limited** [1] - 96:10
**line** [24] - 21:15, 25:4, 25:8, 25:13, 25:14, 26:5, 26:24, 28:14, 28:22, 29:2, 38:7, 38:15, 39:15, 40:2, 56:17, 66:12, 82:14, 82:15, 82:16, 82:25, 84:25, 96:16, 97:4
**lines** [2] - 48:8, 48:15
**lingered** [1] - 45:25
**lingering** [2] - 39:14, 54:14
**list** [2] - 5:9, 26:4

**listened** [1] - 71:2
**listening** [1] - 87:19
**listing** [2] - 5:5, 5:7
**literally** [2] - 26:18, 91:13
**lived** [1] - 95:1
**lives** [1] - 47:18
**living** [3] - 72:10, 72:15, 76:24
**local** [1] - 98:16
**location** [1] - 24:13
**lodge** [1] - 13:24
**lodged** [2] - 9:24, 15:15
**look** [3] - 44:10, 77:14, 80:7
**looked** [4] - 4:19, 4:23, 75:7, 90:3
**looking** [4] - 41:25, 76:16, 93:20, 96:9
**losing** [2] - 67:10, 72:22
**loss** [2] - 61:16, 99:14
**losses** [1] - 47:8
**lost** [1] - 34:20
**loud** [3] - 49:15, 73:18
**love** [1] - 55:1
**low** [1] - 36:7
**lower** [4] - 28:10, 82:24, 85:10, 87:2
**Luther** [1] - 74:13

## M

**ma'am** [8] - 8:14, 9:7, 22:5, 85:16, 87:23, 89:10, 90:11
**machine** [1] - 1:24
**magazine** [1] - 59:11
**magazines** [1] - 73:10
**magnitude** [1] - 32:20
**maintained** [1] - 58:7
**maintains** [3] - 10:19, 11:15, 60:22
**major** [1] - 81:17
**makeshift** [2] - 54:9, 79:3
**malcontents** [1] - 95:18
**malice** [1] - 44:24
**man** [4] - 70:13, 83:17, 83:19, 84:8
**managing** [1] - 73:13
**mandatory** [3] - 50:13, 98:9, 98:14
**manner** [3] - 18:1, 83:4, 102:21
**manual** [1] - 8:4
**March** [1] - 4:14
**married** [1] - 72:21

**marshal** [3] - 75:7, 75:14, 75:20
**Martin** [1] - 74:12
**mass** [1] - 24:22
**massive** [1] - 87:4
**match** [1] - 27:20
**matter** [2] - 7:21, 86:21
**mature** [1] - 80:4
**max** [1] - 50:18
**maximum** [3] - 31:23, 31:25, 100:17
**McFadden** [2] - 64:6, 64:18
**mean** [22] - 10:15, 13:7, 13:8, 38:12, 38:21, 40:22, 55:5, 58:5, 60:24, 65:5, 65:6, 66:7, 66:23, 67:4, 70:17, 70:18, 71:23, 72:7, 72:14, 74:6, 78:23, 85:4
**meaning** [2] - 24:6, 31:6
**meaningful** [1] - 79:6
**means** [3] - 30:8, 52:8, 53:19
**meant** [1] - 23:13
**measure** [1] - 42:19
**media** [7] - 5:8, 43:4, 57:5, 57:7, 71:18, 84:25, 93:21
**Mehaffie** [1] - 64:18
**melee** [1] - 82:12
**member** [1] - 47:22
**members** [12] - 41:21, 47:5, 47:19, 48:6, 57:7, 57:11, 57:12, 59:7, 91:22, 93:9, 95:3, 95:7
**memo** [8] - 5:1, 5:2, 5:3, 19:4, 24:2, 24:10, 64:13
**menace** [1] - 79:8
**menacing** [1] - 78:20
**mental** [1] - 9:13
**mentality** [4] - 51:24, 68:20, 71:21, 71:23
**mentioned** [1] - 46:14
**merely** [2] - 23:13, 24:7
**meter** [1] - 82:4
**Metropolitan** [1] - 78:4
**MICHAEL** [1] - 1:5
**Michael** [5] - 2:3, 2:12, 44:24, 70:12, 97:20
**microphone** [3] - 6:24, 59:1
**middle** [6] - 21:6,

26:17, 27:14, 27:15, 27:19, 37:12
**might** [5] - 10:21, 54:15, 76:4, 90:3, 101:18
**miles** [1] - 86:9
**milling** [1] - 54:25
**million** [2] - 47:7, 91:5
**mind** [5] - 41:9, 55:13, 68:3, 93:3, 96:13
**minded** [1] - 74:5
**minimal** [1] - 88:13
**minimally** [1] - 87:8
**minute** [1] - 67:5
**minutes** [21] - 8:13, 39:14, 40:1, 40:11, 54:12, 54:15, 54:20, 65:22, 65:23, 66:7, 66:9, 66:10, 66:13, 67:7, 67:8, 67:13, 67:21, 68:3
**miraculously** [1] - 83:12
**misconception** [1] - 75:19
**misdemeanor** [2] - 32:6, 32:7
**misdemeanors** [2] - 3:7
**miss** [1] - 74:10
**missed** [1] - 74:18
**mistaken** [2] - 94:7, 94:10
**mitigates** [1] - 46:3
**mitigating** [5] - 66:21, 67:9, 67:22, 69:2, 79:12
**mitigator** [3] - 67:14, 68:4, 69:3
**mob** [14] - 24:25, 34:7, 46:21, 46:25, 47:18, 47:22, 51:23, 57:11, 57:12, 78:1, 92:10, 93:20, 96:17, 96:22
**model** [2] - 88:8, 88:10
**modifications** [1] - 12:5
**moment** [4] - 42:7, 42:14, 43:25, 82:11
**money** [3] - 73:20, 73:25, 74:1
**money-making** [2] - 73:20, 73:25
**monicker** [1] - 40:17
**months** [26] - 31:25, 36:9, 36:15, 36:16, 36:23, 37:4, 37:8, 37:25, 38:3, 45:12, 50:2, 50:18, 50:22,

11

50:23, 51:16, 61:18,
61:19, 61:25, 62:13,
74:17, 76:24, 98:2,
98:3
**months'** [12] - 31:20,
50:10, 50:15, 50:17,
50:19, 96:13, 97:1,
97:9, 97:22, 97:23
**morning** [15] - 2:5,
2:7, 2:9, 2:11, 2:19,
2:22, 2:23, 2:24,
2:25, 3:3, 5:11, 5:12,
6:12, 6:17, 80:19
**most** [7] - 18:10,
54:22, 59:23, 69:13,
69:23, 70:15, 95:2
**mother** [1] - 72:24
**motion** [4] - 3:10,
13:5, 48:24, 96:3
**motives** [1] - 68:14
**move** [9] - 3:24, 12:11,
24:24, 25:9, 26:7,
56:13, 56:14, 67:21,
68:5
**moved** [2] - 25:22,
83:19
**moves** [1] - 39:7
**moving** [2] - 7:3, 83:1
**MPD** [2] - 77:24, 92:7
**MR** [105] - 2:10, 2:16,
6:8, 6:11, 6:16, 6:20,
6:25, 7:8, 7:12, 9:3,
9:12, 9:16, 9:23,
10:14, 10:17, 11:8,
12:1, 12:6, 13:3,
13:10, 13:15, 13:18,
13:21, 14:5, 14:8,
14:14, 14:20, 16:16,
18:4, 18:25, 19:6,
19:15, 20:4, 20:20,
30:18, 32:13, 34:19,
35:17, 35:23, 37:13,
37:19, 38:16, 38:21,
39:4, 40:16, 41:22,
42:1, 42:4, 42:6,
42:16, 42:19, 42:25,
43:7, 45:12, 45:19,
45:22, 61:13, 62:6,
62:10, 62:19, 63:11,
64:15, 65:17, 67:1,
67:11, 67:16, 68:6,
68:10, 69:4, 70:4,
70:20, 70:24, 71:1,
71:9, 71:14, 71:19,
71:24, 72:8, 72:17,
73:5, 73:8, 73:12,
73:16, 74:1, 74:11,
74:20, 74:22, 75:4,
75:8, 75:12, 75:16,
75:21, 76:3, 76:14,

76:21, 78:3, 79:18,
79:24, 101:9,
101:11, 101:15,
101:23, 101:25,
102:4, 102:6
**MS** [40] - 2:7, 2:19,
5:19, 5:21, 6:3, 6:6,
6:18, 7:5, 7:11, 8:19,
9:20, 15:6, 18:2,
20:23, 21:17, 21:21,
22:13, 30:15, 32:11,
33:2, 51:3, 55:4,
55:21, 56:9, 58:10,
58:16, 58:23, 59:9,
59:13, 59:16, 59:21,
62:4, 62:9, 62:15,
62:21, 63:5, 63:10,
63:15, 63:19, 101:7
**mulled** [1] - 80:18
**multiple** [5] - 26:11,
42:5, 55:16, 66:5,
66:12
**must** [7] - 98:15,
98:17, 98:19, 98:23,
98:25, 99:15, 100:24

## N

**namely** [1] - 30:22
**nation** [1] - 84:4
**nature** [12] - 5:23,
20:14, 24:13, 33:9,
46:12, 57:1, 61:4,
74:16, 90:15, 91:9
**near** [1] - 28:21
**nearly** [1] - 39:14
**necessarily** [4] -
19:20, 34:22, 44:17,
64:10
**necessary** [4] - 45:8,
49:12, 82:1, 89:23
**neck** [1] - 83:7
**need** [7] - 6:23, 15:9,
22:21, 89:25, 90:17,
90:19, 96:1
**needed** [1] - 53:10
**needing** [1] - 87:1
**never** [10] - 23:24,
43:3, 64:6, 71:5,
78:5, 78:6, 81:7,
84:22, 84:23, 96:19
**nevertheless** [1] -
43:14
**New** [4] - 70:13, 72:25,
95:1, 102:1
**news** [4] - 59:21, 73:1,
93:22
**next** [8] - 8:13, 16:3,
16:25, 39:11, 59:1,
66:14, 80:14, 87:15

**nice** [1] - 80:21
**night** [1] - 5:12
**ninth** [1] - 4:4
**nobody** [3] - 72:1,
93:3, 94:17
**none** [4] - 49:6, 49:14,
75:9, 94:3
**normalized** [1] - 93:11
**normalizing** [1] - 93:9
**northwest** [3] - 7:6,
21:5, 56:20
**Northwest** [2] - 1:13,
99:24
**Note** [2] - 23:10, 64:13
**note** [2] - 20:5, 64:5
**noted** [4] - 15:8,
33:11, 52:19, 101:6
**notes** [1] - 102:16
**nothing** [10] - 33:17,
39:21, 40:11, 41:19,
60:23, 66:1, 67:18,
68:12, 69:14, 71:15
**notice** [2] - 100:24,
101:1
**notify** [1] - 99:25
**November** [1] - 3:5
**null** [1] - 102:19
**number** [3] - 58:24,
58:25, 66:10
**numerous** [4] - 4:8,
21:19, 56:14, 60:1

## O

**o'clock** [2] - 69:18,
77:20
**oath** [7] - 12:17,
12:24, 15:1, 15:20,
24:19, 65:3, 96:18
**Oath** [1] - 69:7
**object** [4] - 11:1,
11:13, 11:18, 18:22
**objected** [1] - 10:18
**objecting** [1] - 11:6
**objection** [8] - 10:25,
13:24, 15:5, 16:1,
23:1, 29:17, 30:17,
30:19
**objections** [24] - 7:25,
8:1, 8:17, 9:22, 9:23,
10:16, 10:20, 11:9,
11:21, 12:10, 15:11,
15:14, 15:17, 15:24,
16:4, 16:7, 16:9,
16:12, 16:15, 16:18,
16:20, 32:9, 101:5
**objective** [1] - 41:10
**obligation** [1] - 100:2
**obligations** [1] - 99:22
**obliged** [2] - 10:16,

65:7
**obscene** [1] - 66:25
**obstruct** [6] - 31:2,
38:24, 47:23, 49:11,
49:23, 63:16
**obstructing** [2] -
18:11, 35:9
**obstruction** [13] - 3:8,
16:10, 17:12, 34:25,
35:3, 37:1, 37:6,
38:1, 38:2, 46:16,
46:17, 49:18, 61:16
**obstructive** [1] - 38:6
**obtain** [1] - 31:8
**obvious** [2] - 42:6,
64:25
**obviously** [1] - 62:20
**occasions** [3] - 11:11,
25:25, 92:25
**occupying** [1] - 73:1
**occurred** [6] - 47:10,
82:19, 87:9, 91:6,
91:14, 95:11
**ocean** [2] - 42:20, 77:8
**October** [2] - 1:5,
102:23
**OF** [3] - 1:1, 1:3, 1:8
**offense** [55] - 8:5,
10:22, 15:3, 16:5,
16:9, 17:3, 17:7,
17:11, 17:13, 18:19,
18:21, 23:8, 24:18,
24:21, 25:5, 27:1,
29:20, 29:23, 30:2,
30:4, 30:6, 30:9,
30:20, 31:5, 31:6,
31:7, 31:8, 31:9,
31:10, 31:11, 31:13,
31:15, 31:17, 35:2,
35:3, 35:5, 35:22,
46:16, 47:16, 49:21,
49:24, 50:3, 62:11,
62:12, 62:24, 62:25,
63:4, 63:9, 63:13,
64:12, 90:1, 90:16,
91:10
**offense-level** [1] -
17:3
**offenses** [4] - 17:22,
50:18, 91:1, 91:12
**offensive** [3] - 46:2,
69:15, 77:17
**offer** [3] - 10:20,
37:22, 81:23
**offered** [1] - 82:25
**Office** [6] - 1:21, 2:21,
99:12, 99:18, 100:5
**office** [6] - 23:17,
50:15, 98:10, 99:17,
100:3, 100:8

**office's** [1] - 4:23
**Officer** [4] - 5:17,
21:13, 69:8, 99:12
**officer** [30] - 6:21, 7:1,
7:6, 10:1, 20:17,
24:5, 25:17, 27:13,
27:20, 27:22, 27:24,
34:6, 36:14, 39:20,
45:6, 45:9, 62:1,
62:3, 69:9, 78:17,
78:18, 78:19, 78:21,
83:16, 85:13, 96:16,
96:17, 96:22, 98:24,
99:15
**officers** [65] - 3:15,
5:17, 7:2, 17:16,
18:12, 18:13, 19:25,
21:12, 21:14, 24:8,
24:23, 24:24, 25:1,
25:3, 25:7, 25:9,
25:16, 25:18, 25:20,
25:22, 26:5, 26:6,
26:9, 26:10, 26:13,
26:16, 26:19, 26:21,
26:22, 27:5, 27:7,
27:8, 27:12, 28:2,
28:7, 28:14, 28:18,
28:23, 29:5, 29:13,
29:23, 39:24, 41:5,
47:7, 53:25, 54:4,
54:10, 56:4, 56:13,
56:16, 56:18, 56:24,
66:15, 69:7, 70:14,
78:21, 79:4, 83:5,
83:7, 85:12, 92:7,
92:14, 96:14, 97:4
**Official** [1] - 1:23
**official** [8] - 3:9,
29:21, 35:9, 38:6,
38:24, 49:18, 49:23,
102:25
**officials** [2] - 51:13,
60:22
**oftentimes** [1] - 64:7
**OLIVERAS** [1] - 1:5
**Oliveras** [92] - 2:3,
2:12, 2:23, 4:6, 4:15,
6:10, 7:13, 8:8, 8:20,
8:22, 12:15, 13:25,
14:11, 17:6, 20:17,
21:5, 21:11, 21:15,
21:21, 21:23, 21:24,
22:20, 24:4, 24:13,
26:23, 33:14, 33:18,
39:7, 39:13, 39:24,
41:6, 41:10, 43:9,
44:24, 45:9, 45:13,
45:25, 50:21, 51:16,
52:15, 52:17, 52:20,
53:7, 53:13, 54:1,

12

54:8, 54:14, 54:18, 54:19, 55:1, 55:8, 55:21, 56:9, 56:15, 56:22, 57:2, 57:10, 57:18, 58:10, 58:17, 58:24, 59:3, 59:17, 59:25, 60:7, 60:9, 60:17, 69:12, 70:13, 72:10, 73:13, 73:19, 76:2, 76:23, 77:5, 78:16, 78:25, 79:5, 79:11, 79:17, 80:12, 81:3, 82:13, 82:17, 88:1, 89:17, 90:13, 91:16, 97:16, 97:20, 101:18

**Oliveras's** [18] - 3:3, 4:5, 4:22, 9:13, 17:2, 33:22, 34:2, 34:8, 43:20, 45:1, 45:13, 45:14, 51:21, 52:1, 55:7, 56:3, 69:13, 77:14

**omissions** [1] - 27:2

**once** [11] - 40:6, 40:7, 40:16, 46:1, 57:25, 65:25, 68:19, 76:9, 80:7, 96:20

**one** [44] - 5:5, 5:16, 5:20, 11:10, 12:14, 12:25, 25:17, 26:20, 28:19, 31:14, 31:16, 31:23, 32:3, 40:18, 41:2, 41:4, 43:24, 43:25, 44:23, 48:1, 48:19, 48:21, 55:25, 57:11, 57:12, 57:21, 57:22, 61:10, 67:4, 68:21, 72:5, 75:2, 82:4, 82:21, 83:1, 83:4, 86:3, 89:16, 92:11, 97:4, 98:15, 98:20, 101:17

**one-dimensional** [1] - 72:5

**ongoing** [1] - 30:23

**online** [2] - 74:1, 84:24

**open** [3] - 21:9, 65:25, 87:8

**open-source** [1] - 21:9

**opens** [1] - 41:3

**opportunities** [1] - 70:5

**opportunity** [13] - 8:22, 40:7, 48:20, 57:22, 57:25, 70:23, 73:20, 73:25, 76:8, 80:13, 80:16, 80:18,

87:20

**opposed** [1] - 37:21

**Options** [1] - 98:11

**order** [4] - 49:23, 63:16, 91:7, 100:6

**ordered** [2] - 98:5, 99:5

**ordinarily** [1] - 35:1

**original** [2] - 38:17, 64:13

**originally** [1] - 63:22

**otherwise** [1] - 32:13

**outlet** [1] - 43:4

**outlined** [2] - 87:17, 97:12

**outpouring** [1] - 75:23

**outside** [19] - 39:14, 39:19, 40:2, 45:25, 54:14, 58:25, 59:7, 66:1, 66:14, 67:12, 71:4, 71:12, 71:22, 72:4, 72:6, 73:14, 74:2, 77:12, 89:13

**overarching** [1] - 89:20

**overblown** [1] - 65:19

**overly** [1] - 46:3

**overrule** [3] - 11:8, 12:9, 15:5

**overruled** [4] - 11:22, 15:17, 15:24, 29:18

**overruling** [2] - 15:10, 16:19

**overwhelmed** [2] - 46:25, 92:8

**own** [8] - 15:1, 16:24, 21:18, 48:3, 88:23, 89:2, 91:22, 95:4

## P

**p.m** [8] - 24:21, 25:7, 25:25, 26:1, 26:3, 27:9, 54:19, 102:10

**pack** [1] - 25:13

**padded** [1] - 78:22

**page** [3] - 15:15, 16:1, 64:13

**pages** [1] - 24:9

**paid** [1] - 100:2

**papers** [3] - 9:1, 19:5, 33:1

**parading** [1] - 3:19

**paragraph** [7] - 13:1, 15:25, 16:1, 16:4, 23:5, 24:21, 25:5

**paragraphs** [11] - 10:18, 11:5, 11:21, 11:23, 12:4, 13:2, 15:4, 15:17, 15:18,

16:8, 16:20

**pardon** [1] - 81:11

**Parliamentarian** [1] - 39:20

**Parliamentary** [1] - 66:15

**Parlor** [4] - 48:1, 48:16, 52:3, 57:17

**part** [13] - 10:7, 14:1, 14:7, 30:25, 34:7, 37:11, 39:17, 46:21, 46:25, 51:23, 75:11, 76:16, 78:20

**Part** [2] - 23:19, 98:10

**participant** [2] - 33:15, 54:25

**participate** [1] - 96:14

**particular** [6] - 20:15, 74:14, 74:23, 75:22, 97:5

**particularly** [6] - 35:15, 51:7, 56:24, 60:18, 60:19, 73:9

**parties** [5] - 2:4, 17:13, 17:25, 50:7

**party** [1] - 102:21

**passive** [1] - 54:25

**past** [6] - 11:11, 48:14, 54:10, 80:9, 81:14, 84:15

**patriot** [1] - 93:23

**patriots** [5] - 48:2, 48:22, 52:18, 93:24, 94:5

**pattern** [1] - 51:11

**pay** [3] - 98:5, 99:7, 99:19

**payable** [1] - 99:22

**paying** [1] - 76:19, 82:8

**payments** [2] - 76:18, 99:9

**peaceful** [7] - 32:23, 34:1, 47:17, 88:7, 91:14, 94:4, 95:19

**peeked** [1] - 87:11

**penalties** [1] - 99:8

**people** [38] - 22:8, 39:15, 40:1, 40:7, 40:18, 41:7, 42:9, 47:5, 50:8, 54:1, 57:7, 59:6, 59:10, 65:24, 66:4, 66:11, 66:25, 68:1, 68:17, 68:22, 69:11, 71:13, 71:14, 71:21, 72:4, 74:12, 77:24, 83:6, 83:10, 85:21, 88:6, 88:23, 88:24, 88:25, 90:5, 93:24, 94:13

**perception** [1] - 20:18

**perfectly** [2] - 39:16, 84:24

**perhaps** [4] - 81:21, 83:8, 94:7, 94:11

**period** [3] - 32:2, 95:5, 95:16

**periodic** [1] - 98:22

**periods** [1] - 43:23

**permission** [1] - 101:2

**permit** [1] - 57:24

**permits** [1] - 94:8

**permitted** [1] - 100:23

**persistent** [1] - 65:11

**person** [9] - 40:24, 49:23, 55:13, 58:25, 59:5, 60:3, 63:14, 67:4, 83:4

**persona** [1] - 74:2

**personally** [3] - 28:17, 38:11, 86:19

**personnel** [1] - 83:3

**perspective** [1] - 78:14

**petty** [2] - 17:22, 50:18

**Pezzola** [1] - 41:1

**Philadelphia** [1] - 53:9

**phone** [6] - 58:24, 59:2, 60:4, 70:14, 71:7, 76:25

**photocopied** [1] - 102:20

**photos** [1] - 5:8

**physical** [20] - 20:16, 20:24, 21:3, 21:17, 22:17, 24:4, 27:5, 27:25, 28:7, 29:4, 49:22, 63:14, 74:16, 74:24, 75:4, 85:7, 92:5, 92:12

**physically** [10] - 23:24, 26:8, 26:15, 26:19, 27:6, 28:2, 29:3, 53:17, 78:17, 83:15

**pick** [1] - 86:9

**picketing** [1] - 3:19

**picks** [1] - 86:5

**pile** [3] - 85:11, 85:20, 93:21

**pissed** [2] - 48:17, 57:19

**place** [1] - 89:12

**placement** [1] - 98:21

**places** [1] - 93:6

**placing** [1] - 79:7

**plain** [2] - 13:13, 15:7

**plainly** [1] - 35:14

**plan** [2] - 74:16, 97:9

**planned** [2] - 55:14,

85:1

**platoon** [1] - 53:24

**Plaza** [2] - 92:13, 93:16

**plaza** [2] - 28:3, 39:8

**plea** [36] - 2:12, 4:11, 4:12, 5:6, 7:17, 7:18, 10:7, 10:9, 12:15, 12:16, 12:18, 12:20, 13:13, 14:1, 14:6, 15:2, 15:7, 15:20, 15:21, 19:9, 19:11, 19:12, 19:17, 19:18, 22:22, 24:19, 35:10, 37:16, 37:20, 44:3, 44:6, 65:2, 80:2, 81:17, 90:25

**plus** [21] - 50:13, 61:20, 61:24, 62:11, 63:4, 63:7, 63:12, 63:20, 63:23, 63:24, 63:25, 64:1, 64:6, 64:7, 64:12

**PO** [1] - 1:18

**podium** [2] - 6:24, 19:8

**point** [11] - 14:17, 25:21, 31:16, 36:20, 39:5, 47:7, 52:2, 70:24, 72:2, 78:13, 78:15

**pointed** [2] - 39:12, 70:17

**points** [2] - 24:11, 30:2

**police** [48] - 21:11, 24:23, 25:3, 25:7, 25:9, 25:13, 25:14, 25:16, 25:17, 25:19, 25:24, 26:5, 26:14, 26:21, 27:12, 27:16, 28:1, 28:12, 28:13, 28:22, 45:8, 47:1, 47:6, 48:14, 54:7, 54:10, 56:16, 67:17, 68:1, 69:7, 79:4, 82:14, 82:15, 82:16, 82:18, 82:20, 82:22, 82:25, 83:11, 92:14, 92:23, 93:16, 93:18, 96:16, 96:22, 97:4

**Police** [5] - 53:25, 54:22, 78:4, 78:7, 92:8

**policy** [4] - 34:17, 35:14, 35:20, 46:20

**political** [2] - 49:8, 74:5

**popular** [1] - 73:9

**population** [1] - 72:2

13

**portion** [1] - 85:10
**portions** [1] - 16:22
**portrayed** [3] - 59:11, 84:9, 84:10
**portraying** [1] - 83:24
**posed** [1] - 16:21
**poses** [1] - 49:8
**position** [1] - 14:25
**possess** [1] - 98:17
**possible** [3] - 3:23, 4:1, 52:13
**Post** [8] - 42:13, 43:4, 70:10, 70:19, 71:2, 71:5, 71:6, 71:9
**post** [14] - 35:16, 36:21, 37:2, 38:5, 46:19, 52:21, 61:19, 61:21, 61:24, 62:6, 63:1, 63:23, 102:1
**post-Brock** [6] - 61:19, 61:21, 61:24, 62:6, 63:1, 63:23
**post-Fischer** [3] - 36:21, 37:2, 38:5
**postconviction** [1] - 22:6
**posted** [2] - 48:16, 48:22
**posts** [3] - 5:8, 52:3, 91:16
**posttrial** [1] - 38:14
**pouring** [1] - 86:6
**power** [7] - 32:23, 34:1, 47:18, 88:8, 91:15, 94:5, 95:20
**pre** [4] - 36:19, 37:22, 61:15, 61:18
**pre-Brock** [1] - 61:18
**pre-Fischer** [3] - 36:19, 37:22, 61:15
**precipitate** [1] - 81:25
**precisely** [3] - 27:18, 38:12, 48:23
**preface** [1] - 85:3
**prefer** [1] - 78:12
**prepared** [3] - 77:10, 78:23, 80:4
**preponderance** [2] - 21:2, 22:16
**presence** [1] - 54:7
**present** [3] - 58:12, 60:2, 60:15
**PRESENT** [1] - 1:21
**presentation** [1] - 91:11
**presented** [5] - 21:9, 22:24, 48:20, 57:22, 82:7
**presentence** [16] - 4:24, 7:25, 8:18,

8:23, 9:11, 9:22, 15:4, 15:16, 16:13, 16:19, 16:22, 17:5, 23:4, 98:11, 100:3, 100:7
**presided** [2] - 5:10, 16:24
**President** [5] - 46:24, 47:5, 47:19, 92:1
**presidential** [1] - 52:2
**press** [3] - 22:8, 73:10, 73:13
**presupposition** [1] - 20:10
**pretrial** [3] - 95:9, 95:10, 95:13
**pretty** [4] - 66:5, 78:22, 81:20, 83:21
**preventing** [1] - 66:1
**pride** [2] - 51:14, 59:17
**prison** [1] - 69:23
**Prisons** [1] - 97:21
**Prisons'** [1] - 101:13
**privilege** [1] - 49:4
**probation** [13] - 4:23, 10:1, 23:17, 36:14, 50:15, 62:1, 62:3, 98:10, 98:24, 99:15, 99:17, 100:3, 100:8
**Probation** [3] - 1:21, 2:20, 100:5
**probative** [1] - 96:10
**problem** [1] - 78:9
**problems** [2] - 75:6, 101:18
**procedural** [1] - 15:21
**Procedure** [3] - 12:19, 12:22, 15:23
**proceed** [2] - 9:15, 61:12
**proceeding** [13] - 3:9, 33:13, 33:23, 33:24, 34:3, 35:10, 38:7, 38:24, 39:9, 49:19, 49:24, 64:2, 102:10
**Proceedings** [1] - 1:24
**proceedings** [3] - 47:24, 50:1, 102:17
**proceeds** [1] - 25:6
**process** [6] - 32:23, 47:17, 68:11, 80:8, 80:10, 83:9
**proclaims** [1] - 11:2
**procured** [1] - 27:3
**produced** [1] - 1:25
**produces** [1] - 31:19
**profanely** [1] - 83:15
**profiling** [1] - 73:11

**profit** [1] - 76:9
**profiting** [1] - 76:10
**program** [1] - 101:22
**programming** [1] - 4:2
**progress** [1] - 26:8
**progressed** [2] - 25:9, 25:15
**prolifically** [1] - 52:3
**promise** [1] - 55:14
**promote** [2] - 90:1, 90:13
**prompt** [1] - 3:23
**property** [2] - 49:23, 63:14
**proposition** [1] - 78:24
**prosecute** [1] - 84:3
**prosecuted** [1] - 91:13
**prosecution** [2] - 82:7, 84:11
**prosecution's** [1] - 81:3
**protect** [2] - 65:8, 90:12
**protecting** [1] - 54:5
**protections** [1] - 13:14
**proved** [1] - 21:1
**provide** [4] - 49:19, 90:2, 90:19, 99:15
**provided** [4] - 19:1, 54:15, 72:19
**provides** [4] - 18:16, 18:20, 30:2, 46:8
**providing** [2] - 23:8, 29:19
**provision** [2] - 33:1, 35:14
**provisions** [1] - 97:18
**PSR** [8] - 8:17, 10:16, 12:10, 13:2, 16:1, 16:2, 16:15, 49:20
**PSR's** [1] - 11:12
**public** [6] - 42:12, 65:8, 76:13, 88:13, 88:17, 90:12
**published** [5] - 55:3, 55:20, 56:8, 58:9, 70:18
**pull** [2] - 96:16, 96:21
**pulled** [1] - 20:12
**pulling** [1] - 96:22
**punished** [1] - 90:10
**punishment** [2] - 35:6, 90:2
**purely** [1] - 36:17
**purpose** [3] - 41:9, 56:2, 58:3
**purposes** [8] - 11:25, 14:2, 17:14, 89:18,

89:23, 89:24, 90:14
**pursuant** [5] - 15:20, 91:7, 97:17, 100:12, 100:21
**push** [7] - 26:14, 26:22, 27:19, 28:14, 28:23, 48:14, 56:19
**pushed** [7] - 25:2, 25:18, 38:13, 56:11, 57:3
**pushes** [4] - 26:15, 28:10, 28:13, 86:4
**pushing** [10] - 7:3, 25:3, 26:9, 26:11, 26:17, 26:20, 27:6, 27:22, 28:24, 29:3
**put** [8] - 33:17, 36:14, 46:22, 72:15, 77:6, 78:18, 79:10, 83:24
**puts** [2] - 24:2, 59:1
**putting** [1] - 80:21

**Q**

**qualified** [1] - 35:11
**qualifying** [1] - 29:14
**qualms** [1] - 84:13
**quarrel** [1] - 83:18
**questions** [2] - 12:25, 77:6
**quiet** [2] - 22:4, 22:11
**quite** [4] - 22:7, 38:9, 61:5, 72:18
**quote** [6] - 18:17, 24:3, 25:6, 46:9, 49:2, 60:11
**quoted** [1] - 70:11
**quotes** [2] - 42:13, 88:16

**R**

**rabbit** [1] - 76:22
**rack** [2] - 54:9, 97:3
**rain** [1] - 86:6
**raised** [2] - 65:21, 74:23
**raising** [1] - 74:1
**rally** [2] - 92:1, 93:23
**ran** [1] - 82:24
**range** [23] - 8:4, 31:19, 31:22, 31:24, 32:4, 33:7, 36:13, 37:3, 37:7, 37:10, 37:11, 37:21, 38:1, 38:2, 46:11, 49:15, 50:2, 50:4, 50:12, 50:16, 96:4, 97:8, 100:18
**ranges** [4] - 36:7, 36:12, 37:15, 37:20

**rather** [2] - 45:19, 51:25
**rational** [1] - 67:4
**rationale** [2] - 36:11, 44:7
**rationalization** [1] - 36:11
**RDAP** [2] - 101:17, 101:20
**reached** [2] - 53:21, 55:13
**reaching** [1] - 27:18
**read** [5] - 6:15, 7:14, 10:1, 19:3, 75:18
**reading** [2] - 6:20, 70:9
**real** [2] - 77:9, 89:12
**reality** [1] - 42:20
**realize** [1] - 83:20
**really** [8] - 2:16, 11:20, 19:22, 33:25, 44:1, 55:24, 77:9, 87:16
**realtime** [1] - 53:16
**rears** [1] - 86:15
**reason** [2] - 56:2, 56:3
**reasonable** [4] - 21:1, 22:15, 77:14, 95:17
**reasons** [6] - 4:8, 4:16, 15:18, 16:20, 51:15, 97:12
**recalling** [1] - 81:12
**received** [3] - 6:11, 6:17, 100:19
**recent** [1] - 58:19
**recently** [4] - 58:12, 58:14, 58:17, 60:9
**recommend** [4] - 32:1, 95:16, 101:17, 101:20
**recommendation** [8] - 4:25, 34:13, 37:9, 38:15, 79:9, 101:13, 101:24, 102:8
**recommendations** [1] - 50:25
**recommended** [5] - 8:4, 50:9, 50:10, 50:15, 98:10
**recommends** [2] - 23:5, 51:16
**record** [10] - 2:5, 10:11, 13:23, 14:2, 14:3, 14:7, 14:15, 32:9, 91:2, 101:6
**recorded** [1] - 21:18
**records** [1] - 90:18
**red** [5] - 48:17, 48:20, 57:19, 57:21, 84:3
**red-blooded** [5] - 48:17, 48:20, 57:19,

57:21, 84:3
**reduce** [1] - 4:2
**reenter** [1] - 48:12
**refer** [3] - 18:8, 30:1, 74:12
**reference** [6] - 14:17, 18:16, 18:19, 18:23, 23:2, 30:3
**references** [1] - 82:12
**referred** [2] - 18:14, 77:16
**referring** [5] - 48:6, 64:17, 74:12, 74:21, 93:8
**reflect** [10] - 32:21, 35:6, 35:21, 41:10, 45:14, 46:12, 47:13, 49:7, 70:7, 89:25
**reflected** [8] - 10:2, 40:10, 43:20, 43:21, 44:11, 44:12, 49:14, 68:11
**reflection** [1] - 70:23
**Reform** [1] - 97:17
**refrain** [1] - 98:19
**refused** [5] - 25:12, 25:16, 56:15, 57:2, 92:14
**regard** [1] - 10:22
**regarding** [4] - 91:9, 94:25, 95:15, 96:1
**regret** [1] - 65:6
**regretful** [2] - 65:11, 95:24
**regular** [1] - 59:4
**regularly** [1] - 59:17
**rehabilitation** [1] - 90:13
**Reichler** [1] - 2:20
**REICHLER** [6] - 1:21, 2:19, 62:4, 62:9, 62:15, 62:21
**reiterate** [1] - 85:2
**rejected** [1] - 79:11
**related** [1] - 101:19
**relates** [1] - 86:19
**relatively** [1] - 77:21
**release** [13] - 32:2, 50:13, 50:19, 50:20, 50:23, 95:9, 95:10, 95:13, 98:2, 98:3, 99:16, 100:3, 102:1
**relentless** [1] - 56:10
**relevant** [1] - 16:8
**reliance** [1] - 36:17
**relied** [1] - 15:8
**relocate** [1] - 101:25
**reluctance** [1] - 51:8
**rely** [3] - 12:24, 15:1, 22:21

**relying** [1] - 35:19
**remained** [1] - 57:10
**remaining** [2] - 3:16, 17:19
**remains** [1] - 3:11
**remedy** [3] - 76:17, 76:19, 95:6
**remember** [2] - 21:4, 38:12
**reminded** [1] - 85:9
**remorse** [1] - 60:13
**remorseful** [1] - 81:24
**removed** [2] - 48:21, 57:22
**rendered** [2] - 35:11, 82:22
**rendition** [1] - 81:24
**repeat** [2] - 39:6, 62:5
**repeated** [3] - 60:8, 91:24, 95:23
**repeatedly** [3] - 41:13, 48:7, 56:13
**replace** [1] - 86:7
**report** [17] - 4:24, 7:25, 8:18, 8:23, 9:11, 9:22, 15:5, 15:16, 16:14, 16:19, 16:22, 23:4, 75:18, 75:19, 98:11, 100:4, 100:7
**reported** [2] - 1:24, 75:13
**reporter** [1] - 61:10, 71:2, 71:5, 71:10
**Reporter** [3] - 1:22, 1:23, 102:25
**represent** [1] - 88:8
**representations** [1] - 10:5
**republic** [1] - 49:3
**request** [6] - 36:15, 36:16, 37:8, 38:3, 46:7, 101:2
**requested** [3] - 46:4, 63:24, 99:16
**requesting** [1] - 90:24
**requests** [1] - 51:15
**required** [2] - 61:22, 62:13
**requires** [1] - 31:12
**resecure** [1] - 31:3
**residence** [1] - 100:6
**resist** [2] - 26:15, 26:19
**resistance** [1] - 29:4
**resisting** [4] - 3:14, 17:16, 24:7, 25:13
**resolve** [2] - 8:1, 10:16
**resorted** [1] - 34:21
**respect** [7] - 15:14,

17:11, 18:7, 38:22, 90:1, 95:14, 96:25
**respectfully** [1] - 60:24, 92:17
**respond** [1] - 20:22
**responded** [4] - 24:23, 53:4, 53:10, 53:13
**response** [1] - 53:5
**restitution** [1] - 50:13, 76:16, 76:18, 90:20, 90:21, 90:22, 90:24, 91:7, 98:25, 99:2, 99:5, 99:9
**restricted** [6] - 3:17, 17:19, 30:24, 31:1, 47:3, 68:9
**result** [6] - 32:16, 49:25, 72:24, 78:10, 97:6, 100:16
**resulted** [2] - 46:9, 47:7
**resulting** [1] - 29:23
**results** [2] - 33:4, 95:18
**resume** [1] - 56:20
**return** [1] - 99:17
**revert** [1] - 80:25, 85:10
**review** [5] - 4:18, 16:24, 49:17, 58:19, 89:18
**reviewed** [3] - 6:5, 6:9, 9:10
**rhetoric** [10] - 41:14, 42:8, 45:2, 48:8, 52:11, 57:6, 58:2, 58:11, 77:15, 77:16
**rides** [1] - 88:24
**right-hand** [1] - 56:25
**righteousness** [2] - 44:10, 79:19
**rights** [1] - 15:21
**riot** [6] - 54:10, 66:23, 92:6, 93:12, 96:15, 96:21
**rioter** [5] - 25:2, 26:21, 67:25, 84:9, 86:11
**rioter-geared** [1] - 67:25
**rioters** [38] - 21:14, 24:22, 24:24, 24:25, 25:7, 25:10, 25:11, 25:13, 25:14, 25:16, 25:19, 25:20, 26:6, 26:8, 26:11, 26:24, 27:6, 27:16, 27:23, 28:1, 28:3, 28:6, 28:11, 28:12, 28:21, 29:1, 29:4, 46:22, 48:14, 53:22, 54:22,

55:18, 56:19, 57:1, 57:5, 85:4, 92:9, 93:12
**rip** [2] - 48:3, 52:20
**ripped** [1] - 82:22
**ripping** [1] - 91:22
**risk** [1] - 14:1
**risks** [1] - 32:22
**road** [2] - 86:4, 88:24
**roadway** [1] - 86:2
**roamed** [2] - 54:24, 55:15
**robbed** [1] - 49:3
**Robert** [1] - 5:17
**Robertson** [3] - 45:4, 45:5
**role** [1] - 69:4
**Room** [1] - 99:13
**room** [1] - 66:12
**roots** [2] - 74:7, 74:9
**Rotunda** [1] - 87:13
**roughly** [2] - 50:22, 72:25
**RPR** [3] - 1:22, 102:14, 102:24
**Ruffin** [1] - 75:14
**Rule** [6] - 12:19, 12:23, 13:13, 15:22
**rule** [2] - 11:7, 23:1
**run** [4] - 67:6, 71:25, 84:20, 97:24
**rushed** [1] - 82:16

## S

**safety** [1] - 5:23
**Sandlin** [1] - 69:9
**satisfied** [1] - 9:6
**satisfies** [1] - 29:10
**saving** [1] - 42:14
**saw** [11] - 5:9, 5:12, 40:7, 48:23, 52:6, 52:8, 53:20, 65:1, 70:18, 76:3, 87:6
**scaled** [1] - 87:6
**scene** [1] - 67:5
**scheduled** [1] - 4:4
**score** [1] - 17:9
**screen** [2] - 51:4, 56:25
**scrum** [2] - 27:14, 92:13
**season** [1] - 60:18
**seated** [2] - 8:15, 9:9
**second** [11] - 8:2, 22:18, 27:9, 34:23, 54:17, 54:18, 55:23, 56:1, 58:1, 61:10, 61:13
**seconds** [1] - 27:21

**section** [2] - 16:2, 83:6
**Section** [27] - 3:9, 3:14, 3:15, 3:20, 18:11, 18:14, 18:16, 19:11, 19:13, 20:11, 20:12, 23:6, 24:3, 24:20, 26:25, 29:10, 29:18, 29:22, 38:19, 46:8, 46:17, 91:8, 97:18, 98:6, 99:1, 100:12, 100:21
**Sections** [1] - 3:18
**security** [1] - 47:1
**see** [11] - 44:12, 44:22, 45:10, 52:21, 69:19, 78:16, 79:16, 82:1, 83:5, 83:6, 87:4
**seeing** [2] - 66:22, 67:5
**seeking** [2] - 36:5, 36:6
**seem** [1] - 46:1
**select** [1] - 82:10
**self** [1] - 44:10
**self-righteousness** [1] - 44:10
**Senate** [10] - 25:8, 39:10, 48:23, 54:8, 54:14, 54:20, 56:12, 69:10, 93:2
**SENIOR** [1] - 1:9
**sense** [2] - 68:17, 79:19
**sentence** [32] - 8:11, 31:23, 33:8, 37:15, 46:11, 50:21, 51:16, 51:20, 60:6, 69:23, 80:3, 81:25, 84:13, 86:20, 87:24, 87:25, 89:17, 89:22, 89:25, 90:17, 94:23, 96:1, 97:10, 97:15, 99:2, 100:6, 100:13, 100:15, 100:18, 100:22, 101:5
**sentenced** [6] - 3:12, 4:10, 43:12, 96:13, 97:1, 98:1
**sentences** [10] - 3:23, 4:3, 36:18, 36:22, 38:8, 38:11, 50:9, 90:17, 95:15
**Sentencing** [2] - 97:17, 98:11
**SENTENCING** [1] - 1:8
**sentencing** [39] - 3:4, 4:4, 4:13, 4:18, 4:19, 4:22, 4:24, 5:1, 5:2,

15

8:4, 8:9, 9:2, 9:15, 11:25, 13:23, 14:2, 14:18, 16:23, 19:4, 31:22, 37:19, 38:14, 43:11, 49:7, 50:2, 50:25, 55:6, 64:13, 68:24, 84:11, 89:18, 89:19, 89:21, 89:24, 97:19, 100:16, 100:20

**separate** [5] - 17:15, 25:25, 47:3, 92:5, 92:25

**separately** [1] - 18:6

**September** [1] - 3:11

**serious** [4] - 23:14, 49:10, 91:12, 94:21

**seriousness** [2] - 32:21, 90:1

**serve** [1] - 98:1

**served** [3] - 50:22, 50:24, 98:4

**services** [1] - 9:6

**set** [1] - 4:20

**setting** [1] - 37:23

**setup** [1] - 71:15

**seven** [1] - 3:5

**seventy** [1] - 45:12

**seventy-two** [1] - 45:12

**several** [5] - 21:11, 74:25, 78:5, 83:16, 84:15

**severe** [1] - 100:17

**shall** [7] - 98:8, 99:3, 99:9, 99:25, 100:3, 100:7, 102:19

**share** [2] - 72:3, 99:17

**shared** [1] - 41:11

**sheer** [1] - 87:1

**sheet** [1] - 6:1

**shield** [3] - 41:1, 96:15, 96:21

**SHIPLEY** [106] - 1:17, 2:10, 2:16, 6:8, 6:11, 6:16, 6:20, 6:25, 7:8, 7:12, 9:3, 9:12, 9:16, 9:23, 10:14, 10:17, 11:8, 12:1, 12:6, 13:3, 13:10, 13:15, 13:18, 13:21, 14:5, 14:8, 14:14, 14:20, 16:16, 18:4, 18:25, 19:6, 19:15, 20:4, 20:20, 30:18, 32:13, 34:19, 35:17, 35:23, 37:13, 37:19, 38:16, 38:21, 39:4, 40:16, 41:22, 42:1, 42:4, 42:6, 42:16, 42:19,

42:25, 43:7, 45:12, 45:19, 45:22, 61:13, 62:6, 62:10, 62:19, 63:11, 64:15, 65:17, 67:1, 67:11, 67:16, 68:6, 68:10, 69:4, 70:4, 70:20, 70:24, 71:1, 71:9, 71:14, 71:19, 71:24, 72:8, 72:17, 73:5, 73:8, 73:12, 73:16, 74:1, 74:11, 74:20, 74:22, 75:4, 75:8, 75:12, 75:16, 75:21, 76:3, 76:14, 76:21, 78:3, 79:18, 79:24, 101:9, 101:11, 101:15, 101:23, 101:25, 102:4, 102:6

**Shipley** [30] - 2:11, 6:7, 9:1, 9:6, 9:10, 10:13, 12:2, 15:25, 16:13, 18:3, 18:22, 22:4, 32:14, 34:17, 36:24, 41:12, 42:11, 54:13, 55:4, 61:9, 61:12, 62:2, 65:16, 67:10, 73:24, 80:14, 81:14, 81:17, 84:15, 101:8

**Shipley's** [1] - 85:2

**shockingly** [1] - 58:5

**shortfall** [1] - 76:18

**shorthand** [1] - 1:24

**shortly** [4] - 25:19, 58:2, 79:25, 80:1

**shoulder** [1] - 83:17

**shouting** [1] - 92:10

**shoved** [1] - 93:18

**shoving** [1] - 27:20

**show** [2] - 21:10, 22:15

**showed** [3] - 39:17, 84:17, 86:22

**showing** [3] - 95:11, 95:12, 95:14

**shown** [3] - 28:19, 28:20, 44:20

**shows** [7] - 26:4, 26:7, 27:14, 27:25, 39:13, 51:25, 93:22

**siblings** [2] - 72:23, 95:3

**sic** [2] - 3:14, 84:7

**sic]** [1] - 102:6

**side** [3] - 39:4, 56:25, 69:19

**sides** [2] - 7:4, 28:25

**sideways** [1] - 2:13

**sights** [1] - 41:25

**signatory** [1] - 102:21

**signed** [1] - 12:18

**significant** [9] - 32:17, 33:4, 33:12, 46:9, 61:6, 65:14, 70:11, 97:5, 97:7

**signs** [2] - 19:17, 54:6

**silence** [1] - 66:9

**similar** [3] - 28:19, 90:18, 90:19

**simple** [1] - 23:23

**simply** [9] - 9:24, 10:10, 12:8, 13:23, 19:23, 33:17, 36:20, 44:20, 61:5

**single** [1] - 68:21

**sirens** [1] - 54:7

**sitting** [4] - 58:21, 58:25, 60:19, 73:23

**situation** [7] - 11:18, 26:12, 26:18, 28:25, 79:22, 83:14, 83:17

**six** [4] - 3:11, 36:23, 74:23, 76:24

**sketch** [1] - 72:19

**slash** [1] - 53:11

**small** [2] - 26:10, 28:24

**smoke** [1] - 82:2

**social** [2] - 5:8, 84:25

**solitary** [1] - 72:15

**sometimes** [2] - 59:7, 77:7

**somewhat** [1] - 72:5

**somewhere** [1] - 37:12

**soon** [3] - 4:1, 53:21, 82:19

**sorry** [8] - 6:25, 41:12, 41:19, 60:11, 73:5, 94:18, 95:25, 101:10

**sort** [5] - 13:11, 44:1, 69:5, 72:17, 78:23

**sought** [2] - 77:5, 90:23

**sound** [1] - 7:22

**source** [1] - 21:9

**sources** [1] - 42:5

**sovereign** [1] - 49:3

**spared** [2] - 13:11, 13:19

**sparks** [6] - 40:20, 41:2, 41:3, 41:4, 41:6, 69:7

**Sparks** [1] - 40:24

**Speaker** [1] - 47:19

**speaking** [3] - 22:9, 88:13, 88:17

**special** [8] - 20:13, 24:12, 32:4, 32:8,

50:13, 53:15, 98:5, 99:3

**specific** [14] - 10:20, 16:5, 16:9, 16:20, 24:13, 29:7, 31:5, 33:22, 60:16, 61:3, 62:25, 65:7, 65:13, 95:22

**specifically** [3] - 4:7, 11:6, 55:5

**specifics** [1] - 11:1

**specify** [1] - 24:12

**spectrum** [4] - 43:10, 43:13, 77:21, 79:7

**spell** [1] - 102:5

**spent** [1] - 44:4

**spewing** [1] - 86:7

**spoken** [1] - 43:3

**sporadic** [1] - 51:22

**spot** [1] - 78:11

**sprayed** [1] - 25:20

**squad** [1] - 24:22

**staff** [1] - 47:5

**staffs** [1] - 47:20

**stairs** [1] - 41:5

**stand** [11] - 7:15, 8:21, 34:4, 44:14, 44:19, 44:21, 59:7, 80:9, 80:14, 85:23

**standing** [8] - 21:11, 39:20, 44:13, 44:22, 66:1, 67:17, 68:12, 86:6

**stands** [3] - 46:18, 71:12, 92:4

**start** [4] - 2:6, 3:22, 17:2, 63:4

**started** [2] - 52:2, 91:20

**starting** [5] - 8:16, 18:7, 24:17, 52:8, 60:1

**state** [4] - 33:4, 81:22, 97:15, 98:15

**statement** [17] - 5:13, 5:16, 6:1, 6:10, 7:6, 10:7, 12:17, 13:1, 15:3, 19:16, 24:18, 24:20, 25:5, 34:18, 35:14, 35:21, 46:20

**statements** [4] - 15:23, 22:7, 42:13, 65:3

**STATES** [4] - 1:1, 1:3, 1:9, 1:11

**States** [5] - 2:3, 2:8, 2:20, 33:19, 64:17

**statute** [1] - 18:8, 99:1, 100:23

**statutory** [3] - 31:22,

31:25, 100:13

**stay** [2] - 44:3, 87:22

**steady** [1] - 66:12

**steamrolled** [1] - 80:8

**stenographic** [1] - 102:16

**Step** [1] - 4:3

**step** [14] - 6:24, 7:21, 7:23, 8:2, 8:6, 8:10, 8:16, 16:3, 16:25, 19:8, 45:17, 50:6, 81:22, 83:19

**stepped** [1] - 81:17

**steps** [8] - 7:19, 24:25, 26:6, 28:22, 28:23, 48:4, 52:23, 91:24

**Stevens** [3] - 28:4, 29:6, 29:16

**still** [8] - 18:22, 54:21, 60:19, 60:22, 64:3, 64:8, 70:21, 79:11, 79:18, 89:15, 94:18

**stolen** [2] - 49:2, 96:15

**stomach** [1] - 86:8

**stood** [11] - 10:10, 25:12, 46:18, 56:4, 56:16, 66:9, 66:14, 67:12, 68:2, 68:5

**stop** [11] - 33:22, 46:22, 52:7, 53:1, 53:19, 56:3, 67:25, 83:10, 86:6, 86:9, 92:10

**stopping** [2] - 26:8, 34:8

**stops** [2] - 86:1, 86:5

**storm** [1] - 84:1

**story** [2] - 88:23, 89:2

**straight** [1] - 82:20

**strangle** [1] - 23:15

**strangling** [1] - 23:14

**Street** [1] - 1:13

**strength** [1] - 27:7

**strike** [1] - 27:18

**strong** [1] - 72:12

**struggle** [1] - 27:11

**stuck** [5] - 42:2, 69:16, 76:4, 86:2, 93:19

**stuff** [2] - 82:4, 84:7

**Sturgeon** [2] - 96:9, 96:25

**subject** [4] - 7:21, 13:3, 18:1, 72:18

**submit** [1] - 98:20

**submitted** [5] - 5:4, 5:6, 5:7, 6:10, 9:2

**substance** [2] - 98:18, 98:20

**substantial** [3] - 47:10, 49:25, 64:8
**substantive** [1] - 10:9
**sufficient** [2] - 15:10, 89:22
**suffocate** [1] - 23:15
**suffocating** [1] - 23:14
**sum** [1] - 84:12
**summarize** [1] - 15:19
**summarized** [3] - 15:4, 15:15, 51:6
**summarizes** [1] - 32:19
**summation** [1] - 30:13
**summer** [2] - 58:16, 58:20
**Sunday** [1] - 70:10
**superior** [1] - 14:17
**supersede** [1] - 10:4
**superseding** [1] - 3:5
**supervised** [7] - 32:2, 50:12, 50:19, 50:20, 50:23, 98:2, 98:3
**supervision** [3] - 98:8, 98:13, 98:21
**supplemental** [4] - 5:1, 5:3, 24:2, 24:10
**supplemented** [1] - 16:23
**support** [4] - 5:6, 22:23, 75:23, 84:19
**supported** [1] - 29:15
**supporters** [1] - 74:5
**supposed** [2] - 4:10, 35:21
**surge** [1] - 28:22
**surprised** [1] - 87:8
**survive** [1] - 78:1
**swarmed** [2] - 25:1, 53:25
**symbolism** [1] - 44:21
**sympathetically** [1] - 59:11
**system** [2] - 34:1, 89:11

---

**T**

**tail** [1] - 67:6
**tapped** [1] - 83:17
**target** [4] - 34:3, 52:6, 52:12, 53:18
**taxpayers** [1] - 76:19
**technically** [1] - 64:2
**teenage** [1] - 86:1
**ten** [16] - 39:14, 40:1, 54:11, 54:15, 54:19, 65:22, 65:23, 66:7, 66:9, 66:13, 67:8, 67:13, 67:21, 68:3

**tends** [1] - 42:7
**tensions** [1] - 24:21
**term** [4] - 19:17, 61:6, 97:22, 98:1
**termination** [1] - 100:9
**terms** [6] - 13:13, 15:7, 29:7, 34:24, 50:9, 91:24
**terrace** [2] - 82:24, 87:2
**Terrace** [8] - 7:10, 24:1, 26:2, 27:10, 39:8, 82:12, 85:11, 87:1
**terrorist** [3] - 81:5, 81:7, 86:12
**test** [1] - 98:20
**testified** [3] - 5:18, 21:14, 96:18
**testifying** [1] - 5:23
**testimony** [15] - 9:25, 10:4, 10:8, 11:9, 11:23, 12:4, 12:9, 12:10, 12:24, 21:13, 22:15, 56:23, 77:23, 77:25, 96:18
**tests** [1] - 98:22
**thankful** [1] - 90:7
**THE** [198] - 1:1, 1:8, 1:11, 1:17, 2:2, 2:9, 2:14, 2:18, 2:22, 2:24, 2:25, 3:1, 3:2, 4:7, 4:9, 5:20, 5:25, 6:4, 6:7, 6:9, 6:14, 6:19, 6:23, 7:13, 8:14, 8:15, 8:20, 8:24, 8:25, 9:5, 9:7, 9:8, 9:13, 9:18, 9:21, 10:12, 10:15, 10:18, 11:20, 12:2, 12:12, 13:7, 13:11, 13:17, 13:19, 14:3, 14:6, 14:13, 14:19, 14:22, 15:13, 16:17, 18:3, 18:5, 19:3, 19:7, 20:1, 20:18, 20:21, 21:16, 21:20, 21:23, 21:25, 22:1, 22:2, 22:3, 22:5, 22:6, 22:10, 22:11, 22:25, 30:16, 30:19, 32:12, 32:14, 34:16, 34:23, 35:18, 36:24, 37:17, 37:24, 38:17, 38:22, 40:14, 41:12, 41:24, 42:3, 42:5, 42:11, 42:18, 42:24, 43:3, 43:6, 45:11, 45:16, 45:21, 46:6, 58:14,

58:21, 59:6, 59:10, 59:14, 59:20, 61:8, 62:1, 62:17, 62:23, 63:8, 63:12, 63:16, 64:14, 65:5, 66:20, 67:2, 67:12, 67:21, 68:8, 68:21, 70:3, 70:5, 70:21, 70:25, 71:7, 71:13, 71:17, 71:23, 72:7, 72:12, 73:3, 73:6, 73:9, 73:15, 73:22, 74:9, 74:18, 74:21, 75:3, 75:6, 75:9, 75:13, 75:18, 76:1, 76:12, 76:15, 77:23, 79:16, 79:22, 80:12, 80:15, 81:6, 81:8, 81:10, 81:11, 87:22, 87:23, 87:24, 88:4, 88:6, 88:11, 88:15, 88:17, 88:19, 88:21, 88:22, 89:1, 89:2, 89:6, 89:8, 89:10, 89:11, 89:12, 89:14, 90:7, 90:9, 90:11, 90:12, 92:16, 92:18, 92:20, 92:22, 92:23, 92:24, 94:1, 94:2, 94:7, 94:10, 94:11, 94:12, 95:21, 95:22, 101:8, 101:10, 101:12, 101:20, 101:24, 102:3, 102:5, 102:7
**theatrical** [1] - 81:2
**themes** [1] - 71:25
**themselves** [4] - 13:19, 78:11, 83:9, 87:4
**then-acting** [1] - 75:7
**thereafter** [2] - 25:19, 98:22
**therefore** [5] - 11:14, 31:24, 46:19, 99:8, 99:20
**thinking** [2] - 37:19, 90:3
**thinks** [1] - 71:15
**third** [11] - 8:6, 47:3, 47:23, 48:13, 50:6, 55:23, 56:1, 56:11, 58:1, 92:25, 93:14
**thoughts** [2] - 71:24, 83:21
**thousands** [2] - 68:17, 69:2
**threat** [2] - 49:9, 79:7
**threatened** [1] - 47:18
**threatening** [5] - 41:14, 48:8, 49:22,

63:13, 96:23
**three** [9] - 3:6, 42:17, 58:18, 60:20, 67:7, 69:18, 73:17, 83:2, 98:19
**throwing** [2] - 83:11, 97:3
**title** [1] - 81:12
**today** [12] - 3:12, 4:15, 4:20, 4:23, 9:2, 9:15, 55:6, 79:20, 81:19, 81:23, 84:10, 84:13
**together** [5] - 17:17, 17:20, 64:16, 71:20, 80:21
**took** [7] - 27:25, 28:6, 57:16, 63:20, 75:1, 89:12
**total** [13] - 29:23, 31:6, 31:7, 31:8, 31:10, 31:11, 31:13, 31:14, 31:15, 31:17, 32:8, 50:3, 75:19
**totally** [2] - 36:24, 38:19
**tourist** [1] - 55:1
**toward** [1] - 25:20
**track** [1] - 4:6
**trained** [1] - 78:6
**training** [1] - 78:7
**traitor** [1] - 84:3
**traitors** [17] - 41:15, 41:17, 41:18, 41:21, 48:9, 48:10, 48:11, 48:14, 48:21, 55:17, 55:19, 56:7, 57:23, 58:4, 93:7, 93:8
**trampled** [1] - 85:22
**TRANSCRIPT** [1] - 1:8
**transcript** [5] - 1:25, 10:2, 102:16, 102:17, 102:20
**transcription** [1] - 1:25
**transfer** [3] - 91:15, 94:4, 95:19
**transition** [4] - 32:23, 34:1, 47:18, 88:7
**trap** [2] - 26:16, 28:23
**trapped** [3] - 26:9, 27:8, 72:1
**trapping** [1] - 27:6
**traveled** [1] - 53:8
**traveling** [1] - 47:25
**treason** [2] - 48:19, 57:20
**treatment** [3] - 100:7, 100:9, 101:21
**trespass** [6] - 30:2, 30:4, 30:10, 30:21,

30:24, 31:1
**trespassing** [1] - 94:4
**trial** [43] - 3:4, 4:13, 5:9, 5:10, 5:18, 5:24, 9:24, 10:1, 10:4, 10:8, 10:10, 11:9, 11:15, 11:24, 12:4, 12:24, 13:8, 13:16, 13:23, 14:2, 14:3, 14:9, 14:12, 14:15, 15:9, 16:23, 21:4, 22:14, 22:15, 22:24, 35:11, 44:2, 53:14, 53:20, 55:6, 56:23, 60:20, 81:1, 81:7, 82:9, 84:10, 90:25, 96:18
**tried** [8] - 26:7, 26:10, 26:14, 47:3, 47:22, 48:12, 92:25, 95:6
**trouble** [1] - 83:8
**troubling** [1] - 51:11
**true** [3] - 53:15, 102:15, 102:16
**Trump** [1] - 84:19
**truth** [3] - 85:25, 86:14, 86:17
**try** [4] - 44:19, 56:19, 67:25, 81:24
**trying** [13] - 28:2, 28:14, 41:8, 42:20, 53:24, 58:1, 62:21, 68:1, 76:22, 92:7, 92:8, 92:10, 93:10
**tunnel** [1] - 28:11
**tunnels** [1] - 53:11
**turn** [6] - 17:3, 30:6, 51:2, 67:6, 73:25, 76:4
**turned** [2] - 54:9, 73:20
**turning** [3] - 8:20, 38:16, 39:4
**twice** [3] - 17:6, 47:22, 93:18
**Twitter** [1] - 57:16
**two** [24] - 3:7, 5:20, 17:15, 25:24, 32:5, 32:6, 32:7, 39:10, 43:11, 43:22, 43:23, 45:12, 47:3, 64:18, 67:7, 69:17, 77:19, 92:4, 92:5, 92:24, 98:17, 98:21, 101:15
**type** [1] - 86:13
**types** [2] - 90:16, 95:15
**typical** [1] - 37:21
**typically** [2] - 36:4, 58:25

## U

**U.S** [9] - 1:21, 28:4, 84:5, 93:12, 99:10, 99:18, 99:23, 100:5, 100:11
**U.S.C** [17] - 3:9, 3:14, 3:15, 3:18, 3:20, 7:7, 19:13, 22:19, 24:20, 29:10, 46:17, 91:8, 97:18, 98:6, 99:1, 100:12, 100:21
**ugly** [1] - 86:15
**ultimate** [2] - 33:7, 34:13
**ultimately** [2] - 19:10, 96:10
**unabated** [1] - 74:8
**unable** [1] - 101:1
**unAmerican** [1] - 94:5
**unapproved** [1] - 76:25
**unauthorized** [1] - 76:25
**under** [43] - 4:3, 8:4, 12:17, 12:24, 15:1, 15:20, 15:21, 16:9, 20:11, 23:18, 24:19, 29:14, 31:15, 31:16, 32:16, 32:24, 34:11, 37:6, 37:8, 37:22, 38:1, 38:23, 39:23, 40:22, 46:8, 46:20, 49:16, 51:10, 61:20, 62:24, 63:2, 63:3, 63:21, 64:22, 65:3, 79:13, 85:13, 85:14, 89:11, 94:8, 96:18, 97:11, 100:14
**undercuts** [1] - 40:3
**understood** [1] - 80:2
**undisputed** [1] - 33:21
**unfortunate** [5] - 41:22, 41:23, 42:1, 95:4
**unfortunately** [2] - 43:2, 71:19
**unique** [1] - 34:10
**unit** [5] - 31:12, 31:14, 77:24, 78:11, 81:10
**United** [5] - 2:3, 2:8, 2:20, 33:19, 64:17
**UNITED** [4] - 1:1, 1:3, 1:9, 1:11
**units** [1] - 31:14
**unlawful** [1] - 98:19
**unlawfully** [1] - 98:17
**unless** [3] - 35:5, 56:2
**unmonitored** [1] - 76:25
**unusual** [1] - 35:5
**unwarranted** [2] - 90:17, 96:1
**up** [42] - 11:12, 25:21, 26:6, 26:12, 32:3, 37:25, 38:14, 39:8, 41:5, 42:22, 44:13, 45:5, 51:23, 59:23, 60:2, 61:13, 61:23, 66:5, 66:12, 67:8, 70:15, 72:21, 74:2, 74:4, 76:6, 78:22, 80:3, 80:9, 80:10, 80:14, 82:20, 84:12, 84:17, 85:11, 85:23, 86:5, 86:9, 86:22, 87:2, 87:5, 93:23
**upcoming** [1] - 60:6
**upper** [1] - 27:21
**Upper** [6] - 7:9, 23:25, 26:1, 27:10, 39:8, 93:16
**upward** [25] - 32:15, 32:24, 33:1, 34:12, 34:14, 35:12, 35:14, 36:12, 38:4, 38:23, 39:1, 45:21, 46:8, 46:19, 49:16, 50:4, 50:11, 63:25, 64:7, 64:18, 96:3, 96:5, 96:7, 97:10, 97:11
**upwardly** [1] - 97:6
**upwards** [1] - 97:10
**urged** [1] - 48:14
**urgency** [2] - 39:17, 68:12
**urges** [1] - 34:12
**user** [4] - 52:13, 53:2, 53:5, 53:10
**uses** [2] - 41:1, 58:24
**utility** [1] - 96:11
**utter** [1] - 60:13
**utterance** [1] - 42:18

## V

**vacated** [3] - 35:16, 37:2, 46:19
**value** [1] - 96:10
**vanguard** [1] - 66:3
**variance** [6] - 34:15, 36:12, 50:11, 61:23, 62:14, 97:11
**variety** [2] - 13:22, 19:24
**various** [4] - 4:8, 4:15, 5:4, 93:6
**vary** [1] - 64:7
**vehicle** [1] - 86:6
**verbally** [1] - 83:15

**verdict** [3] - 20:12, 24:11, 24:14
**verdicts** [1] - 43:21
**verify** [1] - 86:18
**versus** [2] - 2:3, 64:17
**veteran** [1] - 86:5
**Vice** [2] - 47:4, 47:19
**victim** [8] - 5:13, 5:16, 5:25, 6:10, 7:5, 17:17, 17:21, 29:21
**victims** [1] - 29:22
**Video** [1] - 26:4
**video** [24] - 5:4, 15:10, 25:23, 26:7, 27:12, 27:17, 27:21, 39:13, 39:19, 42:5, 44:20, 55:3, 55:20, 56:8, 58:9, 60:20, 69:19, 75:17, 82:7, 83:10, 83:11, 83:13, 92:20
**videos** [8] - 5:5, 5:8, 28:20, 43:21, 81:15, 87:14, 91:22, 92:18
**videotape** [2] - 78:16, 79:1
**videotaped** [1] - 91:25
**view** [5] - 14:9, 15:6, 72:2, 72:5, 76:7
**vigil** [2] - 70:14, 71:8
**violation** [11] - 3:9, 3:13, 3:15, 3:18, 3:20, 19:13, 20:15, 24:3, 24:19, 29:9, 46:17
**violence** [18] - 49:8, 49:12, 51:12, 51:13, 52:5, 52:8, 53:19, 53:23, 55:2, 60:22, 60:22, 67:18, 77:22, 91:18, 96:14, 96:20, 100:15
**violent** [12] - 25:15, 25:21, 27:11, 27:15, 27:20, 41:14, 48:8, 52:18, 57:1, 57:6, 83:25, 92:13
**violently** [2] - 25:1, 55:18
**Virginia** [1] - 45:6
**visual** [1] - 87:3
**vocal** [1] - 54:3
**vocally** [1] - 22:7
**void** [1] - 102:19
**volitional** [1] - 80:4
**vote** [4] - 38:25, 46:23, 49:4, 50:2
**vs** [1] - 1:4

## W

**wait** [2] - 45:20, 61:10
**waited** [1] - 66:9
**waiting** [1] - 67:4
**waived** [2] - 13:14, 15:21
**waiver** [4] - 10:21, 12:18, 12:22, 14:6
**waives** [2] - 99:8, 99:20
**walk** [2] - 26:5, 66:11
**walked** [4] - 40:11, 54:10, 87:9, 87:13
**walking** [6] - 41:14, 41:24, 54:25, 77:24, 85:21, 93:6
**wants** [2] - 68:13, 88:22
**war** [2] - 52:10, 91:18
**warned** [1] - 60:4
**warrant** [1] - 61:5
**warranted** [2] - 49:16, 96:6
**Washington** [16] - 1:6, 1:14, 42:13, 43:4, 49:1, 53:8, 70:10, 70:19, 71:2, 71:5, 71:6, 71:9, 84:1, 84:17, 99:13, 99:24
**watched** [8] - 21:18, 39:24, 39:25, 57:5, 66:14, 66:16, 67:13
**watching** [3] - 39:21, 40:1, 60:20
**water** [1] - 83:11
**ways** [2] - 19:24, 87:11
**weapon** [5] - 23:12, 23:13, 78:19, 82:21, 83:1
**weapons** [2] - 79:3
**weeks** [1] - 58:18
**weight** [1] - 26:18
**west** [1] - 28:10
**West** [17] - 6:22, 7:1, 7:9, 24:1, 26:1, 27:10, 39:8, 43:22, 53:22, 54:6, 54:21, 57:12, 82:12, 85:10, 86:25, 92:13, 93:16
**wheat** [1] - 69:5
**who'd** [1] - 88:6
**whole** [4] - 12:16, 66:22, 85:5, 93:20
**Wickham** [2] - 5:17, 21:14
**wide** [1] - 13:22
**widespread** [2] - 74:15, 74:22

**wildly** [1] - 65:19
**willfully** [1] - 27:4
**WILLIAM** [1] - 1:17
**William** [1] - 2:11
**willing** [5] - 33:14, 44:14, 44:21, 45:7, 65:20
**wind** [1] - 83:12
**window** [3] - 40:25, 41:2
**windows** [4] - 39:10, 41:8, 67:19, 93:2
**Wing** [8] - 25:8, 39:10, 54:8, 54:14, 54:20, 56:12, 93:2
**wish** [3] - 2:17, 8:8, 80:13
**withdraw** [4] - 13:6, 44:5, 44:6, 80:2
**withdrew** [4] - 4:12, 12:20, 14:1, 19:10
**witness** [5] - 5:24, 81:9
**word** [1] - 81:6
**words** [9] - 42:2, 45:14, 55:7, 55:8, 65:18, 65:19, 66:18, 69:14, 81:6
**works** [1] - 84:23
**world** [3] - 73:14, 88:9, 88:10
**worn** [5] - 21:7, 21:19, 27:13, 28:20, 56:14
**worried** [1] - 60:7
**worse** [2] - 79:2, 85:22
**written** [2] - 74:14, 75:21
**wrote** [1] - 48:1

## Y

**year** [3] - 31:24, 32:3, 36:23
**years** [8] - 32:1, 42:17, 43:11, 50:12, 73:17, 84:16, 86:21, 98:2
**yelled** [6] - 25:3, 25:9, 48:7, 48:13, 56:5, 56:13
**yelling** [4] - 26:23, 41:14, 56:17, 66:25
**yesterday** [4] - 35:24, 43:16, 45:5, 77:1
**young** [1] - 72:21
**yourself** [5] - 22:3, 43:19, 75:1, 91:21, 91:25
**yourselves** [1] - 2:5
**YouTube** [5] - 58:12, 58:17, 58:22, 59:16,

70:19
**YouTubes** [1] - 58:20

## Z

**zero** [1] - 17:9